# EXHIBIT 1

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ Philadelphia _____ **County**

| For Prothonotary Use Only: |
|---|
| Docket No: JUNE 2019 |
| 007522 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N  A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
Michael Weinik, D.O.

Lead Defendant's Name:
Temple University

**Are money damages requested?** ☒ Yes   ☐ No

Dollar Amount Requested:
(check one)
☐ within arbitration limits
☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☐ Yes ☒ No

**Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: Bruce L. Castor, Jr.

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**S E C T I O N  B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☒ Slander/Libel/ Defamation
- ☐ Other:
  _____
  _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:
  _____
  _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:
  _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other:
  _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
  _____
  _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other:
  _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
  _____

*Updated 1/1/2011*

**ROGERS CASTOR**                                    **ATTORNEYS FOR PLAINTIFF**
Bruce L. Castor, Jr.
26 E. Athens Avenue
Ardmore, PA 19003
610.649.1880
877.649.1880 (fax)

---

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
CIVIL ACTION

---

| | |
|---|---|
| MICHAEL WEINIK, D.O.<br>34 Saint James Court<br>Philadelphia, PA 19106<br><div align="right">*Plaintiff,*</div> | **JUNE 2019**<br>_____ TERM 2019 |
| v. | |
| TEMPLE UNIVERSITY OF THE<br>COMMONWEALTH SYSTEM OF<br>HIGHER EDUCATION<br>300 Sullivan Hall,<br>1330 W. Polett Walk<br>Philadelphia, PA 19122, | No. **007522** _____<br><br>*Jury Trial Demanded* |
| and | |
| TEMPLE UNIVERSITY'S LEWIS<br>KATZ SCHOOL OF MEDICINE<br>Medicine Education and<br>Research Building (MERB)<br>3500 N. Broad Street<br>Philadelphia, PA 19140, | |
| and | |
| TEMPLE UNIVERSITY HOSPITAL<br>3401 N. Broad Street<br>Philadelphia, PA 19140, | |
| and | |
| SHIVANI DUA<br>Main Line Spine<br>700 South Henderson Rd.<br>King of Prussia, PA 19406, | |
| and | |
| PHILLIP ACEVEDO<br>Northeastern Rehabilitation Associates<br>3400 Bath Pike Plaza, Suite 400<br>Bethlehem, PA 18017,<br><div align="right">*Defendants.*</div> | |

## COMPLAINT

Plaintiff Michael Weinik, D.O. ("Plaintiff" or "Dr. Weinik"), by and through his attorneys Rogers Castor, hereby submits the following Complaint against Defendant Temple University of the Commonwealth System of Higher Education ("Temple University") and Temple University's Lewis Katz School of Medicine (the "Medical School"), Temple University Hospital (the "Hospital")(collectively, "Defendants" or "Temple.")  In support thereof, he pleads as follows:

## THE PARTIES

1.      Plaintiff is an individual who lives at 34 Saint James Court, Philadelphia, PA 19106.

2.      Temple University is a state university, affiliated with the Commonwealth of Pennsylvania, whose principle place of business is located at 300 Sullivan Hall, 1330 W. Polett Walk, Philadelphia, PA 19122.

3.      Similarly, the Medical School is part of Temple University and is located at Medicine Education and Research Building (MERB), 3500 N. Broad Street, Philadelphia, PA 19140.

4.      In addition, the Hospital is also part of Temple University and is located at 3401 N. Broad Street, Philadelphia, PA 19140.

5.      Accordingly, the Defendants are state-related institutions whose actions are taken under color of state law and are subject to scrutiny under 42 U.S.C. § 1983.

6.      Shivani Dua is a former resident at Temple with a current business address of Main Line Spine, 700 South Henderson Rd., King of Prussia, PA 19406.

7.      Phillip Avevedo is a former Temple Resident with a current business address of Northeastern Rehabilitation Associates, 3400 Bath Pike Plaza, Suite 400, Bethlehem, PA 18017

**JURISDICTION AND VENUE**

8.      This Court possesses jurisdiction over the claims set forth herein, as well as the parties to this action, pursuant to 42 Pa. C.S. §§ 5301 & 5308.

9.      Venue is proper in this Court, pursuant to Pa.R.C.P. 1006, because all of the parties reside in Philadelphia County and this is the place where the causes of action arose.

**FACTUAL BACKGROUND**

10.     Dr. Weinik has served the entirety of his long and distinguished medical career at Temple.

11.     Dr. Weinik began practicing medicine at Temple as a first-year Physical Medicine & Rehabilitation resident over 30 years ago in 1986.

12.     In October of 1989, Dr. Weinik began working as an attending physician at Temple.

13.     From 1991 to 2001 Dr. Weinik served as an Assistant Professor in Temple's Physical Medicine & Rehabilitation Department.

14.     In 2001, Dr. Weinik was promoted to the position of Associate Professor in Temple's Physical Medicine & Rehabilitation Department.

15.     In 2013, Dr. Weinik became a full clinical Professor of Physical Medicine & Rehabilitation at Temple.

16.     He continued to serve in that position until Temple fired him in 2018.

17.     Dr. Weinik served at Shriners Hospital in Philadelphia for 17 years treating children with various disabilities.

18.     Dr. Weinik volunteered to, and treated, children with disabilities in Puerto Rico on more than 10 occasions.

19.     Dr. Weinik was Team Physician for the Philadelphia Flyers for 10 years, the Philadelphia Eagles for five years, and consulted with the Philadelphia Phillies in 2008.

20.     Dr. Weinik was Team Physician for the United States Rowing team for four years and accompanied the team to the World Championships in 1991 and 1993.

21.     Dr. Weinik provided care for the FIFA Soccer World Championships when the championship venue was Philadelphia.

22.     Dr. Weinik believes and therefore avers that no other physiatrist, now or ever, in the Philadelphia area, possesses the depth and diversity of sports medicine experience that he does.

23.     Dr. Weinik is an experienced medical lecturer at the local, state national, and international levels.

24.     Dr. Weinik has trained over 300 residents and an additional approximately 500 medical students from the United States and abroad.

25.     Dr. Weinik is a Board member and Past President of the American Osteopathic College of Physical Medicine and Rehabilitation.

26.     Dr. Weinik's ongoing employment with Temple was renewed on an annual basis by a letter agreement, reappointing him as Professor of Clinical Physical Medicine and Rehabilitation.

27.     On November 18, 2017, Temple University honored Plaintiff at Lincoln Financial Field before thousands of people where the Provost of the College of Medicine recognized Dr. Weinik for his commitment to the education of medical students and residents as a professor, and his exemplary work in providing patients with exceptional clinical care.

28.     The latest iteration of the contract agreement is dated March 14, 2018 ("Contract").  *A true and correct copy of the Contract is attached hereto as Exhibit "A."*

29.     The Dean of the School of Medicine appointed Dr. Weinik as Interim Chair of the Department of Physical Medicine and Rehabilitation in 2015, telling Dr. Weinik that the current chair he was to replace was allowing the program to falter with standards of education and care diminishing from what the School of Medicine expected.

30.     Dr. Weinik was actively engaged in the process of removing the doctor he replaced as Department Chair from that doctor's additional position as the residency program director beginning in November of 2017 and continuing into January of 2018.

31.     The action Dr. Weinik intended on taking against the director of the residency program, removing him from that directorship, would have dealt a severe blow to that doctor's career.

32.     Plaintiff believes and therefore avers that this doctor, Dr. Ian Matin, Director of the Residency Program, and the man Plaintiff replaced as Chair of the Department, out of spite and other malicious motives set in motion a series of events weaponizing residents he befriended, or had power over in his position as Director, to falsely accuse Dr. Weinik of sexual harassment knowing that only by destroying Dr. Weinik could Dr. Matin retain his position as Director.

33.     Plaintiff believes and therefore avers that residents inspired by Dr. Matin began making false allegations against Plaintiff in the middle of January 2018, in order to pre-empt Plaintiff from removing Dr. Matin from his position as Director.

34.     The attack worked, since Plaintiff was forced to defend himself against the lies instead of proceeding with the improvement of medical education at Temple by removing Dr. Matin.

35.     Plaintiff believes and therefore avers that Temple officials (not professionals hired at the direction of Temple, but Temple officials themselves untrained in such matters) conducted

an inept, unprofessional, and incomplete "investigation" into false allegations made against Dr. Weinik in the nature of sexual harassment.

36.     On March 11, 2018, a past resident at Temple, and a current practicing physician, told Plaintiff that Dr. Ian Matin was attempting to ruin Plaintiff's career by enticing residents make bogus complaints of sexual harassment and other misconduct about Dr. Weinik to Temple officials.

37.     On March 13, 2018, supervisors at Temple removed Plaintiff as interim Chair of the Department, leaving Plaintiff to believe this was to be his "punishment" on the unfounded allegations.

38.     The following day, on March 14, 2018, Plaintiff and Temple executed a 15-month employment contract to employ Plaintiff until July 2019, but removing additional compensation previously paid to him as interim Chair.  *See Exhibit "A".*

39.     Temple breached the contract of March 14, 2018, when it stopped paying Plaintiff on October 29, 2018.

40.     On March 15, 2018, Temple orally advised Plaintiff he was on Administrative leave effective immediately and that he had one hour to clean out his office.  Plaintiff was not given written notice of his alleged transgressions, nor notice of any right to counsel.

41.     On March 16, 2018, Temple confirmed in writing that the executed contract of March 14, 2018 was received, and Temple began paying Plaintiff under that contract until October 29, 2018.

42.     On July 10, 2018, a hearing was conducted pursuant to the Temple University Hospital Bylaws 8.3 and 8.4 before a hearing committee appointed following a unanimous adverse recommendation by MSEC under Bylaw 8.2 recommending expulsion of Plaintiff.

43.     The hearing committee, comprised of three Medical Staff Members, was chosen

by Chair of MSEC, Vincent Cowell, M.D., and was, as stated, based on the unanimous recommendation from MSEC that Plaintiff be dismissed from the hospital.

44.    In addition to choosing the hearing committee panelists, the Chair of MSEC, Dr. Cowell, acted as the "prosecutor" at the hearing on July 10, 2018 calling witnesses, giving testimony, and making arguments in an effort to demonstrate to the hearing committee that it ought to agree with the unanimous recommendation of MSEC and that of its leader and the prosecutor of the hearing, Dr. Cowell.[1]

45.    Plaintiff appeared at the hearing on July 10, 2018, and presented his own defense because the hearing panel, incorrectly, believed that Plaintiff could not be represented by counsel under the University by-laws, which in fact, contain no such blanket prohibition.

46.    Plaintiff made procedural objections to preserve his appellate rights under Temple University Bylaw 8.5.2.  These procedural objections are on the record of the proceedings and enumerated in the attached *Exhibit "B"* to show "substantial noncompliance with the procedures required by these Bylaws or applicable law resulting in demonstrable prejudice."  Undersigned Counsel, as the record will reflect, advised Plaintiff not to continue placing his procedural objections on the record, since it was patently obvious that the hearing committee did not care to consider any allegations of procedural irregularities despite being required to do so since consideration of same constitutes one of *only* two basis for appeals to the Board of Trustees such as occurred in this case — a fact known to the Plaintiff, but evidently not known to the hearing

---

[1]  In addition to chairing the MSEC, the very body bringing the charges, *and* acting as the prosecutor *and* as witness in Plaintiff's case, Dr. Cowell was the person responsible for the appointment of himself and Dr. Tedaldi as investigators in direct violation of Bylaw 7.3.2 requiring that three investigators be appointed to investigate complaints of misconduct.  Presumably the purpose of that particular Bylaw is to reduce the possibility that one or two investigators would have a bias or prejudice against an accused since finding three biased persons to conspire is surely harder than finding one or two.  Plaintiff, despite due diligence, has been unable to ascertain the identity of a third investigator appointed to his case. Temple noticed Drs. Cowell and Tedaldi as potential witnesses, never advised Plaintiff concerning the identity of a third investigator, and no third investigator testified at the hearing.

committee chair, nor to the MSEC prosecutor, Dr. Cowell.

47.     Plaintiff presented extensive testimony at the hearing from approximately ten 10 witnesses under oath who testified to firsthand accounts rebutting every allegation made against Plaintiff as presented by the "prosecutor," MSEC Chair Dr. Cowell.  In contrast, Dr. Cowell on behalf of MSEC *presented no direct testimony* from live witnesses and, instead, relied entirely on hearsay statements not subject to cross examination and without giving Plaintiff the benefit of the questions investigators asked, any recordings or notes that might have been taken by MSEC investigators, nor any understanding of whether MSEC investigators interspersed their own opinions and conclusions of what the witness must have "meant," as opposed to what was the witnesses' said.  In short, Plaintiff was unable to test the veracity of any of the so-called evidence presented by MSEC chair and prosecutor Dr. Cowell, who was tasked with "backing up" the allegations brought by the MSEC board under his leadership.

48.     One of the allegations against Plaintiff brought by MSEC Chair Dr. Cowell was an allegation of improper touching supposedly alleged by a resident named Dr. Dua.  Dr. Dua refused to be interviewed by Temple representatives, refused to sign a purported email or letter giving rise to the charges, and after being personally served with notice and asked to appear by Undersigned Counsel for Plaintiff, *consciously elected not to attend* the July 10, 2018 hearing to explain the substance of her allegations.  In fact, not a single person alleging anything adverse to Plaintiff testified against him.  NOT ONE.

49.     However, among the direct eyewitness testimony presented by Plaintiff at the hearing were witnesses who were present when Temple claims Plaintiff improperly touched Dr. Dua. *Every single eyewitness presented agreed that no such improper touching occurred.*  Not a single person testified at the hearing to say they had seen improper touching.

50.     Dr. Weinik believes and avers where the so-called victim refused to cooperate

with MSEC investigators because she knew that she was acting as a puppet for Dr. Matin and did not want to testify under oath or give any sort of adopted statement.  She even refused a confirmed actual notice invitation from Plaintiff to testify.  Temple simply ignored the un-rebutted eyewitness testimony presented by Plaintiff that nothing untoward occurred at this event.

51.     At the conclusion of the hearing, after written submissions from both Prosecutor Dr. Cowell, Chair of MSEC, and the person responsible for the appointment of the hearing committee members, and from Dr. Weinik, the hearing committee voted *unanimously* to overrule the MSEC recommendation to terminate Plaintiff.  The hearing committee came to this conclusion after seeing and hearing the testimony, and hearing and reading the parties' arguments, things that MSEC did not do.  *Plaintiff incorporates herein by reference the Notes of Testimony and exhibits from the proceeding dated July 10, 2018 as Exhibit "C."*

52.     Pursuant to Temple University Hospital Bylaws 8.4.7, Plaintiff availed himself of the opportunity to provide "closing written arguments" *attached hereto as Exhibit "D."*   These written arguments show that the MSEC decision to overrule the hearing committee "was not supported by substantial evidence based upon the hearing record..." *(See Bylaws 8.5.2).*  In fact, it is hard to believe that the voting MSEC members even read the record, or the written arguments, as Plaintiff submits that *any* reasonably fair-minded and just person could not help but conclude that this was a sham prosecution completely lacking in procedural due process that even the MSEC-appointed hearing committee found did not warrant dismissal of Plaintiff.

53.     The written recommendation of the hearing committee, attached hereto as Exhibit "E", was submitted to MSEC.  MSEC, without having seen or heard any of the testimony presented at the hearing on July 10, 2018, chose to "reverse the report and recommendation of the hearing committee" pursuant to Bylaws 8.4.9. without even inviting plaintiff to appear and

answer questions. *See Exhibit "F."*

54.     MSEC chair Dr. Cowell, stated that he did not participate in the decision to overrule the hearing committee in Plaintiff's case apparently because the thoroughness of *his* conducting of the investigation and *his* prosecution was at issue before MSEC. Yet, Dr. Cowell actually *signed the letter* dated August 27, 2018 stating MSEC's final decision (like a decision from a court made up of multiple members signed by the judge assigned to the case) to overturn the hearing panel.  An analogy might be a judge affixing his name alone to an opinion of the full court on the very case on which that judge recused himself.

55.     So, Dr. Cowell appointed himself lead investigator, chaired the MSEC committee that unanimously brought the charges and recommended expulsion, appointed the members of the hearing committee, appointed himself as the prosecutor, acted as Temple's chief witness against Plaintiff, wrote Temple's post-hearing argument (stating, among other nonsensical things, that Plaintiff was required to move into evidence a Bylaw before the hearing panel could consider whether the Bylaw was violated. A Bylaw is simply a rule that the litigants and the hearing panel must abide by.)

56.     Plaintiff suggests that Dr. Cowell's "recusal" rendered him powerless to take *any* action on the matter which caused the recusal.  Such actions, like signing the decision letter, should have been done by an independent person, presumably a MSEC vice chair, or such other member of MSEC the members might themselves select to replace Dr. Cowell in this one instance.

57.     Plaintiff submits that Dr. Cowell's signing of the letter dated August 27, 2018 *(i.e.* MSEC's decision overruling the hearing committee) after he claimed to have ceased participating in the deciding of the case, rendered the decision letter, itself, void on its face.  As such, MSEC missed the filing deadline for acting on the hearing committee's recommendation

by not filing a written determination within the time permitted under the Bylaws attested to by a MSEC official who had not determined he/she could not participate in the decision.  Expressed differently, a prosecutor or judge who has determined he or she cannot be fair and objective, and recuses himself from participating in the decision, *cannot participate at all*, and most certainly cannot be the *only* person to sign a ruling on the very issue on which he/she states that he/she cannot participate pursuant to a perceived (or actual) conflict of interest.

58.     Dr. Cowell relied entirely on hearsay evidence produced from a less-than-thorough investigation completely rebutted by direct, non-hearsay testimony produced by Plaintiff.

59.     As is made clear in the record of the hearing on July 10, 2018, Plaintiff had other witnesses on "stand-by" available to provide additional substantive testimony that the hearing committee deemed not necessary to present as the hearing had already gone on for five (5) hours. Nevertheless, MSEC opted to "reverse the report and recommendation" of the hearing committee even knowing the hearing committee had "heard enough."  Plaintiff suggests that the record plainly supports the notion the hearing committee was satisfied with the strength of Plaintiff's evidence to the point where it discouraged Plaintiff from presenting additional evidence, and that MSEC blatantly ignored this finding by the hearing committee.

60.     Plaintiff avers that not only was he not afforded the "...procedures required by [the] Bylaws resulting in demonstrable prejudice..." *(Bylaws 8.5.2)*, he also was denied basic procedural due process when the chair of the accusing body, MSEC, selected the hearing panel, acted as the "prosecutor," and, upon failing to obtain the desired result from the hearing panel, that same body, MSEC, under the prosecutor's general leadership, reversed the recommendation of the hearing committee. *No member of MSEC voting on the committee recommendation saw or heard the live testimony to judge for him or herself the credibility of the witnesses testifying on*

*July 10, 2018, before MSEC decided to reverse.* Standing alone, Plaintiff avers these facts demonstrate the inherent unfairness of the procedure afforded him in this case.

61.     Plaintiff believes and therefore avers that the entire procedure used by Temple to conduct its so-called investigation pursuant to bylaw "safeguards" was woefully ill-suited to provide even the most rudimentary due process to Plaintiff. Rather Temple's procedures encourage merely a veneer of due process to disguise a blatantly flawed system designed to create the pre-text of procedural due process, while in reality is laughably inadequate to produce any semblance of the concept.

### COUNT I
### VIOLATION OF DUE PROCESS OF LAW
### (AGAINST TEMPLE DEFENDANTS ONLY)

62.     Plaintiff alleges Defendants violated his right to procedural due process pursuant to 42 U.S.C. § 1983 and applicable to the Commonwealth and its agents through the 14th Amendment, and will show the following elements in support thereof:

      a.   Defendants are "state actors" within in the meaning of 42 U.S.C § 1983;

      b.   Defendants engaged in abuse of power, while acting as state actors, intentionally, knowingly, recklessly, and/or with gross negligence beyond ordinary negligence;

      c.   Defendants' conduct interfered with Plaintiff's protected liberty interest of property by failing to provide adequate procedural safeguards;

      d.   Plaintiff has suffered damages as a direct result of Defendants' failure to provide Plaintiff with meaningful procedural due process of law.

63.     Plaintiff hereby incorporates by reference all paragraphs in this Complaint as though fully set forth at length.

64.     Defendants violated the Due Process Clause of the Fourteenth Amendment of the

United States Constitution, and such provisions of the Pennsylvania Constitution providing similar protections, by condoning a retaliatory attack against Plaintiff by a disgruntled employee, orchestrating a pre-textual investigation and a sham disciplinary proceeding to terminate Dr. Weinik from Temple, further ensuring that he could never practice medicine again anywhere at the same level.

65.     Dr. Weinik possessed both a property interest and a liberty interest under the U.S. Constitution in his contractual employment with Temple and in his continued ability to practice medicine.

66.     Because Temple University, the Medical School, and the Hospital are affiliated with the Commonwealth of Pennsylvania, the Defendants acted as agents of the state and under the color of law in taking their actions against Dr. Weinik.

67.     As described in exacting detail above, the pre-textual investigation and sham disciplinary proceeding deprived Dr. Weinik of almost all of the traditional procedural due process protections afforded under the U.S. Constitution, including the ability to cross-examine one's accusers under oath, to question available material witnesses under oath, to have meaningful use of counsel, and to present exculpatory evidence before an impartial and unbiased tribunal.

68.     Temple's investigators failed to identify or interview material witnesses, who would have provided exculpatory evidence and testimony disproving the false accusations of Dr. Weinik's accusers.

69.     Temple's investigators ignored and knowingly failed to provide exculpatory evidence to Dr. Weinik.

70.     Temple failed to adhere to its own Bylaws and procedures by, *inter alia*, allowing the unsworn testimony of Dr. Weinik's accusers to be presented to the tribunal in the form of

hearsay.

71.     Temple failed to timely inform Dr. Weinik that he had the right to be represented by legal counsel at all stages of the investigation and the proceedings.

72.     Temple failed to timely provide Dr. Weinik with a copy of the Bylaws and procedures that governed the investigation and proceedings.

73.     Indeed, the investigation and subsequent proceeding was so biased and utterly devoid of traditional procedural due process protections as to not qualify as a genuine opportunity for Dr. Weinik to be heard or properly defend himself and his professional reputation from his accusers' false accusations.

74.     As a proximate result of Temple's actions, Dr. Weinik's professional reputation has been ruined and he has lost the ability to practice medicine.

75.     Temple reported the pre-textual reasons for Dr. Weinik's dismissal from his positions to a national practitioner data bank falsely claiming he was fired for bylaw violations, disruptive conduct and sexual misconduct, despite there being no direct evidence produced against Dr. Weinik and his main accuser refusing to sign a statement or appear to give evidence despite confirmed personal service for her to attend Dr. Weinik's hearing.

76.     The inclusion of Dr. Weinik's name on this national data bank has made it impossible for him to secure a position in his field, a field where he is objectively considered at the very top of his profession causing him enormous anxiety and depression that he may never be able to again pursue his life's work based on the unsubstantiated lies of others with a motive to want to hurt Dr. Weinik's career.

77.     Temple initiated a state licensing board complaint that resulted in an extensive investigation before the board refused to take *any* action against Dr. Weinik.

78.     Plaintiff has incurred extensive legal fees that have left him at a great

disadvantage in paying for this litigation.

79.     Plaintiff believes and therefore avers that a goal by Defendants in creating its pre-textual disciplinary process designed to appear as due process when it is anything but, is to bankrupt plaintiffs who go through the process like Dr. Weinik so that they are financially damaged from paying lawyers that they cannot afford protracted litigation going forward.

80.     Plaintiff believes and therefore avers that the Temple procedures he was forced to contend with were enacted by Temple to discourage their use by making them so difficult to navigate that only counsel could advise Plaintiff how to navigate them, costing Plaintiff extensive funds, and during which no actual elements of procedural due process occurred.

81.     Plaintiff believes and therefore avers that no other physician has ever gone through the procedure Defendants required of him.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against Defendants, by Ordering Defendants to reinstate Plaintiff to his former positions and provide him with a fair investigation and hearing, which comports with the procedural due process safeguards of the U.S. Constitution.  In addition, Plaintiff requests that the Court Order Defendants to pay compensatory damages of in excessive of $3,000,000 and punitive damages for egregious conduct, and all of Plaintiff's costs and attorneys' fees that he has incurred and will incur,, including treble damages, and Order such other relief as this Court shall deem just and proper, including directing that Plaintiff's name be stricken from the National Practitioner's Databank list of persons dismissed for the type of violations falsely alleged by Defendants against Plaintiff.

<u>**COUNT II**</u>
<u>**BREACH OF CONTRACT**</u>
<u>**(AGAINST TEMPLE DEFENDANTS ONLY)**</u>

82.     In order to prevail in a Breach of Contract Claim, Plaintiff must establish:

     a.   The existence of a contract, including its essential terms;

b.   A breach by the Defendant (s) of a duty imposed by the contract; and

c.   Damages were sustained by the Plaintiff on account of the breach of Defendants' duty under the contract.

83.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as though fully set forth at length.

84.     As described above, Dr. Weinik had a 15 month-long Contract with Temple to provide medical services to Temple and "clinical and didactic instruction" to its medical and physician assistant students, its residents, and fellows. *See Ex. "A".*

85.     In exchange, Dr. Weinik was to receive a minimum annual compensation of $270,999.00, as well as additional incentive compensation and fringe benefits.

86.     Dr. Weinik entered into this Contract with Temple on March 14, 2018.

87.     Temple breached the Contract by improperly and prematurely terminating Dr. Weinik's employment.

88.     In addition, Temple further breached the Contract's implied duty of good faith and fair dealing by failing to properly follow its own Bylaws and policies, which were incorporated into the terms of agreement and also governed Dr. Weinik's rights under the Contract.

89.     Specifically, as described in detail above, Temple used the pre-textual investigation and sham disciplinary proceedings as a means for improperly and prematurely terminating Dr. Weinik's Contract in bad faith.

90.     As a proximate result of Temple's improper and premature termination of its Contract with him, Dr. Weinik has sustained in excess of $210,000 in lost earnings, earning potential, and benefits. Or at the very least approximately 9 months' compensation under the contract at Exhibit "A."

**WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against Defendants, by Ordering Defendants to pay Plaintiff his compensatory and consequential damages, including all costs, and such other relief as this Court shall deem just and proper.

### COUNT III
### LIBEL
### (AGAINST ALL DEFENDANTS)

Libel is proven by the Plaintiff upon a showing that the following can be established:

a)      The publication of;

b)      a statement;

c)      about an individual;

d)      that is defamatory in character; and

e)      the recipient of the publication understands the publication's meaning.

91.      Defendants committed the tort of Libel against Plaintiff.

92.      Plaintiff incorporates all paragraphs in this complaint by reference as if each was enumerated here.

93.      Defendants falsely accused Plaintiff of engaging in sexual harassment.

94.      Defendants made written false statements accusing Plaintiff of criminal sexual harassment to, *inter alia*, employees of Temple, and to the Temple University Hospital Board of Directors.

95.      Defendants' false statements did cause damages to Plaintiff.

96.      Defendants' false statements have *per se* damaged Plaintiff's reputation, are the proximate cause of Plaintiff losing his job and having difficulty finding another job.

97.      Defendants' false statements have *per se* damaged Plaintiff's reputation, are the proximate cause Plaintiff has been shunned in the community in which he formerly freely moved about in educational and professional circles related to medicine.

98.     Defendants' false statements have *per se* damaged Plaintiff's reputation, are the proximate cause of Plaintiff's losing the confidence of those reading the statements as these people are professionals in his field with influence over his career advancement both in the practice of medicine to help people recover from severe illnesses, and the ability to earn money from working in a highly specialized field in which he has spent many years training and developing those special skills.

99.     Defendants' false statements have *per se* damaged Plaintiff's reputation and are the proximate cause of Plaintiff's severe professional and monetary damages.

**WHEREFORE**, Plaintiff demands in excess of $50,000 from each defendant for the tort of libel, and any and all such further relief the Court considers warranted.

<u>**COUNT IV**</u>
<u>**SLANDER**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

Slander can be proven by the Plaintiff upon a showing that the following can be established:

a)     The defamatory nature of the alleged communication(s);

b)     the publication of the communication(s) was by the defendant(s);

c)     the application of the communication to the plaintiff;

d)     the recipient's understanding of the communication's meaning;

e)     the recipient's understanding of the communication is intended to be applied to the plaintiff;

f)     special damages resulting to the plaintiff; and

g)     abuse of a conditionally privileged occasion.

100.    Defendants committed the tort of slander against Plaintiff by making false and defamatory verbal statements damaging Plaintiff's reputation.

101.    Plaintiff incorporates all paragraphs in this complaint by reference as if each was enumerated here.

102.    Defendants falsely accused Plaintiff of engaging in sexual harassment.

103.    Defendants made statements to, *inter alia*, personnel of Temple University and the Temple University Hospital Board of Directors all of whom are experienced in the severity of such complaints in the context of the medical profession.

104.    Defendants' statements led to conduct an investigation specifically against Plaintiff demonstrating the recipients to the statements understood precisely what Defendants wanted to communicate in Defendants' effort to ruin Plaintiff's career in retaliation for Plaintiff attempting to remove Dr. Matin from his position as Director of the Resident Program.

105.    Defendants' statements caused damage to Plaintiff's reputation *per se* since the false accusations of sexual harassment is so vile that the law presumes damage especially since some of the false allegations against Plaintiff could be construed by law enforcement as criminal in nature.

106.    Defendants' statements caused special damages to Plaintiff in that the practice of medicine with patients is heavily dependent on the doctor/patient relationship and the trusting bond necessary, that Plaintiff's loss of his positions, his standing among his peers, his sources of referrals, his professional reputation in his field nationally, to name a few, has brought incalculable harm down upon Plaintiff.

107.    Defendants' have caused special damage further to Plaintiff by forcing him to undergo a humiliating investigation when Plaintiff continued to pursue the removal for Dr. Maitin from his position.

108.    Defendants have done special damage to society since their demonstrably false accusations against Plaintiff not only cast doubt upon the Plaintiff and the medical profession, they cast doubt upon the veracity of woman who truly are victims of sexual assault.

**WHEREFORE**, Plaintiff demands damages in excess of $50,000 from each Defendant for the tort of slander and any and all such further damages as the Court may deem warranted.

## COUNT V
## INJURIOUS FALSEHOOD
## (AGAINST ALL DEFENDANTS)

Injurious is proven by Plaintiff upon a showing that the following can be established:

a)    The statement is false;

b)    the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss;

c)    pecuniary loss does, in fact occur; and

d)    the publisher either knows that the statement is false or acts in reckless disregard its truth or falsity.

109.    Plaintiff is a victim of the tort of Injurious Falsehood caused by Defendants.

110.    Plaintiff incorporates all paragraphs in this complaint by reference as if each was enumerated here.

111.    Defendants made statements that Plaintiff engaged in sexual harassment.

112.    The false accusation was investigated by Temple personnel.

113.    Plaintiff lost his job as a direct result of the false accusations by Defendants.

114.    Plaintiff cannot find further employment because the actions of Defendants caused his name to be placed on a nation registry.

115.    Plaintiff denies the accusation of sexual harassment made in statements by Defendants in the strongest possible terms.

116.    Defendants' actions sought that financial harm would befall Plaintiff by making these false statements either through Plaintiff through Plaintiff losing his career by being fired from his medical positions and unable to find future employment in his medical specialty.

117.    Plaintiff suffered pecuniary loss including, but not limited to the costs to defend himself and the loss of his position with Temple University Hospital and curtailed economic opportunities at other medical venues as word of the false allegations spread.

118.    Defendants Shivani Dua and Phillip Acevedo told their employer, Defendant Temple, Plaintiff engaged in sexual harassment knowing that was false or in reckless disregard for the truth or falsity of said statement.

**WHEREFORE**, Plaintiff demands damages in excess of $50,000 from each Defendant for the tort of Injurious Falsehood, and any and all such further relief the Court deems warranted.

*A TRIAL BY JURY IS DEMANDED.*

Date: June 28, 2019                                     Respectfully Submitted,

                                                  _____/s/ *Bruce L. Castor, Jr.*_
                                                  Bruce L. Castor, Jr. (ID. No. 46370)
                                                  ROGERS CASTOR
                                                  26 East Athens Ave.
                                                  Ardmore, PA 19003
                                                  610.649.1800
                                                  877.649.1880 (Fax)
                                                  Bruce@RogersCastor.com

## VERIFICATION

The undersigned, being duly authorized, verifies that he has read the Complaint filed in this matter and its factual allegations are true and correct to the best of the signer's knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

By: _____

Michael Weinik, D.O.          06/27/19



**TEMPLE UNIVERSITY**

**Lewis Katz School of Medicine**

Larry R. Kaiser, M.D., Dean
Senior Executive V.P., Health Affairs
President and CEO,
Temple University Health System

3500 N Broad Street
Medical Education Research Building
Suite 1141
Philadelphia, PA 19140

*phone:* 215-707-8773
*fax:* 215-707-8431
*E-mail:* larry.kaiser@tuhs.temple.edu
*web:* www.temple.edu/medicine

March 14, 2018

Michael Weinik, DO
34 Saint James Court
Philadelphia, PA  19106-3702
*Emailed to:* michael.weinik@temple.edu

Dear Dr. Weinik:

I write to offer you renewal of an appointment as Professor of Clinical Physical Medicine & Rehabilitation in the Department of Physical Medicine & Rehabilitation in the School of Medicine.  This remains a non tenure-track Dean's Appointment as a Clinician Educator on the Clinician Educator Track that will begin on April 1, 2018, and, unless renewed by a separate written agreement, will automatically end on June 30, 2019.  **This offer carries no presumption of reappointment, and expressly provides terminal year notice as required by University policies and procedures, including Section III of the Temple University Faculty Handbook and Section 1.D. of the Temple University School of Medicine (TUSM) Policy on Appointment as a Clinician Educator on the Clinician Educator Track with regard to non-renewal of contracts for untenured faculty. This letter supersedes my letter to you dated June 30, 2017 for the portion of the term April 1, 2018 to June 30, 2018.**

By accepting this appointment, you agree to teach, conduct research, engage in scholarship or creative work, and/or provide clinical and other service, at any location on behalf of the University as specified or as modified by me or my designee from time to time.  You also agree to the "Terms and Conditions".  This letter and this attachment comprise the entire terms and conditions of your faculty appointment and may not be modified or altered by any oral or written statement or representation unless such statement or representation is confirmed in writing under the President's, Provost's or Dean's signature.

If, as I hope, you find this offer to be satisfactory as presented, please indicate your acceptance by signing and dating the acknowledgement on the last page and returning a copy of the entire letter by fax or email to the Office of Faculty Affairs at LKSOMFaculty@temple.edu or via fax number 215-707-4659.  This offer will remain open for 20 days from the date of this letter.  If we have not received your signed acceptance by that date, we will assume that you have not accepted this offer.  If you require any additional time to consider this offer, please contact Mr. Bryant Tabb, Director of the Office of Faculty Affairs either by email btabb@temple.edu or phone 215-707-0163; Mr. Tabb will confirm any extension in writing.

Michael Weinik, DO
March 14, 2018
Page 2 of 8

I look forward to your continued contributions to the academic and clinical enterprises of the
School of Medicine.

Sincerely,

Larry R. Kaiser, MD

cc: Kevin Delaney, Vice Provost for Faculty Affairs
    Sharon Boyle, Associate Vice President, Human Resources
    Joseph Rudy, Administrator
    Ann Untalan, Assistant Dean, Finance
    Paula Davis West, Assistant Dean, Financial Services

Michael Weinik, DO
March 14, 2018
Page 3 of 8

## Terms and Conditions

### Responsibilities
Your responsibilities for the term of this reappointment continue to include, but are not limited to, providing clinical services and clinical and didactic instruction to medical and physician assistant students, residents, and fellows as assigned, which may be modified by or other duties assigned by the Chair/Dean at his discretion in consultation with you.

Your annual clinical productivity measures (ASA units, work RVUs, and outpatient encounters) are selected based upon the Medical Group Management Association Physician Compensation and Production Survey (65th percentile, calculated from the average of the 3 most recent annual surveys) for your specialty/subspecialty adjusted for your percent of clinical effort.

### Fiscal Year Compensation
Your annual (minimum) fiscal year compensation for the term of this appointment will be as follows:

| | |
|---|---|
| 'A' component | $193,311 |
| 'B' component | 77,688 |
| Total | $270,999 |

All benefits that are salary-based, including retirement plan contributions, will be based on the 'A' component. The sum of your A and B components will not be less than $270,999 for the term of this appointment. Portions of your salary derived from outside funding, if any, will serve as an offset to your salary and will be reflected in a redistribution of your effort. The fiscal year compensation reflected above will be prorated, as necessary, to reflect your start date and is payable in accordance with Temple University payroll practices and subject to state and federal income tax withholding, employment taxes and such other deductions that may be required by law.

### Incentive Compensation
You may also be eligible for incentive compensation. Eligibility for incentive compensation of any kind requires that you be actively employed by Temple University in the position indicated in this Appointment letter on the date of distribution.

### Compensation Limit
In no event will your total annual compensation from Temple University (regardless of the type of compensation) exceed 125% of the then-current 75th percentile as per the Northeast Region Tables of the Association of American Medical Colleges (AAMC) Faculty Salary Survey or 125% of the then-current 90th percentile of the Physician Compensation and Production Survey of the Medical Group Management Association (MGMA) or another published survey as designated by the Lewis Katz School of Medicine.

### Fringe Benefits
As a Temple University full-time faculty member, you are entitled to elect certain fringe benefits. A complete explanation of the University's Faculty Benefit Plan is available online at http://www.temple.edu/hr/faculty/benefits.htm. You must completely satisfy all applicable

Michael Weinik, DO
March 14, 2018
Page 4 of 8

eligibility requirements, make all required co-payments, and complete all applicable enrollment forms in order to be eligible for a particular Temple University benefit.

## Insurance Credentialing

You hereby agree to accept assignment for payment under the Medicare and Pennsylvania Medical Assistance programs. This appointment is also contingent upon Temple University Physicians being able to qualify you, on an ongoing basis, as a participating provider with the federal Medicare program, the Pennsylvania Medicaid program, and all managed care or prepaid health care programs designated by Temple University from time to time.

To the extent permitted by third party payment programs, Temple University or its designee shall bill and collect for all services performed by you. You shall take all steps reasonably requested by Temple University to assist in the billing and collection of any monies due to Temple University for your professional services. In the event regulatory and/or third party payment programs require any or all services you perform to be billed or collected in your name of or on behalf of you, you hereby designate, authorize and appoint Temple University as your agent, and grant Temple University a power of attorney to bill or collect on your behalf for all the services you perform and to obtain provider number(s) on your behalf to facilitate such billing or collection.

You are bound by the Compliance Program of Temple University Health System, which is available on-line at http://www.templehealth.org/tuhs_vendor_policies/, as well as all billing policies and/or procedures as established by the Dean or the Dean's designee and agree to bill all charges for such services through the office established for that purpose. The schedule of charges for all services performed by you as an employee of Temple University shall be determined from time to time by Temple University.

## Professional Services Fees

For so long as you are a member of the faculty of Temple University, all fees received by you for professional services rendered as an employee are the property of Temple University. This does not include honoraria (e.g. for lectures, speeches and the presentation of papers), awards and other similar income that are not related to the rendering of professional services, nor does it include clinical consulting fees for expert testimony. However, clinical expert testimony may only be offered with the written approval of TUHS Office of Counsel to assure there are no conflicts. Such consulting may not interfere with regularly-scheduled University professional time or make use of University resources. In the event of any dispute over whether fees are Temple University's property pursuant to this appointment, the Dean shall have complete discretion in determining whether such fees obtained by you will be considered property of Temple University. Any such decision by the Dean is final and will not be subject to review in any forum.

You may not render professional services to patients at locations other than Temple University Health System facilities or Temple University without the written approval of the Dean, subject to the terms set forth above, and such other terms and conditions as he/she may require.

Michael Weinik, DO
March 14, 2018
Page 5 of 8

## Professional Liability Insurance

During your employment with Temple University, Temple University shall, on your behalf (i) procure and maintain, at its sole cost and expense, medical professional liability insurance in form and amounts not less than the amounts required by the laws of the Commonwealth of Pennsylvania; and (ii) be solely responsible for the payment of any and all requisite surcharges, assessments, and any and all other payments to the Pennsylvania Medical Care Availability and Reduction of Error Fund as required by the laws of Pennsylvania. The above insurance or surcharges paid, secured or maintained by Temple University will only cover your professional activities provided under this Appointment. Any insurance or surcharges for professional activities provided outside the scope of your employment, whether provided before, during or after your employment, is your sole responsibility and includes, without limitation, moonlighting, with or without Temple University's permission, and retrospective surcharges by the MCARE Fund relating to the time prior to your employment by Temple University. In the event that your insurance prior to being employed by Temple University is claims made, you shall secure, or have secured on your behalf, tail coverage for acts or omissions prior to the period that you became employed by Temple University. Moreover, upon the termination of your employment with Temple University, if the insurance provided by Temple University for your services provided as its employee is claims made, Temple University shall, on your behalf, procure and maintain, at its sole cost and expense, medical professional tail coverage in form and amounts not less than the amounts required by the laws of the Commonwealth of Pennsylvania for acts or omissions occurring during the period of time that you were employed by Temple University.

In consideration of Temple University purchasing said insurance, you assign any and all of your rights under said insurance to Temple University including, but not limited to, the authority to control, defend and settle all claims and lawsuits that arise due to your employment by Temple University. You further agree to timely cooperate and comply with any and all requests enabling Temple University to exercise these assigned rights. This assignment shall survive the termination of your employment with Temple University.

## Conditions of Employment

Your appointment to the faculty and continued employment by LKSOM is contingent upon: (a) proof of unrestricted licensure to practice medicine in the Commonwealth of Pennsylvania and in any other state in which you are required to provide clinical services as an employee of Temple University; (b) appointment to the medical staff of Temple University Hospital and such other hospitals as the Dean may designate; (c) proof of registration with the federal Drug Enforcement Administration to prescribe controlled substances without limitation; (d) proof of eligibility for participation in the Medicare and Pennsylvania Medicaid programs; (e) proof of certification or eligibility for certification by the American Board of Physical Medicine and Rehabilitation or other similar certifying board acceptable to the Dean; (f) Temple University's satisfaction with your malpractice claims record; (g) Temple University's ability to qualify you as a participating provider with all governmental and other programs and insurers with which the University participates; and (h) passing a background investigation, which may include employment reference checks, a PA Child Abuse History Clearance, criminal/civil background review, a credit check and/or any other background investigation deemed necessary by Temple University.

Michael Weinik, DO
March 14, 2018
Page 6 of 8

## Representations and Warranties

By accepting this offer of appointment, you represent and warrant that:

- You have never been, and are not now, disciplined, suspended, disbarred, debarred, sanctioned or excluded by or from any federal, state, licensing, accrediting or certifying agency, program or professional association, and that you agree to immediately disclose to the Dean if, at any time, you are threatened with discipline, suspension, disbarment, debarment or other sanction as described above.

- You have never been convicted of any felonies or of any unprofessional or immoral conduct that may injure your reputation or that of Temple University that have not been disclosed in writing to the Dean and to the Office of the Provost.  You agree to disclose immediately to the Dean and to the Office of the Provost, if at any time you are investigated by law enforcement authorities or subject to criminal prosecution by federal or state authorities.

- You have, at all times during your practice of medicine, maintained professional liability insurance in such amounts as have been required by law, and no professional liability insurance carrier has ever canceled, denied or refused to renew your professional liability insurance coverage or imposed a surcharge with respect to such coverage.

- You are not now, and have never been at any time during your practice of medicine, convicted of a criminal offense related to health care nor are there any such actions pending or to your knowledge threatened.

- This Appointment Letter does not violate the terms or provisions of any other agreement to which you are a party or which impacts upon your practice of medicine, including but not limited to any restrictive covenants or other non-competition agreements.

## Termination Related to Conditions of Employment, Representations and Warranties and Other Terms

You understand and agree that if you are unable to practice medicine or Temple University is unable to submit billing statements to governmental or other third party payers for your professional services as a result of your failure to maintain any Condition of Employment or Representation and Warranty contained in this Appointment, or that you otherwise fail to perform any duty of employment contained in this Appointment such that Temple University is unable to submit billing statements to governmental or other third party payers for your professional services, then Temple University shall have the right to terminate this Appointment immediately, without advance notice and without any further obligation to you. Termination pursuant to this provision shall not be considered termination for "adequate cause" as referenced in the *Temple University Faculty Handbook* and the *Lewis Katz School of Medicine Policy on Appointment as a Clinician Educator on the Clinician Educator Track* and neither the Faculty Handbook nor the Lewis Katz School of Medicine Policy shall be applicable to such termination.

## Notice of Resignation

Should you resign from the faculty prior to the expiration of your appointment, you will owe to the University an amount equal to 3/12 of your annual compensation as liquidated damages

Michael Weinik, DO
March 14, 2018
Page 7 of 8

and not as a penalty, unless you provide a minimum of three months' prior written notice. Further, you authorize Temple University to offset from any amounts it may owe to you pursuant to your employment, in satisfaction, or partial satisfaction as the case may be, the amount you are obligated to pay hereunder to the full extent permitted by law. However, early resignation remains a breach of the term of your appointment. Accordingly, this paragraph is not an exclusive remedy nor a waiver of any of the University's rights or remedies relative to any such resignation, all of which Temple University expressly preserves.

## Employment Policies

As a faculty member at Temple University, the terms and conditions of your employment are governed by this Appointment Letter, as well as Temple University's applicable policies and procedures, including any applicable collective bargaining agreement, official School or College policies that are available on-line at http://www.temple.edu/medicine/faculty/policies_procedures.html, the Employee Manual and Board-approved policies and procedures contained in the Temple University Faculty Handbook, that are also available on-line at http://policies.temple.edu, all as may be modified by Temple University and the School from time to time.  School policies include, but are not limited to, its conflict of interest policy at http://www.temple.edu/medicine/faculty/documents/conflict_policy.pdf. You will also be required to provide a financial disclosure at least annually.

## Inventions and Patents Policy

As a faculty member at Temple University, you agree to be bound and abide by the terms of Temple University's Inventions and Patents Policy that is available on-line at http://policies.temple.edu.  By signing the Appointment Letter you represent that you have reviewed Temple University's Inventions and Patents Policy and agree to be bound by this policy, as may be modified by Temple University from time to time. In addition, you hereby assign to Temple University any and all intellectual property rights in any inventions created by you during the period of your employment and emerging from any university research or development activity, or from use of any university facilities or equipment.

## Compliance with Laws, Regulations, Policies and Procedures

In the performance of their functions, faculty members have an obligation to avoid ethical, legal, financial and other conflicts of interest to ensure that their actions and outside activities do not conflict with their primary employment responsibilities at the institution. Faculty members are also expected to understand and be in compliance with applicable laws and regulations, including governmental or other sponsoring agency regulations related to time and effort reporting and sponsored program expenditures and billing, University and employment policies and regulations, and NCAA regulations for areas and departments in which their essential functions cause them to interact with student athletes.

## Non Solicitation

During the period that you are employed by Temple University and for a period of one (1) year thereafter, you will not, except with Temple University's express prior written consent, directly or indirectly, in any capacity, for the benefit of any person, entity or competing health care system, solicit any person who is, or during such period becomes, a patient, supplier, employee, agent or representative of Temple University in any manner which interferes or might interfere with such person's relationship with Temple University, or make any effort to

Michael Weinik, DO
March 14, 2018
Page 8 of 8

obtain such person as a patient, supplier, employee, agent, or representative of any medical practice which provides professional medical services in the specialty of Physical & Rehabilitation Medicine.

You expressly acknowledge that these covenants are a material part of the consideration bargained for by Temple University and, without your agreement to be bound by these covenants, Temple University would not have agreed to enter into this agreement.

The terms and conditions of this agreement shall remain in full force and effect for so long as you remain an employee of the University unless replaced by a fully executed subsequent agreement.  However, compensation adjustments may be made, effective following the expiring appointment period, in accordance with School of Medicine practice and procedure.

I have reviewed and understand the terms and conditions of employment as outlined above. By signing this Appointment Letter I agree to all of those terms including, but not limited to, the requirement of assigning certain patent and other rights to Temple University.

_____          3/14/18  11:00pm
          (Signature)                                (Date)

## **Dr. Weinik's Procedural Objections Demonstrating noncompliance with the Procedures Required by [the] Bylaws or Applicable Law Resulting in Demonstrable Prejudice to Him per 8.5.2 (a)**

"Temple University Administrative Policies and Procedures" were not followed.  Among the deficiencies:

1.    Applicant was never notified that he had an opportunity to go the Medical Staff Office to review the complaint against him.

2.    Applicant was never told that he could seek an advocate to assist him in this process.  The Policies and Procedures indicate that notifications #1 and #2 should have been made BEFORE any investigation commenced. Applicant never received them.  Instead, when he did meet with the investigators, he was shown handwritten excepts

from an email containing allegations against him and was not allowed to know the identity of his accuser.

3.   The timeline produced by the investigators clearly shows that the investigation was well under way by the time they met with Applicant also in violation of the University's Policies and Procedures.

4.   The timeline demonstrates that at the time they finally met with Applicant, the investigators had already meet with Dr. Acevedo, yet, his allegations were never disclosed to Applicant until two weeks before the July 10, 2018 hearing.

5.   The Bylaws of the Professional Medical Staff were also not followed in this process.  Here are a few examples:

- In violation of Section 7.3.4, Applicant was never given the required Special Notice of any recommendation or action by MSEC following their investigation.  Instead,

Applicant was escorted from the building with no notice and no idea of what had transpired to cause his removal in such an embarrassing and undignified way. It wasn't until Applicant's attorneys contacted Temple that Special Notice was actually given.

- In violation of Section 7.4.3, Applicant was never given an opportunity to address MSEC following his being escorted out of the hospital.

- Applicant does not know whether MSEC met to consider his removal from privileges, as is required by Section 7.4.3, nevertheless, Applicant never received the required special notice of MSEC's recommendation pursuant to Section 7.4.4.

- Finally, Section 8.3.1 requires that the CEO provide Applicant with "clear and concise" reasons for the adverse action taken against him. Prior to the hearing on July 10, 2018, no one has provided Applicant with

this information.  In fact, Applicant learned for the
first time 15 days before the hearing much of the
substance about the allegations being leveled against
him.  The only information Applicant had been given
throughout the entire process was to be able to read
excerpts from an email containing allegations.

6.     These deficiencies in process and procedure violate the
clear rules by which accusations and investigations are to
be conducted, and the "just culture" that is supposed to
exist at Temple.  Moreover, MSEC impaired Applicant's
right to, among other things, due process.  The deficiencies
also led to a result which should not have occurred had the
rules been followed.

7.     Applicant objected to these deficiencies, and others, at
the hearing on July 10, 2018 and reserved his right to raise
these procedural deficiencies in any future appeal despite

knowing that his evidence would completely overwhelm the unreliable hearsay MSEC would offer.

8.     Applicant request permission to have hearing conducted by counsel per 8.4.1 – and was never given a chance to be heard on that issue prior to the decision being made that lawyers could not ask questions and make arguments.  Per the Bylaw provision, the *default* is attorneys *do* participate, and an affirmative decision was made by someone without Applicant's knowledge to exercise discretion and not to allow lawyers to ask questions and make arguments.  That decision was made without any input from the accused, Applicant Dr. Weinik.

9.     Temple did not provide Applicant with the correct Standards of Conduct, Rules, and Procedures in effect 2012-2014 governing time period when Dua allegations supposedly occurred.

10. Temple could not certify on the record that it had applied the Standards of Conduct, Rules, and Procedures in effect 2012-2014 in reviewing Dua complaint. Instead, Dr. Cowell applied standards of conduct written after the the allegations concerning Dr. Dua. In short, Dr. Cowell used the wrong standards against Applicant instead of the ones in effect when Applicant was supposed to have engaged in this misconduct.

11. Applicant was never given the date of the alleged event that occurred 4 to 6 years ago where Dr. Dua claims Applicant acted wrongly. The room at PCOM where those lectures were held was wired for video and audio, and Applicant was unable to seek out if there are any recordings and video of the event to disprove Dr. Dua's allegations.

12. The By-Laws say hearsay is only admissible if "...it is the sort of evidence on which responsible persons are

accustomed to rely in the conduct of serious affairs…" See

8.4.7.  The committee members clearly understood that in

arriving at the decision that they did. MSEC, its

investigators, and Dr. Cowell failed to understand this

distinction and credited all hearsay, whether it was reliable

or not, and failed to understand the distinction. Applicant

believes that the members of MSEC asked to vote on the

hearing committee's findings could not have read his post

hearing written argument.  Instead, Applicant believes

MSEC was so anxious to impose its pre-determined guilt

and penalty upon Applicant no matter what the evidence

was that was produced, no matter how the witnesses'

demeanor and affect appeared at hearing, and no matter

what the hearing committee members thought.

13.  Applicant avers that he was denied due process when

the results of a five hour hearing with more that 50 pages

of post hearing argument and exhibits was completely

ignored by the charging body, MSEC, and MSEC unilaterally re-imposed its findings of violations and penalty of expulsion.  Applicant is left to wonder for the entire hearing committee process was a designed farce: a pretext to pretend at "due process" when the MSEC decision was going to the Board no matter what the hearing committee ruling turned out to be.

14.  Applicant points out to the Board that the entire process from allegation through this current appeal has cost Applicant an enormous sum of money and great stress to be currently in exactly the same place Applicant was in when MSEC recommended expulsion before the hearing was scheduled.  Thus, Applicant has not only suffered from a lack of due process since the hearing committee's rulings were wiped away by MSEC, he has suffered extensive monetary damages as well.

Page 1

1        TEMPLE HOSPITAL MEDICAL STAFF HEARING

2

3           RE:  MICHAEL WEINIK, D.O.

4

5

6                    ------

7              Tuesday, July 10, 2018

8                    ------

9          Medical Staff Hearing in the above

10   matter, held at Temple University Hospital, 3401

11   North Broad Street, Boyer Pavilion, 9th Floor,

12   Philadelphia, Pennsylvania, beginning at 5:30

13   p.m., on the above date, before Jan Singer Brooks,

14   Court Reporter and Notary Public.

15                    ------

16            VERITEXT COURT REPORTING

              1801 Market Street

17               Suite 1800

           Philadelphia, Pennsylvania 19103

18

19                    ------

20

21

22

23

24

Page 2

```
1            APPEARANCES
2
3       MEDICAL STAFF PANEL
4
5  JOHN DAY, M.D., Chair
   JOSEPH QUEENAN, M.D.
6  KARN LIN, M.D.
7            - - -
8  PAUL WRIGHT, ESQUIRE
   2450 W. Hunting Park Avenue
9  Floor 4
   Philadelphia, PA 19129-1398
10 Counsel for Temple University Health System
11
   VINCENT COWELL, M.D.
12 For Medical Staff Executive Committee
13
   ROGERS CASTOR
14 BY:  BRUCE L. CASTOR, JR., ESQUIRE
       LANCE ROGERS, ESQUIRE
15 26 East Athens Avenue
   Ardmore, PA 19003
16 ph: 610-649-1880
   bruce@rogerscastor.com
17 Counsel for Michael Weinick, D.O.
18 MICHAEL WEINIK, D.O.
19
20           ------
21
22
23
24
```

Page 3

```
1            INDEX
2
3  WITNESS                PAGE
4
   VINCENT COWELL, M.D.            22
5
     By Dr. Weinik        47
6
7  ELLEN TEDALDI, M.D.
8    By Dr. Cowell        78
9    By Dr. Weinik        104
10
   GILBERT D'ALONZO, D.O.
11
     By Dr. Weinik        109
12
13 JENNIFER YU, M.D.
14   By Dr. Weinik        117
15
   STEPHANIE LI, M.D.
16
     By Dr. Weinik        122
17
18 CHRISTOPHER CONNER, D.O.
19   By Dr. Weinik        127
20
   REED WILLIAMS, M.D.
21
     By Dr. Weinik        141
22
     By Dr. Cowell        152
23
24
```

Page 4

```
1         INDEX (Continued)
2
3  WITNESS                PAGE
4
   VIKRAM ARORA, D.O.
5
     By Dr. Weinik        159
6
     By Dr. Cowell        166
7
8  ILYA ILGONIKOV, M.D.
9    By Dr. Weinik        176
10   By Dr. Cowell        182
11
   JUSTIN AVERNA, D.O.
12
     By Dr. Weinik        194
13
     By Dr. Cowell        203
14
15 MICHAEL WEINIK, D.O.            220
16   By Mr. Cowell        240
17           ------
18         EXHIBITS
19
20 No. 1    TUH Medical Staff Exhibits
21 No. 2    Mullan Statement
22 No. 3    Naftulin Memo
23 No. 4    Castor Letter
24           ------
```

Page 5

```
1            - - -
2         PROCEEDINGS
3            - - -
4       DR. DALY:  We'll go on the record
5  now.
6       Good evening.  I'm Dr. John Daly.
7  We are with here for the Medical Staff
8  Hearing requested by Dr. Michael Weinik
9  regarding the Temple University Hospital
10 Medical Staff Executive Committee's
11 recommendation to the Hospital Board to
12 terminate his medical staff membership.
13      I'm John Daly.  I will chair the
14 hearing.  I am joined by my colleagues Karen
15 Lin and by Dr. Joseph Queenan who are the
16 other hearing panel members.
17      All of us have met before the
18 hearing.  I don't know if Joe did.  But I ask
19 that the parties and their counsel introduce
20 themselves to the panel on the record.  So
21 let's start.  Michael, if you would,
22 Dr. Weinik.
23      DR. WEINIK:  I'm Michael Weinik.
24      MR. CASTOR:  I'm Bruce Caster,
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 6

1   Rogers Castor.
2        MR. ROGERS:  Lance Rogers with
3   Rogers Castor representing Dr. Weinik.
4        MR. WRIGHT:  I'm Paul Wright.  I
5   represent Dr. Cowell and the medical staff.
6        DR. COWELL:  I'm Dr. Vincent
7   Cowell, Past President of the Medical Staff
8   of the University Hospital.
9        DR. QUEENAN:  Joseph Queenan,
10  Temple Neurosurgery.
11        DR. DALY:  I'm Dr. John Daly.
12        DR. LIN:  Karen Lin, General
13  Internal Medicine.
14        DR. DALY:  Thank you.  I know that
15  the parties have been given the Hearing
16  Panel's rules and they have been sent to you
17  but I will briefly review the rules before we
18  begin.
19        First, all witnesses will be sworn
20  in by Jan, the court reporter.
21        Second, the attorneys for each
22  party shall have no speaking role during the
23  hearing.  No opening arguments, no
24  statements, objections, questioning of

Page 7

1   witnesses or closing arguments.
2        Three, the attorneys for either
3   party will be able to privately counsel their
4   clients during the hearing.
5        Fourth, the opening statements by
6   each party will be limited to approximately
7   five minutes.
8        And five, the closing oral
9   arguments by each party will be limited to
10  approximately ten minutes.
11        The Hearing Panel may ask questions
12  of any party or witness.  For each phase of
13  the hearing, that is the opening statements,
14  the presentation of evidence, the closing
15  oral arguments, the Medical Staff shall go
16  first and Dr. Weinik shall go second.
17        The Chair of the Hearing Panel,
18  that is me, in consultation with the other
19  two panel members shall make rulings on the
20  admissibility of any testimony or any other
21  evidence.  The Chair of the Hearing Panel may
22  also ask either party to state the relevance
23  of any proposed testimony or other evidence
24  before hearing or accepting the same.  Any

Page 8

1   witness called by either party will testify
2   once and will be subject to direct or cross
3   examination by either/or both parties and
4   will be dismissed after giving each such
5   testimony.
6        Each party may submit a written
7   closing statement to the Panel within three
8   calendar days of receipt of the hearing
9   transcript that we will obtain.  Any party
10  who will submit a written closing statement
11  to the Panel must so advise the Panel before
12  the hearing is adjourned today.  The Chair of
13  the Hearing Panel, that is myself, may
14  dismiss either party or conclude the hearing
15  if a party repeatedly violates, despite
16  warning, the rules established by this
17  Hearing Panel.
18        Now, do any of the parties have any
19  questions about these rules?
20        DR. WEINIK:  No.
21        DR. DALY:  All right.  Sorry.
22        DR. WEINIK:  Before we have --
23        MR. CASTOR:  No, go ahead.
24        DR. DALY:  So what we will do now,

Page 9

1   we will have opening statements first by
2   Dr. Cowell and then by Dr. Weinik.
3        Vince.  Sorry?
4        MR. CASTOR:  I shouldn't have
5   interrupted him.
6        DR. WEINIK:  I would like to offer
7   some preliminary matters for the record,
8   please.
9        DR. DALY:  You can do that during
10  an opening statement.  Can we do that?  At
11  that point I think would be most appropriate.
12  We'll let Dr. Cowell go first and then,
13  Dr. Weinik, you can entire anything you want
14  at that time.  Statements and all of that
15  will be on the record.
16        Vince, would you start, please?
17        DR. COWELL:  Again, my name is
18  Vince Cowell.  At the time of the concerns
19  before us I was President of Temple
20  University Hospital Medical Staff and I am
21  tasked with presenting and representing the
22  evidence at this hearing based on Temple
23  University Hospital's Medical Staff
24  investigation.

3 (Pages 6 - 9)

Page 10

1    I will bring up and present
2  Dr. Ellen Tedaldi as a witness on behalf of
3  the Medical Staff and we will present
4  numerous documents in support of the Medical
5  Staff Executive Committee's decision to
6  recommend to the hospital Board of Trustees
7  that Dr. Weinik's membership on the Medical
8  Staff be terminated.  The recommendations to
9  terminate Dr. Weinik's Medical Staff
10  membership was based on a pattern of
11  unprofessional behavior that despite verbal
12  warnings and collegial intervention remained
13  inappropriate in several aspects.
14    As you will see, the majority of
15  the complaints detailing Dr. Weinik's
16  unprofessional conduct were made from women
17  reflecting their claims that inappropriate
18  comments to female residents in the Pain
19  Management and Rehabilitation Program.  He
20  commented on their physical appearance, asked
21  inappropriate and personal questions that
22  were sexual in relation.  He had been alleged
23  to have inappropriately touched a resident's
24  female area during simulated demonstration,

Page 11

1  patient exam.
2    In addition, according to multiple
3  PM&R residents, Dr. Weinik's activity, in
4  particular, his conduct with female patients
5  that happened to be described as young,
6  attractive, were routinely more physical and
7  longer than with other patients.  This
8  conduct stood out to several residents in the
9  department to the point where they described
10  his physical exams for -- such as "handsy"
11  and even characterized them as "Weinik being
12  Weinik" or "she got Weinik-ed."
13    Dr. Weinik's behavior created an
14  environment that, as the residents described
15  in the PM&R Department, both male and female,
16  very uncomfortable.
17    Our evidence will show that
18  Dr. Weinik also was alleged to have used his
19  position as Intern Department Chair and his
20  connections in our community to suppress or
21  intimidate potential complaints about his
22  behavior.
23    Dr. Weinik is known by the
24  residents and graduate medical education

Page 12

1  administrator for, as they described, "name
2  dropping" and letting their residents know
3  that they will need a letter from him in
4  order to advance in their careers.
5    I will present the time line events
6  that brings us up to today.  You will see
7  that the professional -- Physician
8  Professional Conduct policy in Article 7 of
9  the Medical Staff Bylaws which establishes
10  the basis for bringing such adverse actions
11  against Dr. Weinik as included in the evident
12  packet.  We will show you that Dr. Weinik has
13  taken the preventive discrimination and
14  harassment courses for all employees,
15  training at the university which is an annual
16  competency.  He should have known that the
17  conduct was improper and unprofessional.  And
18  we will take you through the verbal and
19  written complaints made against Dr. Weinik
20  starting back in November of 2016.
21    Dr. Weinik may view the credibility
22  of those with impunity and as they have been
23  presented.  I only ask you that you consider
24  this firsthand information about the specific

Page 13

1  information that has come our way.
2    We are there for the first
3  allegation of "black dress walk of shame
4  incident" which Dr. Weinik denied as well as
5  inappropriately touching Dr. Dua's private
6  parts.  There are numerous such allegations
7  made that all lead to a body of concern at
8  work.  The evidence has shown that nothing
9  really changed, that Dr. Weinik continues
10  to -- continued to have people characterized
11  activities and actions as "Weinik being
12  Weinik."
13    So as Dr. Tedaldi who is, again,
14  our witness, will explain the highlights of
15  our investigation and we will attempt to
16  present the evidence as it was presented to
17  us starting back in the beginning of November
18  of 2016 leading up to our present scenario.
19    We will also present the work of
20  the collegial intervention that was directed
21  by Allyson Saccomandi, the Director of the
22  Burn Unit and Organizational Development
23  Program here at Temple.  And we will show
24  that in 2000 -- I'm sorry, a January 16, 2018

4 (Pages 10 - 13)

Page 14

1    e-mail from Dr. Dua, another former female
2    PM&R resident, that the basis for -- which is
3    the basis of the most recent investigation of
4    Dr. Weinik's conduct.
5         We will also present an
6    Investigational Report Summary Dr. Tedaldi
7    and I prepared to explain the Medical
8    Staff -- that was prepared for the Medical
9    Staff Committee, Executive Committee,
10   presented on March 15, 2018.
11        Lastly, you will see the letter
12   that Dr. Cushion hand delivered to Dr. Weinik
13   on March 15, 2018 which advised him of the
14   Medical Staff Executive Committee's
15   recommendation to terminate his Medical Staff
16   membership.
17        We believe that the ongoing pattern
18   of unprofessional behavior that continued
19   from March, 2016 until March 15, 2018
20   warranted the Medical Staff Executive
21   Committee's decision to recommend
22   Dr. Weinik's Medical Staff termination.
23        DR. DALY:  Dr. Cowell, you have the
24   document you read?  Will they be available to

Page 15

1    the Panel to be able to see any of these
2    written documents?
3         MR. WRIGHT:  Yes.
4         DR. DALY:  Thank you.  That will
5    help.
6         Is there anything further,
7    Dr. Cowell?
8         DR. COWELL:  That concludes my
9    opening statement.
10        DR. DALY:  Great.  Dr. Weinik?
11        DR. WEINIK:  Before I give my
12   opening statement I would like to address
13   some preliminary matters.  I request
14   permission to have the hearing conducted by
15   counsel per 841.  We were never given the
16   chance to be heard before that decision was
17   made.  The default is the attorneys
18   participate.  A decision was made to exercise
19   discretion and not to allow that without
20   input from us.
21        I request permission to submit a
22   written argument after the transcript is
23   received, as per the Bylaws I need to state
24   that I want to do that.

Page 16

1         I request a copy of Standards of
2    Conduct Rules and Procedures in effect for
3    2012 to 2014 governing the time period when
4    Dr. Dua's allegations supposedly occurred.
5         I also request certification from
6    Temple on the record that it applied the
7    Standards of Conduct Rules and Procedures in
8    effect 2012 to 2014 in reviewing Dua's
9    complaint.  I object to any evidence being
10   considered relative to Dua's complaint if
11   such certification cannot be made.
12        I also object to never being given
13   the date of this alleged event that occurred
14   four to six years ago where Dr. Dua claimed I
15   acted wrongly.
16        The room at PCOM where we did those
17   lectures is wired for video and audio and I
18   was unable to seek out if they have
19   recordings and video of the event to disprove
20   Dr. Dua's allegations because I was not given
21   that information.
22        I also want to point out that not
23   all hearsay is automatically admitted.  The
24   Bylaws, specifically 8.4.7, say hearsay is

Page 17

1    only admissible if, in quotations, "it is the
2    sort of evidence on which responsible persons
3    are accustomed to rely in the conduct of
4    serious affairs," end of quotation marks.  So
5    you must conclude that hearsay you get
6    tonight is strictly reliable, hearsay worthy
7    of reliance upon for decision in serious
8    matters.  Please bear that in mind.
9         I also request permission to
10   reserve defense opening until Temple's case
11   has rested.
12        DR. DALY:  I'm sorry, Dr. Weinik.
13   But your opening statement is the -- because
14   I'm confused by your last comment.  Your
15   opening statement is now.  There will be an
16   opportunity for a closing statement at the
17   end.
18        DR. WEINIK:  I'm sorry, Dr. Daly.
19   This was my preliminary matters before my
20   actual opening statement.
21        DR. DALY:  Sure.  You can make your
22   opening statement now.
23        DR. WEINIK:  Thank you.
24        Let me kindly amend what I said to

5 (Pages 14 - 17)

Page 18

1  reflect that the Bylaws that we have were
2  approved by Professional Medical Staff on
3  October 7, 2016 and that was not in effect
4  when the Dr. Dua alleged event happened.  And
5  as well the Temple University Hospital
6  Administrative Policies and Procedures was
7  last revised in 12/12/2016, again, not
8  reflecting the period of time that Dr. Dua
9  alleged this event happened.
10         Thank you.  I will begin my opening
11 statement.
12         When we reach the stage of
13 proceedings where I'm permitted to finally
14 present my defense I will list for the record
15 my objections to the procedures Temple has
16 followed to reach this point.  The guaranties
17 of due process that Temple claims to give
18 physicians accused of misconduct I contend
19 were not afforded to me in Temple's rush to
20 judgment based on evidence manufactured by
21 persons bent on retaliatory destruction of my
22 reputation.  To state that I am entirely
23 innocent of misconduct by any measure is an
24 understatement.

Page 19

1         I have devoted over 30 years to
2  Temple Medicine, seen over 70,000 patients,
3  healed countless people, taught generations
4  of young doctors including approximately 300
5  residents.  And yet now, only after
6  circumstances thrust me into a supervisory
7  role, to perceive detriment of others who
8  felt slighted.  We are in the environment of
9  the Me, Too movement where any accusation,
10 regardless of substantiation, is given
11 credence, no matter who gets accused.
12         I find myself on the professional
13 equivalent of death row.  I was stripped of
14 my supervisory position, escorted from the
15 hospital, given -- not given the opportunity
16 to present my own statement or assign someone
17 to present my position at the Special
18 MSEC meeting and now I face ruination of my
19 life's work.
20         I'm an even tempered man but I am
21 outraged today to be placed in this position
22 by liars who feel that I somehow impeded
23 their careers going on the defense to take me
24 down.  I will never stop fighting this

Page 20

1  injustice done to me.  I will pursue this.
2  This is my life's work.  I know no greater
3  cause for me than to care for our poorest and
4  to teach and mentor others to do so with
5  great competence, respect and caring.  And
6  that is my job as an attending faculty at
7  Temple and as a mentor and trainer of these
8  young medical students and residents.
9         I will prove that the allegations
10 against me are false.  Moreover, I will show
11 that those accusing me have motive to want to
12 hurt me and that Temple did almost nothing to
13 corroborate those allegations.  Instead,
14 Temple took these vial falsehoods at face
15 value which brings us here today.  Temple
16 presumed me guilty.  I will prove my
17 innocence given the new reality of the true
18 burden of proof now lying on me instead of on
19 Temple where it belongs.
20         You will hear firsthand accounts,
21 not hearsay as Temple presents to you, from
22 peers of those accusing me coming to my
23 defense to refute what has taken me away from
24 the privileged calling of helping patients

Page 21

1  with the skilled I have trained for and
2  taught others continuously over the past 30
3  years, people who Temple should have
4  interviewed extensively and in-depth before
5  recklessly accusing me.
6         When I have completed my defense
7  and submitted my post hearing written
8  argument you will conclude that Temple too
9  quickly believed the allegations against me,
10 failing to thoroughly investigate and
11 deliver -- and discover bias and motive to
12 lie on the part of my accusers and made no
13 effort to collaborate their outrageous lies.
14         I will ask that you recommend full
15 exoneration of me and reinstatement to my
16 previous position because I am convinced that
17 when you hear all the evidence you, too, will
18 conclude that I was falsely accused.
19         Thank you.
20         DR. DALY:  All right.  Thank you,
21 Dr. Weinik.  Anything further?
22         And as I ask Dr. Cowell, your
23 opening statement that you read from, will
24 you submit that to the court reporter as well

6 (Pages 18 - 21)

Page 22

1    so we have this?
2         MR. CASTOR:  I can do that.  It has
3    to be extricated from the notes that we have
4    but I can do that.
5         DR. DALY:  That would be fine.
6         Just for the court reporter, we
7    will be swearing in each of the witnesses.
8    We'll start with Dr. Cowell, and once he and
9    his witnesses are finished, we will be doing
10   that for Dr. Weinik as well.  But if I forget
11   or we forget, you certainly remind me that
12   each of them needs to be sworn in.
13        Thank you.  Dr. Cowell, do you want
14   to start and we will swear, please,
15   Dr. Cowell in.  Thank you very much.
16             - - -
17        VINCENT COWELL, M.D., after having
18   been first duly sworn, was examined and
19   testified as follows:
20             - - -
21        EXAMINATION
22             - - -
23        DR. DALY:  Dr. Cowell, if I might
24   just ask you.  I know you will be speaking

Page 23

1    and you have one other witness.  Is there
2    anyone else other than Dr. Tedaldi that you
3    will wish to call?
4         DR. COWELL:  No.
5         DR. DALY:  Thank you.  Please go
6    ahead.  Thanks.
7         DR. COWELL:  Thank you.
8         So I would like to start off by
9    first submitting and drawing your attention
10   to Temple University Hospital Professional --
11   Physician Professional Conduct Policy.  In
12   particular, the policy outlines a number of
13   points but certainly the key ones that I
14   would like to draw your attention to is the
15   cultural safety that requires collegial
16   cooperation and respectful interactions
17   between physicians.
18        MR. CASTOR:  I'm sorry, you're on
19   Tab 2?
20        DR. COWELL:  Yes.
21        DR. WEINIK:  And it is on what
22   page?
23        DR. COWELL:  The first page.
24        DR. WEINIK:  Thank you.

Page 24

1         DR. COWELL:  The scope and
2    responsibilities that all physicians and
3    Allied Health Professionals are expected to
4    refrain from behaviors towards patients,
5    employees, visitors and other practitioners
6    that undermine the culture of safety.  And
7    those definitions of what we construe is
8    disruptive conduct, verbal or physical abuse
9    of colleagues, residents, students, hospital
10   personnel or patients which includes throwing
11   objects, threatening violence and other
12   aggressive physical contact with others;
13   sexual harassment which includes jokes with
14   sexual content and comments with sexual
15   innuendos, inappropriate language or conduct.
16        Again, it goes on to outline areas
17   of threatening or intimidation, behavior
18   exhibited during interactions with colleagues
19   and residents.  And any of these concerns can
20   be submitted as a formal complaint.  And
21   those complaints are defined as a writing
22   which describes perceived disruptive conduct.
23        The evaluation of the process is
24   one that interviews, takes into account

Page 25

1    directors or leaders or superiors to the
2    individuals where the concerns have been
3    placed and formal interview of those
4    individuals go forward.
5         You will see the next section of
6    the disposition which if you go to Item 3 the
7    behavior that meets the definition of
8    disruptive conduct and wants submission to
9    the Medical Staff Executive Committee for
10   possible corrective actions pursuant to
11   Article 7.3 of the Medical Staff Bylaws
12   either due to severity of the behavior or
13   because the physician has had another formal
14   complaint asserted against him or her within
15   the last five years.
16        The actions that can take place
17   from that point on at Item No. 8, Collegial
18   Intervention, which is outlined for those
19   type of corrective actions.  And then the
20   next, No. 9, more formally the corrective
21   actions.  And those corrective actions
22   pursuant to again 7.3 of the Medical Staff
23   Bylaws.
24        So if we look to the Tab 3, if you

7 (Pages 22 - 25)

1    don't mind, Articles Intervention --
2    Article 7, I'm sorry, Interventional Peer
3    review Corrective Actions and Automatic
4    Limitations. Section 7.2.2 which
5    outlines/describes Collegial Intervention,
6    the relevant department chair working in
7    collaboration with other medical staff
8    leaders. It goes on to say that the goal of
9    Collegial Intervention Peer Review efforts is
10   to arrive at voluntary responsive actions by
11   the practitioner to resolve questions that
12   have been raised.
13          The next step in this process is
14   Corrective Action, 7.3, more specifically
15   7.3.1, Initiation of Formal Corrective Action
16   Proceedings. Whenever material patient
17   safety concern has been raised or where there
18   is collegial intervention efforts have not
19   resolved a question regarding the
20   practitioner's clinical competency.
21          And if you go a little further down
22   to 3, "Conduct of a practitioner that is
23   considered below professional Medical Staff
24   or Hospital standards or disruptive to the

1    orderly operations of the Hospital, the
2    matter will be referred to the President of
3    the Medical Staff and the Chief Medical
4    Officer who shall then review the matter and
5    its appropriateness, forward to the Medical
6    Staff Executive Committee, and the Medical
7    Staff Executive Committee may determine
8    whether there is basis for an investigation."
9          So to start at the time line that,
10   again, the initial concern that was brought
11   to the attention of the Medical Staff
12   President, that being myself, was back in
13   November of 2017 at which time I was called
14   to have counsel with the Vice Dean, Dr. Susan
15   Weigers, and the Director of the Graduate
16   Medical Educational Office, Mrs. Sue Coull
17   who informed me of a --
18          MR. QUEENAN: You said 2017. It's
19   2016.
20          DR. COWELL: 2016, I apologize.
21   2016.
22          In 2016 where I was informed of a
23   concern that was brought up by the residents,
24   more specifically, Dr. Brown, about the --

1    what she construed as inappropriate conduct
2    directed to her by Dr. Weinik. I was told
3    that there was a meeting between Dr. Weinik,
4    Dr. Weigers and Ms. Coull that addressed
5    those concerns and that they themselves found
6    them significant enough that they -- that it
7    should warrant some type of Action Plan.
8          They invited Dr. Weinik to
9    voluntarily enter an Action Plan that would
10   include personal counseling, and that at the
11   time Dr. Weinik declined that offer and that
12   they would hope that the concerns that
13   addressed at the time would not continue.
14          At that time Dr. Brown refused to
15   make it formal, i.e., in writing, and the
16   situation had hoped to have been at least
17   addressed to the point where it was no longer
18   an issue.
19          A few months later in February of
20   2017 it appeared that Dr. Brown met with Sue
21   Coull regarding the new complaint about
22   Dr. Weinik and Dr. Brown was advised that she
23   should put her concerns in writing so that
24   they could be addressed formally through the

1    Physician Professional Conduct Policy.
2          Dr. Brown subsequently made those
3    concerns via writing and you can refer to --
4    and so with those formal concerns placed in
5    writing and submitted to Medical Staff
6    Committee, Dr. Tedaldi and I personally
7    conducted an investigation of those concerns.
8          And so at this point I would like
9    to bring Dr. Tedaldi in to join us.
10          MR. CASTOR: Mr. Chairman, I don't
11   understand. That was testimony. Does not
12   Dr. Weinik get to cross examine that
13   testimony before another with witness is
14   called?
15          DR. DALY: He may.
16          MR. CASTOR: So Dr. Tedaldi should
17   not come in yet.
18          DR. DALY: We can wait for Dr.
19   Tedaldi to come in. We can have some cross
20   examination if you wish at this time.
21          MR. CASTOR: I thought that was the
22   procedure. If I have it wrong. . .
23          DR. DALY: That's fine.
24          Dr. Weinik, go ahead, please.

8 (Pages 26 - 29)

Page 30

1   We'll let the cross examination of Dr. Weinik
2 to Dr. Cowell occur now.
3      MR. WRIGHT:  I don't know whether
4 Dr. Cowell is going to have other statements
5 and testimony that he's going to make
6 that. . .
7      DR. DALY:  Well, let's clarify
8 that.  Will you have things further to say as
9 a witness in the proceeding as well after
10 Dr. Tedaldi is going to testify?
11      DR. COWELL:  There's -- I mean I
12 could in the form of asking Dr. Tedaldi
13 questions to further provide witness to some
14 of the events I may do that depending on what
15 she says or doesn't say.  But certainly I
16 mean --
17      DR. DALY:  Well, just to make this
18 orderly, if you're going to act as a witness
19 further subsequent to Dr. Tedaldi, let's wait
20 for the cross examination.  If, on the other
21 hand, you're simply going to ask Dr. Tedaldi
22 questions during her testimony, then we will
23 not do that.  If you're trying to bring
24 something out we will wait.

Page 31

1      MR. WRIGHT:  I think Dr. Cowell is
2 going to give additional testimony after Dr.
3 Tedaldi testifies.  So I would respectfully
4 suggest that Dr. Tedaldi undergo cross
5 examination be dismissed and then Dr. Weinik
6 can cross examine Dr. Cowell about all of the
7 things that he's stated in his presentation.
8 Does that sound fair?
9      MR. CASTOR:  Mr. Chairman, No. 10
10 of your rules, "Any witness called by either
11 party will testify once and will be subject
12 to direct or cross examination by either/or
13 both parties and will be dismissed after
14 giving such testimony."
15   It sounds like this witness
16 will be testifying more than once.
17      DR. DALY:  It does sound like that
18 to me as well.
19   So I think what might be best would
20 be for you to finish whatever you have to
21 say, we will let the cross examination occur
22 and then have Ellen come in, Dr. Tedaldi come
23 in.
24      DR. COWELL:  So I mean should I

Page 32

1 extend this time line before Dr. Tedaldi?
2      DR. DALY:  Yes, I think you do.  It
3 does not have to happen in sequence like that
4 at times.  So, please, go ahead and finish
5 what you have.
6      DR. COWELL:  So at Tab No. 6 you
7 see the written formal complaint submitted by
8 Dr. Cora Brown.  There was addressed to Sue
9 Coull again who is the Director of the
10 Graduate Medical Education Program.
11   I don't know if you have had time
12 to look at it and review it.
13      DR. DALY:  I haven't.  We are
14 seeing this, the Panel is seeing all this for
15 the very first time.  Dr. Cowell, if you can
16 just point out the salient points that you
17 wish to and then we can move the process
18 along.
19      DR. COWELL:  Got it.
20   So I will take you down to the
21 third paragraph where it says, "On Friday
22 evening, 2/24/17 at the wedding of my
23 correspondent, Dr. Paul Hurd's wedding, Dr.
24 Weinik approached me a few times during the

Page 33

1 evening.  He made comments about my body
2 shape, calling me 'so skinny,' and then
3 labeling me as an anorectic.  He even made
4 comments of how sexy my dress looked but I
5 was too skinny."
6   Further on down please take note of
7 the comments "These instances came after
8 other instances and sexually inappropriate
9 comments he made of me in October of 2016 at
10 which time I brought them up to your
11 attention.  I was aware that Dr. Weinik got
12 verbal warning during that time period.  Dr.
13 Weinik continued showing very inappropriate
14 behaviors and comments about my body shape,
15 clothes and even so intrusive into my
16 personal life in a public place where
17 patients are being seen and in front of other
18 health care professionals.  His obsessive and
19 stalky behaviors about me continue to occur
20 at not only Temple University Hospital but
21 outside Temple Hospital settings as well.
22   "I felt so violated and so
23 uncomfortable even putting my foot step
24 around PM&R clinic that I would run into

9 (Pages 30 - 33)

Page 34

1    Dr. Weinik and hear his inappropriate
2    comments about me.  These instances occurred
3    while I was not even on his rotation.
4         "I would hope further action to be
5    taken from the GME on this matter so that I
6    can believe being at Temple University
7    Hospital is for learning to become a PM&R
8    physician rather than dealing with the sexual
9    inappropriate comments, behaviors from a PM&R
10   attending and interim Chair, Dr. Weinik."
11        So following the submission of
12   these concerns we looked into the matter and
13   we started off by notifying Dr. Weinik,
14   inviting him to access to the concerns
15   expressed.  We informed him that a formal
16   process would be set in place that would
17   interview any and all relevant witnesses and
18   that it would also culminate in inviting him
19   in presenting the concerns expressed and
20   inviting his rebuttal, his answer to some of
21   the questions that we may have.
22        Following that investigation this
23   is the statement that I wrote and culminating
24   my impression of what we had -- the

Page 35

1    proceedings and outline in an Action Plan.
2         If you read this dated April 5,
3    2017 it was outlining the concerns that were
4    presented to -- through the Medical Staff by
5    Cora Brown and then a copy of the written
6    statement detailing her allegations were
7    admitted and the inquiry was taken into
8    consideration, previous concerns starting
9    back in November of 2016 were raised by the
10   same resident.
11        With regard to the most recent
12   concerns by Dr. Brown, separate interviews
13   were conducted by Dr. Tedaldi and I which
14   included Dr. Weigers, Sue Coull and Dr. Brown
15   followed by Dr. Crus prior to our meeting
16   with you.  At that point meeting attempts
17   were made to have a comprehensive and
18   constructive -- and be constructive in
19   securing any and all information relevant to
20   the allegations, and the objective was to
21   identify the issues and create a Plan of
22   Action designated to ensure safe and
23   conductive, effective work environment for
24   all parties involved.

Page 36

1    Dr. Tedaldi and I reviewed the
2    complaints by Dr. Brown as well as the
3    evidence provided, and determined that there
4    is insufficient evidence to fully support all
5    of the individual allegations.  However, we
6    are persuaded that you are responsible in
7    some part for unwelcome inclusion into Dr.
8    Brown's personal and private space.
9    Accordingly, we formally recommend that you
10   undergo professional coaching with follow up,
11   that progress be provided to Dr. Kaiser in
12   lieu of Department Chair person.  The Medical
13   Staff will provide resources in anticipation
14   of your acceptance.
15        This Action Plan was presented to
16   Dr. Weigers' immediate supervisor, that being
17   the fact that he is a Chair and Dr. Kaiser is
18   the Dean and his direct reporting superior.
19        Dr. Kaiser agreed and signed off to
20   this Action Plan in conjunction with
21   Dr. Weigers and it was then presented to
22   Dr. Weinik who agreed to the Action Plan by
23   virtue of his signature and we put in motion
24   the arrangements for him to enter into a

Page 37

1    personal conduct process to try and again
2    find a venue to -- for corrective action.
3         So, again, this is now at the point
4    where we have the collegial intervention.  We
5    went from the personal warning to the
6    collegial intervention phase.
7         The Collegial Intervention Phase,
8    Tab No. 8.  The personal coaching assignment
9    went to Allyson Saccomandi in April of 2017.
10   "Dr. Cowell approached me," this is her
11   memorandum, "approached me to work with Dr.
12   Weinik after a complaint investigation
13   involving unprofessional behavior."
14        As you go on it highlights he was
15   adamant that he understood why the issue was
16   raised and commented -- committed to making
17   sure it would not happen again.
18        "On April 27, 2017 he reached out
19   to tell me that he was behind in his process
20   due to other commitments but was still
21   interested in moving forward and would focus
22   on it in the coming weeks."
23        If we go to Page 2 it says, "By
24   June 1, 2017 I still -- I had still not

Page 38

1  received the information I needed to start
2  the process. I reached out to Dr. Weinik via
3  e-mail to say that I was concerned we were
4  falling behind since I hadn't heard back from
5  him on his final invitation."
6      It goes on to June 12, 2017. She
7  reached out again for the outstanding e-mail
8  addresses. He responded that he was learning
9  something again through the process about
10 himself and his ability to follow through.
11     The next paragraph. "On June 30,
12 2017, we scheduled time to meet face-to-face.
13 We discussed the difficulty we had having
14 getting to the point and the importance of
15 follow through and the impact this has on
16 other work beyond the 360 survey."
17     And so it goes on and on. If you
18 go to Page 3 it says, "By August 24, 2017 I
19 closed the 360 without his feedback as the
20 coaching assignment was beginning to drag on
21 much longer than anticipated and there was
22 relevant feedback from others that we could
23 work with."
24     Further down, "I was out of the

Page 39

1  office on October 25 and due to a
2  certification and rescheduled for November 3,
3  2017. During that conversation we discussed
4  the minimal progress but he said that he had
5  been spending time thinking about the areas
6  he needed to develop and was, in fact,
7  formulating ways to move forward."
8      So as I continued to see that
9  Dr. -- I'm sorry, Mrs. Saccomandi's
10 assessment continues to outline a pattern of
11 what can be seen as less than seriousness in
12 terms of the meaning and purpose and hopeful
13 outcome from this type of intervention where
14 the whole intent and purpose was supposed to
15 focus. And it just goes on.
16     It says, "November 15, 2017 Jean
17 Tamasaukas canceled the meeting scheduled for
18 November 17, 2017 and offered no reschedule,
19 instead saying he would see me again on
20 December 1, 2017.
21     "On November 27, 2017 Jean
22 Tamasaukas e-mailed to cancel my December 1
23 meeting. She asked if she should reschedule
24 sooner or if the next meeting on the 15th

Page 40

1  would be fine. I opted to wait until the
2  meeting on the 15th but was seeing a pattern
3  of non-commitment to the process that had
4  been prevailing from the beginning.
5      "On December 15, 2017 Jean
6  Tamasaukas canceled the meeting scheduled for
7  that afternoon and rescheduled it for
8  December 21, 2017.
9      "At this point I was very concerned
10 this assignment was not moving forward in a
11 positive direction and that there was a lack
12 of commitment to the process. While
13 discussions seemed positive when we did
14 connect, there was a consistent lack of
15 follow-up."
16     On Page 6, the last paragraph in
17 conclusion, it says, "This coaching
18 assignment could have been more concise and
19 focused. I originally thought this
20 engagement would take us through the end of
21 September. After re-focusing I anticipated
22 we would finish up by the end of December. I
23 am hoping 2018 brings a renewed focus but I
24 am concerned that it is not a priority. I am

Page 41

1  committed to working through April with Dr.
2  Weinik. If the pattern of cancellations
3  continue I would recommend ending the
4  assignment."
5      Again, this is the report submitted
6  by Ms. Saccomandi regarding the attempt to
7  get traction on the Action Plan as outlined
8  earlier.
9      So we take you to Section 10. You
10 will see the -- another written concern that
11 was submitted unsolicited to the attention of
12 the Medical Staff by Dr. Dua. And some of
13 the highlights of this submission include the
14 third paragraph. "I was a PGY-2 when I had
15 my first uncomfortable encounter with Dr.
16 Weinik. I was on consults with walking
17 through the hall from the resident's room to
18 the clinic. He stopped me and asked, 'So, my
19 name, are you a good girl or a bad girl?' I
20 was puzzled and weirded out by the tone of
21 his voice and the nature of his questions."
22     "I asked, 'What?'
23     "He repeated, 'Are you a good girl
24 or a bad girl? Bad girl, bad girl.'

11 (Pages 38 - 41)

Page 42

1    "I said, 'I don't know what you are
2  talking about,' to which he replied, 'Yeah,
3  you are definitely a bad girl, bad, bad girl.
4  Don't worry, we like bad girls at Temple.'
5    "Then he laughed and I felt awful
6  and confused and I said, 'I don't know what
7  you're even talking about,' and I just walked
8  away as he kept laughing.
9    "The same year I was wearing an
10 appropriate work skirt that just showed my
11 knees.  In the same hallway he stopped me and
12 asked if I was hyper mobile.  I said, 'I
13 don't think so.'  He then knelt down on his
14 knee to take a look at my knees and then
15 touched the popliteal area of my leg with his
16 hand as he looked from the side and he then
17 said, 'You are like Gumby.  You look like you
18 are probably so flexible.'
19   "I said, 'No, I am not,' and I
20 backed away from his hand.
21   "He responded, 'I would like to
22 find out for myself.'
23   "Again I walked away and this time
24 I remember laughing out loud to try to reduce

Page 43

1  the awkwardness.  I was in fear that one day
2  I had to work with this guy.  I didn't want
3  to piss him off but I felt violated."
4    The next paragraph.  "I avoided him
5  as many female residents do because of his
6  unusual and often perverted comments
7  regarding any female, patients, nurses,
8  therapists and residents.  Anyone was fair
9  game and male residents would often pretend
10 to play along and say, 'It's just Weinik
11 being Weinik.'  I never understood that
12 excuse."
13   Further on in the next paragraph
14 middle, "But when I saw how he treated young
15 female patients or just pretty women
16 differently than any other patient, his exam
17 would become extensive as he would check for
18 various pathologies but it always seemed
19 overboard and, frankly, made me very
20 uncomfortable."
21   Further on at the end of that
22 paragraph, "I understand the importance of
23 the physical exam, but this was just over the
24 top and only directed at a specific

Page 44

1  population, females, especially young and
2  pretty."
3    Next paragraph.  "He had one
4  patient that we saw on the list and he said
5  'She comes in to see me because her husband
6  doesn't give her enough loving.  Weinik will
7  make sure she is taken care of.  Haha.  She
8  will get all dolled up for me and just watch,
9  she will have me adjust osteopathic
10 manipulation and I will make her feel good.'
11 He would make those comments with a tone and
12 smile that was so unprofessional.  I always
13 thought to say something but, again, he was
14 the boss, the attending, the guy filling out
15 my evaluation.  I didn't want to anger him in
16 any way but I hated how this all made me
17 feel."
18   Next page.  "He called me to the
19 stage in front of everyone so he could
20 demonstrate the lower body physical
21 examination maneuver on me."  Further down it
22 says, 'I won't tell them about your tramp
23 stamp.'  I was super offended.  I didn't have
24 a back tattoo, a/k/a a tramp stamp, and that

Page 45

1  was just a super demeaning, unnecessary
2  comment.  He laughed as did the whole
3  audience.  I felt embarrassed but tried to
4  just go with it and get the whole thing over
5  with.
6    "He then had me stand and said he
7  was checking my ischial bursa and he said,
8  'Very nice, very nice.'  Again,
9  uncomfortable.  Audience laughed.  I didn't
10 like his hands on my buttocks because I felt
11 like I was just like those patients he
12 manipulates.  It is an impossible position.
13   "Then he went on and on, hand
14 everywhere, and I just -- eventually saying
15 he was going to check out pubalgia, also
16 known as a sports hernia or athletic
17 pubalgia.  This is a chronic groin lesion but
18 to check he essentially would push in my
19 pubic symphysis in front of everyone.  I said
20 'I don't know about that.'  Before I could
21 stop him his hand was not just on my pubic
22 region but on my vulva.
23   "I shot up off the table and said,
24 'Yeah, that's not my pubic symphysis.'"

12 (Pages 42 - 45)

Page 46

1  Everyone started laughing.  I was mortified.
2  Bumped he tried to play it off.  I was beyond
3  offended and felt manipulated, used,
4  embarrassed and horrified.
5       "The male chief resident came up to
6  me right away and asked if I was okay.  When
7  I said, 'Yes, I'm fine,' he eased up and
8  said, 'Damn, he didn't even buy you dinner
9  before that.'"
10      And again, further on in that
11  paragraph towards the end it says, "Weinik
12  was just being Weinik."
13      The next paragraph down, the last
14  sentence, "His behavior and comments were
15  just often unacceptable."
16      Last paragraph, "But now I fear for
17  others and I feel I must open up about this.
18  I still feel the need to remain anonymous
19  because PM&R is a small field and he is well
20  connected.  I work near and don't want my job
21  or my life to be compromised and I don't want
22  sympathy, I just don't want this to happen to
23  others."
24      With that, I will conclude my

Page 47

1  witness perspective and invite cross
2  examination.
3       DR. DALY:  Thanks, Dr. Cowell.
4       Dr. Weinik.  Dr. Weinik, please.
5       - - -
6       EXAMINATION
7       - - -
8  BY DR. WEINIK:
9   Q.  Dr. Cowell, you read directly from the
10  policy; is that correct?
11      MR. CASTOR:  Tab 2.
12  BY DR. WEINIK:
13  Q.  Tab 2.
14  A.  Yes.
15  Q.  Policies and Procedures.  The policy
16  quoted, was that in effect in 2012 - 2014?
17  A.  I believe so.  The policy had a few
18  revisions that reflected some of the language that
19  I believe were originated from the state and --
20  but for in terms of the concept, the policy from
21  as far as I remember is pretty much the same.
22  Q.  Where is the actual policy from 2012 to
23  2014?
24  A.  I am -- obviously we don't have it here

Page 48

1  but I'm sure it's still a matter of record and we
2  can probably produce that without much effort.
3   Q.  So are you aware that the Dr. Dua
4  situation occurred or complaints occurred in 2012
5  to 2014?
6   A.  I understand that Dr. Dua was a resident
7  here between the time of 2012 and 2014.
8       DR. DALY:  I think we can provide
9  you the Bylaws if that's what you wish.  I'm
10  certain that Bylaws prior to revisions for
11  that period of time can be provided.
12      MR. ROGERS:  Policies and
13  procedures.
14      MR. CASTOR:  Yes, this is not the
15  procedures because they are two different
16  documents.
17      DR. DALY:  I appreciate that.
18  Thank you.
19      MR. CASTOR:  But these were the
20  ones that --
21      DR. DALY:  Please.
22      Dr. Weinik, go ahead.
23  BY DR. WEINIK:
24   Q.  So Dr. Cowell, this policy was adopted

Page 49

1  in 2017.  So you agree it was not in effect in
2  2012 to 2014; is that correct?
3   A.  I agree that there were some revisions
4  made to the policy that updated some of the
5  language.  For instance, the former policy I
6  believe was disruptive physician and we -- names
7  were changed to physician professional conduct.  I
8  don't believe --
9       DR. DALY:  May I ask a question,
10  though, perhaps to Mr. Wright.  This says the
11  last revised is a 12/12/16.  So does this
12  mean that this written policy that we have
13  here in front of us was in effect as of
14  December 12, 2016.
15      MR. WRIGHT:  I believe that's
16  right.  If you look at the last page it's --
17      DR. DALY:  So it's not 2017.  It
18  was in effect as of December, 2016, just so
19  we have this established for the record.
20      Dr. Weinik, please go ahead.
21  BY DR. WEINIK:
22   Q.  We were provided with the Bylaws of
23  10/7/2016.
24   A.  Yes.

13 (Pages 46 - 49)

Page 50

```
1        DR. DALY: A different document,
2   not this document. I understand.
3        So, Dr. Weinik, go ahead, please.
4   BY DR. WEINIK:
5    Q.  So the last page of the Bylaws say
6   amended 2011, 2012 and three times in 2013 and
7   2015. Do you see that?
8    A.  Yes, I see that.
9    Q.  What was amended?
10   A.  I can't tell you specifically what was
11  amended. There are a number of reasons why the
12  Bylaws were adjusted, to again bring things
13  up-to-date and bring things much more relevant
14  regarding the changes in the health system that
15  occurred with the merging of the Fox Chase and
16  Jeans facilities so that the language was
17  consistent throughout the system. Whether or
18  not -- for me to say that I can tell you
19  specifically line by line items which was amended
20  or adjusted I cannot do that.
21       DR. DALY: Dr. Weinik, can I just
22   ask what -- I know there's some relevance to
23   all of this. I think we have said the Bylaws
24   for the various dates can be provided to you
```

Page 51

```
1   and to counsel should you wish.
2        Just as a matter of moving along,
3   perhaps we can do that with your questioning
4   of Dr. Cowell.
5        DR. WEINIK: Okay. With all due
6   respect, sir, it's important that the Bylaws
7   at 2012 - 2014 were in effect and Dr. Dua
8   was -- those actions were held to the Bylaws
9   of that time, not the current Bylaws. And
10  that's what I am trying to ascertain. And I
11  was not given the opportunity to defend the
12  correct Bylaws.
13       DR. DALY: I understand that. I
14  think that you and counsel, your counsel will
15  get the opportunity to look at the Bylaws in
16  effect as of those dates.
17       Do you want to move along with your
18  cross examination of Dr. Cowell's testimony?
19  BY DR. WEINIK:
20   Q.  Let's go to Tab 6. How can we tell this
21  letter is from Cora Brown as there is no return
22  address and it is unsigned?
23   A.  Well, I guess we can -- I mean if
24  there's any opportunity to track -- to do an
```

Page 52

```
1   investigation that includes all of the people
2   involved in it. This was submitted to Sue Coull
3   who is the GME Director, Sue Weigers, the
4   Associate Dean was involved in these proceedings,
5   and this was what was submitted to me. I'm sure
6   there is a track record back to the original
7   submission that would demonstrate there's no
8   alteration of the document.
9    Q.  Dr. Cowell, are you going to present any
10  evidence that demonstrates that Cora Brown
11  authored this letter?
12   A.  Other than the letter itself and the
13  testimony of individuals that were involved in
14  receipt of the letter and yourself when the letter
15  was written and presented to you for review prior
16  to the -- your testimony, that's all I can offer.
17   Q.  Dr. Cowell, where is the date on this?
18   A.  Other than the date of the author of the
19  letter?
20   Q.  Yes.
21   A.  What you see is what I see. I don't --
22   Q.  What is it you see, Dr. Cowell?
23   A.  I see dates that were quoted in the
24  letter. I don't see a date of authorship.
```

Page 53

```
1    Q.  Thank you. So here is a letter that you
2   present that is -- has no date, is unsigned, no
3   return address and no evidence of where it came
4   from?
5    A.  And at the time that it was submitted to
6   you I don't believe you expressed those concerns
7   and you didn't deny that there perhaps were some
8   aspects of the letter that needed clarification.
9   So if, again, if this is a technicality that --
10  the fact that the items that you expressed concern
11  about are not documented, then I can't refute
12  that. The evidence is right in front us for all
13  to see and so I would suggest that anything short
14  of, again, doing a formal investigation to track
15  the authenticity of the letter, I have nothing
16  else to add to it.
17       MR. QUEENAN: I think that we move
18   to say that there's no way that we can at
19   this point validate that this letter is from
20   Dr. Brown. What I would suggest is, and I
21   don't know how reasonable this is or not
22   reasonable, that we contact Dr. Brown as a
23   panel and then determine if she would say
24   that she wrote this letter. And if she does
```

14 (Pages 50 - 53)

Page 54

1  tell us that she wrote the letter, then the
2  question is are you disputing what's in the
3  letter, are you disputing whether she wrote
4  the letter?
5      DR. DALY: I would like to have
6  Dr. Weinik. We are in the midst of cross
7  examination. Let's try to finish with this.
8      MR. QUEENAN: It's taking a long
9  time to say that she didn't sign the letter.
10  It's taking a long time to say that there is
11  not a date on the letter. There's not a date
12  on the letter. We can see that.
13      MR. CASTOR: We took a long time to
14  demonstrate that we have no idea where the
15  letter came from.
16      MR. QUEENAN: And that's why I want
17  to try to solve that problem. The best way
18  to solve that problem is to go to the horse's
19  mouth.
20      DR. DALY: Mr. Castor, I appreciate
21  it. Please.
22      We are going to go ahead with the
23  cross examination. We understand that you
24  dispute the letter, its author, its date,

Page 55

1  etc. So we will take all that under
2  consideration. I thank you for that.
3      Dr. Weinik, please go ahead.
4  BY DR. WEINIK:
5    Q. Dr. Cowell, when you first presented
6  this you told me that there's no corroborated
7  evidence in the testimony for this; is that
8  correct?
9    A. I'm sorry, when I presented it to you?
10   Q. When you had the opportunity to have
11  this and you investigated it.
12      DR. DALY: I am not sure I
13  understand the question actually, Dr. Weinik.
14      MR. QUEENAN: Can legal counsel
15  help clarify?
16      MR. CASTOR: We will move on.
17  BY DR. WEINIK:
18   Q. Dr. Cowell, in this letter there is a
19  mention of Dr. Ernesto Cruz?
20   A. Yes.
21   Q. Where is your documentation of your
22  interview of Dr. Cruz related to this letter, to
23  this event?
24   A. Dr. Cruz was interviewed by the Panel

Page 56

1  Doctor, Dr. Tedaldi, and not myself. There were
2  minutes taken. I don't know what those minutes
3  are at hand at this point in time. But, again, we
4  can probably provide you with those minutes taken
5  when interviewed Dr. Cruz.
6    Q. But Dr. Cruz is not here today?
7    A. No.
8    Q. And you did not give this to us in
9  advance of the hearing?
10   A. Did not give what, this?
11   Q. Dr. Cruz, his information.
12   A. No.
13   Q. Did Dr. Cruz corroborate with you that
14  this event occurred?
15   A. No, Dr. Cruz did not -- at his testimony
16  he did not -- again, as the summary of the letter
17  presented to you at the conclusion of the
18  investigation suggested, Dr. Cruz was not present
19  personally a witness to the things that Dr. Brown
20  alleges in her document but. . .
21   Q. Do you see in the fifth line of the
22  fourth paragraph, "He stopped me and Dr. Cruz.
23  Dr. Weinik spoke in a loud voice."
24      Go ahead. Do you see that?

Page 57

1    A. Yes, I see that.
2    Q. And Dr. Cruz did not remember that or
3  corroborate that?
4    A. Yes. To be perfectly transparent, Dr.
5  Cruz was indifferent at the interview. He felt a
6  little awkward being involved in it. He felt
7  awkward in a lot of the concerns with what was
8  going on in the department and that at times he
9  felt like he was caught in the middle of a lot of
10  the concerns that were being expressed.
11   Q. So you felt that that was not helpful to
12  your concerns and you didn't turn it over to us;
13  is that right?
14   A. Dr. Cruz's testimony?
15   Q. Yes.
16   A. Well, Dr. Cruz's testimony did not
17  provide much support one way or the other. I
18  didn't think personally that it would have lead
19  relevance to your interest or the Panel's
20  interest.
21   Q. So Dr. Cowell --
22   A. Yes.
23   Q. -- this came from Dr. Brown, if it did
24  really come from Dr. Brown. And she says Cruz was

15 (Pages 54 - 57)

Page 58

1 there and you interview Cruz. Do you not think it
2 would be biased of you to not provide me with that
3 testimony of his?
4    A. Not really. I think that Dr. Cruz is
5 one line item amongst a much larger body of work
6 that was expressed in Dr. Brown's letter. So to
7 single out Dr. Cruz, and again, as I already
8 admitted earlier that his testimony didn't support
9 one way or the other. And you can see again in
10 the letter that we submitted to you is it's
11 clearly stated. If you go back to my -- to the
12 letter I presented to you it says that I reviewed
13 the complaint and evidence provided and determined
14 that there's insufficient evidence to support all
15 of the individual allegations.
16    So Dr. Cruz is a witness to one
17 allegation, again, as I stated there which I felt
18 as though was a fair assessment, however, that we
19 were sueded that you are responsible in some part
20 to unwelcome intrusion into Dr. Brown's space.
21    Q. Dr. Cowell, do you realize that Dr. Cruz
22 is the only person in this letter that could have
23 witnessed her complaint and backed up her letter?
24    A. I understand that Dr. Cruz is mentioned

Page 59

1 in her letter and I understand that Dr. Cruz did
2 not collaborate either for or against the concern
3 expressed by Dr. Brown.
4    DR. DALY: Dr. Cowell, did you
5 provide -- Dr. Queenan was asking did you
6 provide this letter from Cora Brown, alleged
7 from Cora Brown to Dr. Weinik previously?
8    DR. COWELL: Yes.
9    MR. QUEENAN: So you could have
10 called Dr. Cruz as a witness today?
11    I don't understand this whole
12 thing. I'm not a lawyer. I'm trying to
13 figure out what is going on.
14    MR. CASTOR: Well, I am a lawyer
15 but I don't know what all this is going on.
16    MR. QUEENAN: Fair enough. Good,
17 so we are all in the same boat.
18    So my concern is now that Dr. Cruz
19 may or may not have corroborated this story
20 and we are trying to figure that out.
21    Did we try -- you didn't want Dr.
22 Cruz here.
23    DR. COWELL: No.
24    MR. QUEENAN: You clearly think

Page 60

1 it's a problem with Dr. Cruz. Is he one of
2 your witnesses?
3    MR. CASTOR: No.
4    MR. QUEENAN: Okay. I just want to
5 know because I'm trying to process this so I
6 know what's coming next. I'm trying to put
7 all these little ducks in a row in my head.
8    DR. DALY: Dr. Weinik, just in the
9 interest of time, let's go ahead and proceed
10 if we could.
11    MR. QUEENAN: So we understand your
12 point, that we don't know if this is her
13 letter, we don't know what the date is, we
14 don't know who wrote the letter and we don't
15 know that Dr. Cruz did or didn't corroborate
16 but it sounds like did and did not, didn't
17 say anything, kind of sounds like he was
18 neutral.
19    MR. CASTOR: Well, there can't be
20 any neutral. He either agrees that that
21 happened or he doesn't know.
22    MR. QUEENAN: Or he says that I was
23 present but I wasn't paying attention.
24    MR. CASTOR: That's not

Page 61

1 corroborating. You either corroborate or
2 don't.
3    DR. COWELL: Well, I wouldn't --
4    MR. QUEENAN: But it's still it's
5 not taking one -- what I am trying to point
6 out here is that's not taking one side or the
7 other. That's like I do often. I'm walking
8 along with my chairman, someone stops to talk
9 to him, I don't pay any attention to what
10 they are saying to him. It has nothing to do
11 with me.
12    DR. DALY: So let's just try to go
13 ahead if we can.
14    A. I think that's an important part. I
15 would have welcomed Dr. Cruz if we thought his
16 testimony as a witness would it be relevant. I
17 have no objections at all. I would be happy to
18 cross examine Dr. Cruz and substantiate again what
19 I said earlier is that he felt a little bit
20 trapped in the ongoings of a lot of issues that
21 were happening in the department, issues that are
22 unrelated to these allegations that I don't want
23 to take the committee's time with going through.
24    DR. DALY: Dr. Weinik, why don't

16 (Pages 58 - 61)

Page 62

1    you go ahead, please.
2 BY DR. WEINIK:
3    Q.  Dr. Cowell, Dr. Brown gives a statement
4 that she was body shamed at someone's wedding.
5 Did you get any other corroborating testimony
6 about that other than Dr. Brown's?
7    A.  No, I did not.
8    Q.  Let's go to Tab 8.  So when was the
9 coaching memo submitted, Dr. Cowell?
10    A.  January 23, 2018.  You can see it on the
11 last page, Page 6.
12    Q.  So none of this progress was given to
13 you on that date -- until that date, correct?
14    A.  The progress was sent to Dr. Kaiser, the
15 Dean, and your immediate supervisor.
16    Q.  In writing or orally?
17    A.  I can't tell you.
18    Q.  Dr. Cowell, you selected certain
19 sections to read here today?
20    A.  Yes, sir.
21    Q.  May I turn your attention to a few
22 different things?
23    A.  Yes, sir.
24    Q.  Dr. Saccomandi -- Ms. Saccomandi

Page 63

1 suggested that there were numerous cancellations?
2    A.  Yes, sir.
3    Q.  Did you take -- and you seemed to
4 suggest that that was my non interest in going.
5 Is that what you are saying?
6    A.  No.  I seem to relay the fact that she
7 indicated in her report that that was her
8 impression.
9    Q.  Right.  But we don't know why it is that
10 I didn't go; is that correct?
11    A.  I can only tell you what Ms. Saccomandi
12 said in the report.  I did interview her and --
13 when she submitted the report.
14    Q.  So would you agree it's entirely
15 possible there were significant and serious
16 medical conditions for which I was going under
17 evaluation for --
18    A.  Yes.
19    Q.  -- that could have taken my time away
20 from this?
21    A.  Yes.
22    Q.  Let me pull your attention to another
23 paragraph that seems it got missed.  Could you
24 kindly read the eighth paragraph on Page 5 which

Page 64

1 talks about my participation further along the way
2 in this cycle?
3    A.  I'm sorry.
4    Q.  Further through the cycle.
5    A.  No, I'm sorry.  Tell me where again.
6    Q.  "I was very. . ."
7    A.  "I was very surprised at the progress
8 and the preparation of Dr. Weinik for the meeting
9 and shared my surprise with him.  I told him that
10 I was not expecting him to have made that
11 progress.  We committed to the following next
12 steps."
13    Q.  Go ahead.
14    A.  "He would support the attendance of his
15 team at the development event he assigned.  He
16 would set up a schedule in the new year that would
17 include meeting through March on his goals and
18 development plan.  He would attend all leadership
19 sessions for chairs as well as the TUH Leadership
20 Academy."
21    Q.  Would you agree with me that that shows
22 progress in participation in that process of
23 counseling?
24    A.  If you want my opinion, as I read

Page 65

1 through starting from the top down throughout the
2 entire page, that a lot of this doesn't lend
3 itself for the purpose of the personal coaching,
4 that it seemed that the attention was shifting
5 towards leadership skill attainment and -- which,
6 again, may have been an opportunity to capture
7 during the sessions.  But, again, in terms of a
8 personal life coachings and in terms of
9 professional conduct, I'm not impressed that this
10 demonstrates that.
11    Q.  Let's move to Tab 10, Dr. Dua.  The date
12 on this e-mail is 1/16/18; is that true,
13 Dr. Cowell?
14    A.  That's true.
15    Q.  You said that this came unsolicited; is
16 that correct?
17    A.  I'm sorry?
18    Q.  This came unsolicited you said?
19    A.  Correct.
20    Q.  What evidence do you have that it came
21 unsolicited?
22    A.  I don't know Dr. Dua.  I didn't reach
23 out to Dr. Dua.  It was presented to me because
24 this was -- this e-mail was received by Amber

17 (Pages 62 - 65)

Page 66

1 Dzikowski who was one of the administrators of GME
2 and she presented it to Sue Coull who presented it
3 to the Medical Staff.
4    Q. Dr. Cowell, what investigation did you
5 do to assure that this came from Dr. Dua?
6    A. We reached out to her to come in and
7 give personal testimony to support the concerns
8 she expressed. She declined.
9    Q. You spoke with her?
10    A. I didn't personally speak to her, no.
11    Q. Who spoke with her?
12    A. Sue Coull.
13    Q. How do you know that it was the other
14 person on the phone?
15    A. I don't.
16    Q. And does Dr. Coull have a record of when
17 that call was made?
18    A. I don't know that.
19    Q. How would anybody know who was on the
20 other end of the phone?
21    A. In terms of whether she would come in
22 and give testimony?
23    Q. Yes.
24    A. I guess other than the obvious, you

Page 67

1 know, who -- what phone number you used, whether
2 or not that can be tracked back to who the number
3 was assigned to.
4    DR. DALY: You're asking about the
5 phone call between Sue Coull --
6    DR. WEINIK: Yes.
7    DR. DALY: -- and this Amber
8 person?
9    DR. COWELL: No, Sue Coull --
10    MR. QUEENAN: It was apparently
11 where it came from, this is who it came to.
12 BY DR. WEINIK:
13    Q. So Dr. Cowell, Dr. Dua never came in and
14 adopted this statement as being true?
15    A. No, Dr. Dua, from what I was told, Dr.
16 Dua is very fearful of retaliation.
17    Q. What I asked, though, did she come in?
18    A. No.
19    Q. Did you go to her?
20    A. No.
21    Q. Do you know where she works?
22    A. I do know where she -- I knew where -- I
23 was shown where she works. I can't recall off the
24 top of my head.

Page 68

1    Q. What measures did you make to get her to
2 adopt this as true?
3    A. Other than reaching out on more than a
4 few occasions to have her come in and offer
5 testimony.
6    Q. Dr. Cowell, when you were given the
7 privilege and responsibility to prepare this
8 report you took it on, you took it on with a great
9 sense of responsibility, did you not?
10    A. Yes, I did.
11    Q. And you took -- you would do this -- you
12 recognize that this report has great implications
13 not only for the community here at
14 the Temple Community but also to my existence as a
15 physician?
16    A. Absolutely I did.
17    Q. And you tell me you have done everything
18 that you could to put all the important
19 information that is out there in this report
20 because this is such a vital document?
21    A. Absolutely I did.
22    Q. And that other people would judge me by
23 this?
24    A. Absolutely I did.

Page 69

1    MR. QUEENAN: Can I ask a question?
2 Am I allowed to do that?
3    Did you actually examine Dr. Dua in
4 front of individuals at any point in your
5 career?
6    MR. CASTOR: Yes, there will be
7 evidence later on that.
8    MR. QUEENAN: Okay. Because that's
9 part of the thing. So let's not -- I think
10 again if we have to move on passed the non
11 signed letter we can understand that we don't
12 know whether Dr. Dua --
13    DR. COWELL: May I continue this
14 train of thought?
15    MR. CASTOR: Or that the
16 allocations are true but there's no effort to
17 corroborate.
18 BY DR. WEINIK:
19    Q. Dr. Cowell, did Temple University put
20 any restrictions on you or any individual at
21 Temple University either encourage you to look
22 into this more or look into this less to benefit
23 me or to hurt me or to limit you in any way to
24 doing this investigation?

18 (Pages 66 - 69)

Page 70

1    A.  We, again, made numerous attempts to
2  reach out to -- am allowed to speak to -- he
3  speaks to me.
4        DR. DALY:  Sure, you can speak to
5    him, he will speak to you, absolutely.
6    A.  Again, through the numerous attempts to
7  get her to --
8  BY DR. WEINIK:
9    Q.  There were absolutely numerous attempts
10  --
11        DR. DALY:  Let him finish, please.
12        Go ahead.
13        DR. WEINIK:  Sorry.
14    A.  There were numerous attempts to get her
15  to collaborate this letter that she wrote.  We --
16  one of the attempts resulted in Mr. Wright
17  receiving a phone call from an individual that
18  qualified herself as a lawyer but not acting in a
19  legal capacity but more in a friend capacity and
20  that she wanted to express the serious and deep
21  concerns that Dr. Dua had about repercussions
22  because of your extensive notoriety amongst -- in
23  the PM&R community.  And because of that concern
24  about her career, implications on her career, that

Page 71

1  she was terrified in regard to coming in to give
2  personal testimony.  And so she was at that time
3  trying to maintain anonymity.
4        DR. DALY:  Dr. Weinik, we are going
5    to have to move this along.  It's 7:00.
6        DR. WEINIK:  Yes, we will move on.
7  BY DR. WEINIK:
8    Q.  Where in the e-mail say that any of
9  these events occurred?
10    A.  The e-mail is what you see.  I don't
11  have any -- this is the complete submission that
12  she provided to us.
13        MR. CASTOR:  No, it's not because
14    it's missing the name at the top.
15    A.  Well, okay.  The name was, from what I
16  understood, again, with her anonymity, this was
17  initially presented but at any time you could have
18  asked the author of the article and we would have
19  given it and we were prepared to do that.  But you
20  never asked who authored it.
21        MR. CASTOR:  Mr. Chairman, I have
22    to object.  There's no procedure that I saw
23    for this.
24        DR. DALY:  Thank you, Mr. Castor.

Page 72

1    Mr. Weinik, did you have anything
2  further that you want to question Dr. Cowell?
3        DR. WEINIK:  Yes.
4        DR. DALY:  As I said, we are going
5    to need to move along with all of this.  I am
6    trying to be patient but I want to move
7    along.
8        MR. CASTOR:  Let me do the
9    questioning and it will move along.
10        DR. DALY:  Mr. Castor, thank you
11    very much.  If you remain quiet I would
12    appreciate it except for your consultation
13    with your client.
14        MR. QUEENAN:  For clarification,
15    though, I mean what do you mean when any of
16    this stuff occurred other than kind of a
17    global period?  Because I don't think that
18    people are going to remember day-to-day.  I
19    don't know that I can remember day-to-day
20    from a few years ago, yesterday, four days
21    ago.  But PGY-2, PGY-3.  We are going to say
22    that this is actually Dr. Dua, which I know
23    we are still arguing that problem, but that's
24    the years they occurred, her PGY-2 year, her

Page 73

1  PGY-3 year.  So we have a year ballpark and
2  then this grand rounds, whatever it is or
3  whatever it was, that day has got to be
4  somewhere written down I would think.  That's
5  one of those things that if you ask us when
6  this person was examined in front of a group
7  and there would be a day, a grand round day,
8  we can find these dates.  What is the, I
9  guess what's the purpose of knowing those
10  specifics dates?  Why, why do we need to know
11  those?
12        DR. DALY:  Joe, we'll just address
13    it to Dr. Weinik.  Dr. Weinik, if you have an
14    answer to Joe, fine as to the relevance here.
15    If not, please question Dr. Cowell further
16    and we will finish up your cross examination.
17        DR. WEINIK:  Dr. Queenan, if I knew
18    the exact date, if I knew when any of these
19    episodes in any of the documentation here
20    presented today, if I knew when they occurred
21    I would be able to go to PCOM for the
22    examination and see and get tapes of this.
23        This examination, this examination,
24    and I will present this later, was conducted

19 (Pages 70 - 73)

Page 74

1  in a theater setting with examination tables,
2  with video and audio. We projected this so
3  that our students and residents could see
4  their demonstration better. Everything was
5  loud, everything was visible.
6          MR. QUEENAN: And recorded? Do we
7  know that for a fact?
8          MR. CASTOR: We don't know for a
9  fact.
10         DR. WEINIK: We don't know.
11         DR. DALY: Dr. Weinik, anything
12  further for Dr. Cowell?
13         DR. WEINIK: Yes.
14 BY DR. WEINIK:
15   Q.  So one of the reasons that we wanted to
16  know, the incident occurred in 2012 and 2014 but
17  it was not until 2018 that this letter was
18  authored.
19         MR. CASTOR: You want the
20  significance of why.
21   A.  From the lead up that was told to us
22  that there was an incident where a patient was
23  being examined, that one of the residents felt
24  uncomfortable, and somehow -- again, I don't have

Page 75

1  the specifics or knowledge of how Dr. Dua became
2  aware of this. And from the report that was given
3  to me, she was upset to the point of feeling like
4  she had picked up concerns that had been -- that
5  she desired to express that were long overdue and
6  spontaneously elected to write and submit this
7  letter.
8  BY DR. WEINIK:
9    Q.  And you don't know how she found that
10  out, do you?
11   A.  No, I do not.
12   Q.  In Dr. Dua's letter on the bottom
13  paragraph of the first page she had one patient
14  that he saw on his list. Did you ever find --
15  take the effort to find out who that patient was?
16   A.  I'm sorry, let me just.
17   Q.  Last paragraph, first line.
18         DR. DALY: You are talking about
19  Page 1 on that.
20   A.  He said he -- no, I did not.
21  BY DR. WEINIK:
22   Q.  Dr. Dua also has on Page 2 in the first
23  paragraph in the middle of the page but the sixth
24  line up it says, "A male resident came up to me

Page 76

1  right away and asked if I was okay."
2          Did you make any effort to find out
3  who that was?
4    A.  No, I did not.
5    Q.  Did Dr. -- and then on the fourth line
6  up it says, "I went home. I called my sister and
7  another co-resident."
8          Did you make any effort to find out
9  to speak to her sister or the other resident?
10   A.  No, I did not.
11         DR. DALY: Anything further,
12  Dr. Weinik?
13         DR. WEINIK: Yes.
14         DR. DALY: Anything further,
15  Dr. Weinik?
16         DR. WEINIK: Let me check with
17  counsel.
18         DR. DALY: Sure.
19         MR. QUEENAN: I have a
20  clarification question.
21         DR. DALY: Joe, you have to speak
22  up loud enough because all of this goes on
23  the record.
24         MR. QUEENAN: Did we contact

Page 77

1  anybody that might be able to corroborate
2  this whole grand rounds or this examination
3  on our side to try to find out if this was a
4  male, female, chief resident at that time.
5          DR. COWELL: No. Again, this is
6  going back during her period here, 2012 to
7  2014. It would have been probably difficult,
8  if not impossible, to track down,
9  particularly the fact that Dr. Dua did not
10  submit personal testimony to be able to
11  investigate who she was referring to.
12         MR. CASTOR: And Mr. Chairman, we
13  do have eyewitness here to that event, so we
14  have tracked them down.
15         DR. DALY: Dr. Weinik, anything
16  further for Dr. Cowell?
17         DR. WEINIK: Not at this time.
18         DR. DALY: Thank you. Could we get
19  Dr. Tedaldi in here?
20         Thanks very much for being with us.
21             - - -
22         DR. DALY: Ellen, just for the
23  record would you state your name, please?
24         THE WITNESS: Ellen Tedaldi,

20 (Pages 74 - 77)

Page 78

1    T-E-D-A-L-D-I.
2          ELLEN TEDALDI, M.D., after having
3    been first duly sworn, was examined and
4    testified as follows:
5          - - -
6          EXAMINATION
7          - - -
8          DR. DALY: Dr. Cowell, please
9    proceed.
10   BY DR. COWELL:
11   Q.   Thank you, Dr. Tedaldi, for being so
12   patient with this proceeding.
13         I wanted to make mention of the
14   fact that you and I were co-responsible for the
15   investigation involving the concerns expressed by
16   various parties about unprofessional conduct by
17   Dr. Weinik.  I briefed this committee on the
18   events leading up to the start of the meeting with
19   myself, Sue Coull and Dr. Weigers and the
20   submission of the written formal complaint by Dr.
21   Brown.  And from that point on you and I solicited
22   a number of witnesses to come in and offer
23   testimony regarding the allegations and comments
24   or concerns that may have relevance to the

Page 79

1    concerns expressed as well.  And so we talked a
2    little bit about the --
3          DR. DALY: Dr. Cowell, would you
4          just -- if you don't mind.
5    BY DR. COWELL:
6    Q.   So would you share with us the
7    impression that the concerns expressed by Dr.
8    Brown in reference to the letter submitted?
9    A.   Okay.  So just so I understand the
10   temporal things, we are talking about the letter
11   written on March 2, 2017?
12   Q.   Yes.  I think it was earlier than that,
13   this letter from Dr. Cora Brown.
14         MR. CASTOR: There's no date.
15   A.   Well, there was a -- she had apparently
16   gone previously to meet with Sue Coull after she
17   had had a conversation with Dr. Maitin.  I'm just
18   trying to get the temporal sequence.  So Dr. Brown
19   had originally gone to Sue Coull after she had a
20   conversation with Dr. Maitin.
21   BY DR. COWELL:
22   Q.   And then she submitted the formal --
23   A.   Then she submitted a letter.
24   Q.   On 2/28/17?

Page 80

1    A.   Right.  And then this was -- so as part
2    of the Complaint, the Medical Staff asked to meet
3    with her and hear about her letter.
4    Q.   Correct.
5    A.   In that letter, just to provide some
6    summary, she talked about behaviors of Dr. Weinik
7    that she wanted us to be aware of.  And I will
8    just cite a couple of them from that lettered.
9    She was in the residents lounge, was trying to
10   leave.  He was blocking her way, not allowing her
11   to leave.  She made comment about being at a
12   wedding with a resident where he was commenting on
13   her body and sexy dress, commented that she was
14   too skinny and anorexic, talked about a hallway --
15   she was citing several events.  She was talking
16   about in the hallway with -- when they encountered
17   Dr. Weinik she was with Dr. Cruz.  Dr. Weinik
18   started to ask her various personal questions
19   about why her last name was Brown and not her
20   husband's last name.  Are you married or divorced,
21   were you adopted, and started commented on her
22   attire as not appropriate for work.
23         She comments in the letter that she
24   felt violated and uncomfortable and wanted further

Page 81

1    action from GME on his sexually inappropriate
2    comments and behavior.  So that was the -- those
3    were extractions from the letter that she sent to
4    us.
5    Q.   Thank you.  And follow-up investigation,
6    what was your impression of the diligence we paid
7    to soliciting individuals to lend testimony to
8    validate her dispute her concerns?
9    A.   Yes, on this first letter we had spoken
10   with her, we spoke to Dr. Weinik, and felt at that
11   point that we needed to -- there was not enough at
12   that point to take the matter further.  We felt
13   that it needed to be on the level of a collegial
14   intervention and to speak with him and recommend
15   that he seek some professional coaching and
16   counseling as there were concerns about this type
17   of interaction.
18   Q.   During our investigation do you feel
19   that we showed bias either way in trying to
20   establish some substance to either support or
21   dispute the concerns expressed?
22   A.   Bias that -- you mean towards --
23   Q.   Dr. Weinik, that he did or didn't was a
24   subject of some of these concerns.

21 (Pages 78 - 81)

Page 82

1    A.  No, I think that they were being raised
2  and there were obviously the previous ones to Sue
3  Coull for granatum of education.  He was going to
4  be -- you know, in his chair position that he
5  really needed to have some counseling so this
6  could be addressed and prevented and certainly to
7  get these comments into some sort of context that
8  it would be in his best interest to seek some
9  professional coaching.
10    Q.  Is --
11    A.  In other words, I don't think there was
12  a bias.  I mean, if anything, it was recognition
13  that if there are these comments you really need
14  to look at making sure that. . .
15    Q.  And in the final statement that we wrote
16  and submitted to Dr. Kaiser and Dr. Weigers and
17  subsequently to Dr. Weinik, do you feel as though
18  that it reflected a fair assessment of what we
19  felt we were subject to and the Action Plan that
20  we submitted?  Is there any second thoughts about
21  any of that action?
22    A.  No, I would still make the same
23  recommend -- I would have us make the same
24  recommendation.

Page 83

1       DR. DALY:  Let me ask a moment.
2  Did you provide this letter from, essentially
3  from Cora Brown, was there any question in
4  your mind that this letter that says Cora
5  Brown was not from Cora Brown?
6       THE WITNESS:  No, I had no reason
7  because we spoke to Dr. Brown herself.
8       DR. DALY:  And did she verbally to
9  you express the same things that were in the
10  letter?
11       THE WITNESS:  Oh, yes, yes.
12       DR. DALY:  All right.  And about
13  when did that occur, give or take?  Not an
14  exact date but what month would we be talking
15  about, what year?
16       THE WITNESS:  Well, it was
17  submitted in March.  Let's see, what do we
18  have?  March of 2017, so it was shortly after
19  this.
20       DR. DALY:  After.
21       THE WITNESS:  Yes.  Usually, I mean
22  our process is as soon as we get a complaint
23  we try and. . .
24       DR. DALY:  And did you provide that

Page 84

1  letter along with your interaction to
2  Dr. Weinik around that time, in March or so
3  of 2017?
4       THE WITNESS:  Yeah, because usually
5  the physician if they are -- have a complaint
6  so they are allowed to look at the complaint.
7       DR. DALY:  So Dr. Weinik saw the
8  letter back in March or so of '17, March or
9  April of 2017.  I see.
10       And you asked -- or did you ask
11  Ms. Brown -- Dr. Brown if she would provide
12  any testimony at the Medical Staff Executive
13  Committee hearing?
14       THE WITNESS:  No, because at this
15  point we were really in -- you know, our
16  usual process is we investigate the
17  complaint, we talk to the complainant and
18  ask, you know, if there are any other -- if
19  there was a witnessed event, then we may
20  bring in some of the other people who were
21  there just to either corroborate or refute
22  what was there.
23       DR. DALY:  All right.
24       THE WITNESS:  At that point it was

Page 85

1  not going to Medical Staff.  It was for us to
2  do the evaluating.
3       DR. DALY:  It was a collegial
4  intervention.
5       THE WITNESS:  Right.  I mean it was
6  still, at this point it was still in the
7  investigatory phase.
8       DR. DALY:  Thank you.
9       Just another question that arose.
10  Dr. Cruz, in this letter it was mentioned
11  about a Dr. Cruz who apparently was also a
12  resident.  Did you speak to Dr. Cruz at all?
13       THE WITNESS:  In that first
14  evaluation we did speak to Dr. Cruz.
15       DR. DALY:  And what was your
16  sense -- I don't need a word for word.  What
17  was your sense of the interview with Dr.
18  Cruz?  Did he, you think he corroborated what
19  was described here in this fourth paragraph
20  or --
21       THE WITNESS:  Yeah.  I mean I think
22  he felt extremely, quite honestly, very
23  uncomfortable.  He felt sort of caught in
24  between.  This was -- I don't know that he --

22 (Pages 82 - 85)

Page 86

1  you know, because some of this was from her
2  point of view. He didn't corroborate word
3  for word. I think he just -- my impression
4  in talking with him is that he really felt
5  torn in terms of making --
6      MR. QUEENAN: Did he specifically
7  say it didn't happen?
8      THE WITNESS: No.
9      DR. DALY: He didn't say it did
10  and he didn't say it didn't. Is that what
11  you're --
12      THE WITNESS: Yeah.
13      DR. DALY: Dr. Cowell, anything
14  further that you want to ask?
15      DR. COWELL: Yes.
16  BY DR. COWELL:
17  Q. So we touched base on Dr. Brown's
18  investigation. So we subsequently followed up on
19  another investigation with the concerns expressed
20  by Dr. Dua. Would you comment, likewise, on your
21  impression of the investigation we did and the
22  individuals we interviewed regarding the concerns
23  expressed by Dr. Dua?
24  A. Well, there were actually, at that time

Page 87

1  there were two. We had gotten them also from the
2  residents. So it was Dr. Dua's letter but then
3  almost simultaneously we also got the complaint
4  from the senior residents.
5  Q. Right. So there was actually something
6  I didn't touch on was that in -- along with Dr.
7  Dua's concerns there were residents that came to
8  us to express concerns and that's why we loosely
9  sort of made the connection because two things had
10  happened at the same time.
11  A. They happened like within a day, a day
12  or two of one another.
13  Q. The senior residents came and expressed
14  concern about the examination techniques that
15  were being had for what they construed as young,
16  attractive females that seemed to be an excessive
17  --
18      DR. DALY: Can you ask the
19  questions to Dr. Tedaldi to let her sort of
20  describe what is happening, please?
21      DR. COWELL: I apologize.
22  BY DR. COWELL:
23  Q. So can you connect those concerns
24  expressed by the residents and the timing of the

Page 88

1  letter we received from Dr. Dua?
2  A. Well, the senior resident, Phil Acevedo,
3  was concerned about the interactions that he
4  observed with Dr. Weinik and a female patient in
5  terms of sort of unnecessary exposure of the
6  patient's backside area during an exam and this
7  was a patient who was in the room with all male
8  physicians and he left because he felt very
9  uncomfortable with the, sort of the way the
10  examination was going and as part of that said
11  that there were -- there was a general feeling
12  among the PM&R residents that when there was a
13  young, attractive female Dr. Weinik took an
14  excessive amount of time, often had prolonged
15  examinations that were sort of they said, you
16  know, sort of "Weinik being Weinik"
17  characteristics. Those exams were very different
18  than with other patient types.
19  Q. And along with that characterization of
20  "Weinik being Weinik," one of the female residents
21  we interviewed also brought up -- would you share
22  with us the concerns that were brought by one of
23  the other female residents about a comment made to
24  her about her dress?

Page 89

1  A. Yeah. We were interviewing several of
2  the PM&R residents and this was Dr. Byas, B-Y-A-S,
3  who was also stating that there was a -- generally
4  felt to be a difference in the nature of the exams
5  provided to female patients.
6      And she apparently showed up one
7  day wearing a black dress and Dr. Weinik commented
8  "There are only certain times a girl wears a
9  little black dress and one of those times is when
10  she is on the walk of shame."
11  Q. And as you had to describe to me, could
12  you describe to me what the "walk of shame"
13  indicates?
14  A. Generally it's reference to someone who
15  shows up with clothing they may have worn before
16  with the presumption that there was some sort of a
17  sexual or other encounter that occurred the
18  evening before. And it's sort of a terminology
19  that it's something that happened that she showed
20  up basically the walk of shame, that you're coming
21  in the same clothing you wore the night before.
22  Q. And could you also share with us another
23  one of the folks we interviewed, Mrs -- I'm sorry,
24  Amber, what her input was?

23 (Pages 86 - 89)

1     A.  Amber Dzikowski.  She is the
2 administrator in the PM&R Department and both in
3 the earlier comments with Sue Coull and now she
4 talked about having to do things like outfit
5 checks when she would meet with Dr. Weinik to make
6 sure that there was not any part of her chest that
7 was exposed, that he was a little overly personal
8 and overly friendly in some of the conversations
9 and, in fact, had called her one time when she
10 left to go home and asked, you know, are you okay,
11 are you pregnant.  And she felt there was at times
12 a little too personal commentary.  But mainly she
13 was also concerned many times about her outfits,
14 whether they would be exposing her chest.
15     Q.  And so would you, your estimation, would
16 you see that -- suggest that there was a pattern
17 of concerns that were expressed by -- and
18 consistency by all the folks that seemed to
19 suggest sexual innuendos and comments and things
20 that gave them a sense of discomfort?
21     A.  Yeah.  I mean we did five residents and
22 each of them did say there was a general consensus
23 that Dr. Weinik spent a fair amount of time, much
24 more with young, attractive females doing the

1 exams and often exams that were prolonged.
2     Q.  And was that sentiment expressed by --
3 we made attempts to interview senior residents,
4 particularly interviewed a few of the senior
5 residents, Nicholas Kenback and -- who shared with
6 us again jokes that were -- the residents do in
7 further collaboration of their concerns that the
8 "Weinik being Weinik" and just being -- "she just
9 got Weinik-ed"?
10    A.  Yeah, he corroborated, you know, again
11 more time with female patients, more hands-on,
12 more thorough exams that may have been not
13 necessarily done with other patients.  Chief
14 resident commented asking some fairly personal
15 questions of patients, like what are you doing
16 later tonight, exams were not inappropriate but
17 you definitely noticed a pattern and I would say
18 from the residents.
19    Q.  And Katie Hatt, would those comments be
20 consistent with her testimony as well?
21    A.  Right.  And the other questions we had
22 asked because of the concerns raised in Dr. Dua's
23 note about using female residents as
24 demonstrations for the musculoskeletal workshop

1 that Dr. Weinik does and said "does seem to choose
2 female residents for patient simulated demos," and
3 that was -- yeah, she commented.  She said, "I was
4 a model.  I didn't feel uncomfortable until the
5 residents pointed out what he was doing during the
6 exam."
7         DR. DALY:  If I might ask, how many
8 residents did you actually interview in total
9 through this whole process that you were
10 investigating?
11        THE WITNESS:  Four residents and
12 then faculty, Reed Williams and Amber, the
13 GME administrator.
14        DR. DALY:  Four residents, one
15 faculty member and the administrator?
16        THE WITNESS:  Right.  And Reed
17 Williams we brought in because he was present
18 during this exam during which Phil Acevedo
19 had commented on the inappropriate --
20        DR. DALY:  And Phil -- Reed
21 Williams is who?
22        THE WITNESS:  He's a PM&R faculty
23 member.
24        DR. DALY:  I wasn't sure.  At any

1 time -- sorry for the interruption.
2         At any time was there ever a
3 complaint from a female patient, any time
4 during 2012 up through 2018?
5        THE WITNESS:  What was told to us
6 by the resident and partly by Dr. Williams is
7 that this particular patient said she did not
8 want to be seen by Dr. Weinik again.
9        DR. DALY:  Other than that --
10        THE WITNESS:  Other than that we
11 did not hear any other female.
12        DR. DALY:  No other complaints came
13 to the hospital or --
14        THE WITNESS:  That came to our
15 attention.
16        DR. DALY:  That you know.
17        THE WITNESS:  Yes.
18        DR. LIN:  How were the residents --
19 how did you decide which residents to
20 interview?  How does that process go about?
21        THE WITNESS:  Usually when a
22 complaint comes into the Medical Staff Office
23 the description is -- you know, if it's an
24 event we find out who else was there at the

24 (Pages 90 - 93)

Page 94

1  event. So in this case it was the two senior
2  residents. And then also because of the
3  previous -- the GME administrator had gone to
4  the GME office and had mentioned it. And
5  then we decided to start to interview some of
6  the other residents just to make sure there
7  wasn't anything in terms of a personal
8  nature.
9      DR. LIN: Of the four residents
10 that you interviewed it sounds like two of
11 them were involved or one of them was
12 involved?
13     THE WITNESS: Yeah, one of them was
14 during the examine.
15     DR. LIN: And then the other two
16 were just kind of randomly to get a sense of
17 the general tone?
18     THE WITNESS: Yeah. Well, they --
19 the other, the two senior residents that we
20 did, Nicholas Kenback and Phil Acevedo, they
21 were, they were the ones that had gone to the
22 administrator with their concerns about
23 Dr. Weinik.
24     DR. LIN: And was there ever a kind

Page 95

1  of a process by -- and I recognize it's a
2  sensitive issue so the confidentiality part
3  is tough, but to get a general tone outside
4  of those folks who came forward with some
5  concerns? Was there kind of an effort to get
6  a sense of other --
7      THE WITNESS: Yeah. So we -- those
8  were the other to the chief residents. So we
9  went to the chief resident, we went to some
10 of the other residents. I believe Kate, I
11 think she's a junior or first year. So we
12 wanted to try to get some of the residents to
13 see if this was --
14     DR. LIN: Pervasive?
15     THE WITNESS: -- pervasive.
16     MR. QUEENAN: I may have missed
17 something. Did you not say that someone said
18 they weren't comfortable, that they were told
19 to be uncomfortable? That was one of the
20 comments that was made, one of the residents
21 said that they didn't feel comfortable when
22 someone said something?
23     DR. LIN: It was about a female
24 resident who was one of the models for the

Page 96

1  physical exam.
2      THE WITNESS: She said, "I didn't
3  necessarily feel uncomfortable until other
4  residents pointed out to me."
5      MR. ROGERS: Dr. Hatt.
6      THE WITNESS: Dr. Hatt.
7      DR. DALY: Ellen, if you could, so
8  you made this informal component of an
9  investigation, you made this investigation by
10 interviewing these four residents, the
11 faculty member, the administrator, et cetera.
12 Did that then lead to the collegial
13 intervention or that happened after the
14 collegial intervention?
15     THE WITNESS: The collegial
16 intervention was in 2017. It was the year
17 prior. And then -- I don't know if you have
18 gone into this. So the recommendation was
19 the coaching and then there was the interim.
20 So this came after that.
21     DR. DALY: And what led, in your
22 mind at least, what led from the collegial
23 intervention to the coaching and what led to
24 this component of the intervention?

Page 97

1      THE WITNESS: The new complaints.
2      DR. DALY: And the new complaints
3  were from?
4      THE WITNESS: The residents and
5  then the letter from Dr. Dua.
6      DR. DALY: And the complaints from
7  the residents were elicited how? They just
8  spontaneously --
9      THE WITNESS: They went via the GME
10 administrator and so then they came to our
11 attention.
12     DR. DALY: And that was verbal to
13 the GME administrator Sue Coull or some --
14     THE WITNESS: I think they went
15 first to -- from my understanding they went
16 first to Amber and then she met with Sue
17 Coull.
18     DR. DALY: And that was a verbal
19 thing, the complaints by these other
20 residents?
21     THE WITNESS: Right.
22     DR. DALY: And so that then led to
23 your interviewing these residents?
24     THE WITNESS: Right, sort of a

Page 98

1  reactivation, right.
2      DR. DALY: Plus then around this
3  time came this letter from Cora Brown?
4      THE WITNESS: Yes, because
5  usually -- what happened was we had Cora
6  Brown last year, recommended coaching for
7  Dr. Weinik. And then we had not heard
8  anything. He was in the process of the
9  coaching. And then these were new concerns
10 raised.
11     MR. QUEENAN: Did anyone speak to
12 Dr. Dua?
13     THE WITNESS: Personally?
14     MR. QUEENAN: Regarding the letter.
15     THE WITNESS: No, because she at
16 that time was not willing to come forward.
17     MR. QUEENAN: Did anyone speak to
18 Dr. Dua on the phone? I am just wondering if
19 you had any sense as to what prompted this
20 letter at this time.
21     THE WITNESS: Yeah. Well, I mean
22 her -- you have access to it, right?
23     DR. DALY: Her letter, yes.
24     THE WITNESS: So her opening thing

Page 99

1  is -- I don't know whether she felt sort of
2  timing-wise, you know, I don't want to put
3  words in her mouth, but sort of Me, Too
4  movement, you know, felt that he was --
5      MR. QUEENAN: You don't know what
6  specifically?
7      THE WITNESS: I don't know why that
8  day or that there was -- I can't say.
9      MR. QUEENAN: Great.
10 BY DR. COWELL:
11 Q.  Dr. Tedaldi, do you remember Katie's
12 concerns about their responses to things that they
13 were uncomfortable with, that they were
14 intimidated because of their concerns about the
15 future regarding jobs after residency?
16 A.  They had mentioned that they were aware
17 that they needed letters from Dr. Weinik and that
18 there was the incident with Phil Acevedo where he
19 texted back and said -- you know, because he was
20 out on a fellowship interview and had gotten a
21 text back that, you know, it's probably not a wise
22 idea that you are talking to this program director
23 because I know him and that others felt that they
24 really couldn't say anything because they needed

Page 100

1  letters. And Amber had commented that it was call
2  up and say -- Dr. Weinik would say take or don't
3  take this resident. And so, in other words, they
4  felt intimidated that they couldn't say anything
5  because they were not getting a letter of
6  recommendation.
7      MR. QUEENAN: I don't know where
8  this comes in since no one has mentioned
9  this. I have read this text message. Is
10 there going to be some sort of context this
11 gets put into? Because I don't understand
12 this text message, understand what the
13 importance of it is.
14     DR. DALY: This is what she's
15 referring to.
16     MR. QUEENAN: I know this is the
17 text you're referring to. So I don't know
18 who Dr. Furman --
19     THE WITNESS: Right, this is Phil
20 Acevedo, one of the senior residents who made
21 the complaint, right.
22     MR. QUEENAN: This is Phil Acevedo,
23 right, who sent the message. Who is
24 Dr. Furman?

Page 101

1      THE WITNESS: I believe he's
2  probably wherever he was interviewing.
3      MR. QUEENAN: Is that what it is?
4  I mean I'm just trying to --
5      MR. CASTOR: Doctor, we will
6  present evidence on this.
7      DR. DALY: Ellen, is there anything
8  further? Or Vince, is anything further you
9  wanted to ask Dr. Tedaldi about this, about
10 the investigation or people or interviews?
11 BY DR. COWELL:
12 Q.  So I think from my perspective that's
13 everything, unless, Dr. Tedaldi, you have anything
14 further that you would like to comment that I
15 haven't asked you that you think is relevant to
16 these proceedings?
17 A.  Yeah, I -- you already went over the
18 letter from Dr. Dua. Yes, okay. Yes. No, I
19 think at this point those are the interviews that
20 we completed.
21 Q.  Just last but not least. Do you think
22 we did our best to conduct this in a fair and
23 unbiased way with no preconceived impressions or
24 biases towards anyone?

26 (Pages 98 - 101)

Page 102

1    A.  Yeah.  I mean I have been doing these
2 now in the Medical Staff office for many years and
3 I really do feel we just try, we really spend a
4 lot of time doing the evaluation piece and trying
5 to get as many voices in the investigation and not
6 to limit it.  So we wanted to get a broader
7 picture from more than just the people who. . .
8         DR. DALY:  Dr. Tedaldi, if I might
9 ask then subsequent to the investigation --
10 there was the coaching, this new information
11 came to be, came to light to you and
12 Dr. Cowell, Medical Staff, Executive
13 Committee.  You then did the investigation.
14 There was a Medical Staff Executive Committee
15 meeting --
16         THE WITNESS:  Yes.
17         DR. DALY:  -- at which you provided
18 and Dr. Cowell provided this information.  Is
19 that true?
20         THE WITNESS:  Yes, it was given
21 to. . .
22         DR. DALY:  And then the
23 recommendation from that meeting was that Dr.
24 Weinik be suspended?

Page 103

1         THE WITNESS:  Correct.
2         DR. DALY:  All right.  Anything
3 further?
4         DR. COWELL:  No.  We just wanted to
5 cap it off with a point that we hadn't made,
6 the point that we just presented to the
7 evidence to the Medical Staff Executive
8 Committee and the Medical Staff Executive
9 Committee made the decision.
10         DR. DALY:  I understand.
11         MR. CASTOR:  Mr. Chairman, you said
12 suspension but I understand that he's on
13 administrative leave.
14         DR. DALY:  I was making that more
15 as a question rather than a statement.  I was
16 asking that.  So if it's not suspension, then
17 it was administrative leave.  Or tell me or
18 tell us, if you would, what was the
19 consequence of the Medical Staff Executive
20 Committee decision?
21         DR. COWELL:  It was a
22 recommendation for termination from the
23 Medical Staff Executive Committee.
24         DR. DALY:  Thank you.

Page 104

1         Anything further?  No, okay.
2         Dr. Weinik, would you cross
3 examine?  And if possible, can we limit this
4 a little bit in time to just Dr. Tedaldi's
5 testimony that you heard?
6             - - -
7         EXAMINATION
8             - - -
9 BY DR. WEINIK:
10    Q.  Dr. Tedaldi, you tried to interview all
11 people who might have been present during any
12 event; is that correct?
13    A.  No, that particular -- for the event
14 related to the patient.
15    Q.  For any event.
16    A.  For any.  I'm not sure I understand your
17 question.
18    Q.  Did you make an effort to interview any
19 and all people who were present at any of the
20 events?
21    A.  Well, the main event that we were
22 talking about where we interviewed was that
23 interview -- I mean the examination with the two
24 residents, with Reed Williams, Acevedo and the

Page 105

1 female patient.  Not all events.  I mean we
2 weren't -- I'm sorry.  I just don't know what
3 you're saying all events.
4         MR. QUEENAN:  I think they are
5 trying to clarify whether or not the Medical
6 Staff spent any time trying to kind of rehash
7 what happened back in 2012 with this whole
8 examination, who might have been present at
9 that point.
10         THE WITNESS:  With Dr. Dua?
11         MR. QUEENAN:  Was Dr. Dua at that
12 exam?
13         THE WITNESS:  Well, because we have
14 no --
15         MR. QUEENAN:  Right, Dr. Dua was at
16 that exam.  So back then did we try to reach
17 out to any other residents that might have
18 been present at that time?
19         THE WITNESS:  Well, I think that
20 was part of our interviewing the residents.
21         MR. QUEENAN:  Back then, 2012, '13?
22         THE WITNESS:  No, because we would
23 have know idea who they -- I mean we wouldn't
24 go all the way back to 2012.  And then also,

Page 106

1 you know, we were still working on the
2 current.
3        MR. QUEENAN: I think that's their
4 question.
5        THE WITNESS: We didn't go back and
6 get people who were there at the 2012.
7 BY DR. WEINIK:
8    Q. Dr. Tedaldi, you go back all the way to
9 2012 but the complaint only occurred for Dr. Dua
10 in 2018.
11   A. Well, I'm sorry. That may be my --
12        MR. QUEENAN: I said 2012 because
13 you asked -- maybe I misunderstood the
14 question. Apparently I messed that up.
15 You're asking did she interview anyone
16 involved in any of these incidents. This is
17 an incident that occurred sometime in 2012,
18 '13, '14. I'm not sure when. So I'm asking
19 if they went back there. She's not asking
20 that, I'm asking that because I thought that
21 was your question. Maybe it wasn't.
22        THE WITNESS: So the answer would
23 be no, we didn't go beyond that.
24        DR. DALY: I think that's a fair

Page 107

1 answer to a fair question.
2        Dr. Weinik, any other questions
3 that you have for Dr. Tedaldi? Dr. Weinik,
4 do you have any questions you have for Dr.
5 Teldaldi?
6        DR. WEINIK: We want to get into
7 our case.
8        DR. DALY: Great. So Dr. Tedaldi,
9 thank you very much.
10        (Witness excused.)
11        DR. DALY: I think with the
12 permission of my other two colleagues we are
13 going to take a bathroom break for about five
14 minutes and then we will come back and then
15 you can call your witnesses. We will go off
16 the record now. We are going to take a
17 five-minute break and we will come back.
18        (A brief recess was held at this
19 time.)
20        DR. DALY: We are ready to go on
21 the record.
22        MR. CASTOR: Thank you,
23 Mr. Chairman. In anticipation of the Temple
24 side finishing their case I had made a list

Page 108

1 of procedural objections for Dr. Weinik to
2 place on the record to preserve. Those would
3 take probably ten or 15 minutes to read. I'm
4 going to suggest that I be permitted to
5 attach that as an exhibit to our post hearing
6 brief and Mr. Wright seems to think that that
7 is a good idea.
8        MR. WRIGHT: We agree to that.
9        DR. DALY: That's fine. I agree as
10 well.
11        MR. CASTOR: But it will become
12 part of record by reference.
13        MR. WRIGHT: Yes, sir, we agree.
14        DR. DALY: Please, if you would
15 start to call your first witness.
16        DR. COWELL: If I may, just for the
17 record officially announce that the Medical
18 Staff rests its case.
19        DR. DALY: Thank you.
20        MR. CASTOR: Mr. Chairman, if I
21 might be heard one more time --
22        DR. DALY: One more time.
23        MR. CASTOR: -- for a procedure
24 issue that might be of value. The questions

Page 109

1 for Dr. Weinik for his witnesses are already
2 pre-written so they will move much more
3 quickly than we had before.
4        DR. DALY: Great. Go ahead, Dr.
5 Weinik.
6        GILBERT D'ALONZO, D.O., after
7 having been first duly sworn, was examined
8 and testified as follows:
9        - - -
10        EXAMINATION
11        - - -
12 BY DR. WEINIK:
13   Q. Dr. D'Alonzo, thank you for coming.
14   A. You're welcome.
15   Q. Briefly explain your career at Temple,
16 briefly.
17   A. I have been here 27, going on 28 years.
18 I started with the Division of Pulmonary and
19 Critical Care Medicine as a pulmonary critical
20 care doctor, now it's the Department of Forensic
21 Medicine and Surgery, involved in every aspect of
22 that division and department's activity, for many
23 years as the deputy director and until today
24 pulmonary critical care medicine.

28 (Pages 106 - 109)

Page 110

1    Q.  Was there ever a time when you were
2  involved on the administrative side for cases of
3  alleged misconduct by Temple doctors?
4    A.  Yes.
5    Q.  What can you tell me about that?
6    A.  I was President of the Medical Staff, I
7  don't know if it was one or two years, and we had
8  several meetings where discipline was discussed
9  and various physician issues were presented and
10  outcomes were determined.
11    Q.  Do you recall about when that was?
12    A.  I forget when I was president.  It would
13  be on my CV.  It's probably eight, eight years
14  ago.
15    Q.  Okay.
16    A.  Something like that.  I'm sorry, I
17  didn't review.  I didn't know what any of these
18  questions were and I didn't review my CV
19  beforehand.
20    Q.  What was your role in the cases of
21  alleged misconduct by Temple doctors back then?
22    A.  I would be at the table often with other
23  members of the faculty and we would listen to the
24  entire process for both sides and try to make a

Page 111

1  determination.  Sometimes attorneys were present.
2  Probably, I was probably only involved with maybe
3  four to six cases over the whole time that I was
4  there, two or three serious cases, and
5  determinations were made as to what needed to be
6  done to either correct the situation or nothing
7  was done.
8    Q.  During the period of time that you were
9  making recommendations concerning alleged
10  doctor misconduct did you ever see a case that
11  rose to the level of dismissal in your view?
12    A.  Close.
13    Q.  Close but not?
14    A.  No dismissal, close.
15    Q.  Did you ever recommend a doctor to be
16  dismissed for alleged misconduct during your time
17  involved with the process?
18    A.  No.
19    Q.  Do you know me?
20    A.  Sure I know you.
21    Q.  How long have you known me?
22    A.  About 25 years.
23    Q.  Would you say we are friends?
24    A.  We are friendly at the hospital but

Page 112

1  outside the hospital we've never had a social
2  relationship.
3    Q.  Do you know others in the medical
4  community that also know me?
5    A.  I know many people that know you.
6    Q.  Would you say you and others in the
7  medical community know me well enough to have an
8  opinion concerning my character and integrity?
9    A.  Absolutely.
10    Q.  What is the opinion that you and others
11  in the medical community share of my character and
12  integrity?
13    A.  I can certainly speak for myself and I
14  can only remember what other people have said.
15  But certainly for myself the highest level of
16  regard in terms of your character, both at a
17  medical level as well as a personal level within
18  the hospital.
19        I can attest further that two of my
20  wives, my first wife and my second wife have
21  received care from you with excellent results and
22  high regard for the care that you provided.  One
23  of my daughters the same exact thing.  I have
24  referred many patients to you for care, both

Page 113

1  diagnostic and therapeutic intervention of the
2  musculoskeletal system with what I remember as
3  excellent outcome.  And I have never heard
4  anything negative about you in any of the dealings
5  that I have had with my own patients, my own
6  family, and I have never heard anything negative,
7  only praise and good outcomes and excellent care
8  from the patients that I have referred to you.
9    Q.  Would you -- are you familiar with the
10  allegations against me today?
11    A.  Absolutely not.
12    Q.  Are you familiar with the allegations
13  against me here today, though?
14    A.  No.
15    Q.  Oh, you're not?
16    A.  No, not at all.  And I have never asked
17  anybody, I have never inquired.
18    Q.  Thank you, Dr. D'Alonzo.  This is my
19  last chance to ask, to ask you before the Panel if
20  there's anything else you would like to add to
21  assist the Panel in coming to their determination?
22    A.  Yes, I would.
23        I think Dr. Weinik has immense
24  value at our institution at the Temple Hospital as

29 (Pages 110 - 113)

1 well as our medical school.  He is the go-to
2 person to send patients to that have
3 musculoskeletal complaints.  He does incredible
4 examinations, comes up with the results that are
5 necessary and the treatment plans that are
6 necessary.  And I have known no one in the PM&R
7 Department that meets his level of care and I have
8 referred a lot of people to different doctors in
9 that department.  That's not to say that those
10 doctors are bad or don't practice at a good level.
11 Dr. Weinik practices at a much higher level.  He's
12 an incredibly valuable individual at our hospital.
13   Q.  Thank you, Doctor.
14   A.  You're welcome.
15      DR. DALY:  Dr. Cowell, any
16 questions?
17      DR. COWELL:  No questions.
18      DR. DALY:  Any questions from
19 anybody on the Panel?
20      (No response.)
21      DR. DALY:  I have no questions.
22 Thank you very much.
23      THE WITNESS:  Thank you very much.
24      (Witness excused.)

1      MR. QUEENAN:  Before we move on, I
2 do have a question.  So no one is disputing
3 the fact that there are people who have high
4 regard and excellent physician, et cetera, et
5 cetera.  Is that what most of these witnesses
6 are going to say because we'll just accept
7 that as truth and yes, but that is -- you
8 know, there are people who typically.  So I
9 don't want to go through a barrage of people
10 who are going to say how great he is because
11 everybody knows him.  Nice guy, does good by
12 his patients, yes, we accept it, we agree
13 with it, but we don't need to have an hour
14 and a half of that.  If there's something
15 specific that is going to come from people
16 that's different, that's fine.  I'm happy to
17 hear as many of them.  I am a neurosurgeon.
18 I will be here until 2:00 in the morning.  I
19 don't care.
20      But it's -- the point I'm trying to
21 make here is that character witnesses are
22 great but we need -- I mean there is a
23 specific allegation here and you can be the
24 most wonderful person in the world over here,

1 you know, and shooting people in your free
2 time.
3      MR. CASTOR:  Can I talk?
4      DR. WEINIK:  So let me talk.
5      DR. DALY:  Joe, thanks very much
6 for that.  I think, Dr. Weinik, what he is
7 asking is the relevance of each of the
8 witnesses that will come and if there are a
9 series of character witnesses if you could
10 truncate some of that a bit.  If you,
11 however, are going to have --
12      DR. WEINIK:  They are quite
13 truncated.
14      MR. CASTOR:  There aren't any
15 others.  I'm trying to get you that.
16      MR. QUEENAN:  That's a simple
17 answer.
18      DR. DALY:  Thank you very much.  I
19 appreciate it.
20      Dr. Weinik, if you have some other
21 witnesses let's call them and we will have
22 them come in and we will go from there.
23      - - -
24      DR. DALY:  Thank you very much for

1 coming.  Would you state your name for the
2 court reporter and be sworn in?
3      THE WITNESS:  My name is Jennifer
4 Yu, Y-U.
5      DR. DALY:  Dr. Weinik.
6      JENNIFER YU, M.D., after having
7 been first duly sworn, was examined and
8 testified as follows:
9      - - -
10      EXAMINATION
11      - - -
12 BY DR. WEINIK:
13   Q.  Dr. Yu, thank you for coming tonight.
14      Do you know me?
15   A.  I do.
16   Q.  How do you know me?
17   A.  You were the Program Chair of my
18 residency program.
19   Q.  Is there any other capacity that you
20 know me?
21   A.  We have worked together covering
22 inpatient floors at Temple.
23   Q.  So you have been with me when I examine
24 patients?

Page 118

1   A.  Yes.
2   Q.  About how many times would you say?
3   A.  I actually think I only worked with you
4  for like three or four days over like a holiday
5  weekend, but I have been around you otherwise.
6   Q.  Have you ever seen me engage in any
7  conduct you thought was inappropriate with a
8  patient?
9   A.  No.
10   Q.  Have you ever seen anything that made
11  you think I spend more time with young female
12  patients than I did with other patients?
13   A.  No.
14   Q.  Did I ever behave with you in a way that
15  made you feel uncomfortable?
16   A.  No.
17   Q.  Did you ever see me engage in any
18  conduct with other female residents that you
19  thought would have made you feel uncomfortable?
20   A.  No.
21   Q.  Did anyone from Temple ever interview
22  you about this case, about the testimony presented
23  about me?
24   A.  Did anyone ever interview me?

Page 119

1   Q.  Did anyone from Temple ever interview
2  you about my behavior?
3   A.  No.
4       DR. WEINIK:  That's it.
5       DR. DALY:  Dr. Cowell, any
6  questions?
7       DR. COWELL:  No questions.
8       DR. DALY:  We have a couple of
9  questions.  Go ahead, Joe.
10       MR. QUEENAN:  You said you worked
11  with him for three or four days.  When were
12  those three or four days?
13       THE WITNESS:  It was just weekend
14  coverage for like Temple.
15       MR. QUEENAN:  You're saying three
16  or four days at a time or just three or four
17  days total?
18       THE WITNESS:  Oh, no, it was total.
19       MR. QUEENAN:  So a total of three
20  or four days you spent with Dr. Weinik
21  examining patients?
22       THE WITNESS:  Yes.
23       MR. QUEENAN:  Within those three or
24  four days you never saw anything you felt was

Page 120

1  inappropriate?
2       THE WITNESS:  No.
3       MR. QUEENAN:  Okay.
4       DR. DALY:  What is your role now?
5       THE WITNESS:  I'm a PGY-4 resident.
6       DR. DALY:  In PM&R.
7       THE WITNESS:  Yes.
8       DR. DALY:  So what level were you
9  when you worked with Dr. Weinik those three
10  or four days?
11       THE WITNESS:  I was a PGY-2.
12       DR. DALY:  So two years ago, give
13  or take, or a year plus a little bit?
14       THE WITNESS:  Yeah, a year and
15  some.
16       DR. DALY:  Okay.
17       - - -
18       EXAMINATION
19       - - -
20  BY DR. WEINIK:
21   Q.  Dr. Yu, just one other question.
22       You were on service with me three
23  or four days you stated.  But you have been around
24  me --

Page 121

1   A.  Yes.
2   Q.  -- more frequently --
3   A.  Yes.
4   Q.  -- in the hospital than just those three
5  or four days.  And around other residents who were
6  around me?
7   A.  Yes, yes.
8       DR. DALY:  We'll allow that.  But
9  again, your attorney has commented about how
10  awkward the particular situation is tonight
11  so let's not make it more awkward.
12       Thank you very much Dr. Yu.  We
13  appreciate it.
14       Do you have any questions?
15       DR. LIN:  I do.  I have one more
16  question.
17       DR. DALY:  I'm sorry.
18       DR. LIN:  So you yourself have
19  never felt uncomfortable.  Is there -- have
20  you heard of any other comments or attitudes
21  from your co-residents about Dr. Weinik?
22       THE WITNESS:  I have not, no.
23       MR. QUEENAN:  No, that's good.
24       DR. DALY:  Great.  Thanks very

31 (Pages 118 - 121)

1  much.  We appreciate it.

2      (Witness excused.)

3          - - -

4      DR. DALY:  Could you just state

5  your name for her and spell it?

6      THE WITNESS:  Sure.  My name is

7  Stephanie Li, spelled S-T-E-P-H-A-N-I-E L-I.

8      STEPHANIE LI, M.D., after having

9  been first duly sworn, was examined and

10  testified as follows:

11          - - -

12          EXAMINATION

13          - - -

14  BY DR. WEINIK:

15  Q.  Thank you, Dr. Li, for coming tonight

16  and waiting so long.

17      Do you know me?

18  A.  I do know you.

19  Q.  How do you know -- how do we know each

20  other?

21  A.  We were -- well, we have known each

22  other for about two years now.  You were my

23  Program Director.  I'm sorry, my chair, my chair.

24  And we worked together in clinic in March of this

1  year.

2  Q.  Have you ever been with me when I

3  examined patients?

4  A.  Yes.

5  Q.  About how many times would you say?

6  A.  Daily for a month.

7  Q.  Have you ever seen me engage in any

8  conduct you thought was inappropriate with a

9  patient?

10  A.  No.

11  Q.  Have you ever seen anything to make you

12  think I spend more time with young female patients

13  than I did with other patients?

14  A.  No.

15  Q.  Did I ever behave with you in a way that

16  made you feel uncomfortable?

17  A.  No.

18  Q.  Did you ever see me engage in any

19  conduct with other female residents that you

20  thought would have made you feel uncomfortable?

21  A.  No.

22  Q.  Was there ever a time when you were

23  placed in an uncomfortable position by a patient

24  and I resolved that situation?

1  A.  Yes, actually.

2  Q.  Was that patient a so-called VIP at the

3  hospital?

4  A.  Yes.

5  Q.  And why was that?

6  A.  So you just want me to describe the

7  story a little bit?

8  Q.  Yes.

9  A.  So we were working in clinic and what

10  happens is we usually see patients together and we

11  were in the room with a patient who was a sort of

12  VIP patient.  He, you know, was a donor.

13      And so he was a gentleman like

14  what, around 40, and he started talking to me and

15  he just made me like a little uncomfortable and he

16  started like asking me out.  And at first I was

17  like haha, it was a joke; I like just brushed it

18  off.  And Dr. Weinik was in the room with me and,

19  you know, we just all took it as a joke.  But then

20  the patient became more insistent and he just like

21  kept being -- aggressively asking me out.

22      So at that point I, I was put in a

23  difficult situation because Dr. Weinik and we all

24  knew this guy was like a VIP patient and I don't

1  want to piss him off.  So it was very awkward and

2  I just walked out.  I asked Dr. Weinik if I can

3  walk out and Dr. Weinik said, "Yes, of course,

4  please walk out."

5      And after that encounter Dr. Weinik

6  talked to the patient and made him realize that it

7  was very inappropriate on his part to have behaved

8  like that in front of me and that the patient had

9  made me very uncomfortable.  And the patient

10  wanted to apologize to me and he texted Dr. Weinik

11  repeatedly, wanted to apologize to me.  And I was

12  like I don't really want to see this guy anymore.

13  So I was grateful for Dr. Weinik for handling that

14  and I thought that it was handled very well.

15  Q.  So do you feel on that occasion that I

16  supported you in a situation that could have been

17  proven to be difficult for you?

18  A.  Yes, absolutely.

19      DR. WEINIK:  Thank you so much.  I

20  appreciate it.

21      DR. DALY:  Dr. Cowell.

22      DR. COWELL:  No questions.

23      DR. DALY:  Dr. Queenan?  Dr.

24  Queenan has none.  Do you have any?

32 (Pages 122 - 125)

1        DR. LIN:  No.
2        DR. DALY:  So you are what now?
3  What do you do here now?
4        THE WITNESS:  I'm a PGY-4.
5        DR. DALY:  And when would this
6  encounter have occurred?  When were you
7  working with Dr. Weinik that month?
8        THE WITNESS:  That was in March
9  of -- this year.
10        DR. DALY:  March of '18.
11        THE WITNESS:  Yes.
12        DR. DALY:  Great.  I have no
13  further questions.  Thank you very much.
14  Thank you for being here.  You can go.
15        (Witness excused.)
16        - - -
17        DR. DALY:  Could you state your
18  name for the court reporter and then she will
19  swear you in?
20        THE WITNESS:  Chris Conner.
21        - - -
22        CHRISTOPHER CONNER, D.O., after
23  having been first duly sworn, was examined
24  and testified as follows:

1        - - -
2        EXAMINATION
3        - - -
4  BY DR. COWELL:
5    Q.  Dr. Conner, thank you for coming.
6        Do you and I know each other?
7    A.  We do.
8    Q.  How do we know each other?
9    A.  You were my attending physician during
10  residency from 2012 to '15.
11    Q.  That's the period of time that we worked
12  together?
13    A.  Yes.
14    Q.  During that time frame did you also know
15  two residents, Dr. Acevedo and Dr. Dua?
16    A.  I know Dr. Dua.  She was in my class.
17  Dr. Acevedo, I believe he interviewed during my
18  time here but I don't think he was a resident yet.
19    Q.  Do you have any general idea why you are
20  here today?
21    A.  Yes.
22    Q.  What is that understanding?
23    A.  My understanding is there were
24  allegations made and you were unfortunately pulled

1  from Temple so we are here to testify on your
2  behalf.
3    Q.  Temple investigating doctors have
4  testified that Dr. Acevedo told them that I made a
5  habit of spending more time with young female
6  patients as compared to other patients.  Are you
7  aware of this accusation against me?
8    A.  I am.
9    Q.  During the time we worked together were
10  you in a position to see me interact with
11  patients?
12    A.  Yes.
13    Q.  Assuming the Temple investigators have
14  accurately reported what Dr. Acevedo told them, do
15  you agree with his accusations concerning the
16  amount of time I spend with young female patients?
17    A.  Absolutely not.
18    Q.  What were your observations?
19    A.  During my time with Dr. Weinik I would
20  say I probably spent the most time with him during
21  my three years here and I don't see how he can
22  make that claim.  We spent lots of time with all
23  our patients, good and bad, you know.  But there
24  was no distinction between sex, race, nothing like

1  that.
2    Q.  When you were a resident and chief
3  resident did you know another resident named Dr.
4  Dua?
5    A.  Yes.
6    Q.  Are you aware of another allegation
7  against me at a lecture between four and six years
8  ago between January of 2012, '13 or '14 where I
9  acted inappropriately while Dr. Dua was -- while
10  she acted as a model?
11    A.  I have heard of that allegation, yes.
12    Q.  Were you at that lecture?
13    A.  I was.
14    Q.  Where did that lecture take place?
15    A.  Philadelphia College of Osteopathic
16  Medicine.
17    Q.  Describe the lecture, what was it about.
18  Can you describe what the lecture was about, how
19  many people were there, how the room was set up,
20  things like that?
21    A.  It was a once-a-year physical exam
22  workshop put on at PCOM because they have a large
23  area where we did our osteopathic training.  So
24  there were a lot of examination tables.  There was

1 one set up at the front of the room with a camera
2 overlooking it to display it to the other TVs at
3 each station. It was our whole residency class.
4 I believe you were the only attending there.
5 There were probably around 30 people.
6    Q.   Was the room wired for sound and video?
7    A.   Yes.
8    Q.   Did you recall Dr. Dua acting as a
9 demonstration model?
10    A.   I do.
11    Q.   Can you explain how that works?
12    A.   We had broken up each body part into
13 regions and we would kind of demonstrate physical
14 exam techniques in the front of the room and then
15 have the small breakout sections.
16    Q.   Do you recall anything out of the
17 ordinary about the event where Dr. Dua acted as a
18 model with me?
19    A.   I do not.
20    Q.   Do you recall me making any comments or
21 jokes at Dr. Dua's expense making the class laugh?
22    A.   I do not.
23    Q.   Do you recall me touching her in a way
24 you saw to be inappropriate?

1    A.   No.
2    Q.   By the way, when I asked if the room was
3 wired for sound and video, was it also wired to
4 amplify my voice?
5    A.   Yes.
6    Q.   Do you think you would have noticed if I
7 humiliated one of your program mates at this
8 lecture?
9    A.   Yes.
10    Q.   Are you confident that I did not do
11 that?
12    A.   I am confident.
13    Q.   Who is Dr. Maitin?
14    A.   Dr. Maitin during my time at Temple was
15 our program chair.
16    Q.   I'm sorry, I didn't hear.
17    A.   Dr. Maitin was our program chair when I
18 was here.
19    Q.   Did he have any other titles at that
20 time?
21    A.   I believe program director. I believe
22 so.
23    Q.   Was Dr. Maitin also the chair at that
24 time?

1    A.   Yes.
2    Q.   Can you explain any supervision
3 structure at the program while you were in it,
4 i.e., was there a sort of change in the structure
5 of the administration of the people in it?
6    A.   During my time here I, I don't believe
7 there was any change that had occurred as far as
8 when you moved into your position. I think that
9 was right after I had left.
10    Q.   So is that to say that the change was
11 made after -- you graduated in?
12    A.   2015.
13    Q.   What change occurred after you
14 graduated?
15    A.   There was repositioning. You became
16 chair of the department. Dr. Maitin I believe was
17 still the residency director.
18    Q.   Okay. So Dr. Maitin at that point was
19 subordinate to me?
20    A.   Yes.
21    Q.   And now I'm not trying to imply anything
22 improper. But did you ever become aware of rumors
23 that Dr. Dua and Dr. Maitin were friends?
24    A.   I had heard rumors.

1    Q.   Was it common knowledge among the
2 residents that Dr. Dua and Dr. Maitin were
3 friends?
4    A.   I don't want to speak for others but I
5 would say I was not the only one who heard those
6 rumors.
7    Q.   Did the Temple investigators ever to
8 your knowledge try to contact you to discuss my
9 case and what you might know about it?
10    A.   No.
11       DR. WEINIK:  Thank you.
12       DR. COWELL:  I have a question if
13    you don't mind.
14          - - -
15       EXAMINATION
16          - - -
17 BY DR. COWELL:
18    Q.   Thank you for being so patient with us.
19       Did I understand you, and correct
20 me if you think I'm wrong, that you said you heard
21 rumors of an alleged event that took place with
22 Dr. Dua?
23    A.   Are we referring to --
24    Q.   At this -- at the exam.

1    A.  I heard the allegation after the fact,
2 like once this news broke I guess not the person
3 but the allegation, yeah.
4    Q.  So only recently?
5    A.  Yeah.
6    Q.  Not back when you were still a resident?
7    A.  No, no.  The rumors I think he was
8 referring to was about relationships with Dr. Dua
9 and someone else, not.
10       MR. QUEENAN:  It sounds like
11    there's a question about insinuation of a
12    relationship between Dr. Dua and Dr. Maitin;
13    is that correct?
14       THE WITNESS:  Yes.
15       MR. QUEENAN:  A relationship that
16    went beyond a mentor/apprentice relationship?
17       THE WITNESS:  That's the rumor.
18       MR. QUEENAN:  Okay.
19 BY DR. COWELL:
20    Q.  So I believe that Dr. Weinik was trying
21 to solicit whether or not you remember the
22 incident where it was alleged that Dr. Dua was
23 inappropriately -- the exam went beyond
24 expectations for Dr. Dua.  Are you aware of any of

1 that?
2    A.  I remember -- I was there.  I remember
3 the examination, I remember her in front of the
4 room but I do not -- I did not witness anything of
5 that sort.
6    Q.  So you can't speak to whether or not Dr.
7 Dua expressed concern about any parts of the
8 examination?
9    A.  No, to my knowledge she had not.
10    Q.  And you can't speak to whether or not
11 there were comments made by other residents
12 regarding their reaction to her behavior?
13    A.  That is true, I did not hear those.
14       DR. COWELL:  Thank you.
15       DR. DALY:  Can I ask you who chose
16    Dr. Dua as the model that day or was she --
17    did she voluntarily?  How did she become the
18    model?
19       THE WITNESS:  I honestly don't
20    know.  There were --
21       DR. DALY:  Well, this happens every
22    year you say.
23       THE WITNESS:  Oh, yes.
24       DR. DALY:  How does someone become

1 the model in the center of the room?
2       THE WITNESS:  It's just somebody
3 grabs a person that's there.  There's no kind
4 of rhyme or reason.
5       DR. DALY:  Wait.  Somebody grabs a
6 person that's there.  Who --
7       THE WITNESS:  There's 30 people.
8       DR. DALY:  I understand.  But who
9 would grab them?  Would it be --
10       THE WITNESS:  Whoever is
11 demonstrating.
12       DR. DALY:  The teacher, the
13 demonstrator.
14       THE WITNESS:  So I had led part of
15 the session.  So if I wanted to demonstrate a
16 physical exam maneuver I would either ask for
17 a volunteer or somebody to come up and that
18 would be it.
19       DR. DALY:  So in that instance with
20 Dr. Dua it's likely since Dr. Weinik was the
21 teacher that day, faculty member, he would
22 have, as you said, "grabbed" Dr. Dua to be
23 the model?
24       THE WITNESS:  Or asked for a

1 volunteer.
2       DR. DALY:  But you don't remember?
3       THE WITNESS:  I don't remember if
4 she volunteered or not.
5       DR. DALY:  And in other instances
6 when this happened do you remember was it
7 voluntary or did somebody -- you said
8 somebody grabbed somebody?
9       THE WITNESS:  You make it sound
10 like teaching an exam maneuver is illegal.
11       DR. DALY:  I'm not trying to make
12 it sound anything.  I'm just trying to figure
13 out how she became the model on that day.
14       THE WITNESS:  And that I don't
15 think.
16       DR. DALY:  Okay.
17       THE WITNESS:  There were numerous
18 models that day.
19       DR. DALY:  Were any of the models
20 that Dr. Weinik examined, were any male or
21 were they all female?
22       THE WITNESS:  Male as well.
23       DR. DALY:  Male as well, okay.
24       Anything else, Dr. Queenan or Dr.

Page 138

1  Lin?
2       MR. QUEENAN:  I guess have a
3  question about is as you recall this thing,
4  and it sounds like you can recall it
5  relatively well, better than I can recall
6  that many years ago, but you said there was
7  no -- essentially you made it sound like it
8  was humorless.
9       THE WITNESS:  What part of --
10      MR. QUEENAN:  When you were asked
11 about was there anything that made her
12 uncomfortable or that she was poked fun at in
13 front of the group you said there was no
14 humor to the -- generally when we get into
15 these sessions something happens that's kind
16 of funny.  I mean, you know, in grand rounds
17 somebody makes a little joke and they laugh.
18 You made it sound like it was, you know, this
19 draconian almost exam, like you did an exam
20 and that was it.  Is that how you recall it?
21      THE WITNESS:  Well, I think you're
22 putting words in my mouth but --
23      MR. QUEENAN:  I'm not trying to but
24 that was essentially what had happened, just

Page 139

1  like he wasn't really saying that there was
2  something harmful about examining someone or
3  illegal about it.  He was simply asking a
4  question.
5       THE WITNESS:  Okay.  So let me
6  explain this again so you can understand.
7  What is your name?
8       MR. QUEENAN:  Queenan.
9       THE WITNESS:  So you had asked or
10 someone had asked if there was -- if I
11 remember anything inappropriate that was
12 done.  I do not.  They asked there was no
13 mention in front of the room --
14      MR. QUEENAN:  They asked did it
15 make her uncomfortable.  So then I asked was
16 there any humor at any point during the
17 course of this.  What makes you uncomfortable
18 and what makes me uncomfortable can be two
19 entirely different things.
20      THE WITNESS:  I agree with that.
21      MR. QUEENAN:  So what's why I was
22 asking.  Do you remember anything that might
23 have been deemed to be humorous?
24      THE WITNESS:  No, I don't.

Page 140

1       MR. QUEENAN:  Nothing?
2       THE WITNESS:  No.
3       MR. QUEENAN:  Thank you.  That was
4  a simple question.  Thanks for the answer.
5       DR. DALY:  Do you have anything
6  else?
7       I might just ask where are you now?
8       THE WITNESS:  I am in a private
9  practice in the Scranton Wilkes-Barre area.
10      DR. DALY:  Okay.  If there's
11 nothing else, thanks very much for your time.
12 We appreciate it.
13      (Witness excused.)
14      MR. QUEENAN:  Can we go off the
15 record for a second?
16      DR. DALY:  We will go off the
17 record.
18      (There was a discussion held off
19 the record.)
20      DR. DALY:  Thanks very much for
21 coming.
22      THE WITNESS:  Pleasure.
23      DR. DALY:  If you could do us a
24 favor and just state your name and the court

Page 141

1  reporter will swear you in.
2       THE WITNESS:  Absolutely.  My name
3  is Reed Conly Williams.
4       REED C. WILLIAMS, M.D., after
5  having been first duly sworn, was examined
6  and testified as follows:
7            - - -
8         EXAMINATION
9            - - -
10 BY DR. WEINIK:
11  Q.  Dr. Williams, thank you for coming
12 today.
13  A.  My pleasure.
14  Q.  And thank you for waiting.
15      Do you and I know each other?
16  A.  Yes, sir.
17  Q.  How do we know each other?
18  A.  We have known each other since I was a
19 medical student at Temple, as a resident training
20 in the PM&R program and as faculty colleagues
21 while I had started my professional career back
22 here at Temple.
23  Q.  And during what period of time were we
24 together?  Do you remember the years?

1    A.   That would be medical student would have
2  been my senior -- 2011. 2012 you would have been
3  a partner in my intern year.  2012 through 2015
4  would have been residency.  I was away for a year
5  in Seattle for fellowship and then have been back
6  at Temple since September of 2016.
7    Q.   Are you generally aware of the
8  circumstances that brings us all here today?
9    A.   Yes, sir.
10   Q.   During your time working with me did you
11  ever see any indication that I spent more time
12  with young female patients as opposed to other
13  patients?
14   A.   No, sir.
15   Q.   Do you think you had enough interactions
16  with me to know if I spent more time with young
17  female patients than other patients?
18   A.   Without a doubt, yes.
19   Q.   Can you explain that for me, please?
20   A.   You are a consummate clinician.  You
21  spend the appropriate amount of time with patients
22  as they need.  I think you spend the time
23  appropriate to a patient's concerns directly.  We
24  do see a number of musculoskeletally complex

1  patients in our field.  A lot of those are not
2  directly musculoskeletal in nature and can be
3  psychosomatically involved.  As statistics would
4  have it, there are many of those patients that are
5  women, I would say statistically more than there
6  are men.  But I have no recollection of you ever
7  singling out younger women or women in general
8  over men.  I think the patient relationships you
9  have are professional and genuine and that's why
10  patients return to see you time and time, year
11  after year.
12   Q.   Based on your firsthand knowledge is
13  that accusation ridiculous?
14   A.   Firsthand knowledge I would say that
15  accusation is unwarranted, unfounded and
16  ridiculous.
17   Q.   When you were a chief resident did you
18  know a man named Phillip Acevedo?
19   A.   As a chief resident I did not.  But we
20  had interviewed him as -- so I guess yes, I would
21  have interviewed him my chief resident year, yes.
22   Q.   And do you know Dr. Acevedo since
23  returning as an attending?
24   A.   Yes, I have been a faculty -- I have

1  been his faculty for the last three -- two years.
2    Q.   So you have trained Dr. Acevedo?
3    A.   Firsthand.
4    Q.   Are you aware of an incident where Dr.
5  Acevedo accused me of exposing too much of a
6  female patient's buttocks during an injection
7  procedure?
8    A.   I am aware of the accusation only
9  because of these procedures.
10   Q.   Describe the procedure I was performing.
11   A.   The procedure in question was an
12  ultrasound guided sacroiliac joint injection.
13   Q.   While I was preparing the patient for
14  the procedure did you observe anything out of the
15  ordinary?
16   A.   I observed the entire procedure from
17  start to finish and recall nothing out of the
18  ordinary or abnormal.
19   Q.   How did I go about preparing the patient
20  for the injection?
21   A.   As per standard, you lay the patient
22  prone.  After describing the risks and benefits
23  you expose the injection site by, you know,
24  usually rolling up the shirt to kind of mid-back,

1  rolling down the pants or whatever under, you
2  know, lower garments to expose some of the gluteal
3  cleft to expose the full SI for sterilization.
4  After sterilizing to keep your area sterile and
5  clean you use the ultrasound to locate your
6  position on the sacroiliac joint which can vary
7  which is a reason for having a little bit of a
8  larger prep area and you use ultrasound guidance
9  to guide the needle to deliver the medication.
10   Q.   Dr. Williams, about how many times would
11  you say that you perform -- have you ever yourself
12  performed the same procedure in your medical
13  career?
14   A.   Yes.
15   Q.   About how many times would you say?
16   A.   Hundreds at this point.
17   Q.   Did I do anything you would not have
18  done?
19   A.   No, sir.  If anything, I think that may
20  be the reason I prepare the way I do.
21   Q.   Was there anything out of the ordinary
22  with this procedure?
23   A.   No, sir.
24   Q.   In your opinion did I uncover any more

Page 146

1 of the patient's buttocks than it was necessary to
2 perform the procedure?
3     A.  I recall again nothing out of the
4 appropriate and it was a normal draping and
5 procedure.
6     Q.  By the way, did you see anything about
7 the patient's demeanor that led you to conclude
8 that she was embarrassed or humiliated more than
9 out of the ordinary?
10     A.  Not at all.  It was the patient, and if
11 I recall, her significant other in the room as
12 well as other educational colleagues with us with
13 residents and medical students.
14     Q.  So obviously the Panel are all doctors
15 and so the next question is for the record only so
16 people reading it later who are not doctors will
17 understand what the doctors already know.  As a
18 doctor administrating an injection into a joint,
19 is that joint always located precisely where it is
20 expected to be?
21     A.  No, there is plenty of anatomical
22 variance, I would say more so with the sacroiliac
23 joint than the majority of other joints.
24     Q.  And is that -- how come the joint is not

Page 147

1 always where doctor expects it to be?
2     A.  There are multiple reasons.  Anatomic
3 variance the way that the pelvis and the sacrum
4 come together, the alignment of that junction, the
5 body mass of the patient, the tissue surrounding
6 said joint.
7     Q.  In order to allow for the differences
8 between people's anatomy, what does a doctor do to
9 make sure the proper area to be treated is
10 sterile?
11     A.  Drapes an appropriate area for sterile
12 field such that the entire scope of the target can
13 be prepared for the procedure in one go.
14     Q.  In this instance where I was injecting
15 the lady and Dr. Acevedo was accusatory, did I
16 uncover the proper amount of the patient's skin to
17 correctly sterilize the area around the injection?
18     A.  I believe you did.
19     Q.  Did that involve uncovering some of the
20 patient's buttocks?
21     A.  I would suggest that yes, it did, the
22 top portion of the patient's buttock.
23     Q.  How come?
24     A.  Standard, again, draping procedure.

Page 148

1 Often times you are at or near the gluteal cleft.
2 Garments can transition and ride up and they could
3 have come into the sterile field, as well as
4 accommodating for variance in injection target.
5     Q.  Dr. Williams, this is a big point in
6 this case.  Are you absolutely sure I properly
7 uncovered this patient, sterilized the correct
8 area and draped her in a professional manner
9 consistent with the way you were also taught to
10 perform this procedure?
11     A.  Yes.  I believe I have enough experience
12 and moral aptitude if there were something
13 inappropriate I would have said something
14 otherwise and there was nothing out of the
15 ordinary.
16     Q.  Dr. Williams, did there come a time when
17 you were interviewed by Temple investigators about
18 this precise incident?
19     A.  Yes.
20     Q.  Who interviewed you?
21     A.  Dr. Cowell, Dr. Ellen Tedaldi, and I
22 believe there was a third.  I think it was Sue
23 Coull but I can't be entirely sure.  It was GME or
24 an administrator.

Page 149

1     Q.  Might there have been someone
2 transcribing?
3     A.  This I have no -- I don't, I don't
4 recall.
5     Q.  Did you basically tell the investigating
6 doctors what you told us here today?
7     A.  Yes, I believe so.
8     Q.  Were they both listening as far as you
9 could tell?
10     A.  Yes.
11     Q.  Now, I understand you spoke by telephone
12 with my counsel, Bruce Castor to my left, on
13 Saturday -- I'm sorry, on Sunday.  Is that right?
14     A.  That is correct.
15     Q.  What position does Dr. Tedaldi hold at
16 Temple as far as you know?
17     A.  She is senior faculty.  I know she's on
18 at least this Board as well as other boards at the
19 executive level.
20     Q.  Do you like her?
21     A.  Yes.  Professionally and personally over
22 the last ten years of my experience here at Temple
23 I would say I do.
24     Q.  Did you tell Mr. Castor you did not want

Page 150

1 to say anything here that would embarrass or
2 humiliate Dr. Tedaldi?
3     A.  I did.
4     Q.  Did Mr. Castor explain to you that you
5 would be testifying under oath here today?
6     A.  He did.
7     Q.  You know what that means, right?
8     A.  Yes.
9     Q.  Did Dr. Castor explain -- did Mr. Castor
10 explain to you that testifying under oath
11 obligates you to tell the truth no matter what?
12     A.  He did, although it was unnecessary to
13 explain that.
14     Q.  In your own mind did you weigh telling
15 the truth against possible embarrassing and
16 humiliating Dr. Tedaldi in public and on a
17 stenographic record?
18     A.  I weighed it, yes.
19     Q.  And you decided that if you were indeed
20 under oath you would have to testify to anything
21 in a truthful way that was asked?
22         DR. DALY:  Dr. Weinik, it's
23     understood about the truth, to tell the
24     truth.  Can you move along?

Page 151

1         MR. QUEENAN:  He's going to tell
2     the truth.
3         DR. WEINIK:  Certainly.
4 BY DR. WEINIK:
5     Q.  Dr. Williams, do you know whether Dr.
6 Tedaldi was paying attention to you when you were
7 explaining about this procedure involving the
8 female patient and the injection?
9     A.  Dr. Tedaldi certainly appeared to be
10 paying attention for the majority of the
11 conversation.  I do have a frank recollection at
12 one point Dr. Tedaldi having her eyes closed.  I
13 have no idea whether or not she was awake and
14 listening or asleep.  But I remember thinking that
15 given the gravity of the situation and the
16 accusations I was being asked about I remember
17 being surprised that if she were not present I
18 found that odd.
19     Q.  Did you tell Mr. Castor that she fell
20 asleep?
21     A.  I did.
22     Q.  Given that I am facing dismissal from my
23 position at the hospital based in part on this
24 event that you witnessed, do you consider it

Page 152

1 professional behavior on the part of investigator
2 Dr. Tedaldi that she fell asleep while you were
3 relating what actually happened?
4     A.  I would agree with that.
5     Q.  If she fell asleep while you were
6 actually talking?
7     A.  It appeared as though she did.
8     Q.  Now, I'm not trying to imply anything
9 improper.  But did you ever become aware of rumors
10 that Dr. Dua and Dr. Maitin were friends?
11     A.  Dr. Dua and Dr. Maitin are friends.
12     Q.  Was that common knowledge among
13 residents that Dr. Dua and Dr. Maitin were
14 friends?
15     A.  Yes, Dr. Dua and Dr. Maitin have a close
16 relationship.
17     Q.  Did the Temple investigators ever ask
18 you about this idea that Dr. Dua and Dr. Maitin
19 were friendly?
20     A.  I don't recall if they did or not.  If
21 they had I would have said that they are friendly.
22         DR. WEINIK:  I'm done.
23         DR. DALY:  Dr. Cowell.
24         - - -

Page 153

1         EXAMINATION
2         - - -
3 BY DR. COWELL:
4     Q.  Dr. Williams, thank you for coming in.
5         You stated but I will state for the
6 record.  You do remember the opportunity we had to
7 interview concerning some of the allegations that
8 are presented here today?
9     A.  Yes, sir.
10     Q.  And do you remember the part of the --
11 during that procedure that Dr. Weinik performed
12 that one of the residents voluntarily withdrew
13 hisself from the procedure?
14     A.  I do.
15     Q.  Do you remember -- am I correct in you
16 recanting that you came out to find out what was
17 wrong?
18     A.  You're correct.  Towards the end of the
19 procedure after noting he had left about
20 two-thirds of the way through as the rest of the
21 room was being clean and the patient was being
22 clothed I stepped out to ask the question.
23     Q.  And can I trouble you to tell us what
24 that resident responded?

39 (Pages 150 - 153)

Page 154

1    A.   Yeah, he said something along the lines
2  of there were too many people in the room and he
3  felt that that was odd or otherwise.  He didn't
4  tell me anything about inappropriate draping or
5  him being uncomfortable, Dr. Weinik or any
6  procedure otherwise.  I didn't know about the
7  draping issue until that, until that meeting.
8    Q.   Did you find that unusual that the
9  resident dismissed himself even with his
10 explanation?
11   A.   Yeah, I thought it was, I mean I thought
12 it was odd for a resident who was interested in
13 doing these procedures to step out.
14   Q.   In part of that interview session when
15 we had the opportunity did you make comment that,
16 in fact, there were times that Dr. Weinik says
17 things that you would not say and the only thing
18 there -- there are times that he says things that
19 he shouldn't say?
20   A.   Yes, yeah, I said that there are
21 comments that I would not make.
22   Q.   Did you make the comment "he may be
23 overly flirtatious and we have had sidebar
24 conversations about this"?

Page 155

1    A.   I don't remember anything about saying
2  overly flirtatious.  We have had sidebar
3  conversations about comments.
4    Q.   Would it be helpful for me to remind you
5  that the third person in the room was not Ms.
6  Coull but, in fact, it was Pam Fierro who was
7  taking minutes of the interview session?
8    A.   Yeah, I mean it would help.  It wouldn't
9  necessarily change what my recollection is.  I
10 just remember a third person.  They weren't asking
11 questions.  I guess I just don't remember.
12   Q.   So could you explain a little bit more
13 about the sidebar discussions and what you're
14 implication of that was?
15   A.   Yeah.  You know, Dr. Weinik and I are as
16 well as colleagues friends and, you know, small
17 jokes, small, you know, comments made without, you
18 know, malice or otherwise I had made comment that
19 I wouldn't do that, you know, that we should be
20 careful of comments of that ilk.
21   Q.   And has it been your experience at any
22 time that there were concerns expressed by the
23 residents about sexual innuendos that may have
24 been inappropriate even if they weren't -- the

Page 156

1  intent wasn't to be as much?
2    A.   No, not a single complaint that I
3  remember or ever having been involved with.
4    Q.   Did you find any breach of attentiveness
5  on my behalf during that interview session?
6    A.   No, sir.  And again, I can only comment
7  on Dr. Tedaldi having her eyes shut.  You know, I
8  can only say she appeared to be fatigued.
9         DR. COWELL:  Thank you.
10        DR. DALY:  A couple of questions.
11 First, Dr. Williams, thanks for coming
12 tonight.
13        Could you give us some flavor
14 that -- there's a great deal of vagueness in
15 your response to Dr. Cowell and I recognize
16 the friendship as you have described here
17 today.  Tell us, give me a flavor of these
18 comments.  Were these comments about cars,
19 horses, tables, chairs, people; were they
20 about men, were they about women; were they
21 jokes?  Give us a flavor.
22        THE WITNESS:  Jokes, jovial
23 offhanded comments that, you know, I honestly
24 have no recollection of individual themes or

Page 157

1  trends.  It was just things that I felt, you
2  know, at the time that I wouldn't do.
3         DR. DALY:  That you felt
4  inappropriate; that what you're saying,
5  that you just felt shouldn't have happened?
6         THE WITNESS:  Inappropriate in a
7  way that it was something you would maybe say
8  to a friend or, you know, on your own
9  personal time but in the workplace maybe not.
10 This was, again, a few times, if ever, once
11 or twice.
12        DR. DALY:  I understand.  When this
13 episode that occurred with these other people
14 in the room and this woman patient lying
15 prone in the injection example you gave or
16 were asked about, did the patient return to
17 your knowledge to see Dr. Weinik as a
18 patient?
19        THE WITNESS:  Not to my knowledge,
20 but I wouldn't have any idea.
21        DR. DALY:  You wouldn't know?
22        THE WITNESS:  No, no, sir.
23        MR. QUEENAN:  She didn't
24 specifically request not to return?  Is that

40 (Pages 154 - 157)

Page 158

1   what you were told?
2       THE WITNESS:  No, to my knowledge
3   that request had never been made.
4       MR. QUEENAN:  That was said
5   earlier.  That's why I am trying to clarify.
6       THE WITNESS:  By myself.
7       MR. QUEENAN:  Not by you.  It was
8   said earlier the specific patient requested
9   not to return.
10       THE WITNESS:  No, I don't remember
11   that at all.  I don't remember being
12   uncomfortable.  I don't remember her
13   significant other in the room being
14   uncomfortable.
15       DR. DALY:  At the time you were
16   here as faculty, during the last three years
17   that you have been here as faculty who has
18   been the program director?
19       THE WITNESS:  Ian Maitin.
20       DR. DALY:  He is still the program
21   director?
22       THE WITNESS:  Correct.
23       DR. WEINIK:  And Dr. Weinik was the
24   either interim chair or chair?

Page 159

1       THE WITNESS:  Correct, Dr. Weinik
2   has been the interim chair for my internship.
3       DR. DALY:  Okay.  Do you have any
4   other questions?
5       MR. QUEENAN:  No.
6       DR. LIN:  No.
7       DR. DALY:  Dr. Williams, thanks
8   very much.  We appreciate you're being here.
9       (Witness excused.)
10           - - -
11       DR. DALY:  Thank you very much for
12   coming.  We are back on the record.  The
13   court reporter will ask your name and will
14   then swear you in.
15       VIKRAM ARORA, D.O., after having
16   been first duly sworn, was examined and
17   testified as follows:
18       DR. DALY:  Could you state your
19   name, please, and spell it if necessary?
20       THE WITNESS:  Dr. Vikram,
21   V-I-K-R-A-M, last name Arora, A-R-O-R-A.
22           - - -
23       EXAMINATION
24           - - -

Page 160

1   BY DR. WEINIK:
2       Q.  Thank you, Dr. Arora, for driving a long
3   distance and coming here tonight and being patient
4   enough to give this important testimony.
5           How do you and I know each other?
6       A.  I was your resident for a period of
7   three years as well as a medical student prior to
8   becoming a resident at Temple.
9       Q.  During what period of time did we work
10   together at Temple?
11       A.  2012 to 2015 as well as 2010 when I was
12   a medical student.
13       Q.  During that period of time frame did you
14   also know two residents, Dr. Acevedo and Dr. Dua?
15       A.  Yes, I did.
16       Q.  How did you know them?
17       A.  Dr. Acevedo as a younger resident
18   interviewing for a residency position and Dr. Dua
19   was a co-resident in my class.  I was her -- one
20   of her chief residents.
21       Q.  Do you have a general idea why you are
22   here today?
23       A.  Yes.
24       Q.  What is your understanding?

Page 161

1       A.  Allegations of misconduct against you
2   filed by a former resident.
3       Q.  Temple investigating doctors have
4   testified that Dr. Acevedo told them that I made a
5   habit of spending more time with young female
6   patients as compared to other patients.  Are you
7   aware of this accusation against me?
8       A.  Yes.
9       Q.  During the time we worked together were
10   you in a position to see and interact with me as I
11   saw patients?
12       A.  Yes.
13       Q.  Assuming the Temple investigators have
14   accurately reported what Dr. Acevedo told them, do
15   you agree with this accusation concerning the
16   amount of time I spent with young female patients?
17       A.  No, I do not.  I feel you spent equal
18   time with all patients.
19       Q.  What were your observations?
20       A.  You spent quite a bit of time with every
21   patient, probably more time than you need to with
22   individual patients.  The time you spend with
23   patients is dependent on the issue the patient had
24   but I felt your timing was equal.

41 (Pages 158 - 161)

1    Q.   If Dr. Acevedo insists that it is a fact
2  as opposed to his own opinion that I took longer
3  with young female patients.  Based on your
4  experience, would that be a truth or a lie?
5    A.   That would be a lie.
6    Q.   When you were a resident and chief
7  resident did you know another resident by the name
8  of Dr. Dua?
9    A.   Yes, I did.
10    Q.   Are you aware of another allegation
11  against me that at a lecture, a physical
12  examination workshop lecture between four to six
13  years ago that somewhere between January, 2012 and
14  2014 that I acted inappropriately with Dr. Dua
15  while she acted as a model?
16    A.   I am aware of the accusation.
17    Q.   Were you at that lecture?
18    A.   I was at the lecture.
19    Q.   Where did the lecture take place?
20    A.   At the Philadelphia College of
21  Osteopathic Medicine OMM lab.
22    Q.   Describe what the lecture was about and
23  how many people were there and how the room was
24  set up, things like that?

1    A.   The lecture was about manipulative
2  medicine, it was about physical examination
3  maneuvers and diagnosing different types of
4  pathology as well as demonstrating how to perform
5  those exam maneuvers as well as different
6  palpatory techniques.  In addition to that, we did
7  include some osteopathic manipulative medicine
8  techniques.  The lecture took place in the OMM
9  room which I am familiar with as a medical
10  student.  There's different sections and tables.
11  We were set up at different stations and then
12  there's the center of the room with a camera as
13  well as screens at each station.  There were a
14  number of residents, probably 35 residents and
15  medical students.
16    Q.   Was the room wired for sound and video?
17    A.   Yes.
18    Q.   Do you recall Dr. Dua acting as a
19  demonstration model?
20    A.   I do.
21    Q.   Explain how that works.
22    A.   The person volunteers to be seen in the
23  front of the room or to have examination maneuvers
24  performed on them in the front of the room.  I

1  don't remember if she was the first one to go or
2  the second one to go.  I don't recall that.  But I
3  do recall her being in the front of the room and
4  being examined.
5    Q.   Do you recall anything out of the
6  ordinary about the event where Dr. Dua acted as a
7  model with me?
8    A.   I do not.
9    Q.   Do you recall me making comments or
10  jokes that at Dr. Dua's expense and making the
11  class laugh?
12    A.   I do not.
13    Q.   Do you recall me touching her in a way
14  you saw to be inappropriate?
15    A.   I do not.
16    Q.   By the way, when I asked if the room was
17  wired for sound and video, was it also wired to
18  amplify my voice?
19    A.   Yes, I believe you had a microphone on.
20    Q.   Do you think you would have noticed if I
21  humiliated one of your program mates at this
22  lecture?
23    A.   Yes.
24    Q.   Are you confident that I did not?

1    A.   Yes.
2    Q.   Can you please tell me who Dr. Maitin
3  is?
4    A.   He was the former chairman of our
5  department and is program director.
6    Q.   Explain the supervision structure
7  while -- of the program while you were in it?
8    A.   Dr. Maitin was our chair and program
9  director, oversaw our responsibilities as chief
10  resident.
11    Q.   So has that structure changed since you
12  were there?
13    A.   I cannot speak to the structure now.
14  But the structure has changed.  You were
15  chairperson after I left and he remained program
16  director and I believe Dr. Cruz was associate
17  program director.
18    Q.   Now, I'm not trying to imply anything
19  improper.  But did you ever become aware of rumors
20  that Dr. Dua and Dr. Maitin were friends?
21    A.   I'm sorry, can you repeat that?
22    Q.   I am not trying to imply anything
23  improper.  But did you ever become aware of rumors
24  that Dr. Dua and Dr. Maitin were friends?

1    A.  Yes, they were.  They had a close
2  relationship.
3    Q.  Was that common knowledge among
4  residents that Dr. Dua and Dr. Maitin were
5  friends?
6    A.  Yes.
7    Q.  Did the Temple investigators ever to
8  your knowledge try to contact you to discuss my
9  case and what you might know about it?
10    A.  No.
11       DR. WEINIK:  That's it.
12       DR. DALY:  Dr. Cowell.
13          - - -
14       EXAMINATION
15          - - -
16  BY DR. COWELL:
17    Q.  Thank you.  Thank you for being patient.
18       So can I trouble you to ask what
19  prompted your memory of the incident with Dr. Dua?
20    A.  In the osteopathic lab?
21    Q.  Exactly.
22    A.  I remember those sessions very well
23  because that's where I went to medical school.  So
24  what prompted my memory of it, I remember --

1    Q.  Specifically of her, her exam.
2    A.  Of her exam.  When I was asked questions
3  about it I remember that lab very, very well.
4    Q.  So you said you don't remember anything
5  being abnormal, unusual?
6    A.  I don't remember anything out of the
7  ordinary at that lab.
8    Q.  So was there anything that made you
9  remember -- if there was nothing unusual or out of
10  the ordinary, what made that stick in your mind to
11  trace back that far?
12    A.  We only do that lab once a year during
13  grand rounds.  So it's a four-hour period.  We had
14  done two labs.  The first lab was a year before
15  and was done by Dr. Dave Mahon who set that up for
16  us.  So he was a former chief resident there and
17  Dr. Weinik participated in that lab as well.  I
18  remember that very well, too.  And then the
19  following year we did the second lab.  It was
20  Dr. Weinik that primarily ran it but we were the
21  chief residents at that time.
22    Q.  Thank you.  Can you tell me some of the
23  other models that were involved in the lab?
24    A.  I remember Dr. Dua specifically.  I

1  believe Dr. Sharma, Annu Sharma was a model at
2  some point, either in the front or at a end of
3  that group session.  And then my specific pod was
4  myself, Dr. Bonner, and I cannot recall the other
5  person.
6       MR. QUEENAN:  There would be like
7    two up at the front?
8       THE WITNESS:  There's one at the
9    front at a time.
10       MR. QUEENAN:  You're saying Dr.
11    Sharma was up at the front?
12       THE WITNESS:  I believe so.
13  BY DR. COWELL:
14    Q.  So you were in the company of 30 other
15  individuals at that session?
16    A.  Approximately.
17    Q.  And you said you don't -- you weren't
18  exposed to anything else.  Can you say for certain
19  that none of the other 30 folks there might have
20  been exposed to something unusual or untoward
21  during that exam?
22    A.  I can only speak to my group and who was
23  in the front of the room.
24    Q.  And up until now had you ever heard

1  anything that someone insinuated that something
2  inappropriate had happened or is this the first
3  you ever heard of it?
4    A.  This was the first I heard of it.
5    Q.  Do you -- you know you and whoever you
6  may have run into while you were waiting, out of
7  the 30 people do you know how many others are
8  coming to supply testimony for what may or may not
9  have happened today out of 30 people?
10    A.  I don't know the number specifically.
11  I'm sorry, I'm not really understanding the
12  question you're asking.
13    Q.  I apologize.  What I'm trying to say is
14  that there were 30 people at the session and
15  you're one of the 30 and you may have met someone
16  else in the room while you were waiting that may
17  have been two of the 30 or three of the 30 or four
18  of the 30.  Are you aware of how many out of the
19  30 people that were there may be available to add
20  testimony to this?
21    A.  I don't know who would be able to
22  provide testimony if they remember that event.
23  That seems a tough question for me to answer.  You
24  could contact 30 people if you would like and see

1   what they say.
2         DR. DALY: I have a couple
3   questions, if you don't mind. The -- we have
4   heard that this room is wired for sound and
5   is wired for video. Did you use videos at
6   all as part of your teaching from these
7   sessions that occurred? I have been to PCOM
8   but I haven't necessarily been to that
9   specific room. Did you use videos afterwards
10  so if Dr. Weinik would examine somebody this
11  is a once a year event and it was --
12        THE WITNESS: Generally they
13  weren't recorded and saved. They were
14  broadcasted for us to be able to see them
15  because sometimes you can't, you know, being
16  in the front of the room if you know the room
17  you can't really see again where you have
18  someone's leg if it's adducted or abducted
19  and certain positions. The overhead cameras
20  allow you to do that. I think the overhead
21  cameras allow you to do that.
22        And then prior to the examination
23  generally sometimes they play a video on the
24  computer and say, you know, this is what we

1   are going to do and then do it.
2         DR. DALY: But you didn't go back a
3   week later and watch a video and say here's
4   how you do this and that exam?
5         THE WITNESS: No.
6         DR. DALY: I understand. And you
7   described how the subjects, the models
8   volunteer, basically students, residents were
9   volunteering. Did they volunteer? Because
10  we have also heard they were "grabbed" by
11  whoever the instructor was and asked to be a
12  model.
13        THE WITNESS: I don't recall that.
14        DR. DALY: You don't. So something
15  happened, somebody became a model but you're
16  not sure how that happened?
17        THE WITNESS: I'm not sure.
18        DR. DALY: Got you. I understand.
19        The other -- there has been this
20  floating thing about Dr. Dua and Dr. Maitin.
21  And it's been said a couple of times "I don't
22  want to imply anything but."
23        Can you just tell us more.
24  Dr. Maitin is still here. Where is Dr. Dua

1   currently; do you know?
2         THE WITNESS: I do, yes. She's an
3   attending physician at I think Main Line
4   Spine.
5         DR. DALY: Out on the Main Line?
6         THE WITNESS: Correct.
7         DR. DALY: And do Dr. Maitin and
8   Dr. Dua continue to be close friends?
9         THE WITNESS: I can't speak to
10  that.
11        DR. DALY: You don't know that?
12        THE WITNESS: No.
13        DR. DALY: But you thought they
14  were close friends back in 2012 or '14 or
15  whatever?
16        THE WITNESS: Yeah. We all had
17  different relationships with each other and
18  they were close friends. That's all I'm
19  aware of.
20        DR. DALY: So you're just aware of
21  their friendship?
22        THE WITNESS: Yes.
23        DR. DALY: Are you friends with Dr.
24  Weinik?

1         THE WITNESS: I am.
2         DR. DALY: Close friends?
3         THE WITNESS: Yes.
4         DR. DALY: Okay. I'm just trying
5   to figure out friends and close friends.
6   Thanks.
7         Anything else from anybody? Karen,
8   do you have any questions?
9         DR. LIN: No.
10        DR. COWELL: Can I just ask --
11        DR. DALY: Well, you have had your
12  chance.
13        DR. COWELL: Thank you.
14        MR. QUEENAN: I'm still trying to
15  clarify because you're the second person now
16  that has come up and basically essentially
17  made this kind of almost a humorless event.
18  You made this sound like it's an almost
19  humorous event when they are examining and
20  I'm trying to -- the point I'm trying to get
21  to --
22        THE WITNESS: I wouldn't use the
23  word humorous. I wasn't trying to be
24  humorous.

Page 174

1    MR. QUEENAN: No, humorless.
2    THE WITNESS: Humorless.
3    MR. QUEENAN: Like the whole
4    examination process there was never any kind
5    of joyalty at all to it which -- is that
6    correct? There was never any kind of -- no
7    one ever laughed, no one ever -- this never
8    happened?
9    THE WITNESS: Not on my end.
10   MR. QUEENAN: You don't recall any?
11   THE WITNESS: Yes.
12   MR. QUEENAN: Okay, that's fine.
13   THE WITNESS: It's eight in the
14   morning there. It's kind of early, so not my
15   end.
16   MR. QUEENAN: I've been through the
17   exams, I've selected people for the exams.
18   DR. DALY: Anything else from you,
19   Dr. Lin?
20   DR. LIN: No.
21   DR. DALY: Thanks very much. We
22   appreciate you're being here. Thank you very
23   much. You can leave now. Thank you.
24   (Witness excused.)

Page 175

1    DR. DALY: Can I ask you, though,
2    how many additional and what is the relevance
3    of some of these that you have for the
4    people? So, first, how many.
5    DR. WEINIK: Two I think.
6    MR. CASTOR: I think there's two
7    more, and Dr. Weinik.
8    DR. DALY: And Dr. Weinik,
9    certainly, and closing statements.
10   MR. CASTOR: In answer to one of
11   the questions that I was asked earlier, I
12   have nine that are on call that would testify
13   essentially the same as the ones you have
14   heard.
15   MR. QUEENAN: This individual was
16   kind of the same testimony as the last one.
17   MR. CASTOR: Yes, but I kind of
18   think he eyewitnessed something. I do think
19   it's important.
20   DR. WEINIK: The importance of
21   these individuals is that they are from
22   different years.
23   DR. DALY: That's fine.
24   MR. CASTOR: I wanted to ask the

Page 176

1    Chair's permission. I have these nine on
2    call. I can let them know they don't have to
3    come.
4    MR. QUEENAN: They don't need to
5    come.
6    MR. CASTOR: It's all the same
7    stuff.
8    DR. DALY: They do not have to
9    come. If you wish to text them during this
10   part you are certainly welcome to, either you
11   or your colleague.
12   - - -
13   DR. DALY: The court reporter will
14   swear you in. If you could give her your
15   name and spelling of your name.
16   THE WITNESS: Ilya Ilgonikov,
17   I-L-Y-A I-L-G-O-N-I-K-O-V.
18   ILYA ILGONIKOV, M.D., after having
19   been first duly sworn, was examined and
20   testified as follows:
21   - - -
22   EXAMINATION
23   - - -
24

Page 177

1    BY DR. WEINIK:
2    Q. Thank you, Doctor, for coming. Thank
3    you for being patient and thank you for arranging
4    your schedule to be here.
5    You and I know each other?
6    A. Yes.
7    Q. How is it that we know each other?
8    A. You helped train me and you have been my
9    mentor for most of residency as well as since.
10   Q. And you eventually became a chief
11   resident as well?
12   A. Yes.
13   Q. So you and I worked together?
14   A. Yes.
15   Q. Did you ever see anything that led you
16   to conclude that I spent more time with young
17   female patients than with other patients?
18   A. You definitely spent more time with
19   certain patients but you spent more time with, you
20   know, most of your patients than other doctors
21   that I know. VIP patients that came in you spent
22   with more time, female patients in general you
23   spent more time with. You know, you gave the
24   patients the time that they needed.

45 (Pages 174 - 177)

Page 178

1    Q.  Do you agree with any claim that I only
2 used female residents as models?
3    A.  Absolutely not.
4    Q.  Were you yourself such a model?
5    A.  I have, yeah, been your model on
6 multiple occasions.
7    Q.  Were you at Temple -- when you were at
8 Temple did you know a doctor named Phillip
9 Acevedo?
10    A.  I did.
11    Q.  So if Dr. Acevedo insists that I only
12 used females models, is he lying about that?
13    A.  That is the absolutely not true.
14    Q.  Was Dr. Acevedo in the residency
15 program?
16    A.  Yes.
17    Q.  Are you aware of an incident where Dr.
18 Acevedo accused me of exposing too much buttocks
19 in the preparation for an injection?
20    A.  I have heard of that incident, yes.
21    Q.  Tell me what you know about that
22 incident.
23    A.  I heard that you were performing a
24 sacroiliac joint injection, you draped the

Page 179

1 patient.  Supposedly Dr. Acevedo felt
2 uncomfortable with that and stepped out of the
3 room, and that he thought it was inappropriate and
4 that no one else in the room, you know, had any
5 discomfort with that and you did the procedure.
6 The patient didn't complain.  Nothing came of it
7 as far as I was concerned -- as far as I heard.
8    Q.  Do you know Dr. Williams?
9    A.  Yes.
10    Q.  Are you aware with that Dr. Williams was
11 a witness to this particular procedure?
12    A.  Yes.
13    Q.  As between Dr. Williams and Dr. Acevedo,
14 whose account of what happened would you believe?
15    A.  I don't know how you can drape a patient
16 inappropriately for that procedure.  You know,
17 when you do a sacroiliac joint injection you have
18 to expose a large area to be sterile.
19 Furthermore, I don't know what -- from what
20 experience Dr. Acevedo would draw other than the
21 teachings of yourself and Dr. Williams to do that
22 procedure.
23    Q.  What sort of resident was Dr. Acevedo?
24    A.  I mean Dr. Acevedo had trouble as a

Page 180

1 resident for most of his residency.  He was
2 delinquent and late as a PGY-2 when I knew him as
3 well as a PGY-3, and I heard that that only got
4 worse from one of his -- from one of the chiefs
5 during his PGY-4 year.
6    Q.  Are you aware that Dr. -- are you aware
7 of Dr. Acevedo being angry with me when he did not
8 get a particular fellowship in York, Pennsylvania?
9    A.  I have heard that account, yes.
10    Q.  Tell us what you know about that.
11    A.  That within a short period of time of
12 him not getting that fellowship that some of those
13 complaints came about.
14    Q.  Do you have any knowledge one way or the
15 other whether I had any hand in Dr. Acevedo not
16 getting a fellowship in York?
17    A.  I don't know about that.
18    Q.  How about a resident named Cora Brown,
19 do you know her?
20    A.  Unfortunately, yes.
21    Q.  How do you know her?
22    A.  She was one of my co-residents in my
23 class.
24    Q.  Why do you say unfortunately?

Page 181

1    A.  Cora Brown was by far the most
2 untrustworthy and vindictive and poorly ethical
3 physician that I have met at my time at Temple.
4    Q.  So this is your experience concerning
5 her at work ethic and character?
6    A.  And I think -- I have had multiple
7 conversations with other physicians, attendings,
8 Dr. Maitin in particular, as well as most of my
9 co-residents that would agree that she lacks
10 quality of care and work ethic.
11    Q.  During what period of time, what years
12 would you say?
13    A.  For all of the residency.  I mean from
14 the very beginning she was trying to get out of
15 any kind of work that she could.  She openly
16 flaunted taking money to go to the AAPM&R
17 conference, our national conference.  She openly
18 bragged about taking the money, signing up to go
19 to that conference and then not going and keeping
20 the money.  She was bragging about that to people
21 in my class.
22    Q.  Was she prosecuted for that?
23    A.  No.
24    Q.  Did Temple know about that?

Page 182

1     A.  Not that I am aware of.

2     Q.  Again, for example, as between Dr.

3   Williams and Dr. Brown, if describing the same

4   incident, who would you believe knowing them both

5   as you do?

6     A.  I mean I would trust Dr. Williams'

7   character far above Dr. Brown's.

8         DR. WEINIK:  Thank you very much.

9   I know it was difficult.  I appreciate you

10   being here.

11         DR. DALY:  Dr. Cowell.

12             - - -

13         EXAMINATION

14             - - -

15   BY DR. COWELL:

16     Q.  Thank you for being patient with us.

17   Just a few questions.

18       One, I'm very impressed with the

19   comments you made about the mentorship that

20   Dr. Weinik has provided you and I'm very impressed

21   about some of the comments you had about Dr. Brown

22   and Dr. Acevedo.

23         What would Dr. Brown and Dr.

24   Acevedo have to say about you?

Page 183

1     A.  I tried to mentor Dr. Acevedo when he

2   was a young resident.  I would like to think that

3   he would speak highly of me.  I never really got

4   into any conflict with him.  I tried to kind of

5   mentor him.  Particularly when he was a PGY-2 he

6   had an episode when he had a seizure and he had

7   difficulty coming back to his -- to being a

8   resident full time afterwards.  He took I believe

9   one or two weeks off during his PGY-2 year to kind

10   of recover from that.  And, you know, after that

11   time when he did come back there was some question

12   about, you know, whether he fully capable and he

13   confided in me and said, you know, "I'm not fully

14   there but I'm afraid to admit that."  And I tried

15   to tell him hey, you need to be honest in this

16   situation.

17         So I would like to think that, you

18   know, he and I have enough of a rapport where I

19   would -- he would speak highly of me.

20         Cora Brown, I quickly learned that

21   I would not be friendly or collegial with her.  I

22   tried to stay out of her way as I know most people

23   did because I know for a fact she's very

24   vindictive.  And I honestly don't know what she

Page 184

1   thinks about me and I just try to stay out of her

2   way.

3     Q.  So you would doubt any credibility with

4   anything that they would share about their

5   personal experiences?

6     A.  Cora Brown, absolutely.  I would not

7   trust a word that she says.

8     Q.  Have you ever been witness exposed to

9   participate in any communication where you have

10   heard the term "They just got Weinik-ed" or

11   "That's just Weinik being Weinik"?

12     A.  Yes, but not in the context I think you

13   mean.  I mean --

14     Q.  What do I mean?

15     A.  I think you mean in terms of like

16   examining young female patients as was kind of

17   brought up in the initial examination.  I mean

18   Dr. Weinik was not known for his efficiency.  And

19   so when someone says oh, that's a Weinik patient,

20   that to me means that's a patient who Weinik was

21   going to take a longer amount of time for.

22     Q.  Why would you interpret that that's what

23   I meant?

24     A.  Because that was the initial commentary

Page 185

1   that I got in the initial questioning.

2         DR. COWELL:  Thank you.

3         DR. DALY:  A couple of things I

4   might ask you.  You talked about the Acevedo

5   event, that is the woman with the buttocks.

6   How did you hear about that and when did you

7   hear about that?

8         THE WITNESS:  I mean I heard about

9   it from several of the residents.

10         DR. DALY:  At the time that it

11   happened or more recently?

12         THE WITNESS:  Afterwards,

13   afterwards when this started transpiring.

14         DR. DALY:  So not until this event

15   in which there were some accusations relative

16   to Dr. Weinik you mean?

17         THE WITNESS:  Yes.

18         DR. DALY:  Is that when you're --

19   I'm just trying to get a sense of time.

20         THE WITNESS:  Yes.

21         DR. DALY:  So that then became,

22   became general knowledge amongst the

23   residents, is that what you are saying --

24         THE WITNESS:  Yes.

47 (Pages 182 - 185)

Page 186

1    DR. DALY: -- after the Medical
2 Staff Executive Committee was interviewing a
3 number of residents, et cetera?
4    THE WITNESS: After Dr. Weinik was
5 removed from his employment.
6    DR. DALY: So after that. But not,
7 not anywhere near the time that the event
8 occurred?
9    THE WITNESS: No.
10    DR. DALY: So this -- and would
11 that be the same thing with hearing about
12 this fellowship relative to this gentleman,
13 that he might not have gotten a fellowship in
14 York because of something that Dr. Weinik did
15 or did not do? Would that have also occurred
16 more recently now?
17    THE WITNESS: Yes.
18    DR. DALY: Rather than before. So
19 a lot of this has been things that you have
20 heard within the last whatever number of
21 months?
22    THE WITNESS: Yes.
23    DR. DALY: Not back previously?
24    THE WITNESS: No.

Page 187

1    DR. DALY: I see. So it's -- I
2 just tried to get a sense that some of this
3 has become knowledge with people talking
4 amongst people about what's transpired since
5 the Medical Staff Executive Committee has
6 either interviewed people or talked, et
7 cetera.
8    THE WITNESS: Yes.
9    DR. DALY: I see. So that's your
10 frame of reference and knowledge.
11    THE WITNESS: Yes.
12    DR. DALY: I got you. I understand
13 now a bit more. Okay. And where are you
14 now? I'm sorry.
15    THE WITNESS: University of
16 Pennsylvania.
17    DR. DALY: Doing what?
18    THE WITNESS: Interventional.
19    DR. DALY: You're in PM&R. You're
20 a faculty member there?
21    THE WITNESS: Yes.
22    DR. WEINIK: I see. And did
23 Dr. Weinik or Dr. Maitin help you in terms of
24 getting that position?

Page 188

1    THE WITNESS: I don't know if they
2 made phone calls on my behalf. They
3 definitely answered phone calls on my behalf.
4    DR. DALY: Would that -- okay. So
5 do you owe your job to either Dr. Weinik,
6 Dr. Maitin for some of that?
7    THE WITNESS: To Dr. Weinik
8 partially.
9    DR. DALY: I see. All right.
10 Karen.
11    DR. LIN: You made some -- you have
12 some very strong feelings with regard to
13 Dr. Cora Brown.
14    THE WITNESS: Yes.
15    DR. LIN: And one of the adjectives
16 you said specifically was vindictive.
17    THE WITNESS: Mm-hmm.
18    DR. LIN: What kind of -- were
19 there any specific encounters that you two
20 had that kind of lead you to that? What were
21 examples that kind of lead you to say that
22 she was vindictive?
23    THE WITNESS: I mean I knew of the
24 incidents between -- so I was a chief

Page 189

1 resident my PGY-4 year and there were a
2 couple of things that happened in trying to
3 get her to take, you know, not necessarily
4 extra call but to do what was expected of
5 her, her expected job. There was one
6 rotation we work out in Abington where you
7 have to cover a weekend and her trying to
8 excuse herself from that and I was trying to
9 reinstate or reinforce, no, you have to do
10 your job turned into, you know, her
11 threatening not to do other parts of her job
12 or her trying to like back out of other
13 obligations.
14    You know, I have had conversations
15 with Amber in the past where she's said, and
16 I quote, you know, she's afraid to cross or
17 kind of reprimand Cora particularly in person
18 because she's afraid that she will, you know,
19 come after her job or something, you know, if
20 something doesn't go her way.
21    DR. DALY: Do the faculty rate the
22 residents on a regular basis in terms of --
23    THE WITNESS: Here?
24    DR. DALY: Do they have faculty

48 (Pages 186 - 189)

Page 190

1  meetings, the PM&R faculty I mean rate the
2  residents how they are doing, how they are
3  progressing, things like that?
4        THE WITNESS:  Yes.
5        DR. DALY:  And are you aware of any
6  derogatory comments or bad ratings for either
7  of these people, Acevedo or Cora Brown?
8        THE WITNESS:  As their co-resident
9  I was never --
10       DR. DALY:  You weren't aware of any
11  of that?
12       THE WITNESS:  No, that was above my
13  level at the time.
14       DR. DALY:  As chief resident did
15  you participate in any of that?  You did not?
16       THE WITNESS:  No.  We helped kind
17  of reprimand and kind of steer the ship but
18  we weren't involved in any formal.
19       DR. DALY:  I understand.  Some
20  programs are.
21       THE WITNESS:  Yes.
22       DR. DALY:  Thank you.
23       Anything?
24       MR. QUEENAN:  I'm trying to get the

Page 191

1  timing down.  So there's some question about
2  the application for the fellowship, Acevedo
3  was upset about that.  This incident, though,
4  occurred before he ever applied for
5  fellowship.  It would seem to be given --
6        THE WITNESS:  That I don't know
7  about the timing.
8        MR. QUEENAN:  You had applied
9  yourself toward the end of your residency
10  career I think.
11       THE WITNESS:  There are several
12  fellowship applications and depending on the
13  accredited pain fellowship matches at the end
14  of one's PGY-3 year and then there's a
15  unaccredited sports and spine match October
16  of your PGY-4 year, and then I'm not sure
17  which of those Dr. Acevedo was applying for
18  but I think this incident happened
19  afterwards.
20       MR. QUEENAN:  Late in his career?
21       THE WITNESS:  Later in his PGY --
22       MR. QUEENAN:  I was under the
23  impression he would not really have
24  understood the full way to drape, prep,

Page 192

1  prepare for one of these things and maybe
2  that's why he thought that this was not
3  draped properly.  But you're saying he was
4  towards the end of his career.
5        THE WITNESS:  I think it was at the
6  end of his.
7        MR. QUEENAN:  I'm just trying to
8  flesh out some things.
9        THE WITNESS:  As far as I know,
10  this incident happened during his PGY-4 year.
11       MR. QUEENAN:  And both of these
12  residents obviously graduated, Brown and
13  Acevedo?
14       THE WITNESS:  Yes.
15       MR. QUEENAN:  They did?
16       THE WITNESS:  Yes.
17       MR. QUEENAN:  Some questions about
18  the honesty, certain things of their
19  character.  It was common knowledge this
20  person essentially stole money from Temple?
21       THE WITNESS:  Amongst the
22  residents.
23       MR. QUEENAN:  Do you know who had
24  oversight on those type of things?

Page 193

1        THE WITNESS:  I mean Amber and me
2  as coordinator and program director.
3        But yeah, I mean this was something
4  that was like within our class of residents
5  I -- we heard about this.  But, again, it's
6  like I was saying, you know, we kind of
7  heard -- I didn't want to cross her.  I
8  didn't want to having anything -- you know,
9  I'm staying out of this person's way, you
10  know.
11       MR. QUEENAN:  Okay.  Thanks.
12       DR. DALY:  Anything else?
13       MR. QUEENAN:  No.
14       DR. LIN:  No.
15       DR. DALY:  Thanks very much.  You
16  can go now.  We appreciate it.
17       (Witness excused.)
18       DR. WEINIK:  Final outside witness,
19  Dr. Averna.  Thank you for coming in.  Please
20  have a seat.
21       THE WITNESS:  Of course.
22       JUSTIN AVERNA, D.O., after having
23  been first duly sworn, was examined and
24  testified as follows:

49 (Pages 190 - 193)

1          THE WITNESS:  Justin Averna,
2     A-V-E-R-N-A.
3                - - -
4          EXAMINATION
5                - - -
6 BY DR. WEINIK:
7     Q.  Thank you for coming so far from New
8 Mexico, Dr. Averna.
9     A.  Of course.
10     Q.  Thank you for being patient and waiting
11 to be the last one to speak tonight.
12          Is this matter the only reason you
13 became for your trip?
14     A.  Correct.
15     Q.  Do you and I know each other?
16     A.  Yes, we do.
17     Q.  How do we know each other?
18     A.  I think I met you back in 2008 when I
19 suffered a spine injury.
20          MR. CASTOR:  A little louder
21 please.
22     A.  I met you in 2008 when I suffered a
23 spine injury.  I saw you in the outpatient clinic.
24

1 BY DR. WEINIK:
2     Q.  During that period of time did we work
3 together at Temple?
4     A.  Subsequently, yes, as a medical student
5 as then as a resident.
6     Q.  And during that time frame did you also
7 know two residents, Dr. Acevedo and Dr. Dua?
8     A.  Correct, I know both, yes.
9     Q.  How do you know them?
10     A.  Dr. Dua was in the class ahead of me and
11 Dr. Acevedo was a PGY-2 when I was a chief during
12 my PGY-4 year.
13     Q.  Do you have a general idea why you are
14 here today?
15     A.  Yes, I do.
16     Q.  And what is that understanding?
17     A.  I guess some allegations against your
18 character and things of that nature.
19     Q.  Temple investigating doctors have
20 testified that Dr. Acevedo told them that I made a
21 habit of spending more time with young female
22 patients as compared to other patients.  Are you
23 aware of this accusation against me?
24     A.  Yes, I have heard the accusation.

1     Q.  During the time we worked together you
2 and I were in a position to see and interact --
3 you were in a position to see and interact with me
4 many patients; is that correct?
5     A.  Correct.
6     Q.  Assuming that Temple investigators have
7 accurately reported what Dr. Acevedo told them, do
8 you agree with his accusations concerning the
9 amount of time I spent with young female patients?
10     A.  I do not.  Can I elaborate on that?
11     Q.  What were your observations?
12     A.  So my observations are you have had
13 patients for 20, 30 years that you see on a
14 frequent basis.  It can be an 80 year old with a
15 hip bone on bone and you spend 40 minutes with
16 them and you spend the same amount of time with
17 the majority of your patients, I think especially
18 the ones where there is a history where you have
19 known the family, the whole family comes in and
20 you check in with the daughters and the brothers
21 and the sisters.  So I think it's an inaccurate
22 accusation to say that, you know, you spend more
23 time with young females in the outpatient clinic.
24     Q.  If Dr. Acevedo insists that this is fact

1 as opposed to his opinion, that I took longer with
2 young female patients, based on your experience
3 would that be truth or a lie?
4     A.  Well, knowing him as a problem resident,
5 that would be a lie for sure.
6     Q.  When you were a resident and chief
7 resident did you know another resident named Dr.
8 Dua?
9     A.  I did, yes.
10     Q.  I'm sorry, let me go back a little bit.
11 Can you tell me why you think Dr. Acevedo was a
12 problem resident?
13     A.  Well, me and the other chiefs had to
14 meet multiple times, one about his
15 professionalism, showing up late, being suspended
16 from the hospital for not doing dictation in a
17 timely manner, from other attendings coming to the
18 chief saying we don't feel that he's safe on the
19 floors taking care of patients.  Also, to his
20 attitude with superiors in terms of being
21 attendings in general.  He rubbed a lot of
22 attendings the wrong way and did not work well or
23 really was not good in a team environment.
24          So me personally, I had to take him

Page 198

1 under my wing and kind of groom him how to be an
2 adult and you're a physician and this is how we
3 work in the hospital and things of that nature.
4          There's just multiple things.  He
5 failed his boards, he should have been dismissed.
6 I mean he was just one of the residents we had
7 frequent meetings about as chiefs.
8     Q.  When you were a resident and chief
9 resident did you know another resident named Dr.
10 Dua?
11    A.  Yes.
12    Q.  Are you aware of another allegation
13 against me that at a lecture between four and six
14 years ago between January of 2012 to 2014 I acted
15 inappropriately with Dr. Dua while she acted as a
16 model?
17    A.  Yes, I know the allegation.
18    Q.  Were you at that lecture?
19    A.  I was.
20    Q.  Where did the lecture take place?
21    A.  At PCOM.
22    Q.  Can you describe the lecture, what the
23 lecture was about and how many people were there?
24    A.  Yes.  So the lecture was a hands-on

Page 199

1 musculoskeletal course that the chiefs, myself and
2 the chiefs above me schedule every year at PCOM
3 and it would be a hands-on manipulation room.  So
4 essentially it's examination tables similar to
5 massage tables.  Approximately 30 residents are
6 there.  All the medical students are there.
7          It's a once-a-year kind of off
8 location kind of specialty hand-on learning.  So
9 it's ingrained in my mind because it's a pain to
10 schedule and accommodate PCOM students as well as
11 our faculty here at Temple.
12          And essentially Dr. Weinik is
13 leading that.  He's on stage, an elevated stage
14 and there's a camera that you can see straight
15 down on the patient as well as you can see
16 Dr. Weinik.  There's multiple views.  And during
17 those examinations he would call up both male and
18 females for examination of the shoulder, knee,
19 hip, whatever kind of musculoskeletal examination.
20 And that was a good three- to four-hour, yes,
21 probably three- to four-hour hands-on learning
22 experience in lieu of our grand rounds.
23    Q.  Do you recall Dr. Dua acting as a
24 demonstration model?

Page 200

1    A.  Yes, I do.
2    Q.  Explain how that works.
3    A.  So essentially either someone volunteers
4 or someone is called up and Dr. Weinik would kind
5 of go through a kind of head to toe, shoulder,
6 hip, knee and a certain part of the body is
7 examined.  So a former chief, a co-chief, Adam
8 Mullan, he had the shoulder so he was shirtless
9 for an hour and was examined on stage in front of
10 everyone for an hour.  And then, you know, other
11 people picked different body parts, hip, knee,
12 ankle, spine.  And it was just either volunteer
13 or, you know, someone was called out of the
14 audience.
15    Q.  Do you recall anything out of the
16 ordinary about that event where Dr. Dua acted as a
17 model with me?
18    A.  Say that again.  I'm sorry.
19    Q.  Do you recall anything out of the
20 ordinary about the event where Dr. Dua acted as a
21 model with me?
22    A.  I do not, no.
23    Q.  Do you recall me making comments or
24 jokes at Dr. Dua's expense making the class laugh?

Page 201

1    A.  No, I do not.
2    Q.  Do you recall me touching her in a way
3 you thought to be inappropriate?
4    A.  No, for sure.
5    Q.  And by the way, I ask this again.  When
6 I asked if the room was wired for sound and video,
7 was it also wired to amplify my voice?
8    A.  Yes, you had a mic on.
9    Q.  Do you think you would have noticed had
10 I humiliated one of your residents, fellow
11 residents at this lecture?
12    A.  Of course, because the examination table
13 is up on the stage and there's a camera pointing
14 down to exactly where your hands are on the body
15 and what you are doing at that time.  So it would
16 have been grossly obvious if it was inappropriate
17 or out of character or she would have responded in
18 a way in which, you know, she felt it was
19 inappropriate.  But she remained on the
20 examination table, so I don't remember anything
21 out of character or anything inappropriate.
22    Q.  Were there any -- were my words
23 appropriate during that?
24    A.  Yes.

Page 202

1    Q.  I didn't say anything that would seem
2  offensive to you or other people?
3    A.  No.
4    Q.  Are you confident that I did not?
5    A.  Yeah.  I mean we are at a campus
6  and we have fellows from PCOM there and we have
7  medical students in attendance and all the
8  residents and that would be the worst time to say
9  things inappropriately and I don't remember
10  anything inappropriate so. . .
11    Q.  So who is Dr. Maitin?
12    A.  So during my stay here he was the chair
13  and the program director and subsequently was just
14  the program director once I left.
15    Q.  And what was the other change?  It was
16  just a program director.  Did I change my position
17  during that time?
18    A.  Yes, I believe you became intern chair
19  as Temple felt there was a conflict of interest
20  for one person to be both the program director and
21  the chair which doesn't exist in medicine but it
22  did here.
23    Q.  Now, I am not trying to imply anything
24  improper.  But did you ever become aware of rumors

Page 203

1  that Dr. Dua and Dr. Maitin were friends?
2    A.  Yeah, I heard that on multiple
3  occasions.  And even more so as a chief we would
4  meet frequently with you and with Dr. Cruz and
5  with Dr. Maitin, and on multiple occasions she
6  would be in his office when she was on a different
7  rotation and she would be like, "Oh, today was a
8  slow day and I just decided to stop by."  And I
9  can remember five to seven instances of seeing her
10  in his office when she was supposed to be on her
11  rotation in New Jersey or at Children's Hospital
12  or elsewhere.  So that clearly is ingrained in my
13  mind as something that's not normal or --
14  especially in that frequency.
15    Q.  Did the Temple investigators ever to
16  your knowledge try to contact you to discuss my
17  case and what you might know about it?
18    A.  No.
19        DR. WEINIK:  That's it for me.
20        DR. DALY:  Dr. Cowell.
21          - - -
22        EXAMINATION
23          - - -
24

Page 204

1  BY DR. COWELL:
2    Q.  Thank you for being so patient.
3    A.  Sure.
4    Q.  I just wanted to clarify a few things.
5  Dr. Acevedo, you mentioned --
6        DR. WEINIK:  His name is
7  Dr. Averna.
8        DR. DALY:  He's asking --
9        MR. QUEENAN:  He's asking about
10  Dr. Acevedo.
11        DR. WEINIK:  Excuse me.
12  BY DR. COWELL:
13    Q.  Dr. Acevedo's credibility based on the
14  few encounters that you had that shed some shade
15  on that.  Do you suggest that anything coming from
16  his behavior would suggest it less than being
17  credible?
18    A.  Oh, sure.  Even as chief resident
19  directly overseeing him he should have been fired
20  on multiple occasions for his behavior, his
21  unprofessionalism.  We had to give him extra
22  calls.  I mean he had a lot of extra chances and
23  probably at any other institution he would have
24  been fired.

Page 205

1    Q.  Who was the chair during the time frame
2  when you think he should have been fired?
3    A.  Dr. Maitin.
4    Q.  So over the extended period was
5  Dr. Weinik every chair?
6    A.  No.  Dr. Maitin was chair in title but
7  the chiefs would discuss things and Dr. Maitin
8  would let us decide because he was, I don't want
9  to say not present but he was not involved.
10    Q.  With Dr. Dua, how was Dr. Dua selected
11  as the model for that particular scenario that was
12  being --
13    A.  I believe she volunteered.  I don't
14  remember specifics but I believe she volunteered.
15    Q.  So Dr. Weinik didn't select her?
16    A.  Not to my knowledge, no.
17    Q.  I have heard this reference about
18  friends, Dr. Dua and Dr. Maitin.  I was suggesting
19  that -- I guess we can leave it up to our
20  interpretation to figure what the implication
21  means.  Can you clarify that for me just so I can
22  understand what the relevance of a friend is?
23    A.  Yeah.  So kind of residents have the
24  responsibility and duty to be on a service and she

Page 206

1  spent a lot of time in his office, not just noted
2  by me and my co-chiefs but the chiefs above me who
3  were in her class.  I don't want to suggest
4  anything but something might have been going on
5  between the two of them to be spending so much
6  time together.  I don't know that as a fact
7  but. . .
8      Q.  Okay.
9      A.  I'm not randomly hanging out in, you
10 know, a female attendings' office during my down
11 time or whenever rotation is slow.
12     Q.  So you don't know?
13     A.  I don't know but frequently the door was
14 closed and knock on the door and she would be
15 there so. . .
16     Q.  So, what is the implication that they
17 were friends?  I'm still trying to understand what
18 the relevance is.
19     A.  I don't know.  It's kind of the same
20 questioning we have here.  It's kind of for your
21 interpretation I believe.
22         DR. COWELL:  Thank you so much.
23         DR. DALY:  Justin, thanks very much
24     for coming in.  At the very beginning I think

Page 207

1      Dr. Weinik said you came from afar.  Where
2  are you?
3         THE WITNESS:  Albuquerque, New
4  Mexico.
5         DR. DALY:  Where?
6         THE WITNESS:  Albuquerque.
7         DR. DALY:  That's a long way.
8         THE WITNESS:  Yeah.
9         DR. DALY:  I have been to
10 Albuquerque.
11        THE WITNESS:  I canceled my clinic
12 and got here at 3:00 a.m. this morning.
13        DR. DALY:  That's a long way and a
14 long flight.  Did you pay for that yourself
15 to fly in and do all this?
16        THE WITNESS:  Yes.  I canceled my
17 clinic.  I'm a board certified physical
18 medicine rehab doc and interventionalist.  I
19 cleared my schedule without objection to be
20 here to defend a man that has worked hard for
21 30 years and had some odd allegations in
22 recent classes, so. . .
23        DR. DALY:  And how did you come to
24 be aware of these allegations?  Who talked to

Page 208

1  you about that?
2         THE WITNESS:  I think I initially
3  heard it from a chief resident, I haven't
4  talked to Dr. Weinik for a while, down in
5  Florida.  Adam Mullan stated I guess --
6         DR. DALY:  He was one of your
7  co-chiefs?
8         THE WITNESS:  Yes.  We talk
9  frequently and he said I guess Dr. Weinik is
10 on administrative reason for some reason.  He
11 didn't know.
12        DR. DALY:  Did you get a chance to
13 talk with any other folks in the room about
14 any of this?
15        THE WITNESS:  No.  They just said
16 it was grilling is all they said.  No
17 specifics.
18        DR. DALY:  Nice people but
19 grilling.
20        THE WITNESS:  They said it was
21 intense, that's all, which it is.  This isn't
22 a normal thing.
23        DR. DALY:  Well, it's not normal,
24 no.  It's not 5:30 at night.  You came in at

Page 209

1  3:00 a.m.
2         One of the comments made by one of
3  the people, and there's a large number so you
4  can't deduce from whom, but made some
5  comments about offhanded remarks, comments,
6  jokes, et cetera, that Dr. Weinik might make
7  in the course of a day that some might find
8  inappropriate.  Was that true from your
9  knowledge of your working with him?  You were
10 pretty intimate with all the faculty.
11        THE WITNESS:  Yeah, but I think
12 that's true of any -- we are blowing off
13 steam.  Even at work when I am with my
14 colleagues in close quarters we talk about
15 patients in certain ways but it's not like
16 it's deliberate.  It's more just blowing off
17 steam, things of that nature.
18        But I don't remember anything in
19 terms of Dr. Weinik speaking poorly about any
20 individual in particular.
21        DR. DALY:  I wasn't thinking about
22 speaking poorly about any individual.  I'm
23 thinking more about comments that you might
24 deem inappropriate that you might not say in

1  your job there in New Mexico.
2       THE WITNESS:  I would say not, not
3  during the working day, no, for sure.
4       DR. DALY:  After hours you are
5  talking about?
6       THE WITNESS:  If we are grabbing
7  beers and we talk about things here and there
8  that are relevant during our day, as well you
9  do here with your colleagues.
10      DR. DALY:  I don't grab beers.  I
11 don't drink.
12      THE WITNESS:  Or wine or spritzers.
13      DR. DALY:  We won't get into that.
14 Thank you for your interest, though, in my
15 drinking habits.
16      And so the other implication was
17 that you and other chief residents got
18 together and talked about your co-residents
19 or residents beneath you.
20      THE WITNESS:  Yes.  So I will kind
21 of fill out that dynamic for you.  So Dr.
22 Maitin was the chair.  So he was a captain
23 who was asleep at the ship -- at the wheel
24 and so the chief residents had to do all the

1  work.  And a lot of times we wouldn't call
2  Maitin because it would be too much to ask of
3  him so we would always have to reach out to
4  Dr. Weinik or Dr. Cruz.  That's how most of
5  the decisions were made.
6       DR. DALY:  These would be decisions
7  about what?
8       THE WITNESS:  About disciplinary
9  actions for problem residents, about coverage
10 issues with people calling in for bogus
11 things, about rescheduling lectures, about
12 everything.  Just the dynamics of how we run
13 the program, the chief residents.
14      DR. DALY:  Chief residents do like
15 in many programs.
16      THE WITNESS:  Yes, but they have
17 the assistance of the chair which we didn't
18 have.  So it's a big difference.
19      DR. DALY:  Okay.
20      DR. LIN:  What percentage of the
21 program in the time that you were there were
22 women and what percentage were men?
23      THE WITNESS:  So now it's 50/50.
24 Before that it was one or two a year female.

1       DR. LIN:  Out of how many?
2       THE WITNESS:  Ten.  Now it's nine,
3  nine residents here.
4       DR. LIN:  So at the time it would
5  be ten to 20 percent of the program were
6  women?
7       THE WITNESS:  I have to look at our
8  roster.
9       DR. LIN:  Ish, with the majority
10 men?
11      THE WITNESS:  Yes.
12      DR. LIN:  Were there ever any -- as
13 a chief -- I don't know how the residency
14 program works.  Is it all PGY-4?
15      THE WITNESS:  No.  So the chiefs
16 are voted on by faculty and the residents for
17 promotion to be chief.
18      DR. LIN:  And so how many chief
19 residents --
20      THE WITNESS:  It's not like it's
21 your fourth year.
22      DR. LIN:  Right.
23      THE WITNESS:  There were four of us
24 my year.

1       DR. LIN:  Four out of the ten?
2       THE WITNESS:  Yes.
3       DR. LIN:  Would you say that -- I
4  mean it sounds like you as chief residents
5  really took the helm and had to have the
6  pulse of what was going on in the residency
7  and knew kind of the issues?
8       THE WITNESS:  Yeah.  We had to meet
9  with Sue Coull on multiple times, yeah.
10      DR. LIN:  Were there female chief
11 residents in kind of the years that you were
12 there?
13      THE WITNESS:  Yeah, Heather Galgon
14 was a chief, probably one of the strongest
15 chiefs we had.  In my class, the two females
16 in my class, they didn't really want to have
17 that extra responsibility so they didn't kind
18 of throw their name in the hat situation.
19      DR. LIN:  So it was a kind of
20 combination of those who were specifically
21 nominated --
22      THE WITNESS:  Yeah, it was either
23 go in or I don't, other people just wanted to
24 just skate by and graduate, some people want

1 to give back and be chiefs, do administrative
2 roles, work with GME, things of that nature.
3     DR. LIN: Right. There are not
4 many parts of being a chief resident that are
5 that glamorous.
6     THE WITNESS: But worth it.
7     DR. LIN: Did you feel that as, you
8 know, there -- it's hard to say. You know, I
9 think with a gender imbalance sometimes it's
10 hard to know. Would you say that you feel
11 like you had a good pulse of what was going
12 on in that people would be comfortable coming
13 to the chiefs and that you had a good sense
14 of what was going on?
15     THE WITNESS: Yeah, yeah. I mean
16 as I kind of progressed we had a bunch of
17 female medical students and I think it is
18 just kind of 60/40 now females to males. And
19 I think it's just females are kind of more
20 like a lifestyle specialty. A lot more
21 females are gravitating towards that
22 flexibility where it might have been
23 different years ago.
24     DR. DALY: When it came to Dr.

1 Acevedo you talked about the chiefs not
2 wanting him to progress, that is terminate
3 him, firing him. Was it then -- and Dr.
4 Maitin you described as being asleep at the
5 wheel. Was it then Dr. Weinik and Dr. Cruz
6 who said don't terminate him, he's a guy we
7 are going to keep progressing?
8     THE WITNESS: Yeah, we kind of
9 internally did an internal remediation with
10 him. When he was I guess here at Temple I
11 forget, but he had like 20-some dictations
12 that were three or four weeks overdue
13 multiple times so we would say you have to go
14 home, you don't have privileges to be on
15 campus, go home and do your dictations. That
16 happened multiple times.
17     He was late to grand rounds all the
18 time. We had to institute like a penalty
19 system. If you were late -- three lates
20 equals extra call. He ended up taking
21 multiple calls. And then Dr. Van Wine and a
22 couple other attendings mentioned they would
23 rather not work with him because he was
24 scheduled to work with him twice during the

1 year and didn't want to work with him again,
2 just his professionalism and kind of
3 abrasiveness.
4     You know, I knew he was struggling,
5 having a hard time. So I was like hey, man,
6 you got to get your act together, you have to
7 play nice in the sandbox with the nurses,
8 residents, physicians.
9     DR. DALY: Did that help?
10     THE WITNESS: I think it did but
11 he's, I don't want to say hard-headed but
12 he's very stubborn. So I think it helped for
13 a while and then I could see him kind of
14 distance himself from us. But then he came
15 back once he failed his boards and asked for
16 my advice about what to do, those type of
17 things.
18     DR. DALY: Anything, Joe?
19     MR. QUEENAN: I just had a -- you
20 were mentioning kind of Dr. Maitin's
21 relationship and you mentioned that you
22 wouldn't be in a female attending's office.
23 Would you be in a male attending's office?
24 Would you ever hang out with -- I'm trying to

1 figure out what the dichotomy is here.
2     THE WITNESS: Well, so the
3 clarification, the distinction here, she was
4 in his office when she was not on his
5 service.
6     MR. QUEENAN: I was asking would
7 you ever find your way into one of your male
8 attending's offices?
9     THE WITNESS: No. The only time
10 I hung out in Dr. Weinik's office was when I
11 was on his service. I wouldn't just
12 randomly.
13     MR. QUEENAN: Because you had made
14 the point of being -- you wouldn't be in a
15 female attending's office, not just an
16 attending.
17     THE WITNESS: Female, male,
18 whatever is my liking. So, yeah, it's
19 inappropriate, especially if you're not on
20 their service.
21     DR. DALY: Okay. Anything else?
22     Thanks very much for coming in. I
23 hope you get some sleep. Safe trip back.
24     THE WITNESS: I will. Thank you.

Page 218

1    (Witness excused.)
2         DR. DALY:  We can -- let me ask the
3    Panel here first do you want to take a quick
4    bathroom break before the final comments?
5         DR. WEINIK:  I'm going to testify
6    in my own defense to refute these allegations
7    in person.
8         However, before I do that, Dr. Adam
9    Mullan, a former resident in the program was
10   unable to come tonight from Florida where he
11   is practicing.  He did send me an e-mail
12   statement which is short to what he would
13   have testified to and I would like to make it
14   part of the record and read it since it is
15   short.
16        DR. DALY:  Can you enter it into
17   the record so that we can have it to read
18   since it is readable?
19        MR. CASTOR:  Very short.  Yes, we
20   can.
21        DR. DALY:  Because we still have --
22   you still want to do something in your own
23   defense besides that, do you?
24        DR. WEINIK:  Yes, but I just want

Page 219

1    to say one or two things about that letter.
2         MR. CASTOR:  Do you want me to just
3    pull it apart?
4         DR. DALY:  Would you, and give it
5    to the court reporter so it could be entered
6    into the record?
7         DR. WEINIK:  Dr. Mullan was at the
8    physical examination and he also testifies
9    that he was a model and he also testifies
10   that he did not see that I, Dr. Weinik,
11   displayed any preference for female models
12   over male models.
13        DR. DALY:  Thank you.  Anything
14   else that you want to say as a witness for
15   yourself, Dr. Weinik?
16        MR. CASTOR:  Well, I'm a little
17   unclear on the procedure.  He has evidence
18   that he would present and then he has a
19   closing statement which is argument.
20        DR. DALY:  Well, he was just
21   describing himself, he wanted to be a witness
22   in his own defense.  So he can do that or we
23   can then have it as a closing statement.
24   It's his preference.

Page 220

1         MR. CASTOR:  But only one of them?
2         DR. DALY:  No, he could have both.
3    We just want to be cognizant of the time.  If
4    the witness -- if he wants to be a witness
5    and then have a closing statement, it would
6    be best not to be redundant in those two
7    episodes.
8         MR. CASTOR:  You heard that
9    instruction.  I can't speak for him.
10        DR. DALY:  We don't want you to.
11   Thank you.
12        MR. CASTOR:  But he has evidence
13   that he wants to present, then he expects
14   Temple's counsel to close, then he wants to
15   close.
16        DR. WEINIK:  It won't be Temple's
17   counsel.  It will be Dr. Cowell and Dr.
18   Weinik will do it.  I'm just asking that
19   there not be redundancy in his being a
20   witness and his closing statement.  So if you
21   can craft it in that way, Dr. Weinik, we all
22   would be very grateful.
23        DR. COWELL:  There may be some
24   overlap.  I will do my best to --

Page 221

1         MR. CASTOR:  If you let me ask the
2    questions there won't be overlap.
3         DR. DALY:  Mr. Castor, I appreciate
4    you're commenting.  If you wouldn't do that
5    anymore I would be very grateful.
6         DR. WEINIK:  I came to Temple as a
7    resident in 1986 and I stayed at TUH, went to
8    the mission to serve the needy, the
9    impoverished and to take on the most
10   challenging cases and, more importantly, to
11   be a teacher and mentor.  I trained
12   approximately 300 residents, even more
13   medical students in nearly 30 years without
14   blemish until a change in my position for me
15   and the responsibilities when the interim
16   chair -- when I became interim chair with the
17   very contested and difficult struggles to
18   follow.
19        To give you some background, in the
20   year that Dr. Averna was there the residents
21   were very disappointed with Dr. Maitin's
22   performance and in ignoring his -- their
23   complaints and their concerns.  Citations
24   were also made for deficiencies at GME.  And

56 (Pages 218 - 221)

Page 222

1  with these increased complaints which went
2  through Dr. Coull, Dr. Weigers, to
3  Dr. Kaiser, Dr. Kaiser made the decision to
4  remove Dr. Maitin from the chair of the
5  department.  He gave me the spot of interim
6  chair.
7        Dr. Maitin was the chair for 15
8  years and PD.  Dr. Kaiser said to me your
9  residency is a mess as well, you have a right
10 to either fire Dr. Maitin, to remove him from
11 that position or the select someone else.  We
12 had really no one else in our department.
13 Our department has only five people at that
14 time.
15       I gave him the opportunity with a
16 new program administrator to get those things
17 done.  To say that things went smoothly
18 thereafter is a -- would be impossible.  Dr.
19 Maitin was very aggressive with me, very
20 angry with me, including having stated in my
21 office, "How did you single-handedly sabotage
22 my career?"
23       I informed him that I did not do
24 that, that this was the decision of someone

Page 223

1  else.  He continued to badmouth me to
2  residents, he continued to be resistant to
3  anything I wanted to try to do and including
4  something that he had promised and I knew he
5  promised Dr. Cruz, was that he decided he
6  would stay as chair and Dr. Cruz who has been
7  waiting for many years to be become program
8  director would then get his chance to become
9  program director.  I knew of this, I approved
10 of that before he lost his program chair.
11 When he lost -- I'm sorry, before he lost his
12 chairmanship.
13       When he lost the chairmanship Dr.
14 Cruz was -- said to me, "What am I going to
15 do, am I going to stay, am I going to leave?
16 He's the program chair."
17       I said, "I will honor that promise
18 that made to you but we are going to give him
19 some time to get it together."
20       Dr. Maitin worked through with the
21 help of Amber and others in GME and got us
22 back up.  There was a review.  We met --
23 internal review.  There were numerous
24 deficiencies noted.  We worked very hard, all

Page 224

1  of us together including myself, to make that
2  residency better and we achieved -- then we
3  had a formal review and there were some
4  citations we met and we met everything that
5  needed to be done after that.
6        So then came the time which -- now
7  Dr. Cruz and Dr. Maitin -- Dr. Cruz also made
8  assistant program director under Dr. Maitin.
9  Dr. Cruz is Filipino.  If you know Filipino
10 culture, you don't go against someone who has
11 trained you and you don't go against your
12 supervisor.  So while Dr. Cruz wanted to be
13 program chair he couldn't voice it to Dr.
14 Maitin and Dr. Maitin in no way was going to
15 let him be program chair.  When he confided
16 in me that he wanted to do that, I pushed for
17 it and I pushed for it hard, and I was pushed
18 by Weigers as well as Coull.  Coull initially
19 wanted me to do it and then -- said she
20 approved it and then she didn't, she wasn't
21 going to back it up.  Weigers initially said,
22 you know, you got to work through this like,
23 you know, do this, and then later flat
24 dropped it.  And they wanted me to make that

Page 225

1  move and I wanted to make that move because I
2  was fearful that I would lose Dr. Cruz and
3  Dr. Cruz has been one of the top trainers in
4  our program.  He's a very bright individual.
5  He's widely respected throughout the
6  hospital.  He has an international presence
7  as well, and I thought he was very valuable
8  and I didn't want to lose him for the
9  training of our residents.  To lose him would
10 be a great loss.  Some would say that he's
11 the best educator in our program most years.
12       So unlike the previous years, I had
13 supervisory duties now and I had tried to
14 change things as well.  And I tried to --
15 pressure really came very strong in December
16 and January of last year because I was trying
17 to get Cruz in for this year, for this
18 July 1.  In fact, what I had thought was I
19 tried to get him in, change him over in March
20 so that he would have time to transition and
21 Maitin could help him transition.
22       In order to keep a bright
23 individual in an academic institution you
24 have to promote them, you have to promote

Page 226

1  them both academically, promote them
2  research-wise and groom and mentor your
3  fellow attendings so that they have goals
4  other than just to be a static doctor with a
5  position that has no end. He's too good a
6  doctor to want to stay that way.
7          And so I put a lot of pressure on
8  Dr. Maitin to move in, you know, in the
9  late -- well, in the winter of late November,
10  '17 through January, fully through January of
11  '18. And with that this adversarial
12  relationship was born.
13          I find it very curious. Let me --
14  before I go to this. Unlike the previous
15  years now I had supervisory duties and out of
16  necessity I had to become a disciplinarian.
17  In my best lighthearted way, not being
18  trained to do this position but thrown in it,
19  not having the advantage of having the
20  professional development training, the
21  leadership training that I would have liked,
22  I, I was given opportunity, things that I had
23  to do to try to correct behaviors as Maitin
24  was not doing them.

Page 227

1          There was a great deal of slackness
2  on how to be a professional as you have heard
3  today. And many residents, including Cora,
4  including Dua, dressed inappropriately
5  including Byas when she said she had a little
6  black dress. But what wasn't continued in
7  that conversation was that dress was
8  inappropriate. It's too short to be on when
9  you are a doctor in the hospital. We often
10  don't wear our coats all the time. We are a
11  very physical specialty. We examine
12  patients. Sometimes we climb up on the table
13  because if you're going to do manipulation on
14  them our tables are not ideal for doing
15  manipulation so we have to move people. So I
16  think it's inappropriate to wear a little
17  short black dress, and that's one of the
18  things that came up.
19          So I became a target because here I
20  am being a disciplinarian when I was a good
21  guy all the years before. I was the person
22  that the residents spoke to. Talking to my
23  residents I was a mentor to many of them and
24  now that role had changed somewhat. So

Page 228

1  things changed there.
2          People had axes to grind. I will
3  first address Dr. Acevedo's complaint.
4  Dr. Cowell had mentioned that Dr. Acevedo
5  indicated that I had in some fashion hurt his
6  chances to be -- to obtain a fellowship in
7  York, PA. He did not show up on my service
8  that day. The chief residents did not get a
9  call from him. He did not arrange backup.
10  It was his first day to be on service I
11  believe. And so when a resident doesn't show
12  up I want to know why they don't show up. I
13  want to know if they are sick, I want to know
14  if they are sad and I want to know if there
15  are other problems.
16          The reason I say that and the
17  reason I hold these residents so close and
18  the reason I get into these residents' heads
19  and ask sometimes, you know, more personal
20  questions is that during that time we had
21  three patients -- three residents with severe
22  depression. We had Ellen --
23          MR. QUEENAN: Three residents is
24  fine.

Page 229

1          DR. WEINIK: Three residents is
2  fine. One was depressed when she first
3  entered and I tried to mentor her to keep her
4  to stay in and she really made the decision
5  that she didn't want to be a physician.
6          Another one had difficulties with
7  substance abuse, had difficulties with
8  depression, was not able to function as a
9  physician. We struggled. We sent them to
10  psychiatrists and other people. He called me
11  rather than Maitin. I talked to him in the
12  evenings. And eventually Dr. Maitin made the
13  decision that he was not going to be able to
14  be rehabilitated and that he was given many
15  chances and he was discharged from the
16  program. He subsequently committed suicide.
17  That left me very shocked and it left the
18  residents very shocked.
19          And then we had another patient
20  just this last year whose first name was
21  Philip and I can't remember his last name who
22  also had problems with depression, who also
23  had to take a leave and who also had
24  concerns.

58 (Pages 226 - 229)

Page 230

1 And I will mention a fourth
2 resident, a female resident who in her senior
3 year had a significant friend, the
4 relationship of which we do not know whether
5 this was a friend or a lover but someone very
6 significant in her life died. She started
7 not showing up. She started not showing up
8 for weeks. No one knew where she was. We
9 were concerned about her. And we had to go
10 to GME to find the address because Dr. Maitin
11 didn't want us involved, to get involved to
12 call and find out where she was and he was
13 unset about that.
14 So to get back to Acevedo, Dr.
15 Acevedo didn't show up. You were given
16 testimony of a phone message, of a text that
17 said -- I asked him where he was. He texted
18 back "I'm in York for an interview."
19 I said that was not a smart idea.
20 Dr. Furman, the residency director, is an old
21 friend of mine. In fact, he was one of my
22 first residents.
23 Now, you took that, put it in the
24 note to mean that that was detrimental to him

Page 231

1 and I was threatening him and I used the
2 position of power to do so. Well, would you
3 be surprised if I presented a letter from
4 Dr. Furman that states, "This response is of
5 your correspondence in which you asked
6 whether you had positive or negative
7 influences on Dr. Acevedo's fellowship
8 application when he last -- when he applied
9 last year.
10 "To respond to your request, I
11 pulled his fellowship application file. The
12 letters of reference in his file were from
13 Dr. Maitin, Dr. Cruz and Dr. Schwartz, and as
14 you know, you never provided a letter of
15 recommendation for him. Likewise, you and I
16 never spoke about him during his application
17 process. We are fortunate that we have very
18 strong fellowship applicants. Dr. Acevedo
19 was on our final list of applicants. He was
20 ranked lower than our list of the ones who
21 were offered each of the six available
22 positions and accepted. He was able to
23 access our ranking -- I was able to access
24 our ranking list and Dr. Acevedo would most

Page 232

1 likely have been offered a spot had two or
2 more people turned down our offers. As you
3 are aware, there are many factors that are in
4 play when we choose and rank fellows."
5 In fact, Dr. Acevedo did get a
6 fellowship, and there is a letter from the
7 fellowship director.
8 "To whom it may concern: This
9 letter is being sent in regards to a
10 recommendation provided to our interventional
11 spine and musculoskeletal program for our
12 next fellow, Phillip Acevedo, by Dr. Weinik.
13 Dr. Weinik's recommendation positively
14 influenced our decision to offer our
15 fellowship position to Dr. Acevedo. Nothing
16 inappropriate was discussed or otherwise
17 mentioned. Dr. Weinik exhibited the utmost
18 professionalism throughout."
19 Signed by Dr. Naftulin, his current
20 fellowship director.
21 DR. DALY: We can enter that as
22 well.
23 DR. WEINIK: Dr. Acevedo had me
24 completely wrong and he led others to believe

Page 233

1 that I was damning him when, in fact, I was
2 supporting him. I would have to hold that
3 his observations of other things are not as
4 accurate as well.
5 I was brought to this because
6 people have made attestations that I hurt
7 Dr. Furman. It would be simple -- I'm sorry,
8 I hurt Dr. Acevedo and damaged his reputation
9 or his ability to get a fellowship. Just the
10 opposite. He damaged mine by making false
11 claims.
12 It would have been very easy to ask
13 Dr. Acevedo where that program was and to
14 call Dr. Furman and see what the situation
15 was. That was not done. I believe there
16 hadn't been -- I haven't been given all the
17 due process to rectify these allegations that
18 Dr. Acevedo had made.
19 He also made other comments in his
20 interviews. He states that approximately
21 50 percent of the residents program are
22 osteopathic and they feel uncomfortable with
23 exams done by Dr. Weinik. But there was no
24 effort in the MSEC evaluation to find out

Page 234

1  from the other osteopathic physicians if they
2  felt that way.  Residents will say oh, here's
3  a young female patient scheduled, Dr. Weinik
4  will be wow.  That's not the case that was
5  demonstrated today.
6      Amber Dzikowski.  She testified
7  that Dr. Weinik used his position as a fear
8  tactic.  He often tells residents they need a
9  letter from him.  He is notorious for making
10  phone calls to either praise a resident or
11  say don't take that resident.
12      There was no effort made to
13  ascertain if those statements are correct.
14  Did anyone ask any other resident that I did
15  that?
16      I also say -- Amber states that I
17  am very friendly, overly friendly and he
18  feels that he wants to be everyone's buddy,
19  Amber feels.
20      Let me state that I don't want to
21  be everyone's buddy.  In fact, the fact that
22  I wasn't everyone's buddy I got a lot of
23  pushback from certain people.  I like to be
24  nice to everybody, I like to be kind to

Page 235

1  everybody and I do like to offer praise when
2  people do a good job.  All of us here and for
3  a residency in somewhat shambles and
4  residency where people aren't happy I would
5  like for people to know they are doing a good
6  job.
7      During that period of time I said a
8  lot of times to Amber that she is doing a
9  good job in reconstructing the residency
10  program in her efforts there.  And she asked
11  me, "I'm new at this job, how am I doing,"
12  and I would tell her.
13      If I was so notorious for making
14  these bad phone calla, someone else, other
15  residents would know that, but there was no
16  effort to go and investigate that.
17      I will skip to something.
18      DR. DALY:  I might just say again
19  given -- I want to give you just due here but
20  your comments are written and one of the
21  other possibilities --
22      DR. WEINIK:  They are not written.
23      DR. DALY:  Sorry, I thought you
24  were reading.

Page 236

1      DR. WEINIK:  Let me go back to
2  another reason why I feel, an important
3  reason why I feel that people have cited me.
4  Dr. Dua, as you heard, is a close friend of
5  Dr. Maitin.  In fact, I hear Dr. Dua went to
6  graduation this year when Dr. Maitin led it.
7  Yet there aren't many residents who come back
8  year after year.
9      I was pushing -- Dr. Dua had a
10  relationship with Dr. Maitin that was closer
11  than other residents have had.  I was pushing
12  her mentor and her friend out of a position
13  which he was struggling and fighting to do
14  so.  I believe that that may be the
15  motivation, that is the motivation why all of
16  a sudden four years after the event, four to
17  six years after the event that a letter
18  appears and I also feel the reason why she
19  doesn't want to defend it.
20      On July 7 we served Dr. Dua with a
21  letter requesting, requesting that she come
22  to this meeting.  She acknowledged receipt of
23  it and has not come.
24      MR. CASTOR:  Is it okay, Mr.

Page 237

1  Chairman, if we make that part of the record?
2      DR. WEINIK:  Dr. Acevedo made
3  complaints because he thought I hurt him as
4  well.  We'll go to Dr. Cowell.
5      I will expand upon the relationship
6  with Dr. Dua and Dr. Maitin.  It's
7  significant because she's lying to help him
8  maintain his position.  Dr. Maitin has been
9  very vocal to residents about my efforts to
10  remove him from that position.  You know,
11  even -- you know, there are other residents
12  who I believe, being Dr. Kenback and Dr.
13  Acevedo and Dr. Hatt as well, who would be
14  willing to go and offer testimony for their
15  favorite attending if he's going to -- and
16  there was great concern about moving him out.
17  It was not a popular -- it was not popular
18  with certain residents.  Dr. Kaiser told me
19  that your residents are upset that if you get
20  rid of Maitin you will -- you know, the other
21  ones will leave.  So they were very vocal
22  about that.
23      But yet it was my prerogative to
24  assign a chair, a program chair.  A program

60 (Pages 234 - 237)

Page 238

1  chair serves at the privilege of the interim
2  chair.  It was ability, it was my privilege
3  to do that.  When these issues came up, all
4  of a sudden the tone changed.  I wasn't going
5  to be able to remove him.  Dr. Dua to this
6  day has a strong relationship with
7  Dr. Maitin.  As well, she was afforded
8  privileges that other residents didn't have,
9  like being able to skip a rotation and come
10  hang out.  This angered the other residents
11  as Dr. Averna described.  And I didn't do the
12  things here that they have asked -- they are
13  accusing me of.
14         Interestingly, with Dr. Hatt, Dr.
15  Hatt was asked if she was every chosen to be
16  a model and she said yes and that she didn't
17  feel uncomfortable until someone pointed
18  certain things out.  She didn't feel
19  uncomfortable and she's an osteopath.  I
20  guess there was no effort to ask who the
21  resident was who pointed things out.
22         Dr. Hatt stated, "In my experience
23  Dr. Weinik does not follow through in giving
24  letters but everyone talks about getting a

Page 239

1  letter from Dr. Weinik."
2         That's true, not everyone gets one
3  because not everyone deserves one.  And
4  Dr. Acevedo, I was not giving Dr. Acevedo a
5  strong letter and so I chose not to give him
6  a letter.  Because a letter goes into a file
7  that everyone sees.  Every application would
8  see that letter and I didn't feel I wanted to
9  damage him by offering fake praise, so I
10  didn't offer him one.  But I do offer letters
11  and strong letters for residents that I feel
12  are capable.
13         And I have to tell you, we have a
14  nearly 100 percent acceptance to the
15  specialty fellowship programs that our
16  residents want based on doing certain things.
17  If you really want to promote a resident you
18  make a call, you give a letter that's strong
19  and you follow-up with a phone call and you
20  mentor that person over the years.
21         I'm going to stop now because I'm
22  long winded, a boy from North Jersey, and I
23  will let the Panel ask their questions.
24         DR. DALY:  Dr. Weinik, thank you.

Page 240

1         Vince, you have some cross
2  examination.
3         DR. WEINIK:  Yes, just a few belief
4  things.
5             - - -
6         EXAMINATION
7             - - -
8  BY DR. COWELL:
9  Q.  Dr. Weinik, at one of the opportunities
10  we had to interview you we actually -- if we look
11  at in Section 11 Page -- I'm sorry, dated the
12  second to last page 2/20/18 the meeting we had
13  with you.  And the minutes reflect that I asked
14  "And do you recall one incident?"
15         "And I am the one to teach hands-on
16  exams because I'm an osteopath and I take
17  seriously what I do.  What I do is ask someone
18  from the audience to come up to exam who
19  demonstrated curves of the spine."
20         DR. WEINIK:  Dr. Cowell, can you.
21         MR. WRIGHT:  Second to last page on
22  Tab 11.
23         DR. WEINIK:  Where are we on the
24  page?

Page 241

1         MR. WRIGHT:  Second bullet point.
2  BY DR. COWELL:
3  Q.  I will start finishing that next to the
4  last sentence.  "I do remember someone asking me
5  to demonstrate an exam.  As I walked around and I
6  do remember someone jumping up and saying "That's
7  not the question mark," and another resident
8  saying, "He didn't even buy her a drink."
9         I can't recall the individual who
10  that happened to.
11  A.  Correct.
12  Q.  Is that -- was that your testimony at
13  the time?
14  A.  That was my testimony at the time.
15  Q.  Does that conflict with what some of the
16  references that some of the residents recalled
17  about that experience?
18  A.  Well, I don't know what one you are
19  talking about.  When you offered this I knew
20  nothing of what this is and I still don't know
21  this today if that's the case.
22  Q.  But was that your statement or did I --
23  do we have it inaccurate?
24  A.  It's a statement on what event?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 242

1   Q.   On -- during the interview on 2/20,
2   whatever your impression was the event, did you
3   make this -- did you answer -- is this your
4   answer?
5   A.   I testified truthfully to you but I
6   don't know which event you are referring to.
7   Q.   So wasn't it your understanding that we
8   were there to discuss the letter that was
9   submitted by Dr. Dua?
10   A.   Not then.  You presented me with a
11   letter, a handwritten letter which I haven't seen
12   since.
13   Q.   No.  I presented you with the same
14   document that we have as evidence.
15   A.   Dr. Cowell, you presented me with a
16   handwritten letter, you had it in the back pocket
17   of your scrubs and I read it.  And then I never
18   saw that handwritten letter again.
19   Q.   Okay.  I will submit that I showed you
20   the exact document that we have as evidence today
21   and I will submit that we gave it to --
22       MR. CASTOR:  Are you testifying a
23   second time now, Mr. Chairman?
24       DR. DALY:  Thank you, Mr. Castor.

Page 243

1   I really appreciate it.  We will let
2   Dr. Cowell finish and he will move forward,
3   please.
4   BY DR. WEINIK:
5   Q.   And I will submitted, provided the same
6   letter at the hearing, at the hearing that we
7   brought you in to finalize the investigation and
8   gave it to you a second time.  We never let you
9   take it out of our presence but you had access to
10   fully read and appreciate the document both the
11   first time that I presented when you came up to --
12   I happened to be working in the operating room and
13   you came up and you and I went into an office.
14   A.   Yes, and you presented me with a
15   handwritten letter.
16   Q.   Handwritten letter from who?
17   A.   That's right, I don't know from who.
18   You presented to me a handwritten letter and when
19   you presented me -- when you came and spoke with
20   me with Dr. Tedaldi you presented me with a
21   printed letter and I said this is not the same
22   thing and it has more content than what I was
23   presented initially.
24   Q.   Well, I won't dispute --

Page 244

1   A.   And you said to me, "What about the
2   e-mails, what about the e-mails?"
3       And I said to you, "What e-mails?"
4   You showed me a letter.
5   Q.   I won't dispute your recollection versus
6   mine.  I will just say that I have no knowledge of
7   a handwritten letter.  I don't have any
8   handwritten letter that I displayed.
9       DR. DALY:  We can probably move
10   forward.
11   A.   Dr. Cowell, do you recall me asking
12   "What e-mails?
13       "What about the e-mails, do you
14   know of any other e-mails?"
15       I said, "What e-mails?"
16       You have never presented me with an
17   e-mail.  You presented me with a letter.
18   Dr. Kaiser said to me, "What about e-mails?"
19       MR. CASTOR:  Let them ask the
20   questions.
21       DR. WEINIK:  Sorry.
22       DR. DALY:  Dr. Cowell, anything
23   further?
24       DR. COWELL:  No, nothing further.

Page 245

1       DR. DALY:  Dr. Weinik, if I could,
2   if we went back to this issue with the coach,
3   the individual who was provided to you.
4       DR. WEINIK:  Yes.
5       DR. DALY:  There were a whole
6   series of canceled meetings.
7       THE WITNESS:  Yes.
8       DR. DALY:  Meetings which were
9   canceled by your secretary at least in the
10   document that we have access to.  Can you
11   explain any of that?  Because it seemed those
12   meetings were canceled repeatedly and over
13   many months.  I don't want any personal
14   health information.
15       DR. WEINIK:  Well, that's the
16   problem.  Can I talk to you about that?  Can
17   we go off the record for one moment?
18       DR. DALY:  Well, you can do that on
19   the record.  If you wish to you can.
20       DR. WEINIK:  I will speak on the
21   record.
22       DR. DALY:  Okay.
23       DR. WEINIK:  I had a parathyroid
24   adenoma removed at one point in time and my

Page 246

1  PTH had creeped back up. I was worried that
2  it was coming back. I also had a high PSA
3  and was -- with a high acceleration and I was
4  worried about prostate cancer which is in my
5  family. And I sought care and evaluation for
6  those things. I, fortunately, did not have
7  prostate cancer but I do have atypical cells.
8  So if I missed something it had to do because
9  I had other concerns that preceded that.
10      Also, as well you know that in our
11  hospital you have to give 60 days' notice
12  before you bump any patients. I can't always
13  give 60 days' notice. And Ms. Saccomandi
14  would often say, "Well, let's do this date."
15  And Jean would say, "Well, he can't do that
16  date." In all due fairness, Dr. Saccomandi
17  did cancel some on her own.
18      And in her absence and in my
19  absence from those meetings I made great
20  progress. If you go to that page you will
21  see --
22      DR. DALY: I saw that. Thank you.
23  I saw that. Thank you.
24      DR. WEINIK: I was scheduled for

Page 247

1  leadership and she had great hopes that I
2  would go to a leadership.
3      Now, Ellen Tedaldi wouldn't let me
4  in the leadership program because -- I'm not
5  sure why. Maybe she was challenged by that.
6  She didn't want older attendings in the
7  leadership program because I am an older
8  attending I guess and that was for younger
9  individuals.
10      DR. COWELL: May I respond to that?
11      DR. DALY: We don't need a
12  response. I'm aware of the leadership
13  program and who it's intended for.
14      Any other questions that you have?
15      MR. QUEENAN: So just you mentioned
16  that Dr. Cruz is Filipino and they don't go
17  against their supervisors. I assume that he
18  would never say anything wrong about you
19  either then when he was asked about the issue
20  with the resident since that was your words,
21  that Dr. Cruz is Filipino and wouldn't go
22  against the supervisor.
23      DR. WEINIK: He would probably do
24  that.

Page 248

1      MR. QUEENAN: Probably not?
2      DR. WEINIK: He would say what he
3  needs to say.
4      MR. QUEENAN: But your words were
5  that he wouldn't go against the supervisor.
6      DR. WEINIK: He wouldn't go against
7  me.
8      MR. QUEENAN: Did you not say that
9  as his culture as a Filipino he would not go
10  against his supervisor? That's what you
11  said.
12      DR. WEINIK: Well, let me modify
13  that.
14      MR. QUEENAN: Okay.
15      DR. WEINIK: Dr. Maitin can be very
16  stern and imposing. All the times I had to
17  just as a regular attending ask -- you know,
18  tell Dr. Maitin to back off Dr. Cruz. Dr.
19  Cruz is diminutive and he is sensitive about
20  that and if you challenge him he feels
21  threatened.
22      MR. QUEENAN: Can I see that
23  fellowship letter?
24      MR. CASTOR: The Furman one.

Page 249

1      MR. QUEENAN: The one he got
2  accepted to.
3      So when this says Dr. Weinik's
4  recommendation it does not mean the letter,
5  it just means your verbal recommendation?
6      DR. WEINIK: I made a verbal
7  recommendation.
8      MR. QUEENAN: Because it said
9  recommendation. You just didn't write him a
10  letter.
11      DR. WEINIK: No.
12      MR. QUEENAN: But your
13  recommendation -- so you did recommend him?
14      DR. WEINIK: Yes.
15      MR. QUEENAN: Okay. I'm just
16  trying to clarify things. A lot of things
17  don't fit in the little spots where they are
18  supposed to fit up here.
19      DR. WEINIK: I'm sorry. We are all
20  tired, too.
21      MR. QUEENAN: So what did this text
22  message mean, "Not a wise move since I'm very
23  good friends with Dr. Furman"?
24      DR. WEINIK: Yes. So if you're

Page 250

1 going to see them and I know them, why don't
2 you give me the opportunity to call them?
3 MR. QUEENAN: So you had no idea he
4 was going to this program?
5 DR. WEINIK: No.
6 MR. QUEENAN: He just kind of went
7 rogue?
8 DR. WEINIK: Yes.
9 MR. QUEENAN: All right. That
10 makes some sense now.
11 So you said that you sent that
12 letter out to Dr. Dua and she acknowledged it
13 but she never responded, no response at all
14 came back?
15 DR. WEINIK: She acknowledged she
16 received it but has opted not to come.
17 MR. QUEENAN: I think I needed
18 clarification on that. Thanks.
19 DR. DALY: Are we good?
20 DR. LIN: I have no questions.
21 DR. DALY: So I think we have
22 concluded testimony, although we may have
23 neglected to swear you in as part of this as
24 a witness, so we can do that.

Page 251

1 DR. WEINIK: We do have a closing
2 statement.
3 MICHAEL WEINIK, D.O., swore the
4 testimony he has given was the truth.
5 DR. DALY: So now we have about ten
6 minutes each for closing statement. What we
7 might do, however, in the interest of biology
8 is we can take a three minute bathroom break
9 and then have your closing statements if we
10 could do that. But literally three minutes.
11 We can go off the record here for
12 the next few minutes.
13 (A brief recess was held at this
14 time.)
15 DR. DALY: We'll go back on the
16 record now and we will have two closing
17 comments, no more than ten minutes. Brevity
18 would be great, if you could.
19 Dr. Cowell, would you start?
20 DR. WEINIK: Thank you. I
21 respectfully suggest to this Panel that
22 Temple University Hospital Medical Staff has
23 provided sufficient facts and evidence that
24 support the Medical Staff Executive

Page 252

1 Committee's decision to recommend to the
2 Board of Trustees that Dr. Weinik's Medical
3 Staff membership be terminated.
4 Dr. Weinik has been a member of the
5 Medical Staff for approximately 30 years. As
6 a member of the Medical Staff he is bound by
7 the Bylaws and is bound to abide by hospital
8 policies. His conduct has proven to be time
9 and time again in violation of the Physicians
10 Professional Conduct Policy and contrary to
11 what we stand for as a Medical Staff.
12 You have heard that several female
13 residents found his conduct do be
14 inappropriate. Dr. Brown was subject to
15 comments about her body and clothing and her
16 personal relationships. She considered this
17 to be stalking both in and outside of Temple
18 Hospital. She felt violated.
19 Dr. Byas, another female resident,
20 described the black dress incident and
21 Dr. Weinik's comment to her about the walk of
22 shame.
23 Amber Dzikowski from the GME office
24 described her discomfort around Dr. Weinik

Page 253

1 because her stairs at her chest. She felt
2 compelled to check her wardrobe whenever she
3 was scheduled to meet with him. She also
4 observed that he used his position as chair
5 as a fear tactic.
6 We have seen an example of this
7 fear tactic in Michael Weinik's text message
8 exchange with Dr. Acevedo. This is classic
9 bullying behavior.
10 Dr. Acevedo told us about Dr.
11 Weinik's undraping a female patient's
12 buttocks inappropriately so for an injection.
13 He became so uncomfortable with the behavior
14 that he left the exam room. He believes that
15 many residents are uncomfortable with the
16 exams that Dr. Weinik performs on female
17 patients. His belief has been corroborated
18 by another PM&R resident who had the same
19 observation, Dr. Nicholas Kenback,
20 Dr. Acevedo, Dr. Katie Hatt and Dr. Byas.
21 Dr. Reed acknowledged friendship
22 and colleagueship but confirmed that Dr.
23 Weinik says things that he should not and
24 many of his comments are not always

64 (Pages 250 - 253)

1 appropriate.
2 　　　　Dr. Brown made comments in 2016.
3 Dr. Weinik was warned verbally.  He had his
4 unprofessional behavior continue and Dr.
5 Brown issued a written complaint.  Collegial
6 intervention was initiated.  Dr. Weinik it
7 appears reflected in Allyson Saccomandi's
8 letter that the professional coaching was not
9 taken seriously and dragged out for months.
10 Despite the collegial intervention Dr.
11 Weinik's unprofessional behavior continued.
12 　　　　Dr. Dua sent her e-mail about his
13 treatment of her, an e-mail describing in
14 great detail inappropriate behavior that
15 included asking her if she was a good girl or
16 a bad girl, telling her "You're definitely a
17 bad girl, don't worry, we like bad girls at
18 Temple," bending down on his knee to touch
19 her knee in the hallway of the hospital,
20 telling her she had flexibility and that he
21 would like to find out about her flexibility
22 himself, telling her that a female patient of
23 his sees him because her husband does not
24 give her enough loving and Dr. Weinik will

1 make her feel good; calling Dr. Dua to
2 perform a physical exam demonstration during
3 which he joked about having a tramp stamp and
4 touch her parts which were unacceptable by
5 her.
6 　　　　Our receipt of the e-mail triggered
7 our latest investigation.  You will note that
8 we interviewed Dr. Weinik about Dr. Dua's
9 allegation that he touched her private areas.
10 He acknowledge that such an incident occurred
11 recalling that someone had jumped up saying
12 "That's not my question mark" and he recalled
13 that another person said that he, Dr. Weinik,
14 didn't even buy her a drink.
15 　　　　Dr. Weinik never denied that the
16 incident occurred.  He only failed to recall
17 which resident was involved.
18 　　　　Dr. Weinik may want to impugn
19 credibility of those who came forward and
20 that were interviewed.  And we ask you to
21 consider whether his witness had firsthand
22 information about the specific information
23 that has come up, were they in the hallway
24 when the Gumby reference was made, were they

1 there for the black dress walk of shame
2 incident, did they deny that Dr. Weinik
3 inappropriately touched Dr. Dua's area?  How
4 do you square that with Dr. Weinik's only
5 acknowledgment that such an incident took
6 place?  Do you find credibility in Dr.
7 Weinik's friends or colleagues or is it many
8 residents both male and female who have had
9 to work under his authority for the past
10 several years?  I ask that you use your good
11 judgment in making credibility decisions.
12 　　　　The evidence has shown that nothing
13 has changed.  Dr. Weinik continues to be as
14 people have come to know, "Weinik being
15 Weinik."  We as a Medical Staff cannot
16 tolerate that behavior.  Dr. Weinik's
17 treatment of women, including residents,
18 staff and patients does not represent the
19 values of our Medical Staff that we work to
20 uphold every day.  We cannot afford to hear
21 one more episode of this type of behavior.
22 It severely impairs the ability of our
23 residents to complete their residencies
24 without intimidation or sexual harassment.

1 　　　　His longstanding pattern of conduct
2 places the reputation and integrity of our
3 institution in serious jeopardy.  The time
4 for verbal warning and collegial intervention
5 has come and passed.  They are no longer an
6 option.
7 　　　　I ask that you carefully review all
8 the Medical Staff evidence before reaching
9 your recommendation and I ask that you uphold
10 the Medical Staff Executive Committee's
11 recommendation to terminate Dr. Weinik's
12 Medical Staff membership.
13 　　　　Thank you.
14 　　　　DR. DALY:  Thank you, Dr. Cowell.
15 Dr. Weinik, please.
16 　　　　DR. WEINIK:  I would like to offer
17 my closing argument.
18 　　　　After 30 years of teaching here at
19 Temple while helping patients with their
20 medical issues I never thought I would be
21 standing here in a quasi legal proceeding
22 defending myself against baseless allegations
23 and misconduct.  Until the last several
24 months I knew nothing of legal proceedings,

Page 258

1  witnesses, evidence, hearsay, direct and
2  cross examination and the like, nor did I
3  know the powerful and severe forces that
4  could be set in motion against me entirely on
5  the say so of people with a motive to want to
6  hurt or destroy me.
7       Motive is another term I rarely
8  heard and certainly hardly ever used. Motive
9  is a term used in criminal cases to explain
10  why a criminal commits a crime.
11  Unfortunately, I have come to learn that it
12  also applies to persons who would use the
13  administrative disciplinary process and
14  falsely accuse me, leaving me to ask the
15  motive question why.
16       Until the reorganization of the
17  department I was a regular attending
18  physician who loved his work shaping young
19  doctors into healers and sending them into
20  the world. And when the residents voted me
21  best teacher four times, as recently as 2015,
22  it made me prouder than even the accolades I
23  received from my peers. Yes, I am proud my
24  peers think highly of me. But that my

Page 259

1  students, my protégés, if you will, believe I
2  have done well passing on my knowledge to
3  actually want -- to them warms my heart even
4  more.
5       When I took over supervision of the
6  department it did not occur to me that I
7  would become a target of those whom I had to
8  correct, to those who resented me getting the
9  post and of course even those sort of people
10  have friends. Maybe I was naive. I thought
11  my easy-going nature and general way of
12  suggesting things to improve behavior would
13  make me a popular supervisor. I now know I
14  was a sucker.
15       I understand now that Dr. Acevedo,
16  however wrongly, could think I sunk his
17  fellowship in York because I was friendly
18  with Dr. Furman. I was irritated that Dr.
19  Acevedo blew off my clinical obligations to
20  attend an interview in York without telling
21  anyone. Sure, I was. He was half of the
22  resident team scheduled to assist me that
23  day. That caused a problem.
24       Would I have let him go with enough

Page 260

1  notice? Of course, I certainly would have.
2  And did I, in fact, have anything to do with
3  him not getting the fellowship? No, I did
4  not. Dr. Furman attests in his letter to
5  that effect. In fact, I helped Dr. Acevedo
6  get his current fellowship we know. Of
7  course, that only came to light after he
8  began accusing me of bad conduct to get to
9  get back at me.
10       You heard firsthand accounts from
11  Dr. Acevedo's contemporaries in the residency
12  program. No one backed up his assertions
13  that I only used female models. No one
14  backed up his assertion that I spent more
15  time with young women patients than other
16  patients. Complete nonsense. In fact, you
17  heard from men who attested to themselves
18  serving as models for me. And yet Temple did
19  nothing to corroborate Acevedo's claims by
20  interviewing these residents.
21       Dr. Acevedo supposedly told
22  investigators he witnessed me exposed a
23  female patient's buttocks unnecessarily.
24  Investigators said that Acevedo said that the

Page 261

1  patient's facial expressions told him she was
2  uncomfortable so Dr. Acevedo walked out the
3  door. But Dr. Williams was right there the
4  whole time assisting. He said everything was
5  by the book. Other witnesses backed him up.
6  But Temple urges you to trust their
7  investigations into what they say.
8       Dr. Acevedo says he thought a
9  patient's facial expressions said over what
10  Dr. Williams and I told you about what
11  happened. Temple might have gotten the story
12  straight from Dr. Williams if the
13  investigator had not fallen asleep while Dr.
14  Williams was relating what happened. And of
15  course Temple made no effort to discover the
16  identity of the patient so we could ask her
17  and naturally Temple shut me out of the
18  system that would allow me to do the same.
19       I should not have to be the one to
20  point out Dr. Acevedo's reasons to want to
21  harm me or the incredible, or the incredible
22  nature of his lies. Temple could and should
23  have uncovered these things itself but it
24  chose not to. Perhaps if it had followed its

66 (Pages 258 - 261)

1  own procedures for reviewing complaints we
2  would not be here today or if it had not
3  jumped to the conclusion I was such a menace
4  to the institution I had to be escorted off
5  the property and have all my access to
6  records, computer and e-mails cut off, the
7  very places where I might have been able to
8  reconstruct firsthand sources to fight off
9  this slanderous hearsay effort at
10 retribution.
11       Briefly, I want to address Dr.
12 Brown and any other passing complaints about
13 my demeanor, again all hearsay. And in Dr.
14 Brown's case, her complaints had already been
15 addressed when the Acevedo and Dua issues
16 came up in January of this year. Curiously,
17 those last two complaints come in despite
18 Dua's being four to six years old in mid
19 January to early February this year, the
20 precise time I'm trying to exercise control
21 over the department much to the distress of
22 Drs. Maitin and Cruz.
23       Witnesses have told you that Dr.
24 Brown was a less than stellar resident. And

1  yes, I had to reprimand her about her
2  clothing being unprofessional. I'm trying to
3  teach young doctors how to interact with
4  patients. The reverse is also true, you
5  recall, when I had to educate the son of a
6  Board member not to flirt and ask out Dr.
7  Stephanie Li. So it went both ways. Did Dr.
8  Brown get her nose out of joint because she
9  wore -- because I said she wore something too
10 revealing? I imagine she did. But what
11 better way to get back at Weinik than to
12 point a finger at him.
13       But as I mentioned, Temple had
14 closed that case until the happy coincident
15 of Dua and Acevedo came together, just as I
16 was pressing to reorganize the department.
17 Now that Dua's complaint is four to six years
18 old, I never saw her unredacted e-mail.
19 Temple reports do not reflect that
20 investigators ever interviewed me. My
21 lawyer asked her to come tonight to tell what
22 happened but she didn't appear. Temple did
23 nothing to corroborate what Dua claims in her
24 letter. Temple did not interview the

1  witnesses I provided saying nothing memorable
2  happened. But what Temple also missed was
3  the rampant speculation that Dua and Maitin
4  enjoyed a special relationship and Maitin was
5  in danger of losing his job. You heard
6  witnesses say it was a well-known rumor. If
7  it was well-known as the residents from back
8  then testified, then how come Temple did not
9  check it out? So easy for Dua to accuse me
10 four to six years after the fact because her
11 friend Maitin in danger from me of losing his
12 job. Did she think it would go this far?
13 Probably not. Once she realized the hornet's
14 nest was stirred up she wanted nothing more
15 to do with it. She wanted to remain
16 anonymous, never gave an interview to
17 investigators while admitting by text she
18 received a letter from my lawyer to come here
19 tonight. She did not show. This is the kind
20 of reliable hearsay that your policy says
21 would be ordinarily something a reasonable
22 person would -- sorry, excuse me. Is this
23 the kind of reliable hearsay that your policy
24 says would be ordinarily something a

1  reasonable person would rely on upon making a
2  decision in his or her own affairs. I think
3  not. And yet Temple wants you to conclude
4  the Dua e-mail is reliable, though
5  uncorroborated hearsay, so powerful as to
6  dismiss me from my post.
7       I am sure there are things that I
8  would want to say that I have forgotten and
9  that is why I have asked to submit a post
10 hearing written argument. But I ask you to
11 assess this evidence for what it is, rank
12 hearsay that is unreliable and not only
13 uncorroborated but intentionally so. Temple
14 could easily have run down firsthand sources
15 and simply did not do it either out of
16 negligence or out of desire to reach a
17 predetermined conclusion that it wanted my
18 head on a spike. In either event, these
19 allegations are not only not proven, they are
20 disproven using any fair measure of
21 credibility determination. I implore you to
22 recommend against any sanction and permit me
23 to resume my duties and my passion teaching
24 young MDs and DOs to be capable practicing

67 (Pages 262 - 265)

1    physicians making Temple proud in the world
2    of medicine.
3        Thank you.
4        DR. DALY:  Thank you, Dr. Weinik.
5        Thank you, Dr. Cowell.
6        We'll end the formal meeting here
7    and we will go off the record at this
8    juncture.
9        MR. WRIGHT:  We want to put on the
10   record our agreement that we are going to --
11   or did we already?  I have forgotten whether
12   we made our decision about ten days for us to
13   receive that.  I don't know whether we put
14   that on the record.
15       DR. DALY:  I don't know whether
16   that was on or off.  It was a conversation
17   off the record, so we will stay on the record
18   then for agreement that there will be --
19   Dr. Weinik mentioned he wanted to have a
20   written document submitted after this.
21       Dr. Cowell, do you want to do the
22   same?
23       DR. COWELL:  Yes.
24       DR. DALY:  You do.  So there will

1    be two written documents that will come, post
2    hearing written closings, if you will.  You
3    can also submit the -- we will have the
4    verbal testimony by the court reporter but
5    you can also submit to her and to us, if you
6    wish, your written closing discussion there,
7    the argument that you have, each of you.  And
8    if there are other written documents that you
9    think would be important, particularly those
10   that are on the record that have been
11   submitted, I think that will be fine for us
12   to receive.
13       We have talked about the time line.
14   I haven't given you the time line of when we
15   meet because we haven't talked about
16   vacations and other things, but we will try
17   to be expeditious in this so that you are not
18   left hanging about a decision.  So we will
19   try to move along.  It will be approximately
20   three weeks before we receive all the written
21   information back.  We will try to do
22   something within a couple of weeks after
23   that.
24       I thank everybody.  The time has

1    gone on.  It's been a long evening.  I
2    appreciate everyone's cooperation getting the
3    witnesses for both sides but particularly
4    yourself, Dr. Weinik, in getting those, the
5    court reporter for staying so late, and the
6    attorneys for not speaking up as much as they
7    would like to and the difficulty with a
8    procedure which is not like that you learned
9    in law school.
10       So thank you.  We will go off the
11   record now and adjourn.  Parental.
12       (The Medical Staff Hearing was
13   concluded at 11:00 p.m.)
14
15       ------
16
17
18
19
20
21
22
23
24

1    C E R T I F I C A T E
2
3        I do hereby certify that I am a
4    Notary Public in good standing, that the
5    aforesaid testimony was taken before me,
6    pursuant to notice, at the time and place
7    indicated; that said deponent was by me duly
8    sworn to tell the truth, the whole truth,
9    and nothing but the truth; that the
10   testimony of said deponent was correctly
11   recorded in machine shorthand by me and
12   thereafter transcribed under my supervision
13   with computer-aided transcription; that the
14   deposition is a true and correct record of
15   the testimony given by the witness; and that
16   I am neither of counsel nor kin to any party
17   in said action, nor interested in the
18   outcome thereof.
19
20       WITNESS my hand and official seal
21   this 23rd of July, 2018.
22                   _Jan Brooks_
23
24   _____
     Notary Public

68 (Pages 266 - 269)

[1 - 841]

**1**

**1**  4:20 37:24 39:20
  39:22 75:19
  225:18
**1/16/18**  65:12
**10**  1:7 31:9 41:9
  65:11
**10/7/2016**  49:23
**100**  239:14
**104**  3:9
**109**  3:11
**11**  240:11,22
**117**  3:14
**11:00**  268:13
**12**  38:6 49:14
**12/12/16**  49:11
**12/12/2016**  18:7
**122**  3:16
**127**  3:19
**13**  105:21 106:18
  129:8
**14**  106:18 129:8
  172:14
**141**  3:21
**15**  14:10,13,19
  39:16 40:5 108:3
  127:10 222:7
**152**  3:22
**159**  4:5
**15th**  39:24 40:2
**16**  13:24
**166**  4:6
**17**  39:18 84:8
  226:10
**176**  4:9
**18**  126:10 226:11
**1800**  1:17
**1801**  1:16
**182**  4:10
**19003**  2:15

**19103**  1:17
**19129-1398**  2:9
**194**  4:12
**1986**  221:7

**2**

**2**  4:21 23:19 37:23
  41:14 47:11,13
  72:21,24 75:22
  79:11 120:11
  180:2 183:5,9
  195:11
**2/20**  242:1
**2/20/18**  240:12
**2/24/17**  32:22
**2/28/17**  79:24
**20**  196:13 212:5
  215:11
**2000**  13:24
**2008**  194:18,22
**2010**  160:11
**2011**  50:6 142:2
**2012**  16:3,8 47:16
  47:22 48:4,7 49:2
  50:6 51:7 74:16
  77:6 93:4 105:7
  105:21,24 106:6,9
  106:12,17 127:10
  129:8 142:2,3
  160:11 162:13
  172:14 198:14
**2013**  50:6
**2014**  16:3,8 47:16
  47:23 48:5,7 49:2
  51:7 74:16 77:7
  162:14 198:14
**2015**  50:7 132:12
  142:3 160:11
  258:21
**2016**  12:20 13:18
  14:19 18:3 27:19
  27:20,21,22 33:9

**35:9 49:14,18**
  142:6 254:2
**2017**  27:13,18
  28:20 35:3 37:9
  37:18,24 38:6,12
  38:18 39:3,16,18
  39:20,21 40:5,8
  49:1,17 79:11
  83:18 84:3,9
  96:16
**2018**  1:7 13:24
  14:10,13,19 40:23
  62:10 74:17 93:4
  106:10 269:21
**203**  4:13
**21**  40:8
**22**  3:4
**220**  4:15
**23**  62:10
**23rd**  269:21
**24**  38:18
**240**  4:16
**2450**  2:8
**25**  39:1 111:22
**26**  2:15
**27**  37:18 39:21
  109:17
**28**  109:17
**2:00**  115:18

**3**

**3**  4:22 25:6,24
  26:22 38:18 39:2
  72:21 73:1 180:3
  191:14
**30**  19:1 21:2 38:11
  130:5 136:7
  168:14,19 169:7,9
  169:14,15,17,17
  169:18,19,24
  196:13 199:5
  207:21 221:13

**252:5 257:18**
**300**  19:4 221:12
**3401**  1:10
**35**  163:14
**360**  38:16,19
**3:00**  207:12 209:1

**4**

**4**  2:9 4:23 120:5
  126:4 180:5 189:1
  191:16 192:10
  195:12 212:14
**40**  124:14 196:15
**47**  3:5

**5**

**5**  35:2 63:24
**50**  233:21
**50/50**  211:23

**6**

**6**  32:6 40:16 51:20
  62:11
**60**  246:11,13
**60/40**  214:18
**610-649-1880**  2:16

**7**

**7**  12:8 18:3 26:2
  236:20
**7.2.2**  26:4
**7.3**  25:11,22 26:14
**7.3.1**  26:15
**70,000**  19:2
**78**  3:8
**7:00**  71:5

**8**

**8**  25:17 37:8 62:8
**8.4.7**  16:24
**80**  196:14
**841**  15:15

| 9 |
| --- |
| **9**   25:20 |
| **9th**   1:11 |

| a |
| --- |

**a.m.**   207:12 209:1
**aapm&r**   181:16
**abducted**   170:18
**abide**   252:7
**ability**   38:10 233:9
   238:2 256:22
**abington**   189:6
**able**   7:3 15:1
   73:21 77:1,10
   169:21 170:14
   229:8,13 231:22
   231:23 238:5,9
   262:7
**abnormal**   144:18
   167:5
**abrasiveness**
   216:3
**absence**   246:18,19
**absolutely**   68:16
   68:21,24 70:5,9
   112:9 113:11
   125:18 128:17
   141:2 148:6 178:3
   178:13 184:6
**abuse**   24:8 229:7
**academic**   225:23
**academically**
   226:1
**academy**   64:20
**acceleration**   246:3
**accept**   115:6,12
**acceptance**   36:14
   239:14
**accepted**   231:22
   249:2

**accepting**   7:24
**access**   34:14 98:22
   231:23,23 243:9
   245:10 262:5
**accolades**   258:22
**accommodate**
   199:10
**accommodating**
   148:4
**account**   24:24
   179:14 180:9
**accounts**   20:20
   260:10
**accredited**   191:13
**accurate**   233:4
**accurately**   128:14
   161:14 196:7
**accusation**   19:9
   128:7 143:13,15
   144:8 161:7,15
   162:16 195:23,24
   196:22
**accusations**
   128:15 151:16
   185:15 196:8
**accusatory**   147:15
**accuse**   258:14
   264:9
**accused**   18:18
   19:11 21:18 144:5
   178:18
**accusers**   21:12
**accusing**   20:11,22
   21:5 238:13 260:8
**accustomed**   17:3
**acevedo**   88:2
   92:18 94:20 99:18
   100:20,22 104:24
   127:15,17 128:4
   128:14 143:18,22
   144:2,5 147:15

160:14,17 161:4
   161:14 162:1
   178:9,11,14,18
   179:1,13,20,23,24
   180:7,15 182:22
   182:24 183:1
   185:4 190:7 191:2
   191:17 192:13
   195:7,11,20 196:7
   196:24 197:11
   204:5,10 215:1
   228:4 230:14,15
   231:18,24 232:5
   232:12,15,23
   233:8,13,18 237:2
   237:13 239:4,4
   253:8,10,20
   259:15,19 260:5
   260:21,24 261:2,8
   262:15 263:15
**acevedo's**   204:13
   228:3 231:7
   260:11,19 261:20
**achieved**   224:2
**acknowledge**
   255:10
**acknowledged**
   236:22 250:12,15
   253:21
**acknowledgment**
   256:5
**act**   30:18 216:6
**acted**   16:15 129:9
   129:10 130:17
   162:14,15 164:6
   198:14,15 200:16
   200:20
**acting**   70:18 130:8
   163:18 199:23
**action**   26:14,15
   28:7,9 34:4 35:1

35:22 36:15,20,22
   37:2 41:7 81:1
   82:19,21 269:17
**actions**   12:10
   13:11 25:10,16,19
   25:21,21 26:3,10
   51:8 211:9
**activities**   13:11
**activity**   11:3
   109:14
**actual**   17:20 47:22
**adam**   200:7 208:5
   218:8
**adamant**   37:15
**add**   53:16 113:20
   169:19
**addition**   11:2
   163:6
**additional**   31:2
   175:2
**address**   15:12
   51:22 53:3 73:12
   228:3 230:10
   262:11
**addressed**   28:4,13
   28:17,24 32:8
   82:6 262:15
**addresses**   38:8
**adducted**   170:18
**adenoma**   245:24
**adjectives**   188:15
**adjourn**   268:11
**adjourned**   8:12
**adjust**   44:9
**adjusted**   50:12,20
**administrating**
   146:18
**administration**
   132:5
**administrative**
   18:6 103:13,17

110:2 208:10 214:1 258:13

**administrator** 12:1 90:2 92:13 92:15 94:3,22 96:11 97:10,13 148:24 222:16

**administrators** 66:1

**admissibility** 7:20

**admissible** 17:1

**admit** 183:14

**admitted** 16:23 35:7 58:8

**admitting** 264:17

**adopt** 68:2

**adopted** 48:24 67:14 80:21

**adult** 198:2

**advance** 12:4 56:9

**advantage** 226:19

**adversarial** 226:11

**adverse** 12:10

**advice** 216:16

**advise** 8:11

**advised** 14:13 28:22

**afar** 207:1

**affairs** 17:4 265:2

**afford** 256:20

**afforded** 18:19 238:7

**aforesaid** 269:5

**afraid** 183:14 189:16,18

**afternoon** 40:7

**aggressive** 24:12 222:19

**aggressively** 124:21

**ago** 16:14 72:20,21 110:14 120:12 129:8 138:6 162:13 198:14 214:23

**agree** 49:1,3 63:14 64:21 108:8,9,13 115:12 128:15 139:20 152:4 161:15 178:1 181:9 196:8

**agreed** 36:19,22

**agreement** 266:10 266:18

**agrees** 60:20

**ahead** 8:23 23:6 29:24 32:4 48:22 49:20 50:3 54:22 55:3 56:24 60:9 61:13 62:1 64:13 70:12 109:4 119:9 195:10

**aided** 269:13

**albuquerque** 207:3,6,10

**alignment** 147:4

**allegation** 13:3 58:17 115:23 129:6,11 134:1,3 162:10 198:12,17 255:9

**allegations** 13:6 16:4,20 20:9,13 21:9 35:6,20 36:5 58:15 61:22 78:23 113:10,12 127:24 153:7 161:1 195:17 207:21,24 218:6 233:17 257:22 265:19

**alleged** 10:22 11:18 16:13 18:4 18:9 59:6 110:3 110:21 111:9,16 133:21 134:22

**alleges** 56:20

**allied** 24:3

**allocations** 69:16

**allow** 15:19 121:8 147:7 170:20,21 261:18

**allowed** 69:2 70:2 84:6

**allowing** 80:10

**allyson** 13:21 37:9 254:7

**alteration** 52:8

**amber** 65:24 67:7 89:24 90:1 92:12 97:16 100:1 189:15 193:1 223:21 234:6,16 234:19 235:8 252:23

**amend** 17:24

**amended** 50:6,9 50:11,19

**amount** 88:14 90:23 128:16 142:21 147:16 161:16 184:21 196:9,16

**amplify** 131:4 164:18 201:7

**anatomic** 147:2

**anatomical** 146:21

**anatomy** 147:8

**anger** 44:15

**angered** 238:10

**angry** 180:7 222:20

**ankle** 200:12

**announce** 108:17

**annu** 168:1

**annual** 12:15

**anonymity** 71:3 71:16

**anonymous** 46:18 264:16

**anorectic** 33:3

**anorexic** 80:14

**answer** 34:20 73:14 106:22 107:1 116:17 140:4 169:23 175:10 242:3,4

**answered** 188:3

**anticipated** 38:21 40:21

**anticipation** 36:13 107:23

**anybody** 66:19 77:1 113:17 114:19 173:7

**anymore** 125:12 221:5

**apart** 219:3

**apologize** 27:20 87:21 125:10,11 169:13

**apparently** 67:10 79:15 85:11 89:6 106:14

**appear** 263:22

**appearance** 10:20

**appearances** 2:1

**appeared** 28:20 151:9 152:7 156:8

**appears** 236:18 254:7

**applicants** 231:18 231:19

application 191:2
  231:8,11,16 239:7
applications
  191:12
applied 16:6 191:4
  191:8 231:8
applies 258:12
applying 191:17
appreciate 48:17
  54:20 72:12
  116:19 121:13
  122:1 125:20
  140:12 159:8
  174:22 182:9
  193:16 221:3
  243:1,10 268:2
apprentice 134:16
approached 32:24
  37:10,11
appropriate 9:11
  42:10 80:22
  142:21,23 146:4
  147:11 201:23
  254:1
appropriateness
  27:5
approved 18:2
  223:9 224:20
approximately 7:6
  7:10 19:4 168:16
  199:5 221:12
  233:20 252:5
  267:19
april 35:2 37:9,18
  41:1 84:9
aptitude 148:12
ardmore 2:15
area 10:24 42:15
  88:6 129:23 140:9
  145:4,8 147:9,11
  147:17 148:8

179:18 256:3
areas 24:16 39:5
  255:9
arguing 72:23
argument 15:22
  21:8 219:19
  257:17 265:10
  267:7
arguments 6:23
  7:1,9,15
arora 4:4 159:15
  159:21 160:2
arose 85:9
arrange 228:9
arrangements
  36:24
arranging 177:3
arrive 26:10
article 12:8 25:11
  26:2 71:18
articles 26:1
ascertain 51:10
  234:13
asked 10:20 39:23
  41:18,22 42:12
  46:6 67:17 71:18
  71:20 76:1 80:2
  84:10 90:10 91:22
  101:15 106:13
  113:16 125:2
  131:2 136:24
  138:10 139:9,10
  139:12,14,15
  150:21 151:16
  157:16 164:16
  167:2 171:11
  175:11 201:6
  216:15 230:17
  231:5 235:10
  238:12,15 240:13
  247:19 263:21

265:9
asking 30:12 59:5
  67:4 91:14 103:16
  106:15,18,19,20
  116:7 124:16,21
  139:3,22 155:10
  169:12 204:8,9
  217:6 220:18
  241:4 244:11
  254:15
asleep 151:14,20
  152:2,5 210:23
  215:4 261:13
aspect 109:21
aspects 10:13 53:8
asserted 25:14
assertion 260:14
assertions 260:12
assess 265:11
assessment 39:10
  58:18 82:18
assign 19:16
  237:24
assigned 64:15
  67:3
assignment 37:8
  38:20 40:10,18
  41:4
assist 113:21
  259:22
assistance 211:17
assistant 224:8
assisting 261:4
associate 52:4
  165:16
assume 247:17
assuming 128:13
  161:13 196:6
assure 66:5
athens 2:15

athletic 45:16
attach 108:5
attainment 65:5
attempt 13:15
  41:6
attempts 35:16
  70:1,6,9,14,16
  91:3
attend 64:18
  259:20
attendance 64:14
  202:7
attending 20:6
  34:10 44:14 127:9
  130:4 143:23
  172:3 217:16
  237:15 247:8
  248:17 258:17
attending's 216:22
  216:23 217:8,15
attendings 181:7
  197:17,21,22
  206:10 215:22
  226:3 247:6
attention 23:9,14
  27:11 33:11 41:11
  60:23 61:9 62:21
  63:22 65:4 93:15
  97:11 151:6,10
attentiveness
  156:4
attest 112:19
attestations 233:6
attested 260:17
attests 260:4
attire 80:22
attitude 197:20
attitudes 121:20
attorney 121:9
attorneys 6:21 7:2
  15:17 111:1 268:6

[attractive - bias]                                                      Page 5

**attractive** 11:6
 87:16 88:13 90:24
**atypical** 246:7
**audience** 45:3,9
 200:14 240:18
**audio** 16:17 74:2
**august** 38:18
**authenticity** 53:15
**author** 52:18
 54:24 71:18
**authored** 52:11
 71:20 74:18
**authority** 256:9
**authorship** 52:24
**automatic** 26:3
**automatically**
 16:23
**available** 14:24
 169:19 231:21
**avenue** 2:8,15
**averna** 4:11
 193:19,22 194:1,8
 204:7 221:20
 238:11
**avoided** 43:4
**awake** 151:13
**aware** 33:11 48:3
 75:2 80:7 99:16
 128:7 129:6
 132:22 134:24
 142:7 144:4,8
 152:9 161:7
 162:10,16 165:19
 165:23 169:18
 172:19,20 178:17
 179:10 180:6,6
 182:1 190:5,10
 195:23 198:12
 202:24 207:24
 232:3 247:12

**awful** 42:5
**awkward** 57:6,7
 121:10,11 125:1
**awkwardness**
 43:1
**axes** 228:2

**b**

**b** 89:2
**back** 12:20 13:17
 27:12 35:9 38:4
 44:24 52:6 58:11
 67:2 77:6 84:8
 99:19,21 105:7,16
 105:21,24 106:5,8
 106:19 107:14,17
 110:21 134:6
 141:21 142:5
 144:24 159:12
 167:11 171:2
 172:14 183:7,11
 186:23 189:12
 194:18 197:10
 214:1 216:15
 217:23 223:22
 224:21 230:14,18
 236:1,7 242:16
 245:2 246:1,2
 248:18 250:14
 251:15 260:9
 263:11 264:7
 267:21
**backed** 42:20
 58:23 260:12,14
 261:5
**background**
 221:19
**backside** 88:6
**backup** 228:9
**bad** 41:19,24,24
 41:24 42:3,3,3,4
 114:10 128:23

 190:6 235:14
 254:16,17,17
 260:8
**badmouth** 223:1
**ballpark** 73:1
**barrage** 115:9
**barre** 140:9
**base** 86:17
**based** 9:22 10:10
 18:20 143:12
 151:23 162:3
 197:2 204:13
 239:16
**baseless** 257:22
**basically** 89:20
 149:5 171:8
 173:16
**basis** 12:10 14:2,3
 27:8 189:22
 196:14
**bathroom** 107:13
 218:4 251:8
**bear** 17:8
**becoming** 160:8
**beers** 210:7,10
**began** 260:8
**beginning** 1:12
 13:17 38:20 40:4
 181:14 206:24
**behalf** 10:2 128:2
 156:5 188:2,3
**behave** 118:14
 123:15
**behaved** 125:7
**behavior** 10:11
 11:13,22 14:18
 24:17 25:7,12
 37:13 46:14 81:2
 119:2 152:1
 204:16,20 253:9
 253:13 254:4,11

 254:14 256:16,21
 259:12
**behaviors** 24:4
 33:14,19 34:9
 80:6 226:23
**belief** 240:3
 253:17
**believe** 14:17 34:6
 47:17,19 49:6,8,15
 53:6 95:10 101:1
 127:17 130:4
 131:21,21 132:6
 132:16 134:20
 147:18 148:11,22
 149:7 164:19
 165:16 168:1,12
 179:14 182:4
 183:8 202:18
 205:13,14 206:21
 228:11 232:24
 233:15 236:14
 237:12 259:1
**believed** 21:9
**believes** 253:14
**belongs** 20:19
**bending** 254:18
**beneath** 210:19
**benefit** 69:22
**benefits** 144:22
**bent** 18:21
**best** 31:19 54:17
 82:8 101:22 220:6
 220:24 225:11
 226:17 258:21
**better** 74:4 138:5
 224:2 263:11
**beyond** 38:16 46:2
 106:23 134:16,23
**bias** 21:11 81:19
 81:22 82:12

biased  58:2
biases  101:24
big  148:5 211:18
biology  251:7
bit  61:19 79:2
    104:4 116:10
    120:13 124:7
    145:7 155:12
    161:20 187:13
    197:10
black  13:3 89:7,9
    227:6,17 252:20
    256:1
blemish  221:14
blew  259:19
blocking  80:10
blowing  209:12,16
board  5:11 10:6
    149:18 207:17
    252:2 263:6
boards  149:18
    198:5 216:15
boat  59:17
body  13:7 33:1,14
    44:20 58:5 62:4
    80:13 130:12
    147:5 200:6,11
    201:14 252:15
bogus  211:10
bone  196:15,15
bonner  168:4
book  261:5
born  226:12
boss  44:14
bottom  75:12
bound  252:6,7
boy  239:22
boyer  1:11
bragged  181:18
bragging  181:20

breach  156:4
break  107:13,17
    218:4 251:8
breakout  130:15
brevity  251:17
brief  107:18 108:6
    251:13
briefed  78:17
briefly  6:17
    109:15,16 262:11
bright  225:4,22
bring  10:1 29:9
    30:23 50:12,13
    84:20
bringing  12:10
brings  12:6 20:15
    40:23 142:8
broad  1:11
broadcasted
    170:14
broader  102:6
broke  134:2
broken  130:12
brooks  1:13
brothers  196:20
brought  27:10,23
    33:10 88:21,22
    92:17 184:17
    233:5 243:7
brown  27:24
    28:14,20,22 29:2
    32:8 35:5,12,14
    36:2 51:21 52:10
    53:20,22 56:19
    57:23,24 59:3,6,7
    62:3 78:21 79:8
    79:13,18 80:19
    83:3,5,5,7 84:11
    84:11 98:3,6
    180:18 181:1
    182:3,21,23

183:20 184:6
    188:13 190:7
    192:12 252:14
    254:2,5 262:12,24
    263:8
brown's  36:8 58:6
    58:20 62:6 86:17
    182:7 262:14
bruce  2:14,16 5:24
    149:12
brushed  124:17
buddy  234:18,21
    234:22
bullet  241:1
bullying  253:9
bump  246:12
bumped  46:2
bunch  214:16
burden  20:18
burn  13:22
bursa  45:7
buttock  147:22
buttocks  45:10
    144:6 146:1
    147:20 178:18
    185:5 253:12
    260:23
buy  46:8 241:8
    255:14
byas  89:2 227:5
    252:19 253:20
bylaws  12:9 15:23
    16:24 18:1 25:11
    25:23 48:9,10
    49:22 50:5,12,23
    51:6,8,9,12,15
    252:7

| c |
| --- |

c  141:4 269:1,1
calendar  8:8

call  23:3 66:17
    67:5 70:17 100:1
    107:15 108:15
    116:21 175:12
    176:2 189:4
    199:17 211:1
    215:20 228:9
    230:12 233:14
    239:18,19 250:2
calla  235:14
called  8:1 27:13
    29:14 31:10 44:18
    59:10 76:6 90:9
    124:2 200:4,13
    229:10
calling  20:24 33:2
    211:10 255:1
calls  188:2,3
    204:22 215:21
    234:10
camera  130:1
    163:12 199:14
    201:13
cameras  170:19
    170:21
campus  202:5
    215:15
cancel  39:22
    246:17
canceled  39:17
    40:6 207:11,16
    245:6,9,12
cancellations  41:2
    63:1
cancer  246:4,7
cap  103:5
capable  183:12
    239:12 265:24
capacity  70:19,19
    117:19

**captain** 210:22
**capture** 65:6
**care** 20:3 33:18
  44:7 109:19,20,24
  112:21,22,24
  113:7 114:7
  115:19 181:10
  197:19 246:5
**career** 69:5 70:24
  70:24 109:15
  141:21 145:13
  191:10,20 192:4
  222:22
**careers** 12:4 19:23
**careful** 155:20
**carefully** 257:7
**caring** 20:5
**cars** 156:18
**case** 17:10 94:1
  107:7,24 108:18
  111:10 118:22
  133:9 148:6 166:9
  203:17 234:4
  241:21 262:14
  263:14
**cases** 110:2,20
  111:3,4 221:10
  258:9
**caster** 5:24
**castor** 2:13,14
  4:23 5:24 6:1,3
  8:23 9:4 22:2
  23:18 29:10,16,21
  31:9 47:11 48:14
  48:19 54:13,20
  55:16 59:14 60:3
  60:19,24 69:6,15
  71:13,21,24 72:8
  72:10 74:8,19
  77:12 79:14 101:5
  103:11 107:22

108:11,20,23
  116:3,14 149:12
  149:24 150:4,9,9
  151:19 175:6,10
  175:17,24 176:6
  194:20 218:19
  219:2,16 220:1,8
  220:12 221:1,3
  236:24 242:22,24
  244:19 248:24
**caught** 57:9 85:23
**cause** 20:3
**caused** 259:23
**cells** 246:7
**center** 136:1
  163:12
**certain** 48:10
  62:18 89:8 168:18
  170:19 177:19
  192:18 200:6
  209:15 234:23
  237:18 238:18
  239:16
**certainly** 22:11
  23:13 30:15 82:6
  112:13,15 151:3,9
  175:9 176:10
  258:8 260:1
**certification** 16:5
  16:11 39:2
**certified** 207:17
**certify** 269:3
**cetera** 96:11 115:4
  115:5 186:3 187:7
  209:6
**chair** 2:5 5:13 7:17
  7:21 8:12 11:19
  26:6 34:10 36:12
  36:17 82:4 117:17
  122:23,23 131:15
  131:17,23 132:16

158:24,24 159:2
  165:8 202:12,18
  202:21 205:1,5,6
  210:22 211:17
  221:16,16 222:4,6
  222:7 223:6,10,16
  224:13,15 237:24
  237:24 238:1,2
  253:4
**chair's** 176:1
**chairman** 29:10
  31:9 61:8 71:21
  77:12 103:11
  107:23 108:20
  165:4 237:1
  242:23
**chairmanship**
  223:12,13
**chairperson**
  165:15
**chairs** 64:19
  156:19
**challenge** 248:20
**challenged** 247:5
**challenging**
  221:10
**chance** 15:16
  113:19 173:12
  208:12 223:8
**chances** 204:22
  228:6 229:15
**change** 132:4,7,10
  132:13 155:9
  202:15,16 221:14
  225:14,19
**changed** 13:9 49:7
  165:11,14 227:24
  228:1 238:4
  256:13
**changes** 50:14

**character** 112:8
  112:11,16 115:21
  116:9 181:5 182:7
  192:19 195:18
  201:17,21
**characteristics**
  88:17
**characterization**
  88:19
**characterized**
  11:11 13:10
**chase** 50:15
**check** 43:17 45:15
  45:18 76:16
  196:20 253:2
  264:9
**checking** 45:7
**checks** 90:5
**chest** 90:6,14
  253:1
**chief** 27:3 46:5
  77:4 91:13 95:8,9
  129:2 143:17,19
  143:21 160:20
  162:6 165:9
  167:16,21 177:10
  188:24 190:14
  195:11 197:6,18
  198:8 200:7,7
  203:3 204:18
  208:3 210:17,24
  211:13,14 212:13
  212:17,18 213:4
  213:10,14 214:4
  228:8
**chiefs** 180:4
  197:13 198:7
  199:1,2 205:7
  206:2,2 208:7
  212:15 213:15
  214:1,13 215:1

children's 203:11
choose 92:1 232:4
chose 135:15
  239:5 261:24
chosen 238:15
chris 126:20
christopher 3:18
  126:22
chronic 45:17
circumstances
  19:6 142:8
citations 221:23
  224:4
cite 80:8
cited 236:3
citing 80:15
claim 128:22
  178:1
claimed 16:14
claims 10:17 18:17
  233:11 260:19
  263:23
clarification 53:8
  72:14 76:20 217:3
  250:18
clarify 30:7 55:15
  105:5 158:5
  173:15 204:4
  205:21 249:16
class 127:16 130:3
  130:21 160:19
  164:11 180:23
  181:21 193:4
  195:10 200:24
  206:3 213:15,16
classes 207:22
classic 253:8
clean 145:5 153:21
cleared 207:19
clearly 58:11
  59:24 203:12

cleft 145:3 148:1
client 72:13
clients 7:4
climb 227:12
clinic 33:24 41:18
  122:24 124:9
  194:23 196:23
  207:11,17
clinical 26:20
  259:19
clinician 142:20
close 111:12,13,14
  152:15 166:1
  172:8,14,18 173:2
  173:5 209:14
  220:14,15 228:17
  236:4
closed 38:19
  151:12 206:14
  263:14
closer 236:10
closing 7:1,8,14
  8:7,10 17:16
  175:9 219:19,23
  220:5,20 251:1,6,9
  251:16 257:17
  267:6
closings 267:2
clothed 153:22
clothes 33:15
clothing 89:15,21
  252:15 263:2
coach 245:2
coaching 36:10
  37:8 38:20 40:17
  62:9 65:3 81:15
  82:9 96:19,23
  98:6,9 102:10
  254:8
coachings 65:8

coats 227:10
cognizant 220:3
coincident 263:14
collaborate 21:13
  59:2 70:15
collaboration 26:7
  91:7
colleague 176:11
colleagues 5:14
  24:9,18 107:12
  141:20 146:12
  155:16 209:14
  210:9 256:7
colleagueship
  253:22
college 129:15
  162:20
collegial 10:12
  13:20 23:15 25:17
  26:5,9,18 37:4,6,7
  81:13 85:3 96:12
  96:14,15,22
  183:21 254:5,10
  257:4
combination
  213:20
come 13:1 29:17
  29:19 31:22,22
  57:24 66:6,21
  67:17 68:4 78:22
  98:16 107:14,17
  115:15 116:8,22
  136:17 146:24
  147:4,23 148:3,16
  173:16 176:3,5,9
  183:11 189:19
  207:23 218:10
  236:7,21,23 238:9
  240:18 250:16
  255:23 256:14
  257:5 258:11

262:17 263:21
  264:8,18 267:1
comes 44:5 93:22
  100:8 114:4
  196:19
comfortable 95:18
  95:21 214:12
coming 20:22
  37:22 60:6 71:1
  89:20 109:13
  113:21 117:1,13
  122:15 127:5
  140:21 141:11
  153:4 156:11
  159:12 160:3
  169:8 177:2 183:7
  193:19 194:7
  197:17 204:15
  206:24 214:12
  217:22 246:2
comment 17:14
  45:2 80:11 86:20
  88:23 101:14
  154:15,22 155:18
  156:6 252:21
commentary
  90:12 184:24
commented 10:20
  37:16 80:13,21
  89:7 91:14 92:3
  92:19 100:1 121:9
commenting 80:12
  221:4
comments 10:18
  24:14 33:1,4,7,9
  33:14 34:2,9 43:6
  44:11 46:14 78:23
  80:23 81:2 82:7
  82:13 90:3,19
  91:19 95:20
  121:20 130:20

[comments - considered] Page 9

135:11 154:21
155:3,17,20
156:18,18,23
164:9 182:19,21
190:6 200:23
209:2,5,5,23 218:4
233:19 235:20
251:17 252:15
253:24 254:2
**commitment**  40:3
40:12
**commitments**
37:20
**commits**  258:10
**committed**  37:16
41:1 64:11 229:16
**committee**  2:12
14:9,9 25:9 27:6,7
29:6 78:17 84:13
102:13,14 103:8,9
103:20,23 186:2
187:5
**committee's**  5:10
10:5 14:14,21
61:23 252:1
257:10
**common**  133:1
152:12 166:3
192:19
**communication**
184:9
**community**  11:20
68:13,14 70:23
112:4,7,11
**company**  168:14
**compared**  128:6
161:6 195:22
**compelled**  253:2
**competence**  20:5
**competency**  12:16
26:20

**complain**  179:6
**complainant**
84:17
**complaint**  16:9,10
24:20 25:14 28:21
32:7 37:12 58:13
58:23 78:20 80:2
83:22 84:5,6,17
87:3 93:3,22
100:21 106:9
156:2 228:3 254:5
263:17
**complaints**  10:15
11:21 12:19 24:21
36:2 48:4 93:12
97:1,2,6,19 114:3
180:13 221:23
222:1 237:3 262:1
262:12,14,17
**complete**  71:11
256:23 260:16
**completed**  21:6
101:20
**completely**  232:24
**complex**  142:24
**component**  96:8
96:24
**comprehensive**
35:17
**compromised**
46:21
**computer**  170:24
262:6 269:13
**concept**  47:20
**concern**  13:7
26:17 27:10,23
41:10 53:10 59:2
59:18 70:23 87:14
135:7 232:8
237:16

**concerned**  38:3
40:9,24 88:3
90:13 179:7 230:9
**concerning**  111:9
112:8 128:15
153:7 161:15
181:4 196:8
**concerns**  9:18
24:19 25:2 28:5
28:12,23 29:3,4,7
34:12,14,19 35:3,8
35:12 53:6 57:7
57:10,12 66:7
70:21 75:4 78:15
78:24 79:1,7 81:8
81:16,21,24 86:19
86:22 87:7,8,23
88:22 90:17 91:7
91:22 94:22 95:5
98:9 99:12,14
142:23 155:22
221:23 229:24
246:9
**concise**  40:18
**conclude**  8:14
17:5 21:8,18
46:24 146:7
177:16 265:3
**concluded**  250:22
268:13
**concludes**  15:8
**conclusion**  40:17
56:17 262:3
265:17
**conditions**  63:16
**conduct**  10:16
11:4,8 12:8,17
14:4 16:2,7 17:3
23:11 24:8,15,22
25:8 26:22 28:1
29:1 37:1 49:7

65:9 78:16 101:22
118:7,18 123:8,19
252:8,10,13 257:1
260:8
**conducted**  15:14
29:7 35:13 73:24
**conductive**  35:23
**conference**  181:17
181:17,19
**confided**  183:13
224:15
**confident**  131:10
131:12 164:24
202:4
**confidentiality**
95:2
**confirmed**  253:22
**conflict**  183:4
202:19 241:15
**confused**  17:14
42:6
**conjunction**  36:20
**conly**  141:3
**connect**  40:14
87:23
**connected**  46:20
**connection**  87:9
**connections**  11:20
**conner**  3:18
126:22 127:5
**connor**  126:20
**consensus**  90:22
**consequence**
103:19
**consider**  12:23
151:24 255:21
**consideration**  35:8
55:2
**considered**  16:10
26:23 252:16

consistency 90:18
consistent 40:14
50:17 91:20 148:9
constructive 35:18
35:18
construe 24:7
construed 28:1
87:15
consultation 7:18
72:12
consults 41:16
consummate
142:20
contact 24:12
53:22 76:24 133:8
166:8 169:24
203:16
contemporaries
260:11
contend 18:18
content 24:14
243:22
contested 221:17
context 82:7
100:10 184:12
continue 28:13
33:19 41:3 69:13
172:8 254:4
continued 4:1
13:10 14:18 33:13
39:8 223:1,2
227:6 254:11
continues 13:9
39:10 256:13
continuously 21:2
contrary 252:10
control 262:20
conversation 39:3
79:17,20 151:11
227:7 266:16

conversations
90:8 154:24 155:3
181:7 189:14
convinced 21:16
cooperation 23:16
268:2
coordinator 193:2
copy 16:1 35:5
cora 32:8 35:5
51:21 52:10 59:6
59:7 79:13 83:3,4
83:5 98:3,5
180:18 181:1
183:20 184:6
188:13 189:17
190:7 227:3
correct 47:10 49:2
51:12 55:8 62:13
63:10 65:16,19
80:4 103:1 104:12
111:6 133:19
134:13 148:7
149:14 153:15,18
158:22 159:1
172:6 174:6
194:14 195:8
196:4,5 226:23
234:13 241:11
259:8 269:14
corrective 25:10
25:19,20,21 26:3
26:14,15 37:2
correctly 147:17
269:10
correspondence
231:5
correspondent
32:23
corroborate 20:13
56:13 57:3 60:15
61:1 69:17 77:1

84:21 86:2 260:19
263:23
corroborated 55:6
59:19 85:18 91:1
253:17
corroborating
61:1 62:5
coull 27:16 28:4
28:21 32:9 35:14
52:2 66:2,12,16
67:5,9 78:19
79:16,19 82:3
90:3 97:13,17
148:23 155:6
213:9 222:2
224:18,18
counsel 2:10,17
5:19 7:3 15:15
27:14 51:1,14,14
55:14 76:17
149:12 220:14,17
269:16
counseling 28:10
64:23 81:16 82:5
countless 19:3
couple 80:8 119:8
156:10 170:2
171:21 185:3
189:2 215:22
267:22
course 125:3
139:17 193:21
194:9 199:1
201:12 209:7
259:9 260:1,7
261:15
courses 12:14
court 1:14,16 6:20
21:24 22:6 117:2
126:18 140:24
159:13 176:13

219:5 267:4 268:5
cover 189:7
coverage 119:14
211:9
covering 117:21
cowell 2:11 3:4,8
3:22 4:6,10,13,16
6:5,6,7 9:2,12,17
9:18 14:23 15:7,8
21:22 22:8,13,15
22:17,23 23:4,7,20
23:23 24:1 27:20
30:2,4,11 31:1,6
31:24 32:6,15,19
37:10 47:3,9
48:24 51:4 52:9
52:17,22 55:5,18
57:21 58:21 59:4
59:8,23 61:3 62:3
62:9,18 65:13
66:4 67:9,13 68:6
69:13,19 72:2
73:15 74:12 77:5
77:16 78:8,10
79:3,5,21 86:13,15
86:16 87:21,22
99:10 101:11
102:12,18 103:4
103:21 108:16
114:15,17 119:5,7
125:21,22 127:4
133:12,17 134:19
135:14 148:21
152:23 153:3
156:9,15 166:12
166:16 168:13
173:10,13 182:11
182:15 185:2
203:20 204:1,12
206:22 220:17,23
228:4 237:4 240:8

240:20 241:2
242:15 243:2
244:11,22,24
247:10 251:19
257:14 266:5,21
266:23
**cowell's** 51:18
**craft** 220:21
**create** 35:21
**created** 11:13
**credence** 19:11
**credibility** 12:21
184:3 204:13
255:19 256:6,11
265:21
**credible** 204:17
**creeped** 246:1
**crime** 258:10
**criminal** 258:9,10
**critical** 109:19,19
109:24
**cross** 8:2 29:12,19
30:1,20 31:4,6,12
31:21 47:1 51:18
54:6,23 61:18
73:16 104:2
189:16 193:7
240:1 258:2
**crus** 35:15
**cruz** 55:19,22,24
56:5,6,11,13,15,18
56:22 57:2,5,24
58:1,4,7,16,21,24
59:1,10,18,22 60:1
60:15 61:15,18
80:17 85:10,11,12
85:14,18 165:16
203:4 211:4 215:5
223:5,6,14 224:7,7
224:9,12 225:2,3
225:17 231:13

247:16,21 248:18
248:19 262:22
**cruz's** 57:14,16
**culminate** 34:18
**culminating** 34:23
**cultural** 23:15
**culture** 24:6
224:10 248:9
**curious** 226:13
**curiously** 262:16
**current** 51:9 106:2
232:19 260:6
**currently** 172:1
**curves** 240:19
**cushion** 14:12
**cut** 262:6
**cv** 110:13,18
**cycle** 64:2,4

**d**

**d** 78:1,1
**d'alonzo** 3:10
109:6,13 113:18
**d.o.** 1:3 2:17,18
3:10,18 4:4,11,15
109:6 126:22
159:15 193:22
251:3
**daily** 123:6
**daly** 5:4,6,13 6:11
6:11,14 8:21,24
9:9 14:23 15:4,10
17:12,18,21 21:20
22:5,23 23:5
29:15,18,23 30:7
30:17 31:17 32:2
32:13 47:3 48:8
48:17,21 49:9,17
50:1,21 51:13
54:5,20 55:12
59:4 60:8 61:12
61:24 67:4,7 70:4

70:11 71:4,24
72:4,10 73:12
74:11 75:18 76:11
76:14,18,21 77:15
77:18,22 78:8
79:3 83:1,8,12,20
83:24 84:7,23
85:3,8,15 86:9,13
87:18 92:7,14,20
92:24 93:9,12,16
96:7,21 97:2,6,12
97:18,22 98:2,23
100:14 101:7
102:8,17,22 103:2
103:10,14,24
106:24 107:8,11
107:20 108:9,14
108:19,22 109:4
114:15,18,21
116:5,18,24 117:5
119:5,8 120:4,6,8
120:12,16 121:8
121:17,24 122:4
125:21,23 126:2,5
126:10,12,17
135:15,21,24
136:5,8,12,19
137:2,5,11,16,19
137:23 140:5,10
140:16,20,23
150:22 152:23
156:10 157:3,12
157:21 158:15,20
159:3,7,11,18
166:12 170:2
171:2,6,14,18
172:5,7,11,13,20
172:23 173:2,4,11
174:18,21 175:1,8
175:23 176:8,13
182:11 185:3,10

185:14,18,21
186:1,6,10,18,23
187:1,9,12,17,19
188:4,9 189:21,24
190:5,10,14,19,22
193:12,15 203:20
204:8 206:23
207:5,7,9,13,23
208:6,12,18,23
209:21 210:4,10
210:13 211:6,14
211:19 214:24
216:9,18 217:21
218:2,16,21 219:4
219:13,20 220:2
220:10 221:3
232:21 235:18,23
239:24 242:24
244:9,22 245:1,5,8
245:18,22 246:22
247:11 250:19,21
251:5,15 257:14
266:4,15,24
**damage** 239:9
**damaged** 233:8,10
**damn** 46:8
**damning** 233:1
**danger** 264:5,11
**date** 1:13 16:13
50:13 52:17,18,24
53:2 54:11,11,24
60:13 62:13,13
65:11 73:18 79:14
83:14 246:14,16
**dated** 35:2 240:11
**dates** 50:24 51:16
52:23 73:8,10
**daughters** 112:23
196:20
**dave** 167:15

**day** 2:5 43:1 72:18
72:18,19,19 73:3,7
73:7 87:11,11
89:7 99:8 135:16
136:21 137:13,18
203:8 209:7 210:3
210:8 228:8,10
238:6 256:20
259:23
**days** 8:8 72:20
118:4 119:11,12
119:16,17,20,24
120:10,23 121:5
246:11,13 266:12
**deal** 156:14 227:1
**dealing** 34:8
**dealings** 113:4
**dean** 27:14 36:18
52:4 62:15
**death** 19:13
**december** 39:20
39:22 40:5,8,22
49:14,18 225:15
**decide** 93:19 205:8
**decided** 94:5
150:19 203:8
223:5
**decision** 10:5
14:21 15:16,18
17:7 103:9,20
222:3,24 229:4,13
232:14 252:1
265:2 266:12
267:18
**decisions** 211:5,6
256:11
**declined** 28:11
66:8
**deduce** 209:4
**deem** 209:24

**deemed** 139:23
**deep** 70:20
**default** 15:17
**defend** 51:11
207:20 236:19
**defending** 257:22
**defense** 17:10
18:14 19:23 20:23
21:6 218:6,23
219:22
**deficiencies**
221:24 223:24
**defined** 24:21
**definitely** 42:3
91:17 177:18
188:3 254:16
**definition** 25:7
**definitions** 24:7
**deliberate** 209:16
**delinquent** 180:2
**deliver** 21:11
145:9
**delivered** 14:12
**demeaning** 45:1
**demeanor** 146:7
262:13
**demonstrate**
44:20 52:7 54:14
130:13 136:15
241:5
**demonstrated**
234:5 240:19
**demonstrates**
52:10 65:10
**demonstrating**
136:11 163:4
**demonstration**
10:24 74:4 130:9
163:19 199:24
255:2

**demonstrations**
91:24
**demonstrator**
136:13
**demos** 92:2
**denied** 13:4
255:15
**deny** 53:7 256:2
**department** 11:9
11:15,19 26:6
36:12 57:8 61:21
90:2 109:20 114:7
114:9 132:16
165:5 222:5,12,13
258:17 259:6
262:21 263:16
**department's**
109:22
**dependent** 161:23
**depending** 30:14
191:12
**deponent** 269:7,10
**deposition** 269:14
**depressed** 229:2
**depression** 228:22
229:8,22
**depth** 21:4
**deputy** 109:23
**derogatory** 190:6
**describe** 87:20
89:11,12 124:6
129:17,18 144:10
162:22 198:22
**described** 11:5,9
11:14 12:1 85:19
156:16 171:7
215:4 238:11
252:20,24
**describes** 24:22
26:5

**describing** 144:22
182:3 219:21
254:13
**description** 93:23
**deserves** 239:3
**designated** 35:22
**desire** 265:16
**desired** 75:5
**despite** 8:15 10:11
254:10 262:17
**destroy** 258:6
**destruction** 18:21
**detail** 254:14
**detailing** 10:15
35:6
**determination**
111:1 113:21
265:21
**determinations**
111:5
**determine** 27:7
53:23
**determined** 36:3
58:13 110:10
**detriment** 19:7
**detrimental**
230:24
**develop** 39:6
**development**
13:22 64:15,18
226:20
**devoted** 19:1
**diagnosing** 163:3
**diagnostic** 113:1
**dichotomy** 217:1
**dictation** 197:16
**dictations** 215:11
215:15
**died** 230:6
**difference** 89:4
211:18

differences  147:7
different  48:15
  50:1 62:22 88:17
  114:8 115:16
  139:19 163:3,5,10
  163:11 172:17
  175:22 200:11
  203:6 214:23
differently  43:16
difficult  77:7
  124:23 125:17
  182:9 221:17
difficulties  229:6,7
difficulty  38:13
  183:7 268:7
diligence  81:6
diminutive  248:19
dinner  46:8
direct  8:2 31:12
  36:18 258:1
directed  13:20
  28:2 43:24
direction  40:11
directly  47:9
  142:23 143:2
  204:19
director  13:21
  27:15 32:9 52:3
  99:22 109:23
  122:23 131:21
  132:17 158:18,21
  165:5,9,16,17
  193:2 202:13,14
  202:16,20 223:8,9
  224:8 230:20
  232:7,20
directors  25:1
disappointed
  221:21
discharged  229:15

disciplinarian
  226:16 227:20
disciplinary  211:8
  258:13
discipline  110:8
discomfort  90:20
  179:5 252:24
discover  21:11
  261:15
discretion  15:19
discrimination
  12:13
discuss  133:8
  166:8 203:16
  205:7 242:8
discussed  38:13
  39:3 110:8 232:16
discussion  140:18
  267:6
discussions  40:13
  155:13
dismiss  8:14 265:6
dismissal  111:11
  111:14 151:22
dismissed  8:4 31:5
  31:13 111:16
  154:9 198:5
display  130:2
displayed  219:11
  244:8
disposition  25:6
disprove  16:19
disproven  265:20
dispute  54:24 81:8
  81:21 243:24
  244:5
disputing  54:2,3
  115:2
disruptive  24:8,22
  25:8 26:24 49:6

distance  160:3
  216:14
distinction  128:24
  217:3
distress  262:21
division  109:18,22
divorced  80:20
doc  207:18
doctor  56:1 101:5
  109:20 111:10,15
  114:13 146:18
  147:1,8 177:2
  178:8 226:4,6
  227:9
doctors  19:4 110:3
  110:21 114:8,10
  128:3 146:14,16
  146:17 149:6
  161:3 177:20
  195:19 258:19
  263:3
document  14:24
  50:1,2 52:8 56:20
  68:20 242:14,20
  243:10 245:10
  266:20
documentation
  55:21 73:19
documented  53:11
documents  10:4
  15:2 48:16 267:1
  267:8
doing  22:9 53:14
  69:24 90:24 91:15
  92:5 102:1,4
  154:13 187:17
  190:2 197:16
  201:15 226:24
  227:14 235:5,8,11
  239:16

dolled  44:8
donor  124:12
door  206:13,14
  261:3
dos  265:24
doubt  142:18
  184:3
dr  3:5,8,9,11,14,16
  3:19,21,22 4:5,6,9
  4:10,12,13 5:4,6,8
  5:15,22,23 6:3,5,6
  6:6,9,11,11,12,14
  7:16 8:20,21,22,24
  9:2,2,6,9,12,13,17
  10:2,7,9,15 11:3
  11:13,18,23 12:11
  12:12,19,21 13:4,5
  13:9,13 14:1,4,6
  14:12,12,22,23,23
  15:4,7,8,10,10,11
  16:4,14,20 17:12
  17:12,18,18,21,23
  18:4,8 21:20,21,22
  22:5,8,10,13,15,23
  22:23 23:2,4,5,7
  23:20,21,23,24
  24:1 27:14,20,24
  28:2,3,4,8,11,14
  28:20,22,22 29:2,6
  29:9,12,15,16,18
  29:18,23,24 30:1,2
  30:4,7,10,11,12,17
  30:19,21 31:1,2,4
  31:5,6,17,22,24
  32:1,2,6,8,13,15
  32:19,23,23 33:11
  33:12 34:1,10,13
  35:12,13,14,14,15
  36:1,2,7,11,16,17
  36:19,21,22 37:10
  37:11 38:2 39:9

41:1,12,15 47:3,3
47:4,4,8,9,12 48:3
48:6,8,17,21,22,23
48:24 49:9,17,20
49:21 50:1,3,4,21
50:21 51:4,5,7,13
51:18,19 52:9,17
52:22 53:20,22
54:5,6,20 55:3,4,5
55:12,13,17,18,19
55:22,24 56:1,5,6
56:11,13,15,18,19
56:22,23 57:2,4,14
57:16,21,23,24
58:4,6,7,16,20,21
58:21,24 59:1,3,4
59:4,5,7,8,10,18
59:21,23 60:1,8,8
60:15 61:3,12,15
61:18,24,24 62:2,3
62:3,6,9,14,18,24
64:8 65:11,13,22
65:23 66:4,5,16
67:4,6,7,9,12,13
67:13,15,15 68:6
69:3,12,13,18,19
70:4,8,11,13,21
71:4,4,6,7,24 72:2
72:3,4,10,22 73:12
73:13,13,15,17,17
74:10,11,11,12,13
74:14 75:1,8,12,18
75:21,22 76:5,11
76:12,13,14,15,16
76:18,21 77:5,9,15
77:15,16,17,18,19
77:22 78:8,8,10,11
78:17,19,20 79:3,3
79:5,7,13,17,18,20
79:21 80:6,17,17
80:17 81:10,23

82:16,16,17 83:1,7
83:8,12,20,24 84:2
84:7,7,11,23 85:3
85:8,10,11,12,14
85:15,17 86:9,13
86:13,15,16,17,20
86:23 87:2,6,18,19
87:21,22 88:1,4,13
89:2,7 90:5,23
91:22 92:1,7,14,20
92:24 93:6,8,9,12
93:16,18 94:9,15
94:23,24 95:14,23
96:5,6,7,21 97:2,5
97:6,12,18,22 98:2
98:7,12,18,23
99:10,11,17 100:2
100:14,18,24
101:7,9,11,13,18
102:8,8,12,17,18
102:22,23 103:2,4
103:10,14,21,24
104:2,4,9,10
105:10,11,15
106:7,8,9,24 107:2
107:3,3,4,6,8,8,11
107:20 108:1,9,14
108:16,19,22
109:1,4,4,12,13
113:18,23 114:11
114:15,15,17,18
114:21 116:4,5,6
116:12,18,20,24
117:5,5,12,13
119:4,5,5,7,8,20
120:4,6,8,9,12,16
120:20,21 121:8
121:12,15,17,18
121:21,24 122:4
122:14,15 124:18
124:23 125:2,3,5

125:10,13,19,21
125:21,22,23,23
125:23 126:1,2,5,7
126:10,12,17
127:4,5,15,15,16
127:17 128:4,14
128:19 129:3,9
130:8,17,21
131:13,14,17,23
132:16,18,23,23
133:2,2,11,12,17
133:22 134:8,12
134:12,19,20,22
134:24 135:6,14
135:15,16,21,24
136:5,8,12,19,20
136:20,22 137:2,5
137:11,16,19,20
137:23,24,24
140:5,10,16,20,23
141:10,11 143:22
144:2,4 145:10
147:15 148:5,16
148:21,21 149:15
150:2,9,16,22,22
151:3,4,5,5,9,12
152:2,10,10,11,11
152:13,13,15,15
152:18,18,22,23
152:23 153:3,4,11
154:5,16 155:15
156:7,9,10,11,15
157:3,12,17,21
158:15,20,23,23
159:1,3,6,7,7,11
159:18,20 160:1,2
160:14,14,17,18
161:4,14 162:1,8
162:14 163:18
164:6,10 165:2,8
165:16,20,20,24

165:24 166:4,4,11
166:12,12,16,19
167:15,17,20,24
168:1,4,10,13
170:2,10 171:2,6
171:14,18,20,20
171:24,24 172:5,7
172:7,8,11,13,20
172:23,23 173:2,4
173:9,10,11,13
174:18,19,20,21
175:1,5,7,8,8,20
175:23 176:8,13
177:1 178:11,14
178:17 179:1,8,10
179:13,13,20,21
179:23,24 180:6,7
180:15 181:8
182:2,3,6,7,8,11
182:11,15,20,21
182:22,23,23
183:1 184:18
185:2,3,10,14,16
185:18,21 186:1,4
186:6,10,14,18,23
187:1,9,12,17,19
187:22,23,23
188:4,5,6,7,9,11
188:13,15,18
189:21,24 190:5
190:10,14,19,22
191:17 193:12,14
193:15,18,19
194:6,8 195:1,7,7
195:10,11,20
196:7,24 197:7,11
198:9,15 199:12
199:16,23 200:4
200:16,20,24
202:11 203:1,1,4,5
203:19,20,20

**[dr - e]**

204:1,5,6,7,8,10
204:11,12,13
205:3,5,6,7,10,10
205:15,18,18
206:22,23 207:1,5
207:7,9,13,23
208:4,6,9,12,18,23
209:6,19,21 210:4
210:10,13,21
211:4,4,6,14,19,20
212:1,4,9,12,18,22
213:1,3,10,19
214:3,7,24,24
215:3,5,5,21 216:9
216:18,20 217:10
217:21 218:2,5,8
218:16,21,24
219:4,7,7,10,13,15
219:20 220:2,10
220:16,17,17,21
220:23 221:3,6,20
221:21 222:2,2,3,3
222:4,7,8,10,18
223:5,6,13,20
224:7,7,7,8,9,12
224:13,14 225:2,3
226:8 228:3,4,4
229:1,12 230:10
230:14,20 231:4,7
231:13,13,13,18
231:24 232:5,12
232:13,15,17,19
232:21,23,23
233:7,8,13,14,18
233:23 234:3,7
235:18,22,23
236:1,4,5,5,6,9,10
236:20 237:2,2,4,6
237:6,8,12,12,13
237:18 238:5,7,11
238:14,14,22,23

239:1,4,4,24,24
240:3,8,9,20,20,23
241:2 242:9,15,24
243:2,4,20 244:9
244:11,18,21,22
244:22,24 245:1,1
245:4,5,8,15,18,20
245:22,23 246:16
246:22,24 247:10
247:11,16,21,23
248:2,6,12,15,15
248:18,18,18
249:3,6,11,14,19
249:23,24 250:5,8
250:12,15,19,20
250:21 251:1,5,15
251:19,20 252:2,4
252:14,19,21,24
253:8,10,10,16,19
253:20,20,20,21
253:22 254:2,3,4,6
254:10,12,24
255:1,8,8,13,15,18
256:2,3,4,6,13,16
257:11,14,14,15
257:16 259:15,18
259:18 260:4,5,11
260:21 261:2,3,8
261:10,12,13,20
262:11,13,23
263:6,7 266:4,4,5
266:15,19,21,23
266:24 268:4
**draconian** 138:19
**drag** 38:20
**dragged** 254:9
**drape** 179:15
191:24
**draped** 148:8
178:24 192:3

**drapes** 147:11
**draping** 146:4
147:24 154:4,7
**draw** 23:14 179:20
**drawing** 23:9
**dress** 13:3 33:4
80:13 88:24 89:7
89:9 227:6,7,17
252:20 256:1
**dressed** 227:4
**drink** 210:11
241:8 255:14
**drinking** 210:15
**driving** 160:2
**dropped** 224:24
**dropping** 12:2
**drs** 262:22
**dua** 14:1 16:14
18:4,8 41:12 48:3
48:6 51:7 65:11
65:22,23 66:5
67:13,15,16 69:3
69:12 70:21 72:22
75:1,22 77:9
86:20,23 88:1
97:5 98:12,18
101:18 105:10,11
105:15 106:9
127:15,16 129:4,9
130:8,17 132:23
133:2,22 134:8,12
134:22,24 135:7
135:16 136:20,22
152:10,11,13,15
152:18 160:14,18
162:8,14 163:18
164:6 165:20,24
166:4,19 167:24
171:20,24 172:8
195:7,10 197:8
198:10,15 199:23

200:16,20 203:1
205:10,10,18
227:4 236:4,5,9,20
237:6 238:5 242:9
250:12 254:12
255:1 262:15
263:15,23 264:3,9
265:4
**dua's** 13:5 16:4,8
16:10,20 75:12
87:2,7 91:22
130:21 164:10
200:24 255:8
256:3 262:18
263:17
**ducks** 60:7
**due** 18:17 25:12
37:20 39:1 51:5
233:17 235:19
246:16
**duly** 22:18 78:3
109:7 117:7 122:9
126:23 141:5
159:16 176:19
193:23 269:7
**duties** 225:13
226:15 265:23
**duty** 205:24
**dynamic** 210:21
**dynamics** 211:12
**dzikowski** 66:1
90:1 234:6 252:23

---
e
---

**e** 14:1 38:3,7 39:22
65:12,24 71:8,10
78:1 122:7,7
194:2 218:11
244:2,2,3,12,13,14
244:15,17,18
254:12,13 255:6
262:6 263:18

265:4 269:1,1
earlier 41:8 58:8
 61:19 79:12 90:3
 158:5,8 175:11
early 174:14
 262:19
eased 46:7
easily 265:14
east 2:15
easy 233:12
 259:11 264:9
ed 11:12 91:9
 184:10
educate 263:5
education 11:24
 32:10 82:3
educational 27:16
 146:12
educator 225:11
effect 16:2,8 18:3
 47:16 49:1,13,18
 51:7,16 260:5
effective 35:23
efficiency 184:18
effort 21:13 48:2
 69:16 75:15 76:2
 76:8 95:5 104:18
 233:24 234:12
 235:16 238:20
 261:15 262:9
efforts 26:9,18
 235:10 237:9
eight 110:13,13
 174:13
eighth 63:24
either 7:2,22 8:1,3
 8:14 25:12 31:10
 31:12 59:2 60:20
 61:1 69:21 81:19
 81:20 84:21 111:6
 136:16 158:24

168:2 176:10
 187:6 188:5 190:6
 200:3,12 213:22
 222:10 234:10
 247:19 265:15,18
elaborate 196:10
elected 75:6
elevated 199:13
elicited 97:7
ellen 3:7 10:2
 31:22 77:22,24
 78:2 96:7 101:7
 148:21 228:22
 247:3
embarrass 150:1
embarrassed 45:3
 46:4 146:8
embarrassing
 150:15
employees 12:14
 24:5
employment 186:5
encounter 41:15
 89:17 125:5 126:6
encountered 80:16
encounters 188:19
 204:14
encourage 69:21
ended 215:20
engage 118:6,17
 123:7,18
engagement 40:20
enjoyed 264:4
ensure 35:22
enter 28:9 36:24
 218:16 232:21
entered 219:5
 229:3
entire 9:13 65:2
 110:24 144:16
 147:12

entirely 18:22
 63:14 139:19
 148:23 258:4
environment
 11:14 19:8 35:23
 197:23
episode 157:13
 183:6 256:21
episodes 73:19
 220:7
equal 161:17,24
equals 215:20
equivalent 19:13
ernesto 55:19
escorted 19:14
 262:4
especially 44:1
 196:17 203:14
 217:19
esquire 2:8,14,14
essentially 45:18
 83:2 138:7,24
 173:16 175:13
 192:20 199:4,12
 200:3
establish 81:20
established 8:16
 49:19
establishes 12:9
estimation 90:15
et 96:11 115:4,4
 186:3 187:6 209:6
ethic 181:5,10
ethical 181:2
evaluating 85:2
evaluation 24:23
 44:15 63:17 85:14
 102:4 233:24
 246:5
evening 5:6 32:22
 33:1 89:18 268:1

evenings 229:12
event 16:13,19
 18:4,9 55:23
 56:14 64:15 77:13
 84:19 93:24 94:1
 104:12,13,15,21
 130:17 133:21
 151:24 164:6
 169:22 170:11
 173:17,19 185:5
 185:14 186:7
 200:16,20 236:16
 236:17 241:24
 242:2,6 265:18
events 12:5 30:14
 71:9 78:18 80:15
 104:20 105:1,3
eventually 45:14
 177:10 229:12
everybody 115:11
 234:24 235:1
 267:24
everyone's 234:18
 234:21,22 268:2
evidence 7:14,21
 7:23 9:22 11:17
 13:8,16 16:9 17:2
 18:20 21:17 36:3
 36:4 52:10 53:3
 53:12 55:7 58:13
 58:14 65:20 69:7
 101:6 103:7
 219:17 220:12
 242:14,20 251:23
 256:12 257:8
 258:1 265:11
evident 12:11
exact 73:18 83:14
 112:23 242:20
exactly 166:21
 201:14

exam   11:1 43:16
  43:23 88:6 92:6
  92:18 96:1 105:12
  105:16 129:21
  130:14 133:24
  134:23 136:16
  137:10 138:19,19
  163:5 167:1,2
  168:21 171:4
  240:18 241:5
  253:14 255:2
examination   8:3
  22:21 29:20 30:1
  30:20 31:5,12,21
  44:21 47:2,6
  51:18 54:7,23
  73:16,22,23,23
  74:1 77:2 78:6
  87:14 88:10 104:7
  104:23 105:8
  109:10 117:10
  120:18 122:12
  127:2 129:24
  133:15 135:3,8
  141:8 153:1
  159:23 162:12
  163:2,23 166:14
  170:22 174:4
  176:22 182:13
  184:17 194:4
  199:4,18,19
  201:12,20 203:22
  219:8 240:2,6
  258:2
examinations
  88:15 114:4
  199:17
examine   29:12
  31:6 61:18 69:3
  94:14 104:3
  117:23 170:10

227:11
examined   22:18
  73:6 74:23 78:3
  109:7 117:7 122:9
  123:3 126:23
  137:20 141:5
  159:16 164:4
  176:19 193:23
  200:7,9
examining   119:21
  139:2 173:19
  184:16
example   157:15
  182:2 253:6
examples   188:21
exams   11:10 88:17
  89:4 91:1,1,12,16
  174:17,17 233:23
  240:16 253:16
excellent   112:21
  113:3,7 115:4
excessive   87:16
  88:14
exchange   253:8
excuse   43:12
  189:8 204:11
  264:22
excused   107:10
  114:24 122:2
  126:15 140:13
  159:9 174:24
  193:17 218:1
executive   2:12
  5:10 10:5 14:9,14
  14:20 25:9 27:6,7
  84:12 102:12,14
  103:7,8,19,23
  149:19 186:2
  187:5 251:24
  257:10

exercise   15:18
  262:20
exhibit   108:5
exhibited   24:18
  232:17
exhibits   4:18,20
exist   202:21
existence   68:14
exoneration   21:15
expand   237:5
expectations
  134:24
expected   24:3
  146:20 189:4,5
expecting   64:10
expects   147:1
  220:13
expeditious
  267:17
expense   130:21
  164:10 200:24
experience   148:11
  149:22 155:21
  162:4 179:20
  181:4 197:2
  199:22 238:22
  241:17
experiences   184:5
explain   13:14 14:7
  109:15 130:11
  132:2 139:6
  142:19 150:4,9,10
  150:13 155:12
  163:21 165:6
  200:2 245:11
  258:9
explaining   151:7
explanation
  154:10
expose   144:23
  145:2,3 179:18

exposed   90:7
  168:18,20 184:8
  260:22
exposing   90:14
  144:5 178:18
exposure   88:5
express   70:20 75:5
  83:9 87:8
expressed   34:15
  34:19 53:6,10
  57:10 58:6 59:3
  66:8 78:15 79:1,7
  81:21 86:19,23
  87:13,24 90:17
  91:2 135:7 155:22
expressions   261:1
  261:9
extend   32:1
extended   205:4
extensive   43:17
  70:22
extensively   21:4
extra   189:4 204:21
  204:22 213:17
  215:20
extractions   81:3
extremely   85:22
extricated   22:3
eyes   151:12 156:7
eyewitness   77:13
eyewitnessed
  175:18

                 f

f   269:1
face   19:18 20:14
  38:12,12
facial   261:1,9
facilities   50:16
facing   151:22
fact   36:17 39:6
  53:10 63:6 74:7,9

77:9 78:14 90:9
115:3 134:1
154:16 155:6
162:1 183:23
196:24 206:6
225:18 230:21
232:5 233:1
234:21,21 236:5
260:2,5,16 264:10
**factors**  232:3
**facts**  251:23
**faculty**  20:6 92:12
92:15,22 96:11
110:23 136:21
141:20 143:24
144:1 149:17
158:16,17 187:20
189:21,24 190:1
199:11 209:10
212:16
**failed**  198:5
216:15 255:16
**failing**  21:10
**fair**  31:8 43:8
58:18 59:16 82:18
90:23 101:22
106:24 107:1
265:20
**fairly**  91:14
**fairness**  246:16
**fake**  239:9
**fallen**  261:13
**falling**  38:4
**false**  20:10 233:10
**falsehoods**  20:14
**falsely**  21:18
258:14
**familiar**  113:9,12
163:9
**family**  113:6
196:19,19 246:5

**far**  47:21 132:7
149:8,16 167:11
179:7,7 181:1
182:7 192:9 194:7
264:12
**fashion**  228:5
**fatigued**  156:8
**favor**  140:24
**favorite**  237:15
**fear**  43:1 46:16
234:7 253:5,7
**fearful**  67:16
225:2
**february**  28:19
262:19
**feedback**  38:19,22
**feel**  19:22 44:10,17
46:17,18 81:18
82:17 92:4 95:21
96:3 102:3 118:15
118:19 123:16,20
125:15 161:17
197:18 214:7,10
233:22 236:2,3,18
238:17,18 239:8
239:11 255:1
**feeling**  75:3 88:11
**feelings**  188:12
**feels**  234:18,19
248:20
**fell**  151:19 152:2,5
**fellow**  201:10
226:3 232:12
**fellows**  202:6
232:4
**fellowship**  99:20
142:5 180:8,12,16
186:12,13 191:2,5
191:12,13 228:6
231:7,11,18 232:6
232:7,15,20 233:9

239:15 248:23
259:17 260:3,6
**felt**  19:8 33:22
42:5 43:3 45:3,10
46:3 57:5,6,9,11
58:17 61:19 74:23
80:24 81:10,12
82:19 85:22,23
86:4 88:8 89:4
90:11 99:1,4,23
100:4 119:24
121:19 154:3
157:1,3,5 161:24
179:1 201:18
202:19 234:2
252:18 253:1
**female**  10:18,24
11:4,15 14:1 43:5
43:7,15 77:4 88:4
88:13,20,23 89:5
91:11,23 92:2
93:3,11 95:23
105:1 118:11,18
123:12,19 128:5
128:16 137:21
142:12,17 144:6
151:8 161:5,16
162:3 177:17,22
178:2 184:16
195:21 196:9
197:2 206:10
211:24 213:10
214:17 216:22
217:15,17 219:11
230:2 234:3
252:12,19 253:11
253:16 254:22
256:8 260:13,23
**females**  44:1 87:16
90:24 178:12
196:23 199:18

213:15 214:18,19
214:21
**field**  46:19 143:1
147:12 148:3
**fierro**  155:6
**fifth**  56:21
**fight**  262:8
**fighting**  19:24
236:13
**figure**  59:13,20
137:12 173:5
205:20 217:1
**file**  231:11,12
239:6
**filed**  161:2
**filipino**  224:9,9
247:16,21 248:9
**fill**  210:21
**filling**  44:14
**final**  38:5 82:15
193:18 218:4
231:19
**finalize**  243:7
**finally**  18:13
**find**  19:12 37:2
42:22 73:8 75:14
75:15 76:2,8 77:3
93:24 153:16
154:8 156:4 209:7
217:7 226:13
230:10,12 233:24
254:21 256:6
**fine**  22:5 29:23
40:1 46:7 73:14
108:9 115:16
174:12 175:23
228:24 229:2
267:11
**finger**  263:12
**finish**  31:20 32:4
40:22 54:7 70:11

73:16 144:17
243:2
**finished** 22:9
**finishing** 107:24
241:3
**fire** 222:10
**fired** 204:19,24
205:2
**firing** 215:3
**first** 6:19 7:16 9:1
9:12 13:2 22:18
23:9,23 32:15
41:15 55:5 75:13
75:17,22 78:3
81:9 85:13 95:11
97:15,16 108:15
109:7 112:20
117:7 122:9
124:16 126:23
141:5 156:11
159:16 164:1
167:14 169:2,4
175:4 176:19
193:23 218:3
228:3,10 229:2,20
230:22 243:11
**firsthand** 12:24
20:20 143:12,14
144:3 255:21
260:10 262:8
265:14
**fit** 249:17,18
**five** 7:7,8 25:15
90:21 107:13,17
203:9 222:13
**flat** 224:23
**flaunted** 181:16
**flavor** 156:13,17
156:21
**flesh** 192:8

**flexibility** 214:22
254:20,21
**flexible** 42:18
**flight** 207:14
**flirt** 263:6
**flirtatious** 154:23
155:2
**floating** 171:20
**floor** 1:11 2:9
**floors** 117:22
197:19
**florida** 208:5
218:10
**fly** 207:15
**focus** 37:21 39:15
40:23
**focused** 40:19
**focusing** 40:21
**folks** 89:23 90:18
95:4 168:19
208:13
**follow** 36:10 38:10
38:15 40:15 81:5
221:18 238:23
239:19
**followed** 18:16
35:15 86:18
261:24
**following** 34:11,22
64:11 167:19
**follows** 22:19 78:4
109:8 117:8
122:10 126:24
141:6 159:17
176:20 193:24
**foot** 33:23
**forces** 258:3
**forensic** 109:20
**forget** 22:10,11
110:12 215:11

**forgotten** 265:8
266:11
**form** 30:12
**formal** 24:20 25:3
25:13 26:15 28:15
29:4 32:7 34:15
53:14 78:20 79:22
190:18 224:3
266:6
**formally** 25:20
28:24 36:9
**former** 14:1 49:5
161:2 165:4
167:16 200:7
218:9
**formulating** 39:7
**fortunate** 231:17
**fortunately** 246:6
**forward** 25:4 27:5
37:21 39:7 40:10
95:4 98:16 243:2
244:10 255:19
**found** 28:5 75:9
151:18 252:13
**four** 16:14 72:20
92:11,14 94:9
96:10 111:3 118:4
119:11,12,16,16
119:20,24 120:10
120:23 121:5
129:7 162:12
167:13 169:17
198:13 199:20,21
212:23 213:1
215:12 236:16,16
258:21 262:18
263:17 264:10
**fourth** 7:5 56:22
76:5 85:19 212:21
230:1

**fox** 50:15
**frame** 127:14
160:13 187:10
195:6 205:1
**frank** 151:11
**frankly** 43:19
**free** 116:1
**frequency** 203:14
**frequent** 196:14
198:7
**frequently** 121:2
203:4 206:13
208:9
**friday** 32:21
**friend** 70:19 157:8
205:22 230:3,5,21
236:4,12 264:11
**friendly** 90:8
111:24 152:19,21
183:21 234:17,17
259:17
**friends** 111:23
132:23 133:3
152:10,11,14
155:16 165:20,24
166:5 172:8,14,18
172:23 173:2,5,5
203:1 205:18
206:17 249:23
256:7 259:10
**friendship** 156:16
172:21 253:21
**front** 33:17 44:19
45:19 49:13 53:12
69:4 73:6 125:8
130:1,14 135:3
138:13 139:13
163:23,24 164:3
168:2,7,9,11,23
170:16 200:9

**full** 21:14 145:3
  183:8 191:24
**fully** 36:4 183:12
  183:13 226:10
  243:10
**fun** 138:12
**function** 229:8
**funny** 138:16
**furman** 100:18,24
  230:20 231:4
  233:7,14 248:24
  249:23 259:18
  260:4
**further** 15:6 21:21
  26:21 30:8,13,19
  33:6 34:4 38:24
  43:13,21 44:21
  46:10 64:1,4 72:2
  73:15 74:12 76:11
  76:14 77:16 80:24
  81:12 86:14 91:7
  101:8,8,14 103:3
  104:1 112:19
  126:13 244:23,24
**furthermore**
  179:19
**future** 99:15

**g**

**g** 176:17
**galgon** 213:13
**game** 43:9
**garments** 145:2
  148:2
**gender** 214:9
**general** 6:12 88:11
  90:22 94:17 95:3
  127:19 143:7
  160:21 177:22
  185:22 195:13
  197:21 259:11

**generally** 89:3,14
  138:14 142:7
  170:12,23
**generations** 19:3
**gentleman** 124:13
  186:12
**genuine** 143:9
**getting** 38:14
  100:5 180:12,16
  187:24 238:24
  259:8 260:3 268:2
  268:4
**gilbert** 3:10 109:6
**girl** 41:19,19,23,24
  41:24,24 42:3,3
  89:8 254:15,16,17
**girls** 42:4 254:17
**give** 15:11 18:17
  31:2 44:6 56:8,10
  66:7,22 71:1
  83:13 120:12
  156:13,17,21
  160:4 176:14
  204:21 214:1
  219:4 221:19
  223:18 235:19
  239:5,18 246:11
  246:13 250:2
  254:24
**given** 6:15 15:15
  16:12,20 19:10,15
  19:15 20:17 51:11
  62:12 68:6 71:19
  75:2 102:20
  151:15,22 191:5
  226:22 229:14
  230:15 233:16
  235:19 251:4
  267:14 269:15
**gives** 62:3

**giving** 8:4 31:14
  238:23 239:4
**glamorous** 214:5
**global** 72:17
**gluteal** 145:2
  148:1
**gme** 34:5 52:3
  66:1 81:1 92:13
  94:3,4 97:9,13
  148:23 214:2
  221:24 223:21
  230:10 252:23
**go** 5:4 7:15,16
  8:23 9:12 23:5
  25:4,6 26:21
  29:24 32:4 37:14
  37:23 38:18 45:4
  48:22 49:20 50:3
  51:20 54:18,22
  55:3 56:24 58:11
  60:9 61:12 62:1,8
  63:10 64:13 67:19
  70:12 73:21 90:10
  93:20 105:24
  106:5,8,23 107:15
  107:20 109:4
  114:1 115:9
  116:22 119:9
  126:14 140:14,16
  144:19 147:13
  164:1,2 171:2
  181:16,18 189:20
  193:16 197:10
  200:5 213:23
  215:13,15 224:10
  224:11 226:14
  230:9 235:16
  236:1 237:4,14
  245:17 246:20
  247:2,16,21 248:5
  248:6,9 251:11,15

  259:24 264:12
  266:7 268:10
**goal** 26:8
**goals** 64:17 226:3
**goes** 24:16 26:8
  38:6,17 39:15
  76:22 239:6
**going** 19:23 30:4,5
  30:10,18,21 31:2
  45:15 52:9 54:22
  57:8 59:13,15
  61:23 63:4,16
  71:4 72:4,18,21
  77:6 82:3 85:1
  88:10 100:10
  107:13,16 108:4
  109:17 115:6,10
  115:15 116:11
  151:1 171:1
  181:19 184:21
  206:4 213:6
  214:11,14 215:7
  218:5 223:14,15
  223:15,18 224:14
  224:21 227:13
  229:13 237:15
  238:4 239:21
  250:1,4 259:11
  266:10
**good** 5:6 41:19,23
  44:10 59:16 108:7
  113:7 114:10
  115:11 121:23
  128:23 197:23
  199:20 214:11,13
  226:5 227:20
  235:2,5,9 249:23
  250:19 254:15
  255:1 256:10
  269:4

gotten  87:1 99:20
186:13 261:11
governing  16:3
grab  136:9 210:10
grabbed  136:22
137:8 171:10
grabbing  210:6
grabs  136:3,5
graduate  11:24
27:15 32:10
213:24
graduated  132:11
132:14 192:12
graduation  236:6
granatum  82:3
grand  73:2,7 77:2
138:16 167:13
199:22 215:17
grateful  125:13
220:22 221:5
gravitating  214:21
gravity  151:15
great  15:10 20:5
68:8,12 99:9
107:8 109:4
115:10,22 121:24
126:12 156:14
225:10 227:1
237:16 246:19
247:1 251:18
254:14
greater  20:2
grilling  208:16,19
grind  228:2
groom  198:1
226:2
grossly  201:16
group  73:6 138:13
168:3,22
grown  45:17

guaranties  18:16
guess  51:23 66:24
73:9 134:2 138:2
143:20 155:11
195:17 205:19
208:5,9 215:10
238:20 247:8
guest  202:5
guidance  145:8
guide  145:9
guided  144:12
guilty  20:16
gumby  42:17
255:24
guy  43:2 44:14
115:11 124:24
125:12 215:6
227:21

h

h  122:7
habit  128:5 161:5
195:21
habits  210:15
haha  44:7 124:17
half  115:14 259:21
hall  41:17
hallway  42:11
80:14,16 254:19
255:23
hand  14:12 30:21
42:16,20 45:13,21
56:3 180:15 199:8
269:20
handedly  222:21
handled  125:14
handling  125:13
hands  45:10 91:11
198:24 199:3,21
201:14 240:15
handsy  11:10

handwritten
242:11,16,18
243:15,16,18
244:7,8
hang  216:24
238:10
hanging  206:9
267:18
happen  32:3 37:17
46:22 86:7
happened  11:5
18:4,9 60:21
87:10,11 89:19
96:13 98:5 105:7
137:6 138:24
152:3 157:5 169:2
169:9 171:15,16
174:8 179:14
185:11 189:2
191:18 192:10
215:16 241:10
243:12 261:11,14
263:22 264:2
happening  61:21
87:20
happens  124:10
135:21 138:15
happy  61:17
115:16 235:4
263:14
harassment  12:14
24:13 256:24
hard  207:20 214:8
214:10 216:5,11
223:24 224:17
harm  261:21
harmful  139:2
hat  213:18
hated  44:16
hatt  91:19 96:5,6
237:13 238:14,15

238:22 253:20
head  60:7 67:24
200:5 265:18
headed  216:11
heads  228:18
healed  19:3
healers  258:19
health  2:10 24:3
33:18 50:14 68:13
245:14
hear  20:20 21:17
34:1 80:3 93:11
115:17 131:16
135:13 185:6,7
236:5 256:20
heard  15:16 38:4
98:7 104:5 108:21
113:3,6 121:20
129:11 132:24
133:5,20 134:1
168:24 169:3,4
170:4 171:10
175:14 178:20,23
179:7 180:3,9
184:10 185:8
186:20 193:5,7
195:24 203:2
205:17 208:3
220:8 227:2 236:4
252:12 258:8
260:10,17 264:5
hearing  1:1,9 5:8
5:14,16,18 6:15,23
7:4,11,13,17,21,24
8:8,12,13,14,17
9:22 15:14 21:7
56:9 84:13 108:5
186:11 243:6,6
265:10 267:2
268:12

**hearsay** 16:23,24
  17:5,6 20:21
  258:1 262:9,13
  264:20,23 265:5
  265:12
**heart** 259:3
**heather** 213:13
**held** 1:10 51:8
  107:18 140:18
  251:13
**helm** 213:5
**help** 15:5 55:15
  155:8 187:23
  216:9 223:21
  225:21 237:7
**helped** 177:8
  190:16 216:12
  260:5
**helpful** 57:11
  155:4
**helping** 20:24
  257:19
**hernia** 45:16
**hey** 183:15 216:5
**high** 112:22 115:3
  246:2,3
**higher** 114:11
**highest** 112:15
**highlights** 13:14
  37:14 41:13
**highly** 183:3,19
  258:24
**hip** 196:15 199:19
  200:6,11
**hisself** 153:13
**history** 196:18
**hmm** 188:17
**hold** 149:15
  228:17 233:2
**holiday** 118:4

**home** 76:6 90:10
  215:14,15
**honest** 183:15
**honestly** 85:22
  135:19 156:23
  183:24
**honesty** 192:18
**honor** 223:17
**hope** 28:12 34:4
  217:23
**hoped** 28:16
**hopeful** 39:12
**hopes** 247:1
**hoping** 40:23
**hornet's** 264:13
**horrified** 46:4
**horse's** 54:18
**horses** 156:19
**hospital** 1:1,10 5:9
  5:11 6:8 9:20 10:6
  18:5 19:15 23:10
  24:9 26:24 27:1
  33:20,21 34:7
  93:13 111:24
  112:1,18 113:24
  114:12 121:4
  124:3 151:23
  197:16 198:3
  203:11 225:6
  227:9 246:11
  251:22 252:7,18
  254:19
**hospital's** 9:23
**hour** 115:13
  167:13 199:20,21
  200:9,10
**hours** 210:4
**humiliate** 150:2
**humiliated** 131:7
  146:8 164:21
  201:10

**humiliating**
  150:16
**humor** 138:14
  139:16
**humorless** 138:8
  173:17 174:1,2
**humorous** 139:23
  173:19,23,24
**hundreds** 145:16
**hung** 217:10
**hunting** 2:8
**hurd's** 32:23
**hurt** 20:12 69:23
  228:5 233:6,8
  237:3 258:6
**husband** 44:5
  254:23
**husband's** 80:20
**hyper** 42:12

**i**

**i.e.** 28:15 132:4
**ian** 158:19
**idea** 54:14 99:22
  105:23 108:7
  127:19 151:13
  152:18 157:20
  160:21 195:13
  230:19 250:3
**ideal** 227:14
**identify** 35:21
**identity** 261:16
**ignoring** 221:22
**ilgonikov** 4:8
  176:16,18
**ilk** 155:20
**illegal** 137:10
  139:3
**ilya** 4:8 176:16,18
**imagine** 263:10
**imbalance** 214:9

**immediate** 36:16
  62:15
**immense** 113:23
**impact** 38:15
**impairs** 256:22
**impeded** 19:22
**implication**
  155:14 205:20
  206:16 210:16
**implications** 68:12
  70:24
**implore** 265:21
**imply** 132:21
  152:8 165:18,22
  171:22 202:23
**importance** 38:14
  43:22 100:13
  175:20
**important** 51:6
  61:14 68:18 160:4
  175:19 236:2
  267:9
**importantly**
  221:10
**imposing** 248:16
**impossible** 45:12
  77:8 222:18
**impoverished**
  221:9
**impressed** 65:9
  182:18,20
**impression** 34:24
  63:8 79:7 81:6
  86:3,21 191:23
  242:2
**impressions**
  101:23
**improper** 12:17
  132:22 152:9
  165:19,23 202:24

improve  259:12
impugn  255:18
impunity  12:22
inaccurate  196:21
  241:23
inappropriate
  10:13,17,21 24:15
  28:1 33:8,13 34:1
  34:9 81:1 91:16
  92:19 118:7 120:1
  123:8 125:7
  130:24 139:11
  148:13 154:4
  155:24 157:4,6
  164:14 169:2
  179:3 201:3,16,19
  201:21 202:10
  209:8,24 217:19
  227:8,16 232:16
  252:14 254:14
inappropriately
  10:23 13:5 129:9
  134:23 162:14
  179:16 198:15
  202:9 227:4
  253:12 256:3
incident  13:4
  74:16,22 99:18
  106:17 134:22
  144:4 148:18
  166:19 178:17,20
  178:22 182:4
  191:3,18 192:10
  240:14 252:20
  255:10,16 256:2,5
incidents  106:16
  188:24
include  28:10
  41:13 64:17 163:7
included  12:11
  35:14 254:15

includes  24:10,13
  52:1
including  19:4
  222:20 223:3
  224:1 227:3,4,5
  256:17
inclusion  36:7
increased  222:1
incredible  114:3
  261:21,21
incredibly  114:12
index  3:1 4:1
indicated  63:7
  228:5 269:7
indicates  89:13
indication  142:11
indifferent  57:5
individual  36:5
  58:15 69:20 70:17
  114:12 156:24
  161:22 175:15
  209:20,22 225:4
  225:23 241:9
  245:3
individuals  25:2,4
  52:13 69:4 81:7
  86:22 168:15
  175:21 247:9
influenced  232:14
influences  231:7
informal  96:8
information  12:24
  13:1 16:21 35:19
  38:1 56:11 68:19
  102:10,18 245:14
  255:22,22 267:21
informed  27:17,22
  34:15 222:23
ingrained  199:9
  203:12

initial  27:10
  184:17,24 185:1
initially  71:17
  208:2 224:18,21
  243:23
initiated  254:6
initiation  26:15
injecting  147:14
injection  144:6,12
  144:20,23 146:18
  147:17 148:4
  151:8 157:15
  178:19,24 179:17
  253:12
injury  194:19,23
injustice  20:1
innocence  20:17
innocent  18:23
innuendos  24:15
  90:19 155:23
inpatient  117:22
input  15:20 89:24
inquired  113:17
inquiry  35:7
insinuated  169:1
insinuation  134:11
insistent  124:20
insists  162:1
  178:11 196:24
instance  49:5
  136:19 147:14
instances  33:7,8
  34:2 137:5 203:9
institute  215:18
institution  113:24
  204:23 225:23
  257:3 262:4
instruction  220:9
instructor  171:11
insufficient  36:4
  58:14

integrity  112:8,12
  257:2
intended  247:13
intense  208:21
intent  39:14 156:1
intentionally
  265:13
interact  128:10
  161:10 196:2,3
  263:3
interaction  81:17
  84:1
interactions  23:16
  24:18 88:3 142:15
interest  57:19,20
  60:9 63:4 82:8
  202:19 210:14
  251:7
interested  37:21
  154:12 269:17
interestingly
  238:14
interim  34:10
  96:19 158:24
  159:2 221:15,16
  222:5 238:1
intern  11:19 142:3
  202:18
internal  6:13
  215:9 223:23
internally  215:9
international
  225:6
internship  159:2
interpret  184:22
interpretation
  205:20 206:21
interrupted  9:5
interruption  93:1
intervention  10:12
  13:20 25:18 26:1

26:5,9,18 37:4,6,7
39:13 81:14 85:4
96:13,14,16,23,24
113:1 254:6,10
257:4
**interventional**
26:2 187:18
232:10
**interventionalist**
207:18
**interview** 25:3
34:17 55:22 57:5
58:1 63:12 85:17
91:3 92:8 93:20
94:5 99:20 104:10
104:18,23 106:15
118:21,24 119:1
153:7 154:14
155:7 156:5
230:18 240:10
242:1 259:20
263:24 264:16
**interviewed** 21:4
55:24 56:5 86:22
88:21 89:23 91:4
94:10 104:22
127:17 143:20,21
148:17,20 187:6
255:8,20 263:20
**interviewing** 89:1
96:10 97:23 101:2
105:20 160:18
186:2 260:20
**interviews** 24:24
35:12 101:10,19
233:20
**intimate** 209:10
**intimidate** 11:21
**intimidated** 99:14
100:4

**intimidation** 24:17
256:24
**introduce** 5:19
**intrusion** 58:20
**intrusive** 33:15
**investigate** 21:10
77:11 84:16
235:16
**investigated** 55:11
**investigating**
92:10 128:3 149:5
161:3 195:19
**investigation** 9:24
13:15 14:3 27:8
29:7 34:22 37:12
52:1 53:14 56:18
66:4 69:24 78:15
81:5,18 86:18,19
86:21 96:9,9
101:10 102:5,9,13
243:7 255:7
**investigational**
14:6
**investigations**
261:7
**investigator** 152:1
261:13
**investigators**
128:13 133:7
148:17 152:17
161:13 166:7
196:6 203:15
260:22,24 263:20
264:17
**investigatory** 85:7
**invitation** 38:5
**invite** 47:1
**invited** 28:8
**inviting** 34:14,18
34:20

**involve** 147:19
**involved** 35:24
52:2,4,13 57:6
94:11,12 106:16
109:21 110:2
111:2,17 143:3
156:3 167:23
190:18 205:9
230:11,11 255:17
**involving** 37:13
78:15 151:7
**irritated** 259:18
**ischial** 45:7
**ish** 212:9
**issue** 28:18 37:15
95:2 108:24 154:7
161:23 245:2
247:19
**issued** 254:5
**issues** 35:21 61:20
61:21 110:9
211:10 213:7
238:3 257:20
262:15
**item** 25:6,17 58:5
**items** 50:19 53:10

| j |
| --- |

**jan** 1:13 6:20
**january** 13:24
62:10 129:8
162:13 198:14
225:16 226:10,10
262:16,19
**jean** 39:16,21 40:5
246:15
**jeans** 50:16
**jennifer** 3:13
117:3,6
**jeopardy** 257:3
**jersey** 203:11
239:22

**job** 20:6 46:20
188:5 189:5,10,11
189:19 210:1
235:2,6,9,11 264:5
264:12
**jobs** 99:15
**joe** 5:18 73:12,14
76:21 116:5 119:9
216:18
**john** 2:5 5:6,13
6:11
**join** 29:9
**joined** 5:14
**joint** 144:12 145:6
146:18,19,23,24
147:6 178:24
179:17 263:8
**joints** 146:23
**joke** 124:17,19
138:17
**joked** 255:3
**jokes** 24:13 91:6
130:21 155:17
156:21,22 164:10
200:24 209:6
**joseph** 2:5 5:15
6:9
**jovial** 156:22
**joviality** 174:5
**jr** 2:14
**judge** 68:22
**judgment** 18:20
256:11
**july** 1:7 225:18
236:20 269:21
**jumped** 255:11
262:3
**jumping** 241:6
**junction** 147:4
**juncture** 266:8

**june** 37:24 38:6,11
**junior** 95:11
**justin** 4:11 193:22
194:1 206:23

**k**

**k** 44:24 159:21
176:17
**kaiser** 36:11,17,19
62:14 82:16 222:3
222:3,8 237:18
244:18
**karen** 5:14 6:12
173:7 188:10
**karn** 2:6
**kate** 95:10
**katie** 91:19 253:20
**katie's** 99:11
**keep** 145:4 215:7
225:22 229:3
**keeping** 181:19
**kenback** 91:5
94:20 237:12
253:19
**kept** 42:8 124:21
**key** 23:13
**kin** 269:16
**kind** 60:17 72:16
94:16,24 95:5
105:6 130:13
136:3 138:15
144:24 173:17
174:4,6,14 175:16
175:17 181:15
183:4,9 184:16
188:18,20,21
189:17 190:16,17
193:6 198:1 199:7
199:8,19 200:4,5
205:23 206:19,20
210:20 213:7,11
213:17,19 214:16

214:18,19 215:8
216:2,13,20
234:24 250:6
264:19,23
**kindly** 17:24 63:24
**knee** 42:14 199:18
200:6,11 254:18
254:19
**knees** 42:11,14
**knelt** 42:13
**knew** 67:22 73:17
73:18,20 124:24
180:2 188:23
213:7 216:4 223:4
223:9 230:8
241:19 257:24
**knock** 206:14
**know** 5:18 6:14
12:2 20:2 22:24
30:3 32:11 42:1,6
45:20 50:22 53:21
56:2 59:15 60:5,6
60:12,13,14,15,21
63:9 65:22 66:13
66:18,19 67:1,21
67:22 69:12 72:19
72:22 73:10 74:7
74:8,10,16 75:9
82:4 84:15,18
85:24 86:1 88:16
90:10 91:10 93:16
93:23 96:17 99:1
99:2,4,5,7,19,21
99:23 100:7,16,17
105:2,23 106:1
110:7,17 111:19
111:20 112:3,4,5,5
112:7 115:8 116:1
117:14,16,20
122:17,18,19,19
124:12,19 127:6,8

127:14,16 128:23
129:3 133:9
135:20 138:16,18
141:15,17 142:16
143:18,22 144:23
145:2 146:17
149:16,17 150:7
151:5 154:6
155:15,16,17,18
155:19 156:7,23
157:2,8,21 160:5
160:14,16 162:7
166:9 169:5,7,10
169:21 170:15,16
170:24 172:1,11
176:2 177:5,7,20
177:21,23 178:8
178:21 179:4,8,15
179:16,19 180:10
180:17,19,21
181:24 182:9
183:10,12,13,18
183:22,23,24
188:1 189:3,10,14
189:16,18,19
191:6 192:9,23
193:6,8,10 194:15
194:17 195:7,8,9
196:22 197:7
198:9,17 200:10
200:13 201:18
203:17 206:6,10
206:12,13,19
208:11 212:13
214:8,8,10 216:4
224:9,22,23 226:8
228:12,13,13,14
228:19 230:4
231:14 235:5,15
237:10,11,20
241:18,20 242:6

243:17 244:14
246:10 248:17
250:1 256:14
258:3 259:13
260:6 266:13,15
**knowing** 73:9
182:4 197:4
**knowledge** 75:1
133:1,8 135:9
143:12,14 152:12
157:17,19 158:2
166:3,8 180:14
185:22 187:3,10
192:19 203:16
205:16 209:9
244:6 259:2
**known** 11:23
12:16 45:16
111:21 114:6
122:21 141:18
184:18 196:19
264:6,7
**knows** 115:11

**l**

**l** 2:14 78:1 122:7
176:17,17
**lab** 162:21 166:20
167:3,7,12,14,17
167:19,23
**labeling** 33:3
**labs** 167:14
**lack** 40:11,14
**lacks** 181:9
**lady** 147:15
**lance** 2:14 6:2
**language** 24:15
47:18 49:5 50:16
**large** 129:22
179:18 209:3
**larger** 58:5 145:8

[lastly - longer]

lastly 14:11
late 180:2 191:20
  197:15 215:17,19
  226:9 268:5
lates 215:19
latest 255:7
laugh 130:21
  138:17 164:11
  200:24
laughed 42:5 45:2
  45:9 174:7
laughing 42:8,24
  46:1
law 268:9
lawyer 59:12,14
  70:18 263:21
  264:18
lay 144:21
lead 13:7 57:18
  74:21 96:12
  188:20,21
leaders 25:1 26:8
leadership 64:18
  64:19 65:5 226:21
  247:1,2,4,7,12
leading 13:18
  78:18 199:13
learn 258:11
learned 183:20
  268:8
learning 34:7 38:8
  199:8,21
leave 80:10,11
  103:13,17 174:23
  205:19 223:15
  229:23 237:21
leaving 258:14
lecture 129:7,12
  129:14,17,18
  131:8 162:11,12
  162:17,18,19,22

163:1,8 164:22
198:13,18,20,22
198:23,24 201:11
lectures 16:17
  211:11
led 96:21,22,23
  97:22 136:14
  146:7 177:15
  232:24 236:6
left 88:8 90:10
  132:9 149:12
  153:19 165:15
  202:14 229:17,17
  253:14 267:18
leg 42:15 170:18
legal 55:14 70:19
  257:21,24
lend 65:2 81:7
lesion 45:17
letter 4:23 12:3
  14:11 51:21 52:11
  52:12,14,14,19,24
  53:1,8,15,19,24
  54:1,3,4,9,11,12
  54:15,24 55:18,22
  56:16 58:6,10,12
  58:22,23 59:1,6
  60:13,14 69:11
  70:15 74:17 75:7
  75:12 79:8,10,13
  79:23 80:3,5,23
  81:3,9 83:2,4,10
  84:1,8 85:10 87:2
  88:1 97:5 98:3,14
  98:20,23 100:5
  101:18 219:1
  231:3,14 232:6,9
  234:9 236:17,21
  239:1,5,6,6,8,18
  242:8,11,11,16,18
  243:6,15,16,18,21

244:4,7,8,17
248:3 249:4,10
250:12 254:8
260:4 263:24
264:18
lettered 80:8
letters 99:17 100:1
  231:12 238:24
  239:10,11
letting 12:2
level 81:13 111:11
  112:15,17,17
  114:7,10,11 120:8
  149:19 190:13
li 3:15 122:7,8,15
  263:7
liars 19:22
lie 21:12 162:4,5
  197:3,5
lies 21:13 261:22
lieu 36:12 199:22
life 33:16 46:21
  65:8 230:6
life's 19:19 20:2
lifestyle 214:20
light 102:11 260:7
lighthearted
  226:17
liked 226:21
likewise 86:20
  231:15
liking 217:18
limit 69:23 102:6
  104:3
limitations 26:4
limited 7:6,9
lin 2:6 5:15 6:12
  6:12 93:18 94:9
  94:15,24 95:14,23
  121:15,18 126:1
  138:1 159:6 173:9

174:19,20 188:11
188:15,18 193:14
211:20 212:1,4,9
212:12,18,22
213:1,3,10,19
214:3,7 250:20
line 12:5 27:9 32:1
  50:19,19 56:21
  58:5 75:17,24
  76:5 172:3,5
  267:13,14
lines 154:1
list 18:14 44:4
  75:14 107:24
  231:19,20,24
listen 110:23
listening 149:8
  151:14
literally 251:10
little 26:21 57:6
  60:7 61:19 79:2
  89:9 90:7,12
  104:4 120:13
  124:7,15 138:17
  145:7 155:12
  194:20 197:10
  219:16 227:5,16
  249:17
locate 145:5
located 146:19
location 199:8
long 54:8,10,13
  75:5 111:21
  122:16 160:2
  207:7,13,14
  239:22 268:1
longer 11:7 28:17
  38:21 162:2
  184:21 197:1
  257:5

**longstanding**
257:1
**look** 25:24 32:12
42:14,17 49:16
51:15 69:21,22
82:14 84:6 212:7
240:10
**looked** 33:4 34:12
42:16
**loosely** 87:8
**lose** 225:2,8,9
**losing** 264:5,11
**loss** 225:10
**lost** 223:10,11,11
223:13
**lot** 57:7,9 61:20
65:2 102:4 114:8
129:24 143:1
186:19 197:21
204:22 206:1
211:1 214:20
226:7 234:22
235:8 249:16
**lots** 128:22
**loud** 42:24 56:23
74:5 76:22
**louder** 194:20
**lounge** 80:9
**loved** 258:18
**lover** 230:5
**loving** 44:6 254:24
**lower** 44:20 145:2
231:20
**lying** 20:18 157:14
178:12 237:7

**m**

**m** 159:21
**m.d.** 2:5,5,6,11 3:4
3:7,13,15,20 4:8
22:17 78:2 117:6
122:8 141:4

176:18
**machine** 269:11
**mahon** 167:15
**mail** 14:1 38:3,7
65:12,24 71:8,10
218:11 244:17
254:12,13 255:6
263:18 265:4
**mailed** 39:22
**mails** 244:2,2,3,12
244:13,14,15,18
262:6
**main** 104:21 172:3
172:5
**maintain** 71:3
237:8
**maitin** 79:17,20
131:13,14,17,23
132:16,18,23
133:2 134:12
152:10,11,13,15
152:18 158:19
165:2,8,20,24
166:4 171:20,24
172:7 181:8
187:23 188:6
202:11 203:1,5
205:3,6,7,18
210:22 211:2
215:4 222:4,7,10
222:19 223:20
224:7,8,14,14
225:21 226:8,23
229:11,12 230:10
231:13 236:5,6,10
237:6,8,20 238:7
248:15,18 262:22
264:3,4,11
**maitin's** 216:20
221:21

**majority** 10:14
146:23 151:10
196:17 212:9
**making** 37:16
82:14 86:5 103:14
111:9 130:20,21
164:9,10 200:23
200:24 233:10
234:9 235:13
256:11 265:1
266:1
**male** 11:15 43:9
46:5 75:24 77:4
88:7 137:20,22,23
199:17 216:23
217:7,17 219:12
256:8
**males** 214:18
**malice** 155:18
**man** 19:20 143:18
207:20 216:5
**management**
10:19
**maneuver** 44:21
136:16 137:10
**maneuvers** 163:3
163:5,23
**manipulated** 46:3
**manipulates** 45:12
**manipulation**
44:10 199:3
227:13,15
**manipulative**
163:1,7
**manner** 148:8
197:17
**manufactured**
18:20
**march** 14:10,13,19
14:19 64:17 79:11
83:17,18 84:2,8,8

122:24 126:8,10
225:19
**mark** 241:7
255:12
**market** 1:16
**marks** 17:4
**married** 80:20
**mass** 147:5
**massage** 199:5
**match** 191:15
**matches** 191:13
**material** 26:16
**mates** 131:7
164:21
**matter** 1:10 19:11
27:2,4 34:5,12
48:1 51:2 81:12
150:11 194:12
**matters** 9:7 15:13
17:8,19
**mds** 265:24
**mean** 30:11,16
31:24 49:12 51:23
72:15,15 81:22
82:12 83:21 85:5
85:21 90:21 98:21
101:4 102:1
104:23 105:1,23
115:22 138:16
154:11 155:8
179:24 181:13
182:6 184:13,13
184:14,15,17
185:8,16 188:23
190:1 193:1,3
198:6 202:5
204:22 213:4
214:15 230:24
249:4,22
**meaning** 39:12

means 150:7
184:20 205:21
249:5
meant 184:23
measure 18:23
265:20
measures 68:1
medical 1:1,9 2:3
2:12 4:20 5:7,10
5:12 6:5,7 7:15
9:20,23 10:3,4,7,9
11:24 12:9 14:7,8
14:14,15,20,22
18:2 20:8 25:9,11
25:22 26:7,23
27:3,3,5,6,11,16
29:5 32:10 35:4
36:12 41:12 63:16
66:3 80:2 84:12
85:1 93:22 102:2
102:12,14 103:7,8
103:19,23 105:5
108:17 110:6
112:3,7,11,17
114:1 141:19
142:1 145:12
146:13 160:7,12
163:9,15 166:23
186:1 187:5 195:4
199:6 202:7
214:17 221:13
251:22,24 252:2,5
252:6,11 256:15
256:19 257:8,10
257:12,20 268:12
medication 145:9
medicine 6:13
19:2 109:19,21,24
129:16 162:21
163:2,7 202:21
207:18 266:2

meet 38:12 79:16
80:2 90:5 197:14
203:4 213:8 253:3
267:15
meeting 19:18
28:3 35:15,16
39:17,23,24 40:2,6
64:8,17 78:18
102:15,23 154:7
236:22 240:12
266:6
meetings 110:8
190:1 198:7 245:6
245:8,12 246:19
meets 25:7 114:7
member 92:15,23
96:11 136:21
187:20 252:4,6
263:6
members 5:16
7:19 110:23
membership 5:12
10:7,10 14:16
252:3 257:12
memo 4:22 62:9
memorable 264:1
memorandum
37:11
memory 166:19
166:24
men 143:6,8
156:20 211:22
212:10 260:17
menace 262:3
mention 55:19
78:13 139:13
230:1
mentioned 58:24
85:10 94:4 99:16
100:8 204:5
215:22 216:21

228:4 232:17
247:15 263:13
266:19
mentioning
216:20
mentor 20:4,7
134:16 177:9
183:1,5 221:11
226:2 227:23
229:3 236:12
239:20
mentorship
182:19
merging 50:15
mess 222:9
message 100:9,12
100:23 230:16
249:22 253:7
messed 106:14
met 5:17 28:20
97:16 169:15
181:3 194:18,22
223:22 224:4,4
mexico 194:8
207:4 210:1
mic 201:8
michael 1:3 2:17
2:18 4:15 5:8,21
5:23 251:3 253:7
microphone
164:19
mid 144:24 262:18
middle 43:14 57:9
75:23
midst 54:6
mind 17:8 26:1
79:4 83:4 96:22
133:13 150:14
167:10 170:3
199:9 203:13

mine 230:21
233:10 244:6
minimal 39:4
minute 107:17
251:8
minutes 7:7,10
56:2,2,4 107:14
108:3 155:7
196:15 240:13
251:6,10,12,17
misconduct 18:18
18:23 110:3,21
111:10,16 161:1
257:23
missed 63:23
95:16 246:8 264:2
missing 71:14
mission 221:8
misunderstood
106:13
mm 188:17
mobile 42:12
model 92:4 129:10
130:9,18 135:16
135:18 136:1,23
137:13 162:15
163:19 164:7
168:1 171:12,15
178:4,5 198:16
199:24 200:17,21
205:11 219:9
238:16
models 95:24
137:18,19 167:23
171:7 178:2,12
219:11,12 260:13
260:18
modify 248:12
moment 83:1
245:17

money  181:16,18
  181:20 192:20
month  83:14
  123:6 126:7
months  28:19
  186:21 245:13
  254:9 257:24
moral  148:12
morning  115:18
  174:14 207:12
mortified  46:1
motion  36:23
  258:4
motivation  236:15
  236:15
motive  20:11
  21:11 258:5,7,8,15
mouth  54:19 99:3
  138:22
move  32:17 39:7
  51:17 53:17 55:16
  65:11 69:10 71:5
  71:6 72:5,6,9
  109:2 115:1
  150:24 225:1,1
  226:8 227:15
  243:2 244:9
  249:22 267:19
moved  132:8
movement  19:9
  99:4
moving  37:21
  40:10 51:2 237:16
msec  19:18 233:24
mullan  4:21 200:8
  208:5 218:9 219:7
multiple  11:2
  147:2 178:6 181:6
  197:14 198:4
  199:16 203:2,5
  204:20 213:9

215:13,16,21
musculoskeletal
  91:24 113:2 114:3
  143:2 199:1,19
  232:11
musculoskeletally
  142:24

**n**

n  122:7 176:17
  194:2
naftulin  4:22
  232:19
naive  259:10
name  9:17 12:1
  41:19 71:14,15
  77:23 80:19,20
  117:1,3 122:5,6
  126:18 139:7
  140:24 141:2
  159:13,19,21
  162:7 176:15,15
  204:6 213:18
  229:20,21
named  129:3
  143:18 178:8
  180:18 197:7
  198:9
names  49:6
national  181:17
naturally  261:17
nature  41:21 89:4
  94:8 143:2 195:18
  198:3 209:17
  214:2 259:11
  261:22
near  46:20 148:1
  186:7
nearly  221:13
  239:14
necessarily  91:13
  96:3 155:9 170:8

189:3
necessary  114:5,6
  146:1 159:19
necessity  226:16
need  12:3 15:23
  46:18 72:5 73:10
  82:13 85:16
  115:13,22 142:22
  161:21 176:4
  183:15 234:8
  247:11
needed  38:1 39:6
  53:8 81:11,13
  82:5 99:17,24
  111:5 177:24
  224:5 250:17
needle  145:9
needs  22:12 248:3
needy  221:8
negative  113:4,6
  231:6
neglected  250:23
negligence  265:16
neither  269:16
nest  264:14
neurosurgeon
  115:17
neurosurgery
  6:10
neutral  60:18,20
never  15:15 16:12
  19:24 43:11 67:13
  71:20 112:1 113:3
  113:6,16,17
  119:24 121:19
  158:3 174:4,6,7
  183:3 190:9
  231:14,16 242:17
  243:8 244:16
  247:18 250:13
  255:15 257:20

263:18 264:16
new  20:17 28:21
  64:16 97:1,2 98:9
  102:10 194:7
  203:11 207:3
  210:1 222:16
  235:11
news  134:2
nice  45:8,8 115:11
  208:18 216:7
  234:24
nicholas  91:5
  94:20 253:19
night  89:21 208:24
nine  175:12 176:1
  212:2,3
nominated  213:21
non  40:3 63:4
  69:10
nonsense  260:16
normal  146:4
  203:13 208:22,23
north  1:11 239:22
nose  263:8
notary  1:14 269:4
  269:24
note  33:6 91:23
  230:24 255:7
noted  206:1
  223:24
notes  22:3
notice  246:11,13
  260:1 269:6
noticed  91:17
  131:6 164:20
  201:9
notifying  34:13
noting  153:19
notoriety  70:22
notorious  234:9
  235:13

november   12:20
13:17 27:13 35:9
39:2,16,18,21
226:9
number   23:12
50:11 67:1,2
78:22 142:24
163:14 169:10
186:3,20 209:3
numerous   10:4
13:6 63:1 70:1,6,9
70:14 137:17
223:23
nurses   43:7 216:7

**o**

o   159:21 176:17,17
oath   150:5,10,20
object   16:9,12
71:22
objection   207:19
objections   6:24
18:15 61:17 108:1
objective   35:20
objects   24:11
obligates   150:11
obligations   189:13
259:19
observation
253:19
observations
128:18 161:19
196:11,12 233:3
observe   144:14
observed   88:4
144:16 253:4
obsessive   33:18
obtain   8:9 228:6
obvious   66:24
201:16
obviously   47:24
82:2 146:14

192:12
occasion   125:15
occasions   68:4
178:6 203:3,5
204:20
occur   30:2 31:21
33:19 83:13 259:6
occurred   16:4,13
34:2 48:4,4 50:15
56:14 71:9 72:16
72:24 73:20 74:16
89:17 106:9,17
126:6 132:7,13
157:13 170:7
186:8,15 191:4
255:10,16
october   18:3 33:9
39:1 191:15
odd   151:18 154:3
154:12 207:21
offended   44:23
46:3
offensive   202:2
offer   9:6 28:11
52:16 68:4 78:22
232:14 235:1
237:14 239:10,10
257:16
offered   39:18
231:21 232:1
241:19
offering   239:9
offers   232:2
offhanded   156:23
209:5
office   27:16 39:1
93:22 94:4 102:2
203:6,10 206:1,10
216:22,23 217:4
217:10,15 222:21
243:13 252:23

officer   27:4
offices   217:8
official   269:20
officially   108:17
oh   83:11 113:15
119:18 135:23
184:19 203:7
204:18 234:2
okay   46:6 51:5
60:4 69:8 71:15
76:1 79:9 90:10
101:18 104:1
110:15 120:3,16
132:18 134:18
137:16,23 139:5
140:10 159:3
173:4 174:12
187:13 188:4
193:11 206:8
211:19 217:21
236:24 242:19
245:22 248:14
249:15
old   196:14 230:20
262:18 263:18
older   247:6,7
omm   162:21 163:8
once   8:2 22:8
31:11,16 129:21
134:2 157:10
167:12 170:11
199:7 202:14
216:15 264:13
one's   191:14
ones   23:13 48:20
82:2 94:21 175:13
196:18 231:20
237:21
ongoing   14:17
ongoings   61:20

open   46:17
opening   6:23 7:5
7:13 9:1,10 15:9
15:12 17:10,13,15
17:20,22 18:10
21:23 98:24
openly   181:15,17
operating   243:12
operations   27:1
opinion   64:24
112:8,10 145:24
162:2 197:1
opportunities
240:9
opportunity   17:16
19:15 51:11,15,24
55:10 65:6 153:6
154:15 222:15
226:22 250:2
opposed   142:12
162:2 197:1
opposite   233:10
opted   40:1 250:16
option   257:6
oral   7:8,15
orally   62:16
order   12:4 147:7
225:22
orderly   27:1 30:18
ordinarily   264:21
264:24
ordinary   130:17
144:15,18 145:21
146:9 148:15
164:6 167:7,10
200:16,20
organizational
13:22
original   52:6
originally   40:19
79:19

originated  47:19
osteopath  238:19
  240:16
osteopathic  44:9
  129:15,23 162:21
  163:7 166:20
  233:22 234:1
outcome  39:13
  113:3 269:18
outcomes  110:10
  113:7
outfit  90:4
outfits  90:13
outline  24:16 35:1
  39:10
outlined  25:18
  41:7
outlines  23:12
  26:5
outlining  35:3
outpatient  194:23
  196:23
outraged  19:21
outrageous  21:13
outside  33:21 95:3
  112:1 193:18
  252:17
outstanding  38:7
overboard  43:19
overdue  75:5
  215:12
overhead  170:19
  170:20
overlap  220:24
  221:2
overlooking  130:2
overly  90:7,8
  154:23 155:2
  234:17
oversaw  165:9

overseeing  204:19
oversight  192:24
owe  188:5

p

p  122:7
p.m.  1:13 268:13
pa  2:9,15 228:7
packet  12:12
page  3:3 4:3 23:22
  23:23 37:23 38:18
  40:16 44:18 49:16
  50:5 62:11,11
  63:24 65:2 75:13
  75:19,22,23
  240:11,12,21,24
  246:20
paid  81:6
pain  10:18 191:13
  199:9
palpatory  163:6
pam  155:6
panel  2:3 5:16,20
  7:11,17,19,21 8:7
  8:11,11,13,17 15:1
  32:14 53:23 55:24
  113:19,21 114:19
  146:14 218:3
  239:23 251:21
panel's  6:16 57:19
pants  145:1
paragraph  32:21
  38:11 40:16 41:14
  43:4,13,22 44:3
  46:11,13,16 56:22
  63:23,24 75:13,17
  75:23 85:19
parathyroid
  245:23
parental  268:11
park  2:8

part  21:12 36:7
  58:19 61:14 69:9
  80:1 88:10 90:6
  95:2 105:20
  108:12 125:7
  130:12 136:14
  138:9 151:23
  152:1 153:10
  154:14 170:6
  176:10 200:6
  218:14 237:1
  250:23
partially  188:8
participate  15:18
  184:9 190:15
participated
  167:17
participation  64:1
  64:22
particular  11:4
  23:12 93:7 104:13
  121:10 179:11
  180:8 181:8
  205:11 209:20
particularly  77:9
  91:4 183:5 189:17
  267:9 268:3
parties  5:19 6:15
  8:3,18 31:13
  35:24 78:16
partly  93:6
partner  142:3
parts  13:6 135:7
  189:11 200:11
  214:4 255:4
party  6:22 7:3,6,9
  7:12,22 8:1,6,9,14
  8:15 31:11 269:16
passed  69:10
  257:5

passing  259:2
  262:12
passion  265:23
pathologies  43:18
pathology  163:4
patient  11:1 26:16
  43:16 44:4 72:6
  74:22 75:13,15
  78:12 88:4,7,18
  92:2 93:3,7
  104:14 105:1
  118:8 123:9,23
  124:2,11,12,20,24
  125:6,8,9 133:18
  143:8 144:13,19
  144:21 146:10
  147:5 148:7 151:8
  153:21 157:14,16
  157:18 158:8
  160:3 161:21,23
  166:17 177:3
  179:1,6,15 182:16
  184:19,20 194:10
  199:15 204:2
  229:19 234:3
  254:22 261:16
patient's  88:6
  142:23 144:6
  146:1,7 147:16,20
  147:22 253:11
  260:23 261:1,9
patients  11:4,7
  19:2 20:24 24:4
  24:10 33:17 43:7
  43:15 45:11 89:5
  91:11,13,15
  112:24 113:5,8
  114:2 115:12
  117:24 118:12,12
  119:21 123:3,12
  123:13 124:10

128:6,6,11,16,23
142:12,13,17,17
142:21 143:1,4,10
161:6,6,11,16,18
161:22,23 162:3
177:17,17,19,20
177:21,22,24
184:16 195:22,22
196:4,9,13,17
197:2,19 209:15
227:12 228:21
246:12 253:17
256:18 257:19
260:15,16 263:4
**pattern** 10:10
  14:17 39:10 40:2
  41:2 90:16 91:17
  257:1
**paul** 2:8 6:4 32:23
**pavilion** 1:11
**pay** 61:9 207:14
**paying** 60:23
  151:6,10
**pcom** 16:16 73:21
  129:22 170:7
  198:21 199:2,10
  202:6
**pd** 222:8
**peer** 26:2,9
**peers** 20:22
  258:23,24
**pelvis** 147:3
**penalty** 215:18
**pennsylvania** 1:12
  1:17 180:8 187:16
**people** 13:10 19:3
  21:3 52:1 68:22
  72:18 84:20
  101:10 102:7
  104:11,19 106:6
  112:5,14 114:8

115:3,8,9,15 116:1
129:19 130:5
132:5 136:7
146:16 154:2
156:19 157:13
162:23 169:7,9,14
169:19,24 174:17
175:4 181:20
183:22 187:3,4,6
190:7 198:23
200:11 202:2
208:18 209:3
211:10 213:23,24
214:12 222:13
227:15 228:2
229:10 232:2
233:6 234:23
235:2,4,5 236:3
256:14 258:5
259:9
**people's** 147:8
**perceive** 19:7
**perceived** 24:22
**percent** 212:5
  233:21 239:14
**percentage** 211:20
  211:22
**perfectly** 57:4
**perform** 145:11
  146:2 148:10
  163:4 255:2
**performance**
  221:22
**performed** 145:12
  153:11 163:24
**performing**
  144:10 178:23
**performs** 253:16
**period** 16:3 18:8
  33:12 48:11 72:17
  77:6 111:8 127:11

141:23 160:6,9,13
167:13 180:11
181:11 195:2
205:4 235:7
**permission** 15:14
  15:21 17:9 107:12
  176:1
**permit** 265:22
**permitted** 18:13
  108:4
**person** 36:12
  58:22 66:14 67:8
  73:6 114:2 115:24
  134:2 136:3,6
  155:5,10 163:22
  168:5 173:15
  189:17 192:20
  202:20 218:7
  227:21 239:20
  255:13 264:22
  265:1
**person's** 193:9
**personal** 10:21
  28:10 33:16 36:8
  37:1,5,8 65:3,8
  66:7 71:2 77:10
  80:18 90:7,12
  91:14 94:7 112:17
  157:9 184:5
  228:19 245:13
  252:16
**personally** 29:6
  56:19 57:18 66:10
  98:13 149:21
  197:24
**personnel** 24:10
**persons** 17:2
  18:21 258:12
**perspective** 47:1
  101:12

**persuaded** 36:6
**pervasive** 95:14
  95:15
**perverted** 43:6
**pgy** 41:14 72:21
  72:21,24 73:1
  120:5,11 126:4
  180:2,3,5 183:5,9
  189:1 191:14,16
  191:21 192:10
  195:11,12 212:14
**ph** 2:16
**phase** 7:12 37:6,7
  85:7
**phil** 88:2 92:18,20
  94:20 99:18
  100:19,22
**philadelphia** 1:12
  1:17 2:9 129:15
  162:20
**philip** 229:21
**phillip** 143:18
  178:8 232:12
**phone** 66:14,20
  67:1,5 70:17
  98:18 188:2,3
  230:16 234:10
  235:14 239:19
**physical** 10:20
  11:6,10 24:8,12
  43:23 44:20 96:1
  129:21 130:13
  136:16 162:11
  163:2 207:17
  219:8 227:11
  255:2
**physician** 12:7
  23:11 25:13 29:1
  34:8 49:6,7 68:15
  84:5 110:9 115:4
  127:9 172:3 181:3

[physician - present]                                                          Page 33

198:2 229:5,9
258:18
**physicians** 18:18
23:17 24:2 88:8
181:7 216:8 234:1
252:9 266:1
**picked** 75:4
200:11
**picture** 102:7
**piece** 102:4
**piss** 43:3 125:1
**place** 25:16 33:16
34:16 108:2
129:14 133:21
162:19 163:8
198:20 256:6
269:6
**placed** 19:21 25:3
29:4 123:23
**places** 257:2 262:7
**plan** 28:7,9 35:1
35:21 36:15,20,22
41:7 64:18 82:19
**plans** 114:5
**play** 43:10 46:2
170:23 216:7
232:4
**please** 9:8,16 17:8
22:14 23:5 29:24
32:4 33:6 47:4
48:21 49:20 50:3
54:21 55:3 62:1
70:11 73:15 77:23
78:8 87:20 108:14
125:4 142:19
159:19 165:2
193:19 194:21
243:3 257:15
**pleasure** 140:22
141:13

**plenty** 146:21
**plus** 98:2 120:13
**pm&r** 11:3,15
14:2 33:24 34:7,9
46:19 70:23 88:12
89:2 90:2 92:22
114:6 120:6
141:20 187:19
190:1 253:18
**pocket** 242:16
**pod** 168:3
**point** 9:11 11:9
16:22 18:16 25:17
28:17 29:8 32:16
35:16 37:3 38:14
40:9 53:19 56:3
60:12 61:5 69:4
75:3 78:21 81:11
81:12 84:15,24
85:6 86:2 101:19
103:5,6 105:9
115:20 124:22
132:18 139:16
145:16 148:5
151:12 168:2
173:20 217:14
241:1 245:24
261:20 263:12
**pointed** 92:5 96:4
238:17,21
**pointing** 201:13
**points** 23:13 32:16
**poked** 138:12
**policies** 18:6 47:15
48:12 252:8
**policy** 12:8 23:11
23:12 29:1 47:10
47:15,17,20,22
48:24 49:4,5,12
252:10 264:20,23

**poorest** 20:3
**poorly** 181:2
209:19,22
**popliteal** 42:15
**popular** 237:17,17
259:13
**population** 44:1
**portion** 147:22
**position** 11:19
19:14,17,21 21:16
45:12 82:4 123:23
128:10 132:8
145:6 149:15
151:23 160:18
161:10 187:24
196:2,3 202:16
221:14 222:11
226:5,18 231:2
232:15 234:7
236:12 237:8,10
253:4
**positions** 170:19
231:22
**positive** 40:11,13
231:6
**positively** 232:13
**possibilities**
235:21
**possible** 25:10
63:15 104:3
150:15
**post** 21:7 108:5
259:9 265:6,9
267:1
**potential** 11:21
**power** 231:2
**powerful** 258:3
265:5
**practice** 114:10
140:9

**practices** 114:11
**practicing** 218:11
265:24
**practitioner** 26:11
26:22
**practitioner's**
26:20
**practitioners** 24:5
**praise** 113:7
234:10 235:1
239:9
**pre** 109:2
**preceded** 246:9
**precise** 148:18
262:20
**precisely** 146:19
**preconceived**
101:23
**predetermined**
265:17
**preference** 219:11
219:24
**pregnant** 90:11
**preliminary** 9:7
15:13 17:19
**prep** 145:8 191:24
**preparation** 64:8
178:19
**prepare** 68:7
145:20 192:1
**prepared** 14:7,8
71:19 147:13
**preparing** 144:13
144:19
**prerogative**
237:23
**presence** 225:6
243:9
**present** 10:1,3
12:5 13:16,18,19
14:5 18:14 19:16

19:17 52:9 53:2
56:18 60:23 73:24
92:17 101:6
104:11,19 105:8
105:18 111:1
151:17 205:9
219:18 220:13
**presentation** 7:14
31:7
**presented** 12:23
13:16 14:10 35:4
36:15,21 52:15
55:5,9 56:17
58:12 65:23 66:2
66:2 71:17 73:20
103:6 110:9
118:22 153:8
231:3 242:10,13
242:15 243:11,14
243:18,19,20,23
244:16,17
**presenting** 9:21
34:19
**presents** 20:21
**preserve** 108:2
**president** 6:7 9:19
27:2,12 110:6,12
**pressing** 263:16
**pressure** 225:15
226:7
**presumed** 20:16
**presumption**
89:16
**pretend** 43:9
**pretty** 43:15 44:2
47:21 209:10
**prevailing** 40:4
**prevented** 82:6
**preventive** 12:13
**previous** 21:16
35:8 82:2 94:3

225:12 226:14
**previously** 59:7
79:16 186:23
**primarily** 167:20
**printed** 243:21
**prior** 35:15 48:10
52:15 96:17 160:7
170:22
**priority** 40:24
**private** 13:5 36:8
140:8 255:9
**privately** 7:3
**privilege** 68:7
238:1,2
**privileged** 20:24
**privileges** 215:14
238:8
**probably** 42:18
48:2 56:4 77:7
99:21 101:2 108:3
110:13 111:2,2
128:20 130:5
161:21 163:14
199:21 204:23
213:14 244:9
247:23 248:1
264:13
**problem** 54:17,18
60:1 72:23 197:4
197:12 211:9
245:16 259:23
**problems** 228:15
229:22
**procedural** 108:1
**procedure** 29:22
71:22 108:23
144:7,10,11,14,16
145:12,22 146:2,5
147:13,24 148:10
151:7 153:11,13
153:19 154:6

179:5,11,16,22
219:17 268:8
**procedures** 16:2,7
18:6,15 47:15
48:13,15 144:9
154:13 262:1
**proceed** 60:9 78:9
**proceeding** 30:9
78:12 257:21
**proceedings** 5:2
18:13 26:16 35:1
52:4 101:16
257:24
**process** 18:17
24:23 26:13 32:17
34:16 37:1,19
38:2,9 40:3,12
60:5 64:22 83:22
84:16 92:9 93:20
95:1 98:8 110:24
111:17 174:4
231:17 233:17
258:13
**produce** 48:2
**professional** 12:7
12:8 18:2 19:12
23:10,11 26:23
29:1 36:10 49:7
65:9 81:15 82:9
141:21 143:9
148:8 152:1
226:20 227:2
252:10 254:8
**professionalism**
197:15 216:2
232:18
**professionally**
149:21
**professionals** 24:3
33:18

**program** 10:19
13:23 32:10 99:22
117:17,18 122:23
131:7,15,17,21
132:3 141:20
158:18,20 164:21
165:5,7,8,15,17
178:15 193:2
202:13,14,16,20
211:13,21 212:5
212:14 218:9
222:16 223:7,9,10
223:16 224:8,13
224:15 225:4,11
229:16 232:11
233:13,21 235:10
237:24,24 247:4,7
247:13 250:4
260:12
**programs** 190:20
211:15 239:15
**progress** 36:11
39:4 62:12,14
64:7,11,22 215:2
246:20
**progressed** 214:16
**progressing** 190:3
215:7
**projected** 74:2
**prolonged** 88:14
91:1
**promise** 223:17
**promised** 223:4,5
**promote** 225:24
225:24 226:1
239:17
**promotion** 212:17
**prompted** 98:19
166:19,24
**prone** 144:22
157:15

proof 20:18
proper 147:9,16
properly 148:6
  192:3
property 262:5
proposed 7:23
prosecuted 181:22
prostate 246:4,7
protégés 259:1
proud 258:23
  266:1
prouder 258:22
prove 20:9,16
proven 125:17
  252:8 265:19
provide 30:13
  36:13 48:8 56:4
  57:17 58:2 59:5,6
  80:5 83:2,24
  84:11 169:22
provided 36:3,11
  48:11 49:22 50:24
  58:13 71:12 89:5
  102:17,18 112:22
  182:20 231:14
  232:10 243:5
  245:3 251:23
  264:1
psa 246:2
psychiatrists
  229:10
psychosomatically
  143:3
pth 246:1
pubalgia 45:15,17
pubic 45:19,21,24
public 1:14 33:16
  150:16 269:4,24
pull 63:22 219:3
pulled 127:24
  231:11

pulmonary 109:18
  109:19,24
pulse 213:6 214:11
purpose 39:12,14
  65:3 73:9
pursuant 25:10,22
  269:6
pursue 20:1
push 45:18
pushback 234:23
pushed 224:16,17
  224:17
pushing 236:9,11
put 28:23 36:23
  60:6 68:18 69:19
  99:2 100:11
  124:22 129:22
  226:7 230:23
  266:9,13
putting 33:23
  138:22
puzzled 41:20

### q

qualified 70:18
quality 181:10
quarters 209:14
quasi 257:21
queenan 2:5 5:15
  6:9,9 27:18 53:17
  54:8,16 55:14
  59:5,9,16,24 60:4
  60:11,22 61:4
  67:10 69:1,8
  72:14 73:17 74:6
  76:19,24 86:6
  95:16 98:11,14,17
  99:5,9 100:7,16,22
  101:3 105:4,11,15
  105:21 106:3,12
  115:1 116:16
  119:10,15,19,23

120:3 121:23
125:23,24 134:10
134:15,18 137:24
138:2,10,23 139:8
139:8,14,21 140:1
140:3,14 151:1
157:23 158:4,7
159:5 168:6,10
173:14 174:1,3,10
174:12,16 175:15
176:4 190:24
191:8,20,22 192:7
192:11,15,17,23
193:11,13 204:9
216:19 217:6,13
228:23 247:15
248:1,4,8,14,22
249:1,8,12,15,21
250:3,6,9,17
question 26:19
  49:9 54:2 55:13
  69:1 72:2 73:15
  76:20 83:3 85:9
  103:15 104:17
  106:4,14,21 107:1
  115:2 120:21
  121:16 133:12
  134:11 138:3
  139:4 140:4
  144:11 146:15
  153:22 169:12,23
  183:11 191:1
  241:7 255:12
  258:15
questioning 6:24
  51:3 72:9 185:1
  206:20
questions 7:11
  8:19 10:21 26:11
  30:13,22 34:21
  41:21 80:18 87:19

91:15,21 107:2,4
108:24 110:18
114:16,17,18,21
119:6,7,9 121:14
125:22 126:13
155:11 156:10
159:4 167:2 170:3
173:8 175:11
182:17 192:17
221:2 228:20
239:23 244:20
247:14 250:20
quick 218:3
quickly 21:9 109:3
  183:20
quiet 72:11
quite 85:22 116:12
  161:20
quotation 17:4
quotations 17:1
quote 189:16
quoted 47:16
  52:23

### r

r 159:21,21,21
  194:2 269:1
race 128:24
raised 26:12,17
  35:9 37:16 82:1
  91:22 98:10
rampant 264:3
ran 167:20
randomly 94:16
  206:9 217:12
rank 232:4 265:11
ranked 231:20
ranking 231:23,24
rapport 183:18
rarely 258:7
rate 189:21 190:1

ratings 190:6
reach 18:12,16
  65:22 70:2 105:16
  211:3 265:16
reached 37:18
  38:2,7 66:6
reaching 68:3
  257:8
reaction 135:12,12
reactivation 98:1
read 14:24 21:23
  35:2 47:9 62:19
  63:24 64:24 100:9
  108:3 218:14,17
  242:17 243:10
readable 218:18
reading 146:16
  235:24
ready 107:20
reality 20:17
realize 58:21
  125:6
realized 264:13
really 13:9 57:24
  58:4 82:5,13
  84:15 86:4 99:24
  102:3,3 125:12
  139:1 169:11
  170:17 183:3
  191:23 197:23
  213:5,16 222:12
  225:15 229:4
  239:17 243:1
reason 83:6 136:4
  145:7,20 194:12
  208:10,10 228:16
  228:17,18 236:2,3
  236:18
reasonable 53:21
  53:22 264:21
  265:1

reasons 50:11
  74:15 147:2
  261:20
rebuttal 34:20
recall 67:23
  110:11 130:8,16
  130:20,23 138:3,4
  138:5,20 144:17
  146:3,11 149:4
  152:20 163:18
  164:2,3,5,9,13
  168:4 171:13
  174:10 199:23
  200:15,19,23
  201:2 240:14
  241:9 244:11
  255:16 263:5
recalled 241:16
  255:12
recalling 255:11
recanting 153:16
receipt 8:8 52:14
  236:22 255:6
receive 266:13
  267:12,20
received 15:23
  38:1 65:24 88:1
  112:21 250:16
  258:23 264:18
receiving 70:17
recess 107:18
  251:13
recklessly 21:5
recognition 82:12
recognize 68:12
  95:1 156:15
recollection 143:6
  151:11 155:9
  156:24 244:5
recommend 10:6
  14:21 21:14 36:9

41:3 81:14 82:23
  111:15 249:13
  252:1 265:22
recommendation
  5:11 14:15 82:24
  96:18 100:6
  102:23 103:22
  231:15 232:10,13
  249:4,5,7,9,13
  257:9,11
recommendations
  10:8 111:9
recommended
  98:6
reconstruct 262:8
reconstructing
  235:9
record 5:4,20 9:7
  9:15 16:6 18:14
  48:1 49:19 52:6
  66:16 76:23 77:23
  107:16,21 108:2
  108:12,17 140:15
  140:17,19 146:15
  150:17 153:6
  159:12 218:14,17
  219:6 237:1
  245:17,19,21
  251:11,16 266:7
  266:10,14,17,17
  267:10 268:11
  269:14
recorded 74:6
  170:13 269:11
recordings 16:19
records 262:6
recover 183:10
rectify 233:17
reduce 42:24
redundancy
  220:19

redundant 220:6
reed 3:20 92:12,16
  92:20 104:24
  141:3,4 253:21
refer 29:3
reference 79:8
  89:14 108:12
  187:10 205:17
  231:12 255:24
references 241:16
referred 27:2
  112:24 113:8
  114:8
referring 77:11
  100:15,17 133:23
  134:8 242:6
reflect 18:1 240:13
  263:19
reflected 47:18
  82:18 254:7
reflecting 10:17
  18:8
refrain 24:4
refused 28:14
refute 20:23 53:11
  84:21 218:6
regard 35:11 71:1
  112:16,22 115:4
  188:12
regarding 5:9
  26:19 28:21 41:6
  43:7 50:14 78:23
  86:22 98:14 99:15
  135:12
regardless 19:10
regards 232:9
region 45:22
regions 130:13
regular 189:22
  248:17 258:17

**rehab** 207:18
**rehabilitated**
  229:14
**rehabilitation**
  10:19
**rehash** 105:6
**reinforce** 189:9
**reinstate** 189:9
**reinstatement**
  21:15
**related** 55:22
  104:14
**relating** 152:3
  261:14
**relation** 10:22
**relationship** 112:2
  134:12,15,16
  152:16 166:2
  216:21 226:12
  230:4 236:10
  237:5 238:6 264:4
**relationships**
  134:8 143:8
  172:17 252:16
**relative** 16:10
  185:15 186:12
**relatively** 138:5
**relay** 63:6
**relevance** 7:22
  50:22 57:19 73:14
  78:24 116:7 175:2
  205:22 206:18
**relevant** 26:6
  34:17 35:19 38:22
  50:13 61:16
  101:15 210:8
**reliable** 17:6
  264:20,23 265:4
**reliance** 17:7
**rely** 17:3 265:1

**remain** 46:18
  72:11 264:15
**remained** 10:12
  165:15 201:19
**remarks** 209:5
**remediation** 215:9
**remember** 42:24
  47:21 57:2 72:18
  72:19 99:11
  112:14 113:2
  134:21 135:2,2,3
  137:2,3,6 139:11
  139:22 141:24
  151:14,16 153:6
  153:10,15 155:1
  155:10,11 156:3
  158:10,11,12
  164:1 166:22,24
  167:3,4,6,9,18,24
  169:22 201:20
  202:9 203:9
  205:14 209:18
  229:21 241:4,6
**remind** 22:11
  155:4
**remove** 222:4,10
  237:10 238:5
**removed** 186:5
  245:24
**renewed** 40:23
**reorganization**
  258:16
**reorganize** 263:16
**repeat** 165:21
**repeated** 41:23
**repeatedly** 8:15
  125:11 245:12
**repercussions**
  70:21
**replied** 42:2

**report** 14:6 41:5
  63:7,12,13 68:8,12
  68:19 75:2
**reported** 128:14
  161:14 196:7
**reporter** 1:14 6:20
  21:24 22:6 117:2
  126:18 141:1
  159:13 176:13
  219:5 267:4 268:5
**reporting** 1:16
  36:18
**reports** 263:19
**repositioning**
  132:15
**represent** 6:5
  256:18
**representing** 6:3
  9:21
**reprimand** 189:17
  190:17 263:1
**reputation** 18:22
  233:8 257:2
**request** 15:13,21
  16:1,5 17:9
  157:24 158:3
  231:10
**requested** 5:8
  158:8
**requesting** 236:21
  236:21
**requires** 23:15
**reschedule** 39:18
  39:23
**rescheduled** 39:2
  40:7
**rescheduling**
  211:11
**research** 226:2
**resented** 259:8

**reserve** 17:10
**residencies** 256:23
**residency** 99:15
  117:18 127:10
  130:3 132:17
  142:4 160:18
  177:9 178:14
  180:1 181:13
  191:9 212:13
  213:6 222:9 224:2
  230:20 235:3,4,9
  260:11
**resident** 14:2
  35:10 46:5 48:6
  75:24 76:7,9 77:4
  80:12 85:12 88:2
  91:14 93:6 95:9
  95:24 100:3 120:5
  127:18 129:2,3,3
  134:6 141:19
  143:17,19,21
  153:24 154:9,12
  160:6,8,17,19
  161:2 162:6,7,7
  165:10 167:16
  177:11 179:23
  180:1,18 183:2,8
  189:1 190:8,14
  195:5 197:4,6,7,7
  197:12 198:8,9,9
  204:18 208:3
  214:4 218:9 221:7
  228:11 230:2,2
  234:10,11,14
  238:21 239:17
  241:7 247:20
  252:19 253:18
  255:17 259:22
  262:24
**resident's** 10:23
  41:17

residents  10:18
11:3,8,14,24 12:2
19:5 20:8 24:9,19
27:23 43:5,8,9
74:3,23 80:9 87:2
87:4,7,13,24 88:12
88:20,23 89:2
90:21 91:3,5,6,18
91:23 92:2,5,8,11
92:14 93:18,19
94:2,6,9,19 95:8
95:10,12,20 96:4
96:10 97:4,7,20,23
100:20 104:24
105:17,20 118:18
121:5,21 123:19
127:15 133:2
135:11 146:13
152:13 153:12
155:23 160:14,20
163:14,14 166:4
167:21 171:8
178:2 180:22
181:9 185:9,23
186:3 189:22
190:2 192:12,22
193:4 195:7 198:6
199:5 201:10,11
202:8 205:23
210:17,18,19,24
211:9,13,14 212:3
212:16,19 213:4
213:11 216:8
221:12,20 223:2
225:9 227:3,22,23
228:8,17,18,21,23
229:1,18 230:22
233:21 234:2,8
235:15 236:7,11
237:9,11,18,19
238:8,10 239:11

239:16 241:16
252:13 253:15
256:8,17,23
258:20 260:20
264:7
resistant  223:2
resolve  26:11
resolved  26:19
123:24
resources  36:13
respect  20:5 51:6
respected  225:5
respectful  23:16
respectfully  31:3
251:21
respond  231:10
247:10
responded  38:8
42:21 153:24
201:17 250:13
response  114:20
156:15 231:4
247:12 250:13
responses  99:12
responsibilities
24:2 165:9 221:15
responsibility
68:7,9 205:24
213:17
responsible  17:2
36:6 58:19 78:14
responsive  26:10
rest  153:20
rested  17:11
restrictions  69:20
rests  108:18
resulted  70:16
results  112:21
114:4
resume  265:23

retaliation  67:16
retaliatory  18:21
retribution  262:10
return  51:21 53:3
143:10 157:16,24
158:9
returning  143:23
revealing  263:10
reverse  263:4
review  6:17 26:3,9
27:4 32:12 52:15
110:17,18 223:22
223:23 224:3
257:7
reviewed  36:1
58:12
reviewing  16:8
262:1
revised  18:7 49:11
revisions  47:18
48:10 49:3
rhyme  136:4
rid  237:20
ride  148:2
ridiculous  143:13
143:16
right  8:21 21:20
46:6 49:16 53:12
57:13 63:9 76:1
80:1 83:12 84:23
85:5 87:5 91:21
92:16 97:21,24
98:1,22 100:19,21
100:23 103:2
105:15 132:9
149:13 150:7
188:9 212:22
214:3 222:9
243:17 250:9
261:3

risks  144:22
rogers  2:13,14 6:1
6:2,2,3 48:12 96:5
rogerscastor.com
2:16
rogue  250:7
role  6:22 19:7
110:20 120:4
227:24
roles  214:2
rolling  144:24
145:1
room  16:16 41:17
88:7 124:11,18
129:19 130:1,6,14
131:2 135:4 136:1
139:13 146:11
153:21 154:2
155:5 157:14
158:13 162:23
163:9,12,16,23,24
164:3,16 168:23
169:16 170:4,9,16
170:16 179:3,4
199:3 201:6
208:13 243:12
253:14
rose  111:11
roster  212:8
rotation  34:3
189:6 203:7,11
206:11 238:9
round  73:7
rounds  73:2 77:2
138:16 167:13
199:22 215:17
routinely  11:6
row  19:13 60:7
rubbed  197:21
ruination  19:18

**rules** 6:16,17 8:16
  8:19 16:2,7 31:10
**rulings** 7:19
**rumor** 134:17
  264:6
**rumors** 132:22,24
  133:6,21 134:7
  152:9 165:19,23
  202:24
**run** 33:24 169:6
  211:12 265:14
**rush** 18:19

**s**

**s** 89:2 122:7
**sabotage** 222:21
**saccomandi** 13:21
  37:9 41:6 62:24
  62:24 63:11
  246:13,16
**saccomandi's** 39:9
  254:7
**sacroiliac** 144:12
  145:6 146:22
  178:24 179:17
**sacrum** 147:3
**sad** 228:14
**safe** 35:22 197:18
  217:23
**safety** 23:15 24:6
  26:17
**salient** 32:16
**sanction** 265:22
**sandbox** 216:7
**saturday** 149:13
**saved** 170:13
**saw** 43:14 44:4
  71:22 75:14 84:7
  119:24 130:24
  161:11 164:14
  194:23 242:18
  246:22,23 263:18

**saying** 39:19 45:14
  61:10 63:5 105:3
  119:15 139:1
  155:1 157:4
  168:10 185:23
  192:3 193:6
  197:18 241:6,8
  255:11 264:1
**says** 30:15 32:21
  37:23 38:18 39:16
  40:17 44:22 46:11
  49:10 57:24 58:12
  60:22 75:24 76:6
  83:4 154:16,18
  184:7,19 249:3
  253:23 261:8
  264:20,24
**scenario** 13:18
  205:11
**schedule** 64:16
  177:4 199:2,10
  207:19
**scheduled** 38:12
  39:17 40:6 215:24
  234:3 246:24
  253:3 259:22
**school** 114:1
  166:23 268:9
**schwartz** 231:13
**scope** 24:1 147:12
**scranton** 140:9
**screens** 163:13
**scrubs** 242:17
**seal** 269:20
**seat** 193:20
**seattle** 142:5
**second** 6:21 7:16
  82:20 112:20
  140:15 164:2
  167:19 173:15
  240:12,21 241:1

  242:23 243:8
**secretary** 245:9
**section** 25:5 26:4
  41:9 240:11
**sections** 62:19
  130:15 163:10
**securing** 35:19
**see** 10:14 12:6
  14:11 15:1 25:5
  32:7 39:8,19
  41:10 44:5 50:7,8
  52:21,21,22,23,24
  53:13 54:12 56:21
  56:24 57:1 58:9
  62:10 71:10 73:22
  74:3 83:17 84:9
  90:16 95:13
  111:10 118:17
  123:18 124:10
  125:12 128:10,21
  142:11,24 143:10
  146:6 157:17
  161:10 169:24
  170:14,17 177:15
  187:1,9,22 188:9
  196:2,3,13 199:14
  199:15 216:13
  219:10 233:14
  239:8 246:21
  248:22 250:1
**seeing** 32:14,14
  40:2 203:9
**seek** 16:18 81:15
  82:8
**seen** 19:2 33:17
  39:11 93:8 118:6
  118:10 123:7,11
  163:22 242:11
  253:6
**sees** 239:7 254:23

**seizure** 183:6
**select** 205:15
  222:11
**selected** 62:18
  174:17 205:10
**send** 114:2 218:11
**sending** 258:19
**senior** 87:4,13
  88:2 91:3,4 94:1
  94:19 100:20
  142:2 149:17
  230:2
**sense** 68:9 85:16
  85:17 90:20 94:16
  95:6 98:19 185:19
  187:2 214:13
  250:10
**sensitive** 95:2
  248:19
**sent** 6:16 62:14
  81:3 100:23 229:9
  232:9 250:11
  254:12
**sentence** 46:14
  241:4
**sentiment** 91:2
**separate** 35:12
**september** 40:21
  142:6
**sequence** 32:3
  79:18
**series** 116:9 245:6
**serious** 17:4,7
  63:15 70:20 111:4
  257:3
**seriously** 240:17
  254:9
**seriousness** 39:11
**serve** 221:8
**served** 236:20

serves 238:1
service 120:22
205:24 217:5,11
217:20 228:7,10
serving 260:18
session 136:15
154:14 155:7
156:5 168:3,15
169:14
sessions 64:19
65:7 138:15
166:22 170:7
set 34:16 64:16
129:19 130:1
162:24 163:11
167:15 258:4
setting 74:1
settings 33:21
seven 203:9
severe 228:21
258:3
severely 256:22
severity 25:12
sex 128:24
sexual 10:22 24:13
24:14,14 34:8
89:17 90:19
155:23 256:24
sexually 33:8 81:1
sexy 33:4 80:13
shade 204:14
shambles 235:3
shame 13:3 89:10
89:12,20 252:22
256:1
shamed 62:4
shape 33:2,14
shaping 258:18
share 79:6 88:21
89:22 112:11
184:4

shared 64:9 91:5
sharma 168:1,1,11
shed 204:14
shifting 65:4
ship 190:17
210:23
shirt 144:24
shirtless 200:8
shocked 229:17,18
shooting 116:1
short 53:13 180:11
218:12,15,19
227:8,17
shorthand 269:11
shortly 83:18
shot 45:23
shoulder 199:18
200:5,8
show 11:17 12:12
13:23 20:10 228:7
228:11,12 230:15
264:19
showed 42:10
81:19 89:6,19
242:19 244:4
showing 33:13
197:15 230:7,7
shown 13:8 67:23
256:12
shows 64:21 89:15
shut 156:7 261:17
si 145:3
sick 228:13
side 42:16 61:6
77:3 107:24 110:2
sidebar 154:23
155:2,13
sides 110:24 268:3
sign 54:9
signature 36:23
269:22

signed 36:19 69:11
232:19
significance 74:20
significant 28:6
63:15 146:11
158:13 230:3,6
237:7
signing 181:18
similar 199:4
simple 116:16
140:4 233:7
simply 30:21
139:3 265:15
simulated 10:24
92:2
simultaneously
87:3
singer 1:13
single 58:7 156:2
222:21
singling 143:7
sir 51:6 62:20,23
63:2 108:13
141:16 142:9,14
145:19,23 153:9
156:6 157:22
sister 76:6,9
sisters 196:21
site 144:23
situation 28:16
48:4 111:6 121:10
123:24 124:23
125:16 151:15
183:16 213:18
233:14
six 16:14 111:3
129:7 162:12
198:13 231:21
236:17 262:18
263:17 264:10

sixth 75:23
skate 213:24
skill 65:5
skilled 21:1
skin 147:16
skinny 33:2,5
80:14
skip 235:17 238:9
skirt 42:10
slackness 227:1
slanderous 262:9
sleep 217:23
slighted 19:8
slow 203:8 206:11
small 46:19
130:15 155:16,17
smart 230:19
smile 44:12
smoothly 222:17
social 112:1
solicit 134:21
solicited 78:21
soliciting 81:7
solve 54:17,18
somebody 136:2,5
136:17 137:7,8,8
138:17 170:10
171:15
someone's 62:4
170:18
somewhat 227:24
235:3
son 263:5
soon 83:22
sooner 39:24
sorry 8:21 9:3
13:24 17:12,18
23:18 26:2 39:9
55:9 64:3,5 65:17
70:13 75:16 89:23
93:1 105:2 106:11

110:16 121:17
122:23 131:16
149:13 165:21
169:11 187:14
197:10 200:18
223:11 233:7
235:23 240:11
244:21 249:19
264:22
**sort** 17:2 82:7
85:23 87:9,19
88:5,9,15,16 89:16
89:18 97:24 99:1
99:3 100:10
124:11 132:4
135:5 179:23
259:9
**sought** 246:5
**sound** 31:8,17
130:6 131:3 137:9
137:12 138:7,18
163:16 164:17
170:4 173:18
201:6
**sounds** 31:15
60:16,17 94:10
134:10 138:4
213:4
**sources** 262:8
265:14
**space** 36:8 58:20
**speak** 66:10 70:2,4
70:5 76:9,21
81:14 85:12,14
98:11,17 112:13
133:4 135:6,10
165:13 168:22
172:9 183:3,19
194:11 220:9
245:20

**speaking** 6:22
22:24 209:19,22
268:6
**speaks** 70:3
**special** 19:17
264:4
**specialty** 199:8
214:20 227:11
239:15
**specific** 12:24
43:24 115:15,23
158:8 168:3 170:9
188:19 255:22
**specifically** 16:24
26:14 27:24 50:10
50:19 86:6 99:6
157:24 167:1,24
169:10 188:16
213:20
**specifics** 73:10
75:1 205:14
208:17
**speculation** 264:3
**spell** 122:5 159:19
**spelled** 122:7
**spelling** 176:15
**spend** 102:3
118:11 123:12
128:16 142:21,22
161:22 196:15,16
196:22
**spending** 39:5
128:5 161:5
195:21 206:5
**spent** 90:23 105:6
119:20 128:20,22
142:11,16 161:16
161:17,20 177:16
177:18,19,21,23
196:9 206:1
260:14

**spike** 265:18
**spine** 172:4 191:15
194:19,23 200:12
232:11 240:19
**spoke** 56:23 66:9
66:11 81:10 83:7
149:11 227:22
231:16 243:19
**spoken** 81:9
**spontaneously**
75:6 97:8
**sports** 45:16
191:15
**spot** 222:5 232:1
**spots** 249:17
**spritzers** 210:12
**square** 256:4
**staff** 1:1,9 2:3,12
4:20 5:7,10,12 6:5
6:7 7:15 9:20,23
10:3,5,8,9 12:9
14:8,9,14,15,20,22
18:2 25:9,11,22
26:7,23 27:3,6,7
27:11 29:5 35:4
36:13 41:12 66:3
80:2 84:12 85:1
93:22 102:2,12,14
103:7,8,19,23
105:6 108:18
110:6 186:2 187:5
251:22,24 252:3,5
252:6,11 256:15
256:18,19 257:8
257:10,12 268:12
**stage** 18:12 44:19
199:13,13 200:9
201:13
**stairs** 253:1
**stalking** 252:17

**stalky** 33:19
**stamp** 44:23,24
255:3
**stand** 45:6 252:11
**standard** 144:21
147:24
**standards** 16:1,7
26:24
**standing** 257:21
269:4
**start** 5:21 9:16
22:8,14 23:8 27:9
38:1 78:18 94:5
108:15 144:17
241:3 251:19
**started** 34:13 46:1
80:18,21 109:18
124:14,16 141:21
185:13 230:6,7
**starting** 12:20
13:17 35:8 65:1
**state** 7:22 15:23
18:22 47:19 77:23
117:1 122:4
126:17 140:24
153:5 159:18
234:20
**stated** 31:7 58:11
58:17 120:23
153:5 208:5
222:20 238:22
**statement** 4:21 8:7
8:10 9:10 15:9,12
17:13,15,16,20,22
18:11 19:16 21:23
34:23 35:6 62:3
67:14 82:15
103:15 218:12
219:19,23 220:5
220:20 241:22,24
251:2,6

statements  6:24
7:5,13 9:1,14 30:4
175:9 234:13
251:9
states  231:4
233:20 234:16
static  226:4
stating  89:3
station  130:3
163:13
stations  163:11
statistically  143:5
statistics  143:3
stay  183:22 184:1
202:12 223:6,15
226:6 229:4
266:17
stayed  221:7
staying  193:9
268:5
steam  209:13,17
steer  190:17
stellar  262:24
stenographic
150:17
step  26:13 33:23
154:13
stephanie  3:15
122:7,8 263:7
stepped  153:22
179:2
steps  64:12
sterile  145:4
147:10,11 148:3
179:18
sterilization  145:3
sterilize  147:17
sterilized  148:7
sterilizing  145:4
stern  248:16

stick  167:10
stirred  264:14
stole  192:20
stood  11:8
stop  19:24 45:21
203:8 239:21
stopped  41:18
42:11 56:22
stops  61:8
story  59:19 124:7
261:11
straight  199:14
261:12
street  1:11,16
strictly  17:6
stripped  19:13
strong  188:12
225:15 231:18
238:6 239:5,11,18
strongest  213:14
structure  132:3,4
165:6,11,13,14
struggled  229:9
struggles  221:17
struggling  216:4
236:13
stubborn  216:12
student  141:19
142:1 160:7,12
163:10 195:4
students  20:8 24:9
74:3 146:13
163:15 171:8
199:6,10 202:7
214:17 221:13
259:1
stuff  72:16 176:7
subject  8:2 31:11
81:24 82:19
252:14

subjects  171:7
submission  25:8
34:11 41:13 52:7
71:11 78:20
submit  8:6,10
15:21 21:24 75:6
77:10 242:19,21
265:9 267:3,5
submitted  21:7
24:20 29:5 32:7
41:5,11 52:2,5
53:5 58:10 62:9
63:13 79:8,22,23
82:16,20 83:17
242:9 243:5
266:20 267:11
submitting  23:9
subordinate
132:19
subsequent  30:19
102:9
subsequently  29:2
82:17 86:18 195:4
202:13 229:16
substance  81:20
229:7
substantiate  61:18
substantiation
19:10
sucker  259:14
sudden  236:16
238:4
sue  27:16 28:20
32:8 35:14 52:2,3
66:2,12 67:5,9
78:19 79:16,19
82:2 90:3 97:13
97:16 148:22
213:9
sueded  58:19

suffered  194:19,22
sufficient  251:23
suggest  31:4 53:13
53:20 63:4 90:16
90:19 108:4
147:21 204:15,16
206:3 251:21
suggested  56:18
63:1
suggesting  205:18
259:12
suicide  229:16
suite  1:17
summary  14:6
56:16 80:6
sunday  149:13
sunk  259:16
super  44:23 45:1
superior  36:18
superiors  25:1
197:20
supervision  132:2
165:6 259:5
269:12
supervisor  36:16
62:15 224:12
247:22 248:5,10
259:13
supervisors
247:17
supervisory  19:6
19:14 225:13
226:15
supply  169:8
support  10:4 36:4
57:17 58:8,14
64:14 66:7 81:20
251:24
supported  125:16
supporting  233:2

**supposed** 39:14 203:10 249:18
**supposedly** 16:4 179:1 260:21
**suppress** 11:20
**sure** 17:21 37:17 44:7 48:1 52:5 55:12 70:4 76:18 82:14 90:6 92:24 94:6 104:16 106:18 111:20 122:6 147:9 148:6 148:23 171:16,17 191:16 197:5 201:4 204:3,18 210:3 247:5 259:21 265:7
**surgery** 109:21
**surprise** 64:9
**surprised** 64:7 151:17 231:3
**surrounding** 147:5
**survey** 38:16
**susan** 27:14
**suspended** 102:24 197:15
**suspension** 103:12 103:16
**swear** 22:14 126:19 141:1 159:14 176:14 250:23
**swearing** 22:7
**swore** 251:3
**sworn** 6:19 22:12 22:18 78:3 109:7 117:2,7 122:9 126:23 141:5 159:16 176:19 193:23 269:8

**sympathy** 46:22
**symphysis** 45:19 45:24
**system** 2:10 50:14 50:17 113:2 215:19 261:18

**t**

**t** 78:1 122:7 269:1 269:1
**tab** 23:19 25:24 32:6 37:8 47:11 47:13 51:20 62:8 65:11 240:22
**table** 45:23 110:22 201:12,20 227:12
**tables** 74:1 129:24 156:19 163:10 199:4,5 227:14
**tactic** 234:8 253:5 253:7
**take** 12:18 19:23 25:16 32:20 33:6 40:20 41:9 42:14 55:1 61:23 63:3 75:15 81:12 83:13 100:2,3 107:13,16 108:3 120:13 129:14 162:19 184:21 189:3 197:24 198:20 218:3 221:9 229:23 234:11 240:16 243:9 251:8
**taken** 12:13 20:23 34:5 35:7 44:7 56:2,4 63:19 254:9 269:5
**takes** 24:24
**talk** 61:8 84:17 116:3,4 208:8,13

209:14 210:7 245:16
**talked** 79:1 80:6 80:14 90:4 125:6 185:4 187:6 207:24 208:4 210:18 215:1 229:11 267:13,15
**talking** 42:2,7 75:18 79:10 80:15 83:14 86:4 99:22 104:22 124:14 152:6 187:3 210:5 227:22 241:19
**talks** 64:1 238:24
**tamasaukas** 39:17 39:22 40:6
**tapes** 73:22
**target** 147:12 148:4 227:19 259:7
**tasked** 9:21
**tattoo** 44:24
**taught** 19:3 21:2 148:9
**teach** 20:4 240:15 263:3
**teacher** 136:12,21 221:11 258:21
**teaching** 137:10 170:6 257:18 265:23
**teachings** 179:21
**team** 64:15 197:23 259:22
**technicality** 53:9
**techniques** 87:14 130:14 163:6,8
**tedaldi** 3:7 10:2 13:13 14:6 23:2 29:6,9,16,19 30:10

30:12,19,21 31:3,4 31:22 32:1 35:13 36:1 56:1 77:19 77:24 78:2,11 87:19 99:11 101:9 101:13 102:8 104:10 106:8 107:3,8 148:21 149:15 150:2,16 151:6,9,12 152:2 156:7 243:20 247:3
**tedaldi's** 104:4
**teldaldi** 107:5
**telephone** 149:11
**tell** 37:19 44:22 50:10,18 51:20 54:1 62:17 63:11 64:5 68:17 103:17 103:18 110:5 149:5,9,24 150:11 150:23 151:1,19 153:23 154:4 156:17 165:2 167:22 171:23 178:21 180:10 183:15 197:11 235:12 239:13 248:18 263:21 269:8
**telling** 150:14 254:16,20,22 259:20
**tells** 234:8
**tempered** 19:20
**temple** 1:1,10 2:10 5:9 6:10 9:19,22 13:23 16:6 18:5 18:15,17 19:2 20:7,12,14,15,19 20:21 21:3,8

23:10 33:20,21
34:6 42:4 68:14
69:19,21 107:23
109:15 110:3,21
113:24 117:22
118:21 119:1,14
128:1,3,13 131:14
133:7 141:19,22
142:6 148:17
149:16,22 152:17
160:8,10 161:3,13
166:7 178:7,8
181:3,24 192:20
195:3,19 196:6
199:11 202:19
203:15 215:10
221:6 251:22
252:17 254:18
257:19 260:18
261:6,11,15,17,22
263:13,19,22,24
264:2,8 265:3,13
266:1
**temple's** 17:10
18:19 220:14,16
**temporal** 79:10,18
**ten** 7:10 108:3
149:22 212:2,5
213:1 251:5,17
266:12
**term** 184:10 258:7
258:9
**terminate** 5:12
10:9 14:15 215:2
215:6 257:11
**terminated** 10:8
252:3
**termination** 14:22
103:22
**terminology** 89:18

**terms** 39:12 47:20
65:7,8 66:21 86:5
88:5 94:7 112:16
184:15 187:23
189:22 197:20
209:19
**terrified** 71:1
**testified** 22:19
78:4 109:8 117:8
122:10 126:24
128:4 141:6
159:17 161:4
176:20 193:24
195:20 218:13
234:6 242:5 264:8
**testifies** 31:3 219:8
219:9
**testify** 8:1 30:10
31:11 128:1
150:20 175:12
218:5
**testifying** 31:16
150:5,10 242:22
**testimony** 7:20,23
8:5 29:11,13 30:5
30:22 31:2,14
51:18 52:13,16
55:7 56:15 57:14
57:16 58:3,8
61:16 62:5 66:7
66:22 68:5 71:2
77:10 78:23 81:7
84:12 91:20 104:5
118:22 160:4
169:8,20,22
175:16 230:16
237:14 241:12,14
250:22 251:4
267:4 269:5,10,15
**text** 99:21 100:9
100:12,17 176:9

230:16 249:21
253:7 264:17
**texted** 99:19
125:10 230:17
**thank** 6:14 15:4
17:23 18:10 21:19
21:20 22:13,15
23:5,7,24 48:18
53:1 55:2 71:24
72:10 77:18 78:11
81:5 85:8 103:24
107:9,22 108:19
109:13 113:18
114:13,22,23
116:18,24 117:13
121:12 122:15
125:19 126:13,14
127:5 133:11,18
135:14 140:3
141:11,14 153:4
156:9 159:11
160:2 166:17,17
167:22 173:13
174:22,23 177:2,2
177:3 182:8,16
185:2 190:22
193:19 194:7,10
204:2 206:22
210:14 217:24
219:13 220:11
239:24 242:24
246:22,23 251:20
257:13,14 266:3,4
266:5 267:24
268:10
**thanks** 23:6 47:3
77:20 116:5
121:24 140:4,11
140:20 156:11
159:7 173:6
174:21 193:11,15

206:23 217:22
250:18
**theater** 74:1
**themes** 156:24
**therapeutic** 113:1
**therapists** 43:8
**thereof** 269:18
**thing** 45:4 59:12
69:9 97:19 98:24
112:23 138:3
154:17 171:20
186:11 208:22
243:22
**things** 30:8 31:7
50:12,13 56:19
62:22 73:5 79:10
83:9 87:9 90:4,19
99:12 129:20
139:19 154:17,18
157:1 162:24
185:3 186:19
189:2 190:3 192:1
192:8,18,24
195:18 198:3,4
202:9 204:4 205:7
209:17 210:7
211:11 214:2
216:17 219:1
222:16,17 225:14
226:22 227:18
228:1 233:3
238:12,18,21
239:16 240:4
246:6 249:16,16
253:23 259:12
261:23 265:7
267:16
**think** 9:11 31:1,19
32:2 42:13 48:8
50:23 51:14 53:17
57:18 58:1,4

| | | | |
|---|---|---|---|
| 59:24 61:14 69:9 | 125:14 154:11,11 | 107:19 108:21,22 | 90:13 118:2 123:5 |
| 72:17 73:4 79:12 | 172:13 179:3 | 110:1 111:3,8,16 | 145:10,15 148:1 |
| 82:1,11 85:18,21 | 192:2 201:3 225:7 | 116:2 118:11 | 154:16,18 157:10 |
| 86:3 95:11 97:14 | 225:18 235:23 | 119:16 123:12,22 | 171:21 197:14 |
| 101:12,15,19,21 | 237:3 257:20 | 127:11,14,18 | 211:1 213:9 |
| 105:4,19 106:3,24 | 259:10 261:8 | 128:5,9,16,19,20 | 215:13,16 235:8 |
| 107:11 108:6 | **thoughts** 82:20 | 128:22 131:14,20 | 248:16 258:21 |
| 113:23 116:6 | **threatened** 248:21 | 131:24 132:6 | **timing** 87:24 99:2 |
| 118:3,11 123:12 | **threatening** 24:11 | 140:11 141:23 | 161:24 191:1,7 |
| 127:18 131:6 | 24:17 189:11 | 142:10,11,16,21 | **tired** 249:20 |
| 132:8 133:20 | 231:1 | 142:22 143:10,10 | **tissue** 147:5 |
| 134:7 137:15 | **three** 7:2 8:7 50:6 | 148:16 155:22 | **title** 205:6 |
| 138:21 142:15,22 | 111:4 118:4 | 157:2,9 158:15 | **titles** 131:19 |
| 143:8 145:19 | 119:11,12,15,16 | 160:9,13 161:5,9 | **today** 8:12 12:6 |
| 148:22 164:20 | 119:19,23 120:9 | 161:16,18,20,21 | 19:21 20:15 56:6 |
| 170:20 172:3 | 120:22 121:4 | 161:22 167:21 | 59:10 62:19 73:20 |
| 175:5,6,18,18 | 128:21 144:1 | 168:9 177:16,18 | 109:23 113:10,13 |
| 181:6 183:2,17 | 158:16 160:7 | 177:19,22,23,24 | 127:20 141:12 |
| 184:12,15 191:10 | 169:17 199:20,21 | 180:11 181:3,11 | 142:8 149:6 150:5 |
| 191:18 192:5 | 215:12,19 228:21 | 183:8,11 184:21 | 153:8 156:17 |
| 194:18 196:17,21 | 228:21,23 229:1 | 185:10,19 186:7 | 160:22 169:9 |
| 197:11 201:9 | 251:8,10 267:20 | 190:13 195:2,6,21 | 195:14 203:7 |
| 205:2 206:24 | **throw** 213:18 | 196:1,9,16,23 | 227:3 234:5 |
| 208:2 209:11 | **throwing** 24:10 | 201:15 202:8,17 | 241:21 242:20 |
| 214:9,17,19 | **thrown** 226:18 | 205:1 206:1,6,11 | 262:2 |
| 216:10,12 227:16 | **thrust** 19:6 | 211:21 212:4 | **toe** 200:5 |
| 250:17,21 258:24 | **time** 9:14,18 12:5 | 215:18 216:5 | **told** 28:2 55:6 64:9 |
| 259:16 264:12 | 16:3 18:8 27:9,13 | 217:9 220:3 | 67:15 74:21 93:5 |
| 265:2 267:9,11 | 28:11,13,14 29:20 | 222:14 223:19 | 95:18 128:4,14 |
| **thinking** 39:5 | 32:1,11,15 33:10 | 224:6 225:20 | 149:6 158:1 161:4 |
| 151:14 209:21,23 | 33:12 38:12 39:5 | 227:10 228:20 | 161:14 195:20 |
| **thinks** 184:1 | 42:23 48:7,11 | 235:7 241:13,14 | 196:7 237:18 |
| **third** 32:21 41:14 | 51:9 53:5 54:9,10 | 242:23 243:8,11 | 253:10 260:21 |
| 148:22 155:5,10 | 54:13 56:3 60:9 | 245:24 251:14 | 261:1,10 262:23 |
| **thirds** 153:20 | 61:23 63:19 71:2 | 252:8,9 257:3 | **tolerate** 256:16 |
| **thorough** 91:12 | 71:17 77:4,17 | 260:15 261:4 | **tone** 41:20 44:11 |
| **thoroughly** 21:10 | 84:2 86:24 87:10 | 262:20 267:13,14 | 94:17 95:3 238:4 |
| **thought** 29:21 | 88:14 90:9,23 | 267:24 269:6 | **tonight** 17:6 91:16 |
| 40:19 44:13 61:15 | 91:11 93:1,2,3 | **timely** 197:17 | 117:13 121:10 |
| 69:14 106:20 | 98:3,16,20 102:4 | **times** 32:4,24 50:6 | 122:15 156:12 |
| 118:7,19 123:8,20 | 104:4 105:6,18 | 57:8 89:8,9 90:11 | 160:3 194:11 |

218:10 263:21
264:19
top   43:24 65:1
67:24 71:14
147:22 225:3
torn   86:5
total   92:8 119:17
119:18,19
touch   87:6 254:18
255:4
touched   10:23
42:15 86:17 255:9
256:3
touching   13:5
130:23 164:13
201:2
tough   95:3 169:23
trace   167:11
track   51:24 52:6
53:14 77:8
tracked   67:2
77:14
traction   41:7
train   69:14 177:8
trained   21:1 144:2
221:11 224:11
226:18
trainer   20:7
trainers   225:3
training   12:15
129:23 141:19
225:9 226:20,21
tramp   44:22,24
255:3
transcribed
269:12
transcribing   149:2
transcript   8:9
15:22
transcription
269:13

transition   148:2
225:20,21
transparent   57:4
transpired   187:4
transpiring
185:13
trapped   61:20
treated   43:14
147:9
treatment   114:5
254:13 256:17
trends   157:1
tried   45:3 46:2
104:10 183:1,4,14
183:22 187:2
225:13,14,19
229:3
triggered   255:6
trip   194:13 217:23
trouble   153:23
166:18 179:24
true   20:17 65:12
65:14 67:14 68:2
69:16 102:19
135:13 178:13
209:8,12 239:2
263:4 269:14
truncate   116:10
truncated   116:13
trust   182:6 184:7
261:6
trustees   10:6
252:2
truth   115:7 150:11
150:15,23,24
151:2 162:4 197:3
251:4 269:8,8,9
truthful   150:21
truthfully   242:5
try   37:1 42:24
54:7,17 59:21

61:12 77:3 83:23
95:12 102:3
105:16 110:24
133:8 166:8 184:1
203:16 223:3
226:23 267:16,19
267:21
trying   30:23 51:10
59:12,20 60:5,6
61:5 71:3 72:6
79:18 80:9 81:19
101:4 102:4 105:5
105:6 115:20
116:15 132:21
134:20 137:11,12
138:23 152:8
158:5 165:18,22
169:13 173:4,14
173:20,20,23
181:14 185:19
189:2,7,8,12
190:24 192:7
202:23 206:17
216:24 225:16
249:16 262:20
263:2
tuesday   1:7
tuh   4:20 64:19
221:7
turn   57:12 62:21
turned   189:10
232:2
tvs   130:2
twice   157:11
215:24
two   7:19 48:15
87:1,9,12 94:1,10
94:15,19 104:23
107:12 110:7
111:4 112:19
120:12 122:22

127:15 139:18
144:1 153:20
160:14 167:14
168:7 169:17
175:5,6 183:9
188:19 195:7
206:5 211:24
213:15 219:1
220:6 232:1
251:16 262:17
267:1
type   25:19 28:7
39:13 81:16
192:24 216:16
256:21
types   88:18 163:3
typically   115:8

**u**

u   117:4
ultrasound   144:12
145:5,8
unable   16:18
218:10
unacceptable
46:15 255:4
unaccredited
191:15
unbiased   101:23
unclear   219:17
uncomfortable
11:16 33:23 41:15
43:20 45:9 74:24
80:24 85:23 88:9
92:4 95:19 96:3
99:13 118:15,19
121:19 123:16,20
123:23 124:15
125:9 138:12
139:15,17,18
154:5 158:12,14
179:2 233:22

238:17,19 253:13
253:15 261:2
**uncorroborated**
265:5,13
**uncover** 145:24
147:16
**uncovered** 148:7
261:23
**uncovering** 147:19
**undergo** 31:4
36:10
**undermine** 24:6
**understand** 29:11
43:22 48:6 50:2
51:13 54:23 55:13
58:24 59:1,11
60:11 69:11 79:9
100:11,12 103:10
103:12 104:16
133:19 136:8
139:6 146:17
149:11 157:12
171:6,18 187:12
190:19 205:22
206:17 259:15
**understanding**
97:15 127:22,23
160:24 169:11
195:16 242:7
**understatement**
18:24
**understood** 37:15
43:11 71:16
150:23 191:24
**undraping** 253:11
**unfortunately**
127:24 180:20,24
258:11
**unfounded** 143:15
**unit** 13:22

**university** 1:10
2:10 5:9 6:8 9:20
9:23 12:15 18:5
23:10 33:20 34:6
69:19,21 187:15
251:22
**unnecessarily**
260:23
**unnecessary** 45:1
88:5 150:12
**unprofessional**
10:11,16 12:17
14:18 37:13 44:12
78:16 254:4,11
263:2
**unprofessionalism**
204:21
**unredacted**
263:18
**unrelated** 61:22
**unreliable** 265:12
**unset** 230:13
**unsigned** 51:22
53:2
**unsolicited** 41:11
65:15,18,21
**untoward** 168:20
**untrustworthy**
181:2
**unusual** 43:6
154:8 167:5,9
168:20
**unwarranted**
143:15
**unwelcome** 36:7
58:20
**updated** 49:4
**uphold** 256:20
257:9
**upset** 75:3 191:3
237:19

**urges** 261:6
**use** 145:5,8 170:5
170:9 173:22
256:10 258:12
**usual** 84:16
**usually** 83:21 84:4
93:21 98:5 124:10
144:24
**utmost** 232:17

| v |
|---|

**v** 159:21 176:17
194:2
**vacations** 267:16
**vagueness** 156:14
**validate** 53:19
81:8
**valuable** 114:12
225:7
**value** 20:15
108:24 113:24
**values** 256:19
**van** 215:21
**variance** 146:22
147:3 148:4
**various** 43:18
50:24 78:16 80:18
110:9
**vary** 145:6
**venue** 37:2
**verbal** 10:11 12:18
24:8 33:12 97:12
97:18 249:5,6
257:4 267:4
**verbally** 83:8
254:3
**veritext** 1:16
**versus** 244:5
**vial** 20:14
**vice** 27:14
**video** 16:17,19
74:2 130:6 131:3

163:16 164:17
170:5,23 171:3
201:6
**videos** 170:5,9
**view** 12:21 86:2
111:11
**views** 199:16
**vikram** 4:4 159:15
159:20
**vince** 9:3,16,18
101:8 240:1
**vincent** 2:11 3:4
6:6 22:17
**vindictive** 181:2
183:24 188:16,22
**violated** 33:22
43:3 80:24 252:18
**violates** 8:15
**violation** 252:9
**violence** 24:11
**vip** 124:2,12,24
177:21
**virtue** 36:23
**visible** 74:5
**visitors** 24:5
**vital** 68:20
**vocal** 237:9,21
**voice** 41:21 56:23
131:4 164:18
201:7 224:13
**voices** 102:5
**voluntarily** 28:9
135:17 153:12
**voluntary** 26:10
137:7
**volunteer** 136:17
137:1 171:8,9
200:12
**volunteered** 137:4
205:13,14

**volunteering**
171:9
**volunteers** 163:22
200:3
**voted** 212:16
258:20
**vulva** 45:22

**w**

**w** 2:8
**wait** 29:18 30:19
30:24 40:1 136:5
**waiting** 122:16
141:14 169:6,16
194:10 223:7
**walk** 13:3 89:10
89:12,20 125:3,4
252:21 256:1
**walked** 42:7,23
125:2 241:5 261:2
**walking** 41:16
61:7
**want** 9:13 15:24
16:22 20:11 22:13
43:2 44:15 46:20
46:21,22 51:17
54:16 59:21 60:4
61:22 64:24 72:2
72:6 74:19 86:14
93:8 99:2 107:6
115:9 124:6 125:1
125:12 133:4
149:24 171:22
193:7,8 205:8
206:3 213:16,24
216:1,11 218:3,22
218:24 219:2,14
220:3,10 225:8
226:6 228:12,13
228:13,14 229:5
230:11 234:20
235:19 236:19

239:16,17 245:13
247:6 255:18
258:5 259:3
261:20 262:11
265:8 266:9,21
**wanted** 70:20
74:15 78:13 80:7
80:24 95:12 101:9
102:6 103:4
125:10,11 136:15
175:24 204:4
213:23 219:21
223:3 224:12,16
224:19,24 225:1
239:8 264:14,15
265:17 266:19
**wanting** 215:2
**wants** 25:8 220:4
220:13,14 234:18
265:3
**wardrobe** 253:2
**warms** 259:3
**warned** 254:3
**warning** 8:16
33:12 37:5 257:4
**warnings** 10:12
**warrant** 28:7
**warranted** 14:20
**watch** 44:8 171:3
**way** 13:1 44:16
53:18 54:17 57:17
58:9 64:1 69:23
80:10 81:19 88:9
101:23 105:24
106:8 118:14
123:15 130:23
131:2 145:20
146:6 147:3 148:9
150:21 153:20
157:7 164:13,16
180:14 183:22

184:2 189:20
191:24 193:9
197:22 201:2,5,18
207:7,13 217:7
220:21 224:14
226:6,17 234:2
259:11 263:11
**ways** 39:7 209:15
263:7
**we've** 112:1
**wear** 227:10,16
**wearing** 42:9 89:7
**wears** 89:8
**wedding** 32:22,23
62:4 80:12
**week** 171:3
**weekend** 118:5
119:13 189:7
**weeks** 37:22 183:9
215:12 230:8
267:20,22
**weigers** 27:15 28:4
35:14 36:16,21
52:3 78:19 82:16
222:2 224:18,21
**weigh** 150:14
**weighed** 150:18
**weinick** 2:17
**weinik** 1:3 2:18
3:5,9,11,14,16,19
3:21 4:5,9,12,15
5:8,22,23,23 6:3
7:16 8:20,22 9:2,6
9:13 11:11,12,12
11:18,23 12:11,12
12:19,21 13:4,9,11
13:12 14:12 15:10
15:11 17:12,18,23
21:21 22:10 23:21
23:24 28:2,3,8,11
28:22 29:12,24

30:1 31:5 32:24
33:11,13 34:1,10
34:13 36:22 37:12
38:2 41:2,16
43:10,11 44:6
46:11,12 47:4,4,8
47:12 48:22,23
49:20,21 50:3,4,21
51:5,19 54:6 55:3
55:4,13,17 56:23
59:7 60:8 61:24
62:2 64:8 67:6,12
69:18 70:8,13
71:4,6,7 72:1,3
73:13,13,17 74:10
74:11,13,14 75:8
75:21 76:12,13,15
76:16 77:15,17
78:17 80:6,17,17
81:10,23 82:17
84:2,7 88:4,13,16
88:16,20,20 89:7
90:5,23 91:8,8,9
92:1 93:8 94:23
98:7 99:17 100:2
102:24 104:2,9
106:7 107:2,3,6
108:1 109:1,5,12
113:23 114:11
116:4,6,12,20
117:5,12 119:4,20
120:9,20 121:21
122:14 124:18,23
125:2,3,5,10,13,19
126:7 128:19
133:11 134:20
136:20 137:20
141:10 150:22
151:3,4 152:22
153:11 154:5,16
155:15 157:17

158:23,23 159:1
160:1 166:11
167:17,20 170:10
172:24 175:5,7,8
175:20 177:1
182:8,20 184:10
184:11,11,18,19
184:20 185:16
186:4,14 187:22
187:23 188:5,7
193:18 194:6
195:1 199:12,16
200:4 203:19
204:6,11 205:5,15
207:1 208:4,9
209:6,19 211:4
215:5 218:5,24
219:7,10,15
220:16,18,21
221:6 229:1
232:12,17,23
233:23 234:3,7
235:22 236:1
237:2 238:23
239:1,24 240:3,9
240:20,23 243:4
244:21 245:1,4,15
245:20,23 246:24
247:23 248:2,6,12
248:15 249:6,11
249:14,19,24
250:5,8,15 251:1,3
251:20 252:4,24
253:16,23 254:3,6
254:24 255:8,13
255:15,18 256:2
256:13,14,15
257:15,16 263:11
266:4,19 268:4
**weinik's**  10:7,9,15
11:3,13 14:4,22

217:10 232:13
249:3 252:2,21
253:7,11 254:11
256:4,7,16 257:11
**weirded**  41:20
**welcome**  109:14
114:14 176:10
**welcomed**  61:15
**went**  37:5,9 45:13
76:6 95:9,9 97:9
97:14,15 101:17
106:19 134:16,23
166:23 221:7
222:1,17 236:5
243:13 245:2
250:6 263:7
**wheel**  210:23
215:5
**widely**  225:5
**wife**  112:20,20
**wilkes**  140:9
**williams**  3:20
92:12,17,21 93:6
104:24 141:3,4,11
145:10 148:5,16
151:5 153:4
156:11 159:7
179:8,10,13,21
182:3,6 261:3,10
261:12,14
**willing**  98:16
237:14
**winded**  239:22
**wine**  210:12
215:21
**wing**  198:1
**winter**  226:9
**wired**  16:17 130:6
131:3,3 163:16
164:17,17 170:4,5
201:6,7

**wise**  99:2,21 226:2
249:22
**wish**  23:3 29:20
32:17 48:9 51:1
176:9 245:19
267:6
**withdrew**  153:12
**witness**  3:3 4:3
7:12 8:1 10:2
13:14 23:1 29:13
30:9,13,18 31:10
31:15 47:1 56:19
58:16 59:10 61:16
77:24 83:6,11,16
83:21 84:4,14,24
85:5,13,21 86:8,12
92:11,16,22 93:5
93:10,14,17,21
94:13,18 95:7,15
96:2,6,15 97:1,4,9
97:14,21,24 98:4
98:13,15,21,24
99:7 100:19 101:1
102:16,20 103:1
105:10,13,19,22
106:5,22 107:10
108:15 114:23,24
117:3 119:13,18
119:22 120:2,5,7
120:11,14 121:22
122:2,6 126:4,8,11
126:15,20 134:14
134:17 135:4,19
135:23 136:2,7,10
136:14,24 137:3,9
137:14,17,22
138:9,21 139:5,9
139:20,24 140:2,8
140:13,22 141:2
156:22 157:6,19
157:22 158:2,6,10

158:19,22 159:1,9
159:20 168:8,12
170:12 171:5,13
171:17 172:2,6,9
172:12,16,22
173:1,3,22 174:2,9
174:11,13,24
176:16 179:11
184:8 185:8,12,17
185:20,24 186:4,9
186:17,22,24
187:8,11,15,18,21
188:1,7,14,17,23
189:23 190:4,8,12
190:16,21 191:6
191:11,21 192:5,9
192:14,16,21
193:1,17,18,21
194:1 207:3,6,8,11
207:16 208:2,8,15
208:20 209:11
210:2,6,12,20
211:8,16,23 212:2
212:7,11,15,20,23
213:2,8,13,22
214:6,15 215:8
216:10 217:2,9,17
217:24 218:1
219:14,21 220:4,4
220:20 245:7
250:24 255:21
269:15,20
**witnessed**  58:23
84:19 151:24
260:22
**witnesses**  6:19 7:1
22:7,9 34:17 60:2
78:22 107:15
109:1 115:5,21
116:8,9,21 258:1
261:5 262:23

264:1,6 268:3
**wives** 112:20
**woman** 157:14
185:5
**women** 10:16
43:15 143:5,7,7
156:20 211:22
212:6 256:17
260:15
**wonderful** 115:24
**wondering** 98:18
**word** 85:16,16
86:2,3 173:23
184:7
**words** 82:11 99:3
100:3 138:22
201:22 247:20
248:4
**wore** 89:21 263:9
263:9
**work** 13:8,19
19:19 20:2 35:23
37:11 38:16,23
42:10 43:2 46:20
58:5 80:22 160:9
181:5,10,15 189:6
195:2 197:22
198:3 209:13
211:1 214:2
215:23,24 216:1
224:22 256:9,19
258:18
**worked** 117:21
118:3 119:10
120:9 122:24
127:11 128:9
161:9 177:13
196:1 207:20
223:20,24
**working** 26:6 41:1
106:1 124:9 126:7

142:10 209:9
210:3 243:12
**workplace** 157:9
**works** 67:21,23
130:11 163:21
200:2 212:14
**workshop** 91:24
129:22 162:12
**world** 115:24
258:20 266:1
**worn** 89:15
**worried** 246:1,4
**worry** 42:4 254:17
**worse** 180:4
**worst** 202:8
**worth** 214:6
**worthy** 17:6
**wow** 234:4
**wright** 2:8 6:4,4
15:3 30:3 31:1
49:10,15 70:16
108:6,8,13 240:21
241:1 266:9
**write** 75:6 249:9
**writing** 24:21
28:15,23 29:3,5
62:16
**written** 8:6,10
12:19 15:2,22
21:7 32:7 35:5
41:10 49:12 52:15
73:4 78:20 79:11
109:2 235:20,22
254:5 265:10
266:20 267:1,2,6,8
267:20
**wrong** 29:22
133:20 153:17
197:22 232:24
247:18

**wrongly** 16:15
259:16
**wrote** 34:23 53:24
54:1,3 60:14
70:15 82:15

| y |
|---|

**y** 89:2 117:4
176:17
**yeah** 42:2 45:24
84:4 85:21 86:12
89:1 90:21 91:10
92:3 94:13,18
95:7 98:21 101:17
102:1 120:14
134:3,5 154:1,11
154:20 155:8,15
172:16 178:5
193:3 202:5 203:2
205:23 207:8
209:11 213:8,9,13
213:22 214:15,15
215:8 217:18
**year** 42:9 64:16
72:24 73:1,1
83:15 95:11 96:16
98:6 120:13,14
123:1 126:9
129:21 135:22
142:3,4 143:10,11
143:21 167:12,14
167:19 170:11
180:5 183:9 189:1
191:14,16 192:10
195:12 196:14
199:2,7 211:24
212:21,24 216:1
221:20 225:16,17
229:20 230:3
231:9 236:6,8,8
262:16,19

**years** 16:14 19:1
21:3 25:15 72:20
72:24 102:2
109:17,23 110:7
110:13 111:22
120:12 122:22
128:21 129:7
138:6 141:24
144:1 149:22
158:16 160:7
162:13 175:22
181:11 196:13
198:14 207:21
213:11 214:23
221:13 222:8
223:7 225:11,12
226:15 227:21
236:16,17 239:20
252:5 256:10
257:18 262:18
263:17 264:10
**yesterday** 72:20
**york** 180:8,16
186:14 228:7
230:18 259:17,20
**young** 11:5 19:4
20:8 43:14 44:1
87:15 88:13 90:24
118:11 123:12
128:5,16 142:12
142:16 161:5,16
162:3 177:16
183:2 184:16
195:21 196:9,23
197:2 234:3
258:18 260:15
263:3 265:24
**younger** 143:7
160:17 247:8
**yu** 3:13 117:4,6,13
120:21 121:12

# Transcript Exhibits



# Michael Weinik, D.O., Medical Staff Hearing
Tuesday July 10, 2018 5:30 P.M.
9Th Floor Executive Conference Room
Boyer Pavilion
Temple University Hospital
3509 N. Broad Street, Philadelphia PA 19140

## Temple University Hospital Medical Staff Evidence/Exhibits

1. Timeline of Events

2. Physician Professional Conduct Policy (TUH-ADMIN-950.1044);

3. Bylaws – Article VII;

4. Proof of Participation in Training for Dr. Weinik (including prevention of discrimination and harassment);

5. Background information from Sue Coull re: concerns brought to her attention;

6. Letter of PGY4 female PM&R Resident, Cora Brown, M.D., received by Susan Coull on March 2, 2017 re: Sexual Harassment;

7. April 5, 2017 Letter from Drs. Cowell and Tedaldi to Dr. Weinik re: complaint and coaching;

8. Memorandum from Allyson Saccomandi, Directory Learning and Organizational Development, re: Coaching Assignment for Michael Weinik, D.O.;

9. Text Message exchange between male PM&R Resident and Dr. Weinik, dated August 28, 2017, re: fellowship opportunity;

10. Email from former female PM&R Resident dated January 16, 2018 to Amber Dzikowski re: Sexual Harassment;

11. Investigation Report Summary for March 15, 2018 MSEC meeting; and

12. March 15, 2018 Letter from Dr. Cushing to Dr. Weinik advising him of the MSEC recommendation to terminate his Medical Staff membership.

1

# Timeline

## Complaints/Interventions re: Michael Weinik, D.O.

**6/3/14** – Dr. Weinik participates in Temple University training for, among other things, "Preventing Discrimination and Harassment for Employees."

**12/1/15** – Dr. Weinik becomes Interim Chair of the Department of Physical Medicine and Rehabilitation (PM&R).

**11/3/16**- Cora Brown, M.D. (female PM&R resident) makes verbal complaints to Sue Coull, TUH Designated Institutional Official (DIO), about Dr. Weinik's behavior.

**11/22/16** – Sue Coull and Susan Wiegers, M.D. meet with Dr. Brown to allow her to communicate her experiences with Dr. Weinik directly Dr. Wiegers.

**12/1/16**- Sue Coull and Dr. Wiegers meet with Dr. Weinik to notify and counsel him about an anonymous resident's complaints.

**2/28/17**- Dr. Brown met with Sue Coull regarding a new complaint about Dr. Weinik. Dr. Brown was advised that she should put her concerns in writing so that they could be addressed through the Physician Professional Conduct policy.

**3/2/17**- Sue Coull received a written complaint from Dr. Brown. The written complaint was referred to Vincent Cowell, M.D., the Medical Staff President, for investigation under the Physician Professional Conduct policy.

**3/3/17**- Dr. Cowell and Ellen Tedaldi, M.D. (past Medical Staff President) begin an investigation of the complaints contained in the letter from Dr. Brown.

**4/5/17** – Drs. Cowell and Tedaldi issue a letter to Dr. Weinik, following their investigation, advising him that they formally recommend professional coaching with progress reports to Larry Kaiser, M.D. (Medical School Dean to whom Dr. Weinik reports).

**4/19/17** – Allyson Saccomandi, Director of Leadership and Organizational Development, begins the professional coaching sessions with Dr. Weinik and initiates a 360 review[1].

**1/15/18** – Amber Dzikowski, GME Program Administrator, receives verbal notice from a male, senior PM&R resident, Nichols Kinback, M.D. that another male, senior PM&R resident, Philip Acevedo M.D., complained that Dr. Weinik's behavior with a female patient made him (Dr. Acevedo) uncomfortable.

---

[1] The **360 review** is a professional feedback opportunity that enables a group of coworkers to provide feedback on an employee's performance.

**1/16/18** – Amber Dzikowski receives an email from a female, former PM&R resident, complaining about Dr. Weinik's behavior (*circa* 2012 through 2014, the resident's PGY2 and PGY3 years). The email satisfies the "Formal Complaint" requirement under the Physician Professional Conduct policy that triggers an investigation. The email is provided to Sue Coull. Sue Coull meets with Dr. Kinback.

**1/17/18** – Sue Coull meets with Dr. Cowell and provides him with the 1/16/18 email. Sue Coull also meets with Dr. Acevedo.

Dr. Cowell asks Allyson Saccomandi to provide him with a status report regarding Dr. Weinik's coaching/360 review. Dr. Cowell asks Dr. Tedaldi to assist him with the investigation of the complaints made in the 1/16/18 email and the concerns expressed by the male PM&R residents (Drs. Acevedo and Kinback).

**1/23/18** – Allyson Sccomandi issues her report regarding Dr. Weinik's coaching sessions and 360 review.

**1/25/18** – Drs. Cowell and Tedaldi begin their investigation of the complaints made about Dr. Weinik in the 1/16/18 email and those made by Drs. Acevedo and Kinback. They also reviewed and considered the prior complaints and interventions taken with regard to Dr. Weinik.

**1/26/18** – Dr. Cowell meets with Dr. Weinik to advise him of the complaint made against him and shows him the email sent by the complainant.

**3/13/18** - Drs. Kaiser and Wiegers advise Dr. Weinik that he will no longer serve as interim Chair of the Department of Physical Medicine and Rehabilitation.

**3/15/18** – Drs. Cowell and Tedaldi present the findings from their investigation to the Temple University Hospital Medical Staff Executive Committee (MSEC). The MSEC is advised of the issues that arose and the interventions taken with regard to Dr. Weinik's conduct, beginning with the verbal complaint by Dr. Brown (November, 2016) through the present. The 2018 investigation included interviews of the following individuals: Philip Acevedo, M.D.; Amber Dzikowski; Katie Hatt, M.D. (female PM&R Chief Resident); Rakhi Vyas, M.D. (female, senior PM&R resident); Reed Williams, M.D. (male Attending PM&R physician); and Michael Weinik, D.O.

The MSEC votes to recommend (to the TUH Board) that Dr. Weinik's Medical Staff Membership be terminated immediately.

Dr. Weinik is given verbal and written notice of the MSEC's recommendation by Herbert Cushing, M.D. – TUH Chief Medical Officer.

Dr. Weinik is placed on paid administrative leave.

**4/6/18** – Dr. Weinik, through his counsel, requests a hearing pursuant to Article VIII of the Bylaws of the Professional Medical Staff of Temple University Hospital.

2

# TEMPLE UNIVERSITY HOSPITAL
## ADMINISTRATIVE POLICIES AND PROCEDURES

| | |
|---|---|
| Number: | TUH-ADMIN-950.1044 |
| Title: | PHYSICIAN PROFESSIONAL CONDUCT |
| Effective Date: | 12/2002 |
| Last Reviewed: | 04/12/2013 |
| Last Revised: | 12/12/2016 |
| References: | TUHS-950.559-Policy Against Workplace-Harassment and Violence |
| | TUH-ADM-950.1035-Physician Health and Wellness Policy |
| Attachments: | None |

## POLICY

Temple University Hospital is committed to providing and fostering a culture of safety. A culture of safety requires collegial, cooperative and respectful interactions between physicians and all others at the hospital. This policy addresses physician and allied health professionals' behaviors that undermine a culture of safety.

## SCOPE AND RESPONSIBILITIES

All physicians and allied health professionals (AHPs) are expected to refrain from behaviors toward patients, employees, visitors and other practitioners that undermine a culture of safety. This policy applies to any physician or AHP conduct that occurs on hospital campuses, including, but not limited to offices and clinics within the hospital, common areas, and parking facilities. The Medical Staff President, in coordination with the respective Department Chairs and, as needed, the Medical Staff Officers and/or Medical Staff Executive Committee (MSEC) shall enforce this policy in a firm, fair and equitable manner. Such enforcement will be undertaken without assumptions or bias.

## DEFINITIONS

<u>Disruptive Conduct</u> - Disruptive conduct is defined as behavior that threatens patient safety because it inhibits collegiality and cooperation essential to teamwork, impairs communication, undermines morale, and inhibits compliance with existing practices/policies as well as implementation of new practices/policies. Disruptive conduct may be overt or passive (i.e. refusal to act or respond) and includes, but is not limited to:

1. Verbal or physical abuse of colleagues, residents, students, hospital personnel or patients, which includes throwing objects, threatening violence and/or aggressive physical contact with others.
2. Sexual harassment, which includes jokes with sexual content and comments with sexual innuendo.
3. Inappropriate language or comments, which includes racial, ethnic, gender, sexual orientation or socioeconomic slurs, profanities or obscenities, sarcastic, cynical or demeaning remarks, and statements that show a blatant disdain for another person.

---

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

4.  Threatening or intimidating behavior exhibited during interactions with colleagues, residents, students, hospital personnel or patients, which includes finger pointing, invading another's personal space and yelling or screaming.

5.  Inappropriate responses to patient needs or staff requests, which include late replies to pages, knowingly disregarding hospital policies and impertinent or inappropriate comments (or illustrations) made in patient medical records or other official documents, impugning the quality of care in the hospital.

6.  Retaliation against persons who report disruptive behavior.

Formal Complaint - A Formal Complaint is defined as a writing that describes perceived Disruptive Conduct. The Formal Complaint will include:

*   The date and time of the perceived Disruptive Conduct
*   A description of the perceived Disruptive Conduct that is, to the extent possible, limited to factual, objective, and observed acts or omissions
*   The circumstances which precipitated the perceived Disruptive Conduct
*   The name of any patient involved in, or affected by, the perceived Disruptive Conduct
*   The consequences, if any, of the perceived Disruptive Conduct as it relates to patient care and/or hospital operations
*   A description of any action already taken to remedy the situation including date, time, place, action, and name(s) of those intervening, and
*   The identities, if possible, of others who may be able to corroborate the perceived Disruptive Conduct.

Just Culture – A process that promotes a culture of full disclosure of mistakes, errors, near misses, patient safety concerns, and sentinel events in order to facilitate learning from such occurrences and identifying opportunities for process and system improvement. It is also a culture of accountability in which individuals will be held responsible for their actions within the context of the system in which they occurred; such accountability may involve system improvement or individual consoling, coaching, education, counseling, or corrective action. It is a culture that balances the need to learn from mistakes with the need to take corrective action against an individual if the individual's conduct warrants such action.

PROCEDURES

Reporting and Receipt

1.  Anyone, including a medical staff member, resident, student, employee or agent of the hospital or a patient or their family member/friend may submit a Formal Complaint about a physician or allied health professional (AHP) regarding perceived Disruptive Conduct.

2.  Formal Complaints will be submitted to the Medical Staff President. If complaints are initially submitted to a Department Chair, the Chief Executive Officer (CEO), Chief Medical Officer (CMO) or other hospital administrator, the recipient will forward the Formal Complaint to the Medical Staff President.

3.  Upon receipt of a Formal Complaint, the Medical Staff President shall review the Formal Complaint to determine whether it meets the requirements of this policy.
    *   If the Formal Complaint does not meet the requirements, the Medical Staff President shall request the author(s) of the Formal Complaint to provide additional information. If the author(s) cannot provide required information, they will be advised that the process cannot go forward and the matter will be closed.

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

- If requirements have been met, the Medical Staff President shall notify the CMO and the Department Chair/Section Chief of the complaint and the involved physician/AHP and shall offer the Department Chair/Section Chief the opportunity to evaluate the allegations in the Formal Complaint. The Department Chair/Section Chief may elect to conduct the evaluation or have the Medical Staff President (or their designee from the elected Medical Staff) conduct the evaluation.

4. Prior to commencement of an evaluation of the allegations, the Department Chair/Section Chief shall notify the involved physician/AHP about the Formal Complaint in person or by telephone/e-mail. The involved physician shall be advised that that he/she may go to the Medical Staff Office to review a copy of the Formal Complaint but may not make a copy of that document and that he/she may select an advocate for support.

## Evaluation

5. The person evaluating the allegations contained in the Formal Complaint (i.e. Department Chair or Medical Staff President or designee):
   (1) May interview the author(s) of the Formal Complaint;
   (2) Shall interview the involved physician;
   (3) Shall review documentation, if any, maintained by the Medical Staff Office for the involved physician regarding any previous Formal Complaint(s) that have been addressed pursuant to this policy (or an earlier version of this policy);
   (4) May interview other individuals involved in or knowledgeable about the incident; and
   (5) May review medical records, incident reports, surveillance video, etc.

## Disposition

6. After the evaluation is complete the Department Chair/Section Chief and the Medical Staff President may share the results of the evaluation with the others to determine a disposition as follows:

   (1) The behavior does not meet the definition of Disruptive Conduct such that the matter shall be dismissed and closed; or
   (2) The behavior meets the definition of Disruptive Conduct and warrants a Collegial Intervention pursuant to Article 7.2.2 of the Medical Staff Bylaws; or
   (3) The behavior meets the definition of Disruptive Conduct and warrants submission to the MSEC for possible Corrective Action pursuant to Article 7.3 of the Medical Staff Bylaws either due to the severity of the behavior or because the physician has had another Formal Complaint asserted against her/him within the last five (5) years, or
   (4) The behavior suggests impairment (medical, psychological, or substance abuse problem) that warrants referral to the Physician's Health & Wellness Committee.

   If the Department Chair/Section Chief and the Medical Staff President cannot agree on a disposition, the Medical Staff President shall have the sole discretion to decide the disposition. The CMO and Medical Staff Executive Committee shall be advised of the disposition

7. Dismissal of the Complaint
   - The Medical Staff President shall verbally notify the involved physician and the physician's Department Chair/Section Chief and the author(s) of the Formal Complaint

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

that, after evaluation, the conduct was not deemed to be Disruptive Behavior and shall document when such notifications were made.

8. Collegial Interventions

   ◦ The Medical Staff President shall prepare a written report regarding the findings of the evaluation (including systems issues, "triggering events", etc.) and the basis for the Collegial Intervention.
   ◦ The Medical Staff President, in consultation with the physician's Department Chair/Section Chief, shall establish the terms of the Collegial Intervention.
   ◦ The physician's Department Chair/Section Chief shall notify the physician about the Collegial Intervention.
   ◦ The involved physician may be asked to sign a written agreement, deemed a behavioral contract, which includes specific requirements that the physician must fulfill to avoid a recurrence of Disruptive Behavior.
   ◦ The physician shall have the right to present a written response to their Department Chair and the Medical Staff President regarding the Collegial Intervention.
   • A copy of the Medical Staff President's report (including the terms of the Collegial Intervention, the behavioral contract, if any, and the physician's written response, if any) shall be submitted to the physician's Department Chair and to the Medical Staff Office.
   • The physician's Department Chair and the Medical Staff Office shall remove these documents from the physician's confidential file and destroy them after five (5) years if no new Formal Complaints have been filed since the initiation of this Collegial Intervention.
   • The Medical Staff President shall verbally notify the author(s) of the Formal Complaint that the matter has been handled as a Collegial Intervention, without making reference to any of the underlying facts or findings and shall document when such notification(s) were made.

9. Corrective Actions

   • The Medical Staff President shall prepare a written report regarding the findings of the evaluation (including systems issues, "triggering events", prior Formal Complaints, if any, etc.) and submit the report to the Medical Staff Executive Committee for potential Corrective Action pursuant to 7.3 of the Medical Staff Bylaws. A copy of the report shall also be submitted to the physician's Department Chair and the Temple University School of Medicine – Office of Faculty Affairs.
   • The MSEC shall, in Executive Session, handle the matter in accordance with Article 7.3 of the Bylaws or may elect to have the matter handled pursuant to Article 7.2 of the Bylaws (i.e. as a Collegial Intervention) at its discretion.
   • Any reports prepared in accordance with Article 7.3 of the Bylaws shall remain in the physician's confidential credentials file permanently.
   • The Medical Staff President shall verbally notify the author(s) of the Formal Complaint that the matter has been handled as a Corrective Action, without making reference to any of the underlying facts or findings and shall document when such notification(s) were made.

10. Referral to Physician's Health Committee

   • Matters deemed to warrant referral to the Physician's Health Committee shall be handled in accordance with the TUH Physician Health and Wellness Policy – TUH-ADMIN-950.1035

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

- ○ The Medical Staff President shall document that such referral was made. Such documentation shall not make reference to any underlying facts or findings.
- ○ The Medical Staff President shall verbally notify the author(s) of the Formal Complaint that the matter has been handled appropriately but that no further information may be provided.

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

**APPROVALS**

Recommended by:

Sherry Mazer
Chief Regulatory Affairs Officer – TUH, TUHS

12/12/2016

Approved by:

Robert McNamara, MD
Chair, Medical Staff Executive Committee – TUH

Elizabeth Craig, DNP, CRNP, FACHE
Vice President Patient Care Services & Chief Nursing Officer – TUH

Herbert E. Cushing, MD, FACP
Chief Medical Officer, TUH

Verdi J. DiSesa, M.D., MBA
President and Chief Executive Officer - TUH

Date:
12/15/2016

NOTE:

*Refer to the on-line version of this policy for the most current information. Printed copies of this policy may not be current.*

*Use of this document is limited to the Temple University Health System staff and physicians only. It is not to be copied or distributed outside of the institution without Administrative permission.*

3

## ARTICLE VII: INTERVENTIONAL PEER REVIEW, CORRECTIVE ACTION, AND AUTOMATIC LIMITATIONS

### 7.1   OVERVIEW

These Bylaws encourage informal, collegial, and educational efforts by Professional Medical Staff leaders including Department/Section Chairs/Chiefs, and/or the Medical Staff President to identify and address questions relating to clinical practice and professional conduct, using a systems-based analysis and Just Culture principles, as defined in the Definitions, and reserving formal corrective action procedures for those infrequent situations in which collegial efforts have not succeeded and/or where material patient safety concerns have arisen. The provisions of this section are applied in concert with specific Hospital/Medical Staff policies regarding: (1) peer review; (2) disruptive conduct (including sexual harassment); (3) physician health/impairment; and (4) late career practitioner matters involving these issues. Matters involving these issues should be referred to the relevant committees as specified in those policies.

### 7.2   INTERVENTIONAL PEER REVIEW

7.2.1   Initiation of a Concern. Members of the Professional Medical Staff have the responsibility to report to the relevant Department Chairs, the Medical Staff President, or the CMO, any Practitioner whose activities or professional conduct are reasonably likely to be: (1) detrimental to patient safety or the delivery of quality patient care, including matters related to physician health; (2) disruptive to Hospital operations; (3) contrary to these Bylaws; or (4) below applicable professional standards.

7.2.2   Collegial Intervention. The relevant Department Chair, working in collaboration with other Medical Staff Leaders, and Hospital Administration, as appropriate, will address concerns raised under Bylaws section 7.2.1 through collegial intervention. The goal of collegial interventional peer review efforts is to arrive at voluntary, responsive actions by the Practitioner to resolve questions that have been raised. Collegial interventional efforts are encouraged, but are not mandatory. All collegial interventional efforts by Professional Medical Staff leaders and Hospital Administration constitute peer review activities. Collegial intervention does not preclude the reporting to appropriate licensing boards, the Department of Health or other governmental entity as required by law.

### 7.3   CORRECTIVE ACTION

7.3.1   Initiation of Formal Corrective Action Proceedings. Whenever a material patient safety concern has been raised, or where collegial interventional efforts have not resolved a question, regarding (1) a

Practitioner's clinical competence, clinical practice, or interactions with graduate medical trainees, students or other persons in the Hospital; (2) known or suspected violation of applicable ethical standards, these Bylaws, or Professional Medical Staff or Hospital Policies; or (3) conduct of a Practitioner that is considered below Professional Medical Staff or Hospital standards or disruptive to the orderly operations of the Hospital, the matter will be referred to the President of the Medical Staff and the Chief Medical Officer, who shall review the matter, and if appropriate, forward it to the MSEC. The MSEC may determine there is no basis for an investigation, or may initiate formal corrective action proceedings by opening an investigation. If the MSEC determines that an investigation is appropriate, it will advise the Practitioner unless, under extraordinary circumstances, it determines that informing the person might compromise the investigation or disrupt the operations of the Hospital or the Professional Medical Staff. The Chair of the MSEC will keep the CEO of the Hospital fully informed of the question raised and of any actions taken in connection therewith.

7.3.2    Investigation. The MSEC shall appoint a three (3)-physician ad hoc committee to investigate the matter. If requested, the Practitioner under investigation will provide information to the ad hoc investigating committee in a manner and upon such terms as the ad hoc investigating committee deems appropriate. The ad hoc investigating committee may, but is not obligated to, review medical files or other documents, obtain an external consultant to conduct a comprehensive chart audit, and conduct interviews with witnesses. Such investigation will not constitute a "hearing" (as that term is used in Article VIII), nor will the procedural rules with respect to hearings or appeals apply. The ad hoc investigating committee may, in its sole discretion, grant the Practitioner under investigation an interview at which the Practitioner being investigated may discuss the matters under investigation, or may require the Practitioner to appear and to discuss the matters. A record of such interview will be made by the ad hoc investigating committee and forwarded to the MSEC with its report. If the Practitioner refuses to participate in such an interview, the involved parties may not draw an adverse presumption from the refusal, and the Practitioner waives the right to subsequently argue that the ad hoc committee failed to take into account any information that he/she could have provided during the interview.

The ad hoc investigating committee should seek to complete the investigation within sixty (60) days, but no longer than ninety (90) days, of its receipt of a request to investigate and, within fourteen (14) days thereafter, forward a written report of the investigation to

the MSEC. The report may, at the ad hoc committee's option, include recommendations for appropriate corrective action. The ad hoc committee may also elect to defer the discussion of recommendations to the full MSEC.

Despite the status of any investigation, at all times the MSEC, in consultation with the CEO of the Hospital, will retain authority and discretion to take whatever action may be warranted by the circumstances, including summary suspension, termination of the investigative process, or other action, as otherwise set forth in these Bylaws.

7.3.3    Action. The MSEC will take action upon the results of the investigation at its meeting following receipt of the report of the ad hoc committee. Such action may include, without limitation:

(a)    Rejecting the possibility of corrective action and, if the MSEC determines there was not credible evidence for the complaint in the first instance, removing any adverse information from the Practitioner's file;

(b)    Referring the matter back to the ad hoc committee with specific directions for further investigation;

(c)    Issuing a letter of admonition, reprimand, or warning to be included in the credentials file of the Practitioner. In the event such a letter is issued, the Practitioner may make a written response that will be placed in the Practitioner's credentials file; a letter of admonition, reprimand, or warning will not entitle the Practitioner to the hearing and appellate review procedures of Article VIII of these Bylaws.  Such letter will be removed from the Practitioners' credentials file after five (5) years if no further corrective action is taken against the Practitioner during this time;

(d)    Recommending a remedial action plan to be designed in consultation with the Department Chair and subject to the oversight of the Department Chair and MSEC, with specific outcome measures and a compliance monitoring plan;

(e)    Recommending reduction, modification, suspension, or termination of Clinical Privileges, or Specified AHP Privileges, as applicable;

(f)    Recommending reductions of Professional Medical Staff membership status or limitation of any prerogatives related to the Practitioner's delivery of patient care;

(g) Recommending suspension, termination, or probation of Professional Medical Staff membership; or

(h) Taking other actions deemed appropriate under the circumstances.

7.3.4 <u>Notice to Practitioner</u>. The Practitioner will receive Special Notice of any recommendation or action taken by the MSEC, including a decision that no corrective action is necessary. If the MSEC recommends a form of corrective action that results in hearing rights as set forth in section 8.2 of these Bylaws, the Special Notice shall inform the Practitioner that he/she has a right to invoke the hearing procedures in Article VIII, and shall include the information specified in Bylaws section 8.3.1. As stated in the Special Notice, the affected Practitioner waives his/her right to a hearing by failing to request a hearing within thirty (30) days of receiving Special Notice of the MSEC's recommendation. If the Practitioner does not request a hearing, the matter will be transmitted to the Board for final review and action, of which the Practitioner will receive Special Notice.

7.3.5 <u>Joint Conference Committee Review</u>. If at any point during the corrective action review proceedings, the Board reaches a determination that is different from that recommended by the MSEC, then, prior to final action by the Board, a Joint Conference Committee shall be convened to review the matter and make recommendations that the Board shall consider before taking final action.

## 7.4 SUMMARY SUSPENSION OR RESTRICTION

7.4.1 <u>Grounds</u>. Summary suspension or restriction of a Practitioner may be imposed if a Practitioner: (1) disregards and/or violates these Bylaws, Medical Staff Policies or Hospital Policies in a manner that endangers the health, life or well-being of any patient, prospective patient, or other person in the Hospital, (2) engages in conduct, or it is reasonably believed that the Practitioner may engage in conduct, that requires prompt action be taken to protect the health, life or well-being of any patient, prospective patient, or other person in the Hospital, (3) engages in conduct that materially disrupts any aspect of the Hospital's operations, so as to create a material safety risk, or (4) exhibits signs of impairment, including but not limited to alcohol or drug use, while providing, or available to provide, patient care services at the Hospital.

7.4.2 <u>Authority</u>. The CEO of the Hospital, or his/her designee, in consultation with the Chair of MSEC and/or the President of the

Professional Medical Staff, has the authority to impose summary suspension or restriction, which may involve the Practitioner's Professional Medical Staff membership or all or any portion of the Practitioner's Clinical Privileges or Specified AHP Privileges, as applicable. Unless otherwise stated, such summary suspension or restriction will become effective immediately upon imposition and the CEO of the Hospital will give Special Notice of the suspension promptly to the Practitioner, applicable Department Chair(s), and the MSEC. The summary suspension or restriction may be limited in duration and will remain in effect for the period stated or, if not so limited, will remain in effect until resolved by the procedures specified in this Bylaws section 7.4.

7.4.3    Review. Within five (5) business days of such summary suspension or restriction, the MSEC will convene to review and consider the action; provided, however, that the MSEC may extend the period of review for good cause. In no case, however, may the extension exceed a period of fourteen (14) days. Upon request of the MSEC by the Practitioner, the Practitioner may attend and make a statement concerning the issues under investigation, on such terms and conditions as the MSEC may impose, although in no event will any meeting of the MSEC, with or without the Practitioner, constitute a "hearing" within the meaning of Article VIII, nor will any procedural rules apply except those adopted by the MSEC. The MSEC may recommend that the summary suspension be terminated, modified, continued for a specified period, or made permanent.

7.4.4    Special Notice/Hearing Rights. The CEO or his designee will furnish the Practitioner with Special Notice of the MSEC's recommendation, with copies to the MSEC Chair and applicable Department Chair(s). If the MSEC recommends that the summary suspension be modified, continued for a specified period, or made permanent, the Special Notice will inform the Practitioner that he/she has a right to invoke the hearing procedures in Article VIII, and shall include the information specified in Bylaws section 8.3.1. In the event that the Article VIII procedures are requested, the summary suspension shall remain in effect throughout the pendency of the hearing and appeal process. As started in the Special Notice, the affected Practitioner waives his/her right to a hearing by failing to request a hearing within thirty (30) days of receiving Special Notice of the MSEC's recommendation. If the Practitioner does not request a hearing, the matter will be transmitted to the Board for final review and action, of which the Practitioner will receive Special Notice.

7.4.5　　　Recommendation for Termination of Summary Suspension. If the MSEC recommends termination of the summary suspension, that recommendation will be transmitted immediately to the Board for review and final action. If the Board determines that the summary suspension should remain in place, in whole or in part, the CEO will inform the Practitioner, by Special Notice, that he/she has a right to invoke the hearing procedures in Article VIII, and shall include the information specified in Bylaws section 8.3.1. In the event that the Article VIII procedures are requested, the summary suspension shall remain in effect throughout the pendency of the hearing and appeal process. The affected Practitioner waives his/her right to a hearing by failing to request a hearing within thirty (30) days of receiving Special Notice of the MSEC's recommendation, and the Board decision will become final, subject to the provisions of section 7.4.6, below.

7.4.6　　　Joint Conference Committee Review. If at any point during the summary suspension review proceedings, the Board reaches a determination that is different from that recommended by the MSEC, then, prior to final action by the Board, a Joint Conference Committee shall be convened to review the matter and make recommendations that the Board shall consider before issuing its final action.

## 7.5　　AUTOMATIC LIMITATIONS

7.5.1　　　Automatic Limitation: Faculty Status. The Professional Medical Staff membership and privileges of a Member in the category of Active Staff who is no longer a faculty member at the Temple University School of Medicine, School of Podiatric Medicine, or School of Dentistry will automatically be re-assigned to the Associate Staff category as of the date of such cessation, unless the Member's contract or separation agreement does not allow for that.

7.5.2　　　Staff providing services pursuant to a contract (all categories). In the event that a Practitioner is providing services directly or indirectly at the hospital pursuant to a contract and such contractual relationship terminates; or the Staff member's relationship with his/her employer (which is contracting with the hospital) terminates, then the Practitioner's membership and Clinical Privileges, or Specified AHP Privileges, as applicable, shall be governed by the terms of the contractual relationship.

7.5.3　　　Grounds. In the instances discussed below, the Practitioner's membership and Clinical Privileges, or Specified AHP Privileges as applicable, will be terminated, suspended or limited as set forth

below. It is the obligation of each Practitioner to advise the CEO of the Hospital immediately upon learning of an event that could lead to the termination, suspension or limitation of his/her Professional Medical Staff membership, Clinical Privileges, or Specified AHP Privileges, as set forth below. Promptly upon learning of such an event, the CEO of the Hospital will advise the Chair of the MSEC, who will in turn promptly advise the MSEC.

(a)  <u>Termination, Revocation, Suspension, Restriction or Limitation of License or Other Legal Credential.</u> If a Practitioner's license or other legal credential authorizing practice in the Commonwealth of Pennsylvania is: (1) terminated or revoked; or (2) surrendered while under investigation or in return for not conducting an investigation, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, automatically will be terminated as of the date such action becomes effective. In the event Professional Medical Staff membership and Clinical Privileges terminate on such basis, the procedures set forth in Article VIII will not apply.

If a Practitioner's license or other legal credential authorizing practice in the Commonwealth of Pennsylvania is: (1) suspended; (2) limited or restricted by a licensing or certifying authority, or (3) subject to a period of probation, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, automatically will be suspended as of the date such action becomes effective.

If a Practitioner's license or other legal credential authorizing practice in a state other than one in which the Hospital has a facility is (1) terminated, revoked or suspended; or (2) surrendered while under investigation or in return for not conducting an investigation, the Medical Staff Member's Professional Medical Staff membership and Clinical Privileges automatically will be suspended as of the date such action becomes effective.



(b)  <u>Termination, Revocation, Suspension, Restriction or Limitation on DEA Certificate.</u> If a Practitioner's DEA certificate is terminated, revoked, or surrendered, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges, as applicable, automatically will be terminated as of the date such action becomes effective. In the event Professional

Medical Staff membership and Clinical Privileges, or Specified AHP Privileges, as applicable, terminate on such basis, the procedures set forth in Article VIII will not apply.

If a Practitioner's DEA certificate is suspended, limited or subject to a period of probation, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges, as applicable, automatically will be suspended as of the date such action becomes effective. This provision does not pertain to a Practitioner whose practice does not require a DEA Certificate and who has elected not to maintain one.

(c)     Professional Liability Insurance. If a Practitioner fails to maintain professional liability insurance in amounts and of a type required, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, automatically will be suspended as of the date that the Practitioner first failed to maintain the required professional liability insurance. If, within thirty (30) days thereafter, the Practitioner does not provide evidence of required professional liability insurance, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, automatically will be terminated. In the event Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, are suspended or terminate on such basis, the procedures set forth in Article VIII will not apply.

(d)     Exclusion or Suspension from Government Program. If a Practitioner is excluded or suspended from Medicare, Medicaid or participation in another state or federal government health care program, the Practitioner's Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, automatically will be terminated as of the date such action becomes effective. In the event Professional Medical Staff membership and Clinical Privileges, or Specified AHP Privileges as applicable, terminate on such basis, the procedures set forth in Article VIII will not apply.

(e)     Medical Records. Members of the Professional Medical Staff are required to complete medical records according to the time periods set forth in these Professional Medical Staff Bylaws, Medical Staff Policies and Hospital Policies. A temporary suspension in the form of withdrawal of Clinical

Privileges until medical records are completed or the suspension is lifted will be imposed by the Chair of the MSEC or CEO of the Hospital, after Special Notice of delinquency for failure to complete medical records within such period. The suspension will be lifted upon completion of the delinquent records, or for good cause shown, by the person who imposed the suspension. In the event that Clinical Privileges are suspended on such basis, the procedures of Article VIII will not apply.

7.5.4 <u>MSEC Review of Automatic Suspension</u>. The MSEC shall convene to review an automatic suspension imposed pursuant to Bylaws section 7.5.3(a) through (d) within five (5) business days. The review of the MSEC will not constitute a "hearing" within the meaning of Article VIII, and no procedural rules apply except those adopted by the MSEC. In the event that the MSEC determines to maintain the automatic suspension in place as mandated by the nondiscretionary terms of Bylaws sections 7.5.3 (a) through (d) above, the MSEC's decision is final and non-appealable. In the event that the MSEC votes to exercise its discretion to modify, extend or expand the automatic suspension beyond that which is dictated by the nondiscretionary provisions of Bylaws section 7.5.3 (a) through (d) above, the CEO will inform the Practitioner, by Special Notice, that he/she has a right to invoke the hearing procedures in Article VIII, and shall include with the notice the information specified in Bylaws section 8.3.1. In the event that the Article VIII procedures are requested, the automatic suspension, with the modification, extension or expansion recommended by the MSEC, shall remain in effect throughout the pendency of the hearing and appeal process. The affected Practitioner waives his/her right to a hearing by failing to request a hearing within thirty (30) days' of receiving Special Notice of the MSEC's recommendation, and the matter is then transmitted to the Board for review and action, following the procedures set forth in Bylaws sections 7.4.4-7.4.6, above, with regard to summary suspension.

7.5.5 <u>Corrective Action</u>. Suspension does not preclude the imposition of other corrective action, nor does it require the prior imposition of other corrective action. Additional corrective action may be implemented if a suspended Practitioner admits, treats, consults, performs or assists in surgery or otherwise exercises any Clinical Privileges, or Specified AHP Privileges, as applicable, during the period of suspension. Corrective action may be taken prior to the time that automatic termination occurs (e.g., prior to the exhaustion of appeals after conviction).

## 7.6    APPLICATION FOR MEDICAL STAFF MEMBERSHIP AFTER TERMINATION

A Practitioner whose membership on the Professional Medical Staff and Clinical Privileges, or Specified AHP Privileges as applicable, have been terminated under this Article VII will not be eligible to reapply to the Professional Medical Staff for a period of two (2) years unless invited to reapply by the President of the Professional Medical Staff and the Chair of the appropriate Department. Any reapplication will be processed as an initial application, except that the Applicant will submit such additional information as may be required to demonstrate that the basis for the termination no longer exists.

## 7.7    CONTINUITY OF PATIENT CARE

Upon termination, suspension, restriction or resignation of Professional Medical Staff membership or Clinical Privileges, or Specified AHP Privileges as applicable, the President of the Professional Medical Staff or, at his/her request, the Chair of an appropriate Department or Section Chief, will assign the Practitioner's patients to one or more other members of the Professional Medical Staff. Reasonable efforts will be made to respect patient preference in making such assignments.

4

Participation in Training for: Michael Weinik [Temple University]

| Program | Language | Assumed | Started | Stopped | Time | Status | |
|---|---|---|---|---|---|---|---|
| 2016 Disability Inclusion and Accessibility at Temple University | English | 11/16/2016 | 12/29/2016 12:36:05 PM | 12/29/2016 1:16:07 PM | 00:57:26 | Completed | |
| Clery Act - Short | English | 4/9/2014 | 6/11/2014 9:36:20 AM | 6/11/2014 10:50:05 AM | 00:18:25 | Completed | |
| Clery Act - Short | English | Elective | 6/11/2014 11:39:31 AM | 6/11/2014 12:37:13 PM | 00:57:41 | In progress | |
| HazCom/Right To Know | English | 11/13/2013 | 2/25/2014 1:35:34 PM | 2/25/2014 2:05:04 PM | 00:29:30 | Completed | |
| Preventing Discrimination and Harassment for Employees | English | 6/3/2014 | 6/11/2014 9:53:29 AM | 6/11/2014 10:30:49 AM | 00:37:18 | Completed | |
| Reporting Child Abuse on Campus | English | 6/3/2014 | 6/11/2014 10:31:48 AM | 6/11/2014 10:47:13 AM | 00:16:06 | Completed | |
| Reporting Child Abuse on Campus | English | Elective | 6/11/2014 10:47:39 AM | 6/11/2014 10:47:43 AM | 00:00:03 | In progress | |

Page 1

Close Window

5

Background on other issue Sue Coull had a concern about

- Sue Coull oversees all the GME programs and the administrative staff for all the programs are in the GME department reporting up to Sue Coull
- The Manager of GME is Jackie Schacht and the Director is Luda Cruz
- Amber Dzikowski is the GME Administrator of PM&R and her office is located in the central GME office
- Amber has been in this position for year and half
- Luda and Jackie came to me about their concern regarding Amber and Dr. Weinik
- Amber is not complaining but often goes to Jackie for outfit checks
- She would lean over and ask Jackie to look down her top to make sure you can't see anything
- Or she would just generally ask before she meets with Dr. Weinik if her outfit is professional/appropriate
- Jackie said she wears turtle necks when she knows she will be meeting with him
- Amber has said he makes off color jokes
- He is over the top friendly
- She wasn't feeling well one time and had to leave. He called her and said "are you pregnant"

Sue Coull met with Amber around the first week of November. After Cora's complaint and before Sue met with Susan Wiegers to discuss Cora's complaint

Ambers comments:

- He is very complimentary about the job I do
- He would say "you're so good at your job"
- He likes to get personal- overly social – overly complimentary
- Mixes professional and personal
- She said she was sick on time and he called her and said" are you pregnant- don't leave us
- He looks at my chest a lot. Amber says she is used to it by men. She can't help that she has a big chest. She tries to be very careful about what she wears when she is meeting with him
- He can be very informal
- She does not feel creeped out by him
- He has a need to be accepted

Background from November and December 2016 timeframe
Prepared by Susan Coull on March 15, 2017

Notes from 11/3/16 meeting with Cora Brown and Sue Coull:

- Cora described being in the EMG room to work on reports by herself over the lunch time break 12:30-1pm. It is shared room used by Dr. Maitin 80% of the time. Dr. Weinik go upset about the use of the clip for a needle that is used by Dr. Maitin and said in an angry way no more using tape to hold the clip for the needle
- He then made a comment asking her if she was going to the APE conference. Cora said no, she doesn't have anything to present and she doesn't want to take the time away. He made a comment like "you don't want to hang out us anymore" and "it's in Vegas, there are a lot of whore houses in Vegas I can bring you to one"
- Another comment was made (not sure if at this time in the EMG room) about moonlighting. He asked Cora if she moonlights and Cora said no. And he said "don't you need the money… oh that's right… I forgot your husband does well…"
- She said Dr. Weinik asked about the number of EMG's she saw with Dr. Maitin and it should be 10. She explained the EMG # is based on the attending patient schedule, not the resident, so she has not control over it. Cora described Dr. Weinik's behavior as strange, angry at times, suspicious.
- Cora described something from 1 year ago:
  o She spent 1 month with him on outpatient in clinic
  o Around March of last year
  o It was about 4 weeks after she deliver her baby
  o He made a comment about her weight- said she lost weight and your tummy looks tight
  o She said he sometimes touches her hair but she thinks its just his way
- In September 2016 Cora secured job at Abington after residency
- He makes comments about her clothes – "I like your outfit" "you look great today"
- Cora said she spoke with Dr. Maitin and he advised her to speak to me.
- Cora said Dr. Maitin said there were complaints from other female residents in the past but they were not extreme enough to escalate. He advised her to see me so it can be officially recorded with GME
- Other comments she said he made to her "what is it with you Asian girls, always into Jewish men". She explained his ex-wife is Asian. She told me about a comment he made about Jeff Loire, owner of the Philadelphia Eagles, and his wife Tina, who is Asian.
- Cora said she respects him as a doctor and doesn't want to get him in trouble. She thinks he just tries to be everyone's friend, but as Chair he can't act like a friend.
  She said there is a lot of stress in the department between Dr. Maitin and Dr. Weinik. They on't get along and it cause a lot of stress.

- She doesn't want to make a formal complaint in writing, and thinks that he just needs to be advised to be careful what he says and acts because he is in a leadership position now
- Asked not to disclose her name because she has to work with him and it would be difficult for her.
- We talked about themes and general inappropriateness

6

Dear Ms. Susan Coull,

I am Cora H. Brown, MD, PM&R PGY-4 resident and currently in EMG rotation under the supervision of Dr. Maitin/Dr Cruz for the month of February 2017. For the past few weeks I have encountered a few instances with Dr. Weinik in which his behaviors made me uncomfortable.

First, about 7-10 days ago I was getting out of the resident lounge in the basement of the Rock Pavilion and Dr. Weinik was entering in the lounge. Dr. Weinik blocked the door with his body preventing me from leaving the lounge. I told him that I needed to see a patient who came for an EMG study. He responded "Excuse me! I needed to get in to the lounge." I pulled back to make room for him entering the lounge but he continued standing and blocking the door. I attempted to leave again and he continued rocking his body side to side preventing me from leaving. After the third attempt I was be able to leave the lounge. His body came so close to mine when he tried to prohibit me from leaving the lounge.

Secondly, on Friday evening 2/24/17 at the wedding of my coresident (Dr. Paul Hurd's wedding), Dr. Weinik approached me a few times during the evening. He made comments about my body shape calling me "so skinny" and even labeled me as "an anorexic." He even made comments how sexy my dress looked but I was too skinny!!

Thirdly, on Monday afternoon of 2/27/17 around 3 pm in the public hallway of the basement in Rock Pavilion (the hallway where the employee health and outpatient PM&R clinic rooms locate)  I was getting out of the EMG room with Dr. Ernesto Cruz after performing an EMG procedure on a female patient. Dr. Weinik was passing through the hallway and he stopped me and Dr. Cruz. Dr. Weinik spoke in a loud voice questioning why my last name was "Brown" and my husband's last name "Jachnicki," He bombarded me with questions like "Were you married before?", "Were you got divorced and remarried because your last name was different from your husband's last name?" and "Were you adopted?" I told him that these questions were personal and I did not feel comfortable answering in a public place. He again did not stopped and had to comment on how I looked. He then told me my attire was not appropriate for work (I wore a khaki pant and long sleeve sweater with a pair of brown boots).

These instances came after other instances and sexual/ inappropriate comments he made of me in October 2016 at which time I brought them up to your attention. I was aware that Dr. Weinik got verbal warning during that time period.

Dr. Weinik continued showing very inappropriate behaviors and comments about my body shape, clothes and even so intrusive into my personal life in a public place where patients are being seen and in front of other health care professionals. His obsessive and stalking behaviors about me continue to occur at not only Temple University Hospital but at outside Temple hospital setting as well.

I feel so violated and so uncomfortable even putting my footstep around PM&R clinic worrying that I would run into Dr. Weinik and hear his inappropriate comments about me. These instances occurred while I was not even on his rotation. I would hope further action to be taken from the GME on this matter so that I can believe being at Temple University Hospital is for learning to become a PM&R physician rather than dealing with these sexual inappropriate comments/behaviors from a PM&R attending and Interim Chair dr. Weinik.

Sincerely Yours,

Cora H. Brown, MD

7



**TEMPLE**
U N I V E R S I T Y
Lewis Katz School of Medicine

April 5, 2017

Michael Weinik, DO
Interim Chair Person
Department of Physical Medicine & Rehabilitation
Professor of Clinical Physical Medicine & Rehabilitation

4/5/17

Dear Dr. Weinik,

On March 2, 2017, the Medical Staff was notified by the GME office regarding a written complaint submitted by Temple Hospital PM&R PGY4 resident Cora Brown, MD. In the complaint, Dr. Brown detailed her concerns relevant to the scope and responsibilities of Physician Professional Conduct outlined in the Administrative Policies and Procedures document naming you, Dr Weinik, Interim Chair, Department PM&R as the offender.

A copy of Dr. Brown's written statement detailing her allegations of disruptive conduct in addition, a copy of the Physician Professional Conduct policy have been provided by the Medical Staff Office. Also, the inquiry has taken into consideration previous concerns starting on or about 11/3/2016 raised by the same resident. Meetings and interviews to address and outline the allegations have taken place and were inclusive of Sue Coull, Dr Wiegers, Dr. Brown, and yourself. At the conclusion of the meetings, it was reported that you denied the accusations. It's noted that the accuser's identity was not provided to you at that time. Dr. Weigers states that she expressed unease with your assessment and recommended that you undergo counseling. It was reported that you respectfully declined.

With regard to the most recent concerns submitted by Dr. Brown, separate interviews were conducted by Dr. Tedaldi and I which included: Dr. Weigers, Sue Coull and Dr. Brown, followed by Dr Cruz – prior to our meeting with you. At all meetings attempts were made to be comprehensive and constructive in securing any and all information relevant to the allegations. The objective was to identify the issues and to create a plan of action designed to ensure a safe and effective work environment for all parties involved.

Dr. Tedaldi and I have reviewed the complaint by Dr. Brown as well as the evidence provided and determined that there is insufficient evidence to fully support all of the individual allegations. However, we are persuaded that you are responsible in some part for an unwelcomed intrusion into Dr. Brown's personal and private space. Accordingly, we formally recommend that you undergo professional coaching with follow-up and that progress be provided to Dr. Kaiser, in lieu of the department Chair person. The Medical Staff will provide the resources in anticipation your acceptance.

Respectfully,

Vincent S. Coweil,
President, Medical Staff

Ellen Tedaldi
Past President, Medical Staff

8

# Internal Memorandum

To:    Vincent Cowell, MD

From:  Allyson Saccomandi

RE:    Coaching Assignment for Michael Weinik

---

In April of 2017, Dr. Cowell approached me to work with Dr. Weinik after a complaint investigation involving unprofessional behavior.

I emailed Dr. Weinik to set-up a meeting to discuss on April 12, 2017 and requested a time for the initial meet and greet. We held that initial meeting on April 19th at 8 am in the HR Office in Zone B.

The discussion was wide-ranging and Dr. Weinik was very emotional. He expressed concern about his reputation, gossip about the situation and lack of confidentiality in the process. He gave specific examples of other physicians approaching him and raising the topic. He was adamant that he understood why the issue was raised and committed to making sure it would not happen again. We discussed the root cause for such a problem and preliminary ways to avoid issues in the future. In addition, we discussed his current position as interim, his desire to be named Chair, and what he might need to demonstrate to be positioned for the permanent role. We agreed to seek more feedback and discussed the 360 review process as a tool, which he committed to participate in.

Later that day, April 19, 2017, I emailed Dr. Weinik all the relevant forms required for the process and instructions to complete.

On April 21, 2017 I emailed Dr. Cowell to confirm we had met and we were moving forward. On April 24, 2017 I emailed Dr. Kaiser with the same information.

On April 27, 2017 he reached out to tell me that he was behind in the process due to other commitments but was still interested in moving forward and would focus on it in the coming week.

TUHS Confidential Document L&OD

On May 9, 2017 I reached out to meet with Dr. Weinik to move the process along. We met on May 11, 2017 and discussed where he was in the process of compiling raters. We also discussed the messaging for his invitation to participate. Dr. Weinik still had some work to do in finalizing the list. We discussed the pros and cons of some of the raters. In general my impression was that he would be able to gain the appropriate amount of honest insight with his selections.

On May 17, 2017 I reached out again to see if we could finalize his raters and asking for a time to meet. He indicated he as on-call and ill and that was slowing his process. We agreed to meet at 2:15 on the 19th. We had a good meeting and robust discussion. The rater sheet was finalized with appropriate names and we discussed how he would invite people to participate and he committed to customizing the invitation to participate and would send me the final draft. Dr. Weinik also committed to sending me the outstanding email addresses he needed to complete the setup of the survey.

By June 1, 2017 I had still not received the information I needed to start the process. I reached out to Dr. Weinik via email to say that I was concerned we were falling behind since I hadn't heard back from him on his final invitation and did not have the outstanding email addresses. I included a sample invitation for him to edit to help him move the process along. That evening he finalized the invitation and sent it back to me for approval. On June 12, 2017 I reached out again for the outstanding email addresses. He responded that he was learning something through the process about himself and his ability to follow through. He confirmed that he sent all invitations and wanted to add a few more names. In the end I launched the survey using the names he originally provided to me.

On June 30, 2017 we schedule time to meet face-to-face. We discussed the difficulty we were having getting to the point and the importance of follow through and the impact this has on his other work beyond the 360 survey. We discussed the current survey respondents and who had not responded. He committed to following up with those outstanding raters in order to finalize the 360 data. We discussed how he was interacting with residents, the boundaries he was setting and the importance of those boundaries. We discussed the current staff, openings, state of the department, staff engagement and morale, his vision and also roadblocks. He alerted me to vacation time and some conferences that were on the horizon. I promised to monitor his respondents.

On July 26, 2017 I emailed Dr. Weinik to let him know that the 360 was nearly complete with only his leader outstanding and asked how he wanted to handle the situation and I was looking forward to catching up with him. He alerted me to some medical concerns and then said he

would look into when he asked Dr. Kaiser to complete the 360. He then confirmed that he texted him a reminder. I let him know that as soon as it was complete we could sit and review.

Throughout the next several weeks I continued to monitor completion by his manager. By August 24, 2017 I closed the 360 without this feedback as the coaching assignment was beginning to drag on much longer than anticipated and there was relevant feedback from other that we could work with. I requested to meet with him on September 6th or 7th and ultimately was scheduled on September 13, 2017 to review the 360 feedback report.

We met on September 13, 2017 and debriefed the 360. We reviewed the written feedback and the top developmental opportunities and noted an overlap on several categories. I discussed the resources Dr. Weinik had to help him understand more about the competencies. His assignment was to determine the top 2 or 3 items that would become his focus. During this conversation he was open about the struggles of his team, the lack of vision, planning, and strategy of PM&R over the past several years, and his ability to balance the administration required of a Chair with his duties as a physician. We also discussed training opportunities for someone at his level and reviewed both physician leadership academy and the health system academy as possible opportunities. Once again we discussed the residents and his relationship with them. He noted with clarity the boundaries that were needed with his residents and the team now that he was interim Chair. He again provided examples of interactions where he set those boundaries. We agreed on next steps and he asked me to contact his assistant to set up regular meetings since he does not have access to his own calendar for scheduling.

On September 18, 2017 I contacted Jean Tamasauskas and requested a meeting with Dr. Weinik in two weeks. I also requested that those meetings be recurring every two weeks through the end of December. Jean did not respond to my requests until October 6, 2017. She provided the following meeting times that extended later in the year than I would have liked or anticipated:

October 25th
November 17th
December 1st
December 15th

I was out of the office on October 25, 2017 due to a certification and rescheduled for November 3, 2017. During that conversation we discussed the minimal progress, but he said that he had been spending time thinking about the areas he needed to develop and was in fact formulating ways to move forward. Taking time to think through the feedback is not unusual. Since we had

3                           TUHS Confidential Document L&OD

regular meetings scheduled through the end of the year I felt comfortable at this point that progress could be made.  During this meeting we spent most of the time talking about his team and how he envisioned the future of PM&R.  We discussed the roles on his team, the impact of the roles on his time, funding in the unit, grant opportunities, working cross-functionally with other departments and development opportunities for his staff among other things. I shared with him the TUH goals and we discussed how PM&R could fit into the framework. He committed to setting goals for his team and sharing his future vision as next steps.

As in the prior meetings we also discussed his position as interim Chair and how he was interacting with those on his team.  He communicated again that he was seeing the value in setting professional boundaries between himself and his team.

On November 10, 2017, I sent him sample forms for planning goals and the electronic version of the TUH goal setting deck and told him that I was looking forward to seeing what he would pull together at our next meeting on November 17, 2017.

On November 15, 2017, Jean Tamasauskas canceled the meeting scheduled for November 17, 2017 and offered no re-schedule instead saying he would see me again on December 1, 2017.

On November 27, 2017 Jean Tamasauskas emailed to cancel my December 1, 2017 meeting. She asked if she should reschedule sooner or if the next meeting on the 15th would be fine. I opted to wait until the meeting on the 15th but was seeing a pattern of non-commitment to the process that has been prevalent from the beginning.

On December 15, 2017, Jean Tamasauskas canceled the meeting scheduled for that afternoon and rescheduled it for December 21, 2017.

At this point I was very concerned this assignment was not moving forward in a positive direction and that there was a lack of commitment to the process.  While the discussions seemed positive when we did connect, there was a consistent lack of follow-up.  I planned to meet with Dr. Weinik on the 21st of December to have a frank conversation about ending the assignment and then communicating with Dr. Cowell and Dr. Kaiser on the situation.

4                                    TUHS Confidential Document L&OD

On December 21, 2017 I met with Dr. Weinik and he pre-empted my agenda with a discussion on what he had been working on and implementing since we last met.

- Dr. Weinik set forth a plan for role clarification with regard to his team. He reviewed the specifics of team and individual discussions including providing PM&R physicians opportunities to teach. He highlighted a difficult conversation with a tenured physician, but felt it would turn out to be a positive over time.

- Dr. Weinik set forth a plan for development of staff, including himself, and outlined the physicians recommended for leadership academy and other development opportunities. He reported positive response from his team.

- Dr. Weinik updated me on what he wanted to accomplish in terms of grants and fundraising and that he discussed his ideas with his team. He also asked for their input on how to raise funds for PM&R.

- Dr. Weinik updated me on discussions with the physicians on timely billing and the importance of timely billing to the system.

- Dr. Weinik also outlined the beginning of a 3 year plan that would align with the building of the MOB and anticipated growth with regard to that change. This included the continung partnerships with other departments.

- Dr. Weinik relayed two stories where he had the opportunity to socialize with a resident but declined in a continued effort to remain true to professional boundaries. We discussed the current environment related to inappropriate behavior, the #MeToo Campaign, and the importance of making sure all interactions are professional.

I was very surprised at the progress and the preparation of Dr. Weinik for that meeting and shared my surprise with him. I told him that I was not expecting him to have made that progress. We committed to the following next steps:

- He would support the attendance of his team at the development events he assigned.
- We would set up a schedule in the new year that would include meeting through March on his goals and development plan.
- He would attend all leadership sessions for Chairs as well as the TUHS Leadership Academy.

5                          TUHS Confidential Document L&OD

I have reached out to Jean Tamasauskas to schedule recurring meetings through March.   Those meetings are schedule for:

January 26, 2018
February 2, 2018
February 16, 2018
March 2, 2018
March 16, 2018

I have registered Dr. Weinik for Leadership Academy in April.  As we work through the academy sessions I will partner with Dr. Weinik for implementation of the concepts.

I have spoken with Dr. Tedaldi on including Dr. Weinik in Chair leadership sessions that are being held in early 2019.

I planned to provide my update to Dr. Kaiser in January of 2018 as to Dr. Weinik's progress and plan for 2018.  I have not yet sent that report as of the date of this memo, January 22, 2018.

This coaching assignment could have been more concise and focused.  I originally thought this engagement would take us through the end of September.  After refocusing I anticipated we would finish up by the end of December.  I am hoping 2018 brings a renewed focus but I am concerned that it is not a priority.  I am committed to working through April with Dr. Weinik.  If the pattern of cancelations continues I would recommend ending the assignment.

A.S.
1/23/2018

TUHS Confidential Document L&OD

9

iMessage
Today 9:12 AM

Acevedo

Goodmorning. I'm at the York interview today. I spoke with chiefs. Sorry for the inconvenience.



Weinikiphone

Who did you speak to? More important who did you ask cover you?

Not a wise move, since I'm very good friends with Dr. Furman



10

**Dzikowski, Amber**

From:
Sent:                    Tuesday, January 16, 2018 8:10 AM
To:                      Dzikowski, Amber

WARNING:
**** EXTERNAL Message. DO NOT open attachments or click links from unknown senders or unknown emails. ****

---

I am writing to discuss some experiences, moments of concern, shame, and frustration that I experienced as a resident physician with my previous attending, Dr. Michael Weinik.

In the current environment where women are finally being supported instead of hushed, deemed dramatic or ignored for telling their stories of sexual harassment and misconduct, I feel it is time to share some situations I experienced not very long ago at Temple as a pmr resident.

I was a PGY-2 when I had my first uncomfortable encounter with Dr. Weinik. I was on consults and walking through the hall from the resident room through his clinic. He stopped me and asked me "So (my name), Are you a good girl or a bad girl?" I was puzzled and weirded out by the tone of his voice and the nature of his question. I asked "what?" He repeated "Are you a good girl or a bad girl? I bet you're a bad girl". I said "I dont know what you are talking about" to which he replied "yeah, you are definitely a bad bad girl, dont worry, we like bad girls at Temple". He then laughed and I felt awful and confused and I said "I dont know what you are even talking about" and I just walked away as he kept laughing.

That same year I was wearing an appropriate length work skirt that just showed my knees. In that same hallway he stopped me and asked me if I was hyper-mobile. I said "I don't think so". He then knelt down on his knee to take a look at my knees and then touched the popliteal area of my leg with his hand as he looked from the side and he then said "you are like Gumby, you look like you are probably so flexible". I said "No, I am not" and I backed away from his hand. He responded "I would like to find out for myself". Again I walked away and this time I remember laughing out loud to try to reduce the awkwardness. I was in fear that one day I had to work with this guy. I didn't want to piss him off but I felt violated.

I avoided him as many female residents do because of his unusual and often perverted comments regarding any female: patients, nurses, therapists, and residents. Anyone was fair game and male residents would often pretend to play along and say "its just weinik being weinik." I never understood that excuse.

As a PGY-3 I had only one rotation that I had to work with him once a week in march because I had an outpatient block and weinik always needs extra residents assigned as the "helper resident" on his rotation because he cannot seem to effectively complete a clinic without lots of resident help. I was already on guard but he was generally friendly and yes he would make comments but I was glad they were not directed at me. But then I saw how he treated young female patients or just pretty women differently than other patients. His exam would become "extensive" as he would check for various pathologies but it always seemed overboard and frankly made me really uncomfortable. Other residents would make comments like "oh boy she is a pretty girl, looks like this should take about an hour", I hated those encounters as they were unnecessarily "handsy" exams and the patients were oblivious to the fact that he was touching them everywhere looking for god knows what. I understand the importance of the physical exam but this was just over the top and only directed at a specific population - females - especially young and pretty.

He had one patient that he saw on his list and he said "she comes in to see me because her husband doesn't give her enough loving. Weinik will make sure she is taken care of, haha,  She will get all dolled up for me and just watch, she will have me adjust (osteopathic manipulation) her and ill make her feel good." He would make these comments with a tone and smile that was so unprofessional.  I always thought to say something but again he was the boss, the attending, the guy filling out my evaluation. I didnt want to anger him in any way but I hated how this all made me feel.

That month we had our yearly physical examination workshop at pcom. He called me to the stage in the front of everyone to so he could demonstrate the lower body physical examination maneuvers on me. I declined and lied and said I had a spinning injury and I didnt want to make anything worse. His response in front of everyone was "If something is wrong ill find it so just come up here." I obliged because I felt cornered after that response but I really didnt want his hands to touch my body. I had the right to decline but couldn't because he was insisting I participate. I went up there faced everyone and he was behind me. First thing he says is to check range of motion of my spine by touching my toes. I said I cant touch my toes. And he said "sure you can, just try, I wont tell them about your tramp stamp." I was super offended. I dont have a back tattoo aka a tramp stamp and that was just a super demeaning unnecessary comment. He laughed as did the whole audience. I felt embarrassed but tried to just go with it to get the whole thing over with. He then had me stand and said he was checking my ischial bursa and he said "very nice, very nice". Again uncomfortable audience laughter... I didnt like his hands on my buttocks because I felt like I was just like those patients he manipulates... in an impossible position. Then he went on and on hand everywhere and eventually saying he was going to check for Pubalgia also known as a sports hernia or athletic pubalgia. This is a chronic groin lesion but to check he essentially would pushing my pubic symphysis in front of everyone. I said "I dont know about all that". Before I could stop him his hand was on not just my pubic region but on my vulva! I shot up off the table and said "yeah thats not my pubic symphysis". Everyone started laughing, I was mortified but tried to play it off. I was beyond offended and felt manipulated, used, embarrassed and horrified. A male chief resident came up to me right away and asked if I was ok. When I said "yes im fine" he eased up and said "damn he didnt even buy you dinner before that." I went home and called my sister and another co-resident and cried... a lot., not just that night either. I carried it with me. They encouraged me to say something to my chairman or to gme or anyone, even weinik himself. I said i would and i didnt... probably because I thought it wouldnt make a difference, that I would be ignored, that "weinik was just being weinik", because i was scared and embarrassed and wanted to just move on.

My #1 scheduling request was to work on the weinik rotation in February because its a short month and the emg course would reduce the number of days of interaction. He is a good teacher and I learned a lot from him about the spine and sports. He has good qualities and attributes as no one is all bad. His behavior and comments were just often unacceptable

But now i fear for others and feel I must open up about this. I still feel the need to remain anonymous because pmr is a small field and he is well connected. I work near and dont want my job or my life to be compromised and I dont want sympathy. I just dont want this to happen to others.

11

# Confidential

Physician Professional Conduct Policy – Investigative Report Summary Description: The President of the TUH Medical Staff, Vince Cowell, MD, was made aware of a complaint against a medical staff member (Michael Weinik, DO) on January 17, 2018 which possibly constitutes a breach in professional conduct. In compliance with the Physician Professional Conduct policy, Dr Cowell organized a panel (himself and Past-President, Ellen Tedaldi, MD) to conduct the investigation.

The issue was brought to Dr Cowell's attention by Susan Coull, Designated Institutional Offical for GME, Assistant Dean, and Associate Hospital Director for Medical Education (Attachment A), following 2 concerns:

- 01/15/18 - The GME Administrator  brought a concern to Ms. Coull's attention re: Michael Weinik, DO following a conversation the GME Administrator had with a senior PM&R resident
- 01/16/18 - The same GME Administrator received an email from a 2015 PM&R graduate re: Michael Weinik, DO

Process:

01/25/18 – Meeting with Senior Resident, Philip Acevedo.  The following are the observations, interactions, impressions and opinions expressed by Dr. Acevedo regarding his experience with Dr. Weinik during his (Dr. Acevedo's) residency:

- Dr. Acevedo described an incident that he witnessed when on a rotation with Dr Reed Williams. A young, female patient was being prepped for a procedure in a prone position when Dr Weinik took over the prep.  Dr. Acevedo believed that the prep area was unnecessarily extended to reveal the patients buttocks and Philip believed that the patient was uncomfortable based on her facial expressions. Dr. Acevedo excused himself in hopes of minimizing patient's discomfort as there were 3 men in the room.  He was later asked by Dr Williams why he left the room and Dr. Acevedo explained that the patient seemed to be uncomfortable and, according to Dr. Acevedo, Dr. Williams responded that he understood and also confided that the patient requested to not be seen by Dr Weinik again.
- Dr. Acevedo shared that as a resident, you observe many different attendings and there is a difference in Dr Weinik's approach.
- Dr. Acevedo explained that things may get "blurred" between a MD exam and a DO exam, but approximately 50% of residents in the program are osteopathic and they feel uncomfortable with the exams done by Dr Weinik.
- As a resident, you notice a pattern in how Dr Weinik treats his patients.  There is a difference between young female patients and other patients.  Dr Weinik will spend 45 minutes with a young female patient compared to 10 minutes with an older male patient.  Residents will say "Oh, there is a young female patient scheduled, Dr Weinik will be awhile."
- Dr. Acevedo agreed that there is an understanding among residents that if someone refers to "That's a Weinik" all residents understand what that means.

- Dr. Acevedo believes that every resident will feel the same way regarding Dr Weinik, but no one will question anything as everyone needs a letter of recommendation from Dr Weinik.
- Dr Cowell asked if Dr Weinik was threatening to Dr. Acevedo. Dr. Acevedo shared a story where he was on an interview and could not find coverage. Dr. Acevedo had a text message exchange with Dr. Weinik and his Program Director (see Attachment "A") explaining that he was at a fellowship interview and described his efforts to find coverage. Dr. Weinik indicated that he knew the person Dr. Acevedo was interviewing with and said "not a smart move". Dr. Acevedo took this to imply that his fellowship chances would be hurt. Dr. Acevedo did not get that particular fellowship.
- Dr. Acevedo shared that Dr Weinik does patient simulated demonstrations at PCOM and uses residents as the patient. Dr Weinik seems only to choose female patients and stated: "It fits the pattern, so you feel uneasy about it".

01/25/18 – Meeting with GME Administrator, Amber Dzikowski. The following are the observations, interactions, impressions and opinions expressed by Ms. Dzikowski regarding her experience with Dr. Weinik in her role as a GME Administrator:

- Two residents have come to Amber to discuss Dr Weinik.
- Amber explained that she hears a lot of stories from residents regarding Dr Weinik's inappropriate behavior.
- Dr Cowell asked if she had any inappropriate dealings with Dr Weinik. Amber responded that she feels uncomfortable around him, that his eyes would look at her chest and not her face and he is very complimentary of her hair and outfits. He asked very personal questions, he asked if she was married and then asked why she wasn't married. He is very friendly, overly friendly. Amber feels that he wants to be everyone's buddy.
- Amber hears that he uses his position as Chair as a fear tactic. He openly tells residents that they need a letter from him. He is notorious for making phone calls to either praise a resident or say "don't take that resident".

02/01/18 - Meeting with Senior Resident, Nicholas Kinback. The following are the observations, interactions, impressions and opinions expressed by Dr. Kinback regarding his experience with Dr. Weinik during his (Dr. Kinback's) residency:

- It has become a joke among residents that Dr Weinik spends more time with young, female patients and that Dr Weinik is more "hands-on" with young, female patients.
- There is "nothing illegal" in the exams; there is just a pattern of behavior that the majority of residents have noticed.
- Dr. Cowell asked Dr. Kinback if he ever witnessed anything with regards to Dr. Weinik that made him feel uncomfortable. Dr. Kinback noted that nothing has made him feel uncomfortable but he has observed that certain patients get checked a little differently than others, by certain patients, Dr. Kinback, means younger females. Younger females get a more thorough exam like pelvic tilt and muscle energy. All exams are medically appropriate but only done on certain . patients.

- o   Out of a class of 9 residents, Dr Kinback has heard at least 6 residents make the same comments and observations.

02/06/18 - Meeting with Chief Resident, Katie Hatt. The following are the observations, interactions, impressions and opinions expressed by Dr. Hatt regarding her experience with Dr. Weinik during her (Dr. Hatt's) residency:

- o   Dr. Hatt has never had a personal incident with Dr. Weinik ever saying or doing anything inappropriate, but knows that if Dr. Weinik has a younger attractive female patient that Dr. Weinik will be more thorough and take longer during the examination.
- o   Dr. Weinik always chooses female patients for the patient simulated demos.
- o   "It is difficult because I see things that don't seem right but not sure if they are really wrong; he is always within the scope of practice. For example, I observe Dr. Weinik asking personal questions of his patients like 'what are you going to do later tonight?'"
- o   "The exams are not inappropriate but you notice a pattern."
- o   Dr. Cowell asked if Dr. Hatt has experienced Dr. Weinik intimidating residents or holding his position over a resident to get a letter. She responded, "In my experience Dr. Weinik does not follow through on giving letters but everyone talks about getting a letter from Dr. Weinik."
- •   Dr. Hatt did share that in her position of Chief Resident, she creates the resident schedules and "Dr. Weinik throws a hissy fit if you take a resident from him even on a light patient day." Dr. Hatt feels that Dr. Weinik uses his position as Chair to insist on getting a resident scheduled with him.
- •   Dr. Cowell asked if Dr. Hatt was ever chosen to be a model for Dr Weinik.  Dr. Hatt said yes and that she didn't feel uncomfortable until someone pointed certain things out.
- •   Dr. Hatt said that Dr. Weinik's patient exams on young female patients are longer.  Dr. Weinik uses some of the time as just more social time, talking more with the patients.  And the physical exam is always more thorough.

Dr. Cowell shared that he had spoken with Susan Wiegers, MD to see if she had any additional information to add to the investigation and she had nothing further.


02/06/18 - Meeting with Resident, Rakhi Vyas. The following are the observations, interactions, impressions and opinions expressed by Dr. Vyas regarding her experience with Dr. Weinik during her (Dr. Vyas') residency:

- •   Dr. Vyas believes there have definitely been times where she thinks Dr. Weinik was inappropriate.  Dr. Vyas does not believe that there has ever been any physical inappropriateness.  Dr. Cowell requested that Dr. Vyas elaborate on what she believed to be inappropriate.  Dr. Vyas explained that one time last year she was wearing a black dress and Dr. Weinik commented that "there are only certain times a girl wears a little black dress and one of those times is when she is on the walk of shame".

- Dr. Vyas believes that when Dr. Weinik sees an attractive female patient, he is more thorough.
- Residents will make comments like, "Oh, that's a pretty patient, this will take a while."
- Dr. Vyas was asked about the patient exams: "Dr. Weinik doesn't do anything inappropriate but he takes much longer with the patient."
- Dr. Vyas was asked if this meeting was a surprise and if this is behavior that she believes needs to be addressed, or if this is perhaps over the top. Her response: "Not surprised, residents all know how things are. I think this needs to be addressed because he says inappropriate things. I just don't let things get to me. Maybe that's not good and I should have said or done something."
- Dr. Vyas was asked what a longer exam entails, her response: "different techniques are used, longer social time, more exams."
- "I don't think in my experience that Dr. Weinik has ever said anything inappropriate to a patient."
- "I think he favors doing simulation exams on females. I was a model and I did not feel strange when he did the exam."

02/08/18 – Dr Cowell sent '        an email requesting a personal interview to discuss the allegations in her email (See Attachment "C").        ı never responded.

02/06/18 - Meeting with Faculty, Reed Williams, M.D. The following are the observations, interactions, impressions and opinions expressed by Dr. Williams regarding his experience with Dr. Weinik:

- Dr. Cowell explained to Dr. Reed that there was a report of potential unprofessional conduct during a patient procedure and indicated that Dr. Reed was present. Dr. Reed had a vague recollection of a situation where a resident stepped out of the room during a procedure because the room was too crowded. Dr. Reed does not recall that there was anything inappropriate or egregious or that there was an aggressive prep field.
- Dr. Williams was asked if he was familiar with the lore that Dr. Weinik spends additional time with young, attractive patients? Dr Williams responded: "Dr. Weinik is a connector. He is gregarious. I remember that as a resident he may have spent more time with patients he had a history with. I don't recall ever thinking that he was ever out of bounds or inappropriate but I do remember thinking that there were some things that he said that I would not say. He is a phenomenal clinician; he senses patient's anxiety and may respond to that by spending more time with them. I have been around Weinik a long time and nothing he has done would be questioned as inappropriate."
- Dr. Williams was asked if he has had any patient say anything to him about Dr. Weinik. Dr. Williams response: "I had one patient say that she didn't want to see him but I think that was because she wasn't getting anywhere with her treatment."
- "He is a consummate clinician and the only thing is sometimes he may say things he shouldn't."
- "He is a dear friend so this is difficult."

- "He may be overly flirtatious and we (i.e., Dr. Williams and Dr. Weinik) have had sidebar conversations about this."

02/20/18 – Meeting with Michael Weinik, MD

- Dr. Cowell reviewed the process that has occurred and provided Dr. Weinik the email (Exhibit "C") to allow Dr Weinik to re-review it. (The email author was redacted).
- Dr. Weinik commented when reading the email, "I don't know who this is; I can't put a name to it. I am trying to remember. I do recall one incident, and I am the one to teach hands-on exams because I'm an osteopath and I take seriously what I do. What I do is ask someone from the audience come up to examine. We demonstrate curves of spine, pelvis and hip. Then everyone breaks down in to tables so I walk around to answer questions and offer help. I do remember someone asking me to demonstrate an exam as I walked around and I do remember someone jumping-up and saying 'that's not the (?)' and another resident saying 'he didn't even buy her a drink.'" "I can't recall the individual who that happened to."
- Dr. Weinik reviewed the complaints and addressed several points.
- "I run late with all of my patients. I don't feel like I run later with women than men. I have never had a patient complain in 32 years of treating patients. I have never handled a patient inappropriately."
- "I feel bad that I don't know who this (referring to complaint) resident is cause I would have corrected. She had a horrible experience and I regret that. Had I known she was uncomfortable, I would not have examined her".
- Dr. Cowell asked Dr. Weinik if he understood our responsibility to investigate, and Dr. Weinik responded "yes".
- Dr. Weinik indicated that since the last complaint, he has towed the line. He said he is extremely careful. "Since that time I don't go out for drinks, I don't go to the resident bbq, I don't go to the holiday party, I don't go out to any social events. I have separated myself completely from the residents. I don't want to be in a situation where I can be misconstrued."
- "I have known some of my patients for over 30 years so maybe I do get too casual."
- "I don't like to hurt anyone. I don't like conflict."
- "I came here as a young professor so when residents say 'that's Weinik being Weinik' I'm not the same Weinik.
- Dr. Tedaldi asked where these reactions from residents may be coming from. Dr Weinik's response: "I have been very mindful since last year. I don't think this was recent or I would have remembered it. I don't know who this was."
- (Referencing the complaint) "This is not acceptable; I was not a good person for this person. I think I have done better. I have given up having certain relationships..."
- "I have done a lot of soul-searching. I like to teach, that's why I am here. The fact that I'm doing this bothers me. I think about how I do everything, try to be mindful of what I do. I am different."

- o "If I knew who this was I would apologize. This can't happen. I own it."
- o "I know what I have to do. But I get depressed that my behavior has hurt anyone. I am disappointed in myself, that I didn't see this. I am not the type to consider suicide."
- o Dr Cowell explained that the process will proceed as last time and Dr Kaiser will be presented with a report

**12**



**TEMPLE HEALTH**
TEMPLE UNIVERSITY HOSPITAL

3401 North Broad Street
Philadelphia, PA 19140

March 15, 2018

Michael Weinik, DO
"VIA HAND DELIVERY"

Dear Dr. Weinik:

This shall serve as your Special Notice (as defined by the Temple University Hospital Bylaws of the Professional Medical Staff ("Bylaws")) that, today, the MSEC recommended that your Medical Staff membership and privileges be terminated effective immediately. This recommendation has been made pursuant to Article VII 7.3.2 of the Bylaws, and more specifically pursuant to the provision that "at all times the MSEC, in consultation with the CEO of the Hospital, will retain authority and discretion to take whatever action may be warranted by the circumstances, including summary suspension,… or other action, as otherwise set forth in these Bylaws." The MSEC's recommendation was based upon its receipt and consideration of a report that summarized a recent complaint (of which you are aware), the investigation that then ensued under the Physician Professional Conduct policy (TUH-ADMIN-950.1044) and previous allegations of professional misconduct that had been made against you.

I have enclosed a copy of the Bylaws and the Physician Professional Conduct policy for your reference. I invite your attention to article VIII of the Bylaws, which sets forth your rights in these circumstances. Please be advised that you have thirty (30) days from your receipt of this Special Notice to invoke your right to the hearing procedures set forth in Article VIII. Your request must be in writing and should be addressed to Verdi DiSesa, M.D. – CEO of Temple University Hospital. In the event that you do not invoke your right to the hearing procedures within thirty (30) days, you will be deemed to have waived your right to a hearing and to have accepted the MSEC's recommendation to terminate your Medical Staff membership. In that case, the recommendation will be submitted to the Board for review and final action.

Please know that you are being removed from the PM&R schedule and will not be scheduled for inpatient service nor seeing outpatients while the Bylaws process takes place.

Sincerely,

Herbert Cushing, M.D.
Chief Medical Officer

Enclosure
cc:    Verdi DiSesa, M.D. – CEO, Temple University Hospital
       Robert M. McNamara, M.D. – Chair, TUH MSEC
       (w/o encl.)

**From the desk of**

*Scott Naftulin, D.O., FAOCPMR, DABPMR*

RE: Michael Weinik, DO

To whom it may concern:

This letter is being sent in regards to a recommendation provided to our Interventional Spine and Musculoskeletal Fellowship program for our next fellow, Phillip Acevedo, MD, by Dr. Weinik. Dr. Weinik's recommendation positively influenced our decision to offer our fellowship position to Dr. Acevedo. Nothing inappropriate was discussed or otherwise mentioned. Dr. Weinik exhibited the utmost professionalism throughout.

If you should have any other question or concerns, please feel free to contact me at your convenience.

Respectfully submitted,

Scott Naftulin, D.O.

Fellowship Director

NERA Spine & Sports Medicine





## ROGERS CASTOR

Bruce L. Castor, Jr.
610.285.7338 (Direct)
Bruce@RogersCastor.com

July 7, 2018

Shivani Dua, MD
c/o Main Line Spine
South Henderson Rd.
King of Prussia, PA 19406

### Re: Your complaint against Dr. Michael Weinik

Dear Dr. Dua:

We are counsel to Dr. Michael Weinik.  There is a hearing scheduled for Tuesday, July 10, 2108 at 5:30pm in the 9th Floor Executive Conference Room in the Boyer Pavilion of Temple Universary Hospital, 3509 N. Broad Street, Philadelphia, PA 19140.  That hearing is to determine what recommendations will be made concerning Dr. Weinik's future employment at Temple which could also have further serious repercussions for Dr. Weinik.  Counsel for Temple has informed me that you are not scheduled to be a witness against Dr. Weinik, but that what you told others about an incident some four to six years ago during which you were a teaching subject before a class where you said Dr. Weinik made inappropriate comments that embarrassed you before the group and where you said Dr. Weinik touched you on an intimate part of your body without what on an actual patient would be considered a good medical reason. Dr. Weinik denies he did anything wrong.

Witnesses at this hearing will be sworn and give evidence under oath with a court reporter making a record.  Should the hearing go ill for Dr. Weinik, he will appeal to the hospital Board and ultimately to the Court of Common Pleas of Philadelphia County where any civil trial starting from scratch would take place.  Since the hearing on Tuesday evening is not a court proceeding in the normal sense, hearsay testimony (i.e. other people testifying as to what you told them) is admissible.  That is why Temple can go forward now without you physically being present.  However, you may certainly appear and testify if you

26 E. Athens Avenue • Ardmore, PA 19003 • Phone: 610.649.1880 • Fax: 877.649.1880
Email: info@rogerscastor.com • www.rogerscastor.com

**EXHIBIT**
3

wish, and I invite you to do so.  Should the case progress to a Philadelphia courtroom, as it certainly will should Temple take an adverse action against Dr. Weinik as a result of what you reported, hearsay generally is *not* admissible, and you would be obligated to give testimony under oath both at a deposition and at any trial that might ensue.  That is the ordinary course of a civil case and should not concern you in any way.  It is a basic rule of court in the United States that persons accused of improper conduct receive an opportunity to confront their accusers.

There is nothing that requires you to attend and participate in the hearing on July 10th, though.  I write to ask you to come on the 10th so that the panel of doctors, counsel for Temple, and I can see and hear from you to make a first hand assessment of what you have to say potentially detrimental to Dr. Weinik's career, and his professional and personal reputation.  I suggest that the stakes are too high for Dr. Weinik's future to be determined by hearsay testimony.

While I have no reason to feel adverse to you and most assuredly hold no preconceived opinions, I remind you that I am Dr. Weinik's lawyer which puts you and me on opposing sides in this litigation.  It is not for me to say whether you, yourself, should be advised by your own counsel.  But as time is short, if you do in fact decide that having your own lawyer is a good idea, I respectfully request you have that lawyer contact me as soon as possible.

It is my intent to have this letter delivered to you in person.  I am going to try to send it by text as well.  If you acknowledge receiving it by text, then I will cancel having it delivered in person.  The last thing I want to do is cause you the aggravation of receiving an unscheduled visit from a stranger simply to drop off a letter. So if you receive this via text, kindly text me back that you did.  Thank you.

Very Truly Yours,

Bruce L. Castor, Jr.

cc:  Michael Weinik, DO

From: Adam Mullan <acmullan@icloud.com>
Subject: Phone Conversation
Date: July 9, 2018 at 8:26:38 AM EDT
To: sportsmeddoctor@gmail.com
Cc: bruce@rogerscastor.com

Good morning Dr. Weinik,

Unfortunately, I will not be able to make the trip up to
Philadelphia tomorrow to testify on your behalf due to
clinic obligations here in Pensacola, FL.  Otherwise, I
would be present to testify.

I recall participating in the annual musculoskeletal
anatomy and physical examination class held at PCOM
at which Dr. Dua was a model for Dr. Weinik to
explain various concepts to the class of residents and to
demonstrate different physical examination maneuvers
from the Malanga textbook.  I recall Dr. Dua acting as a
model and Dr. Weinik using her for demonstration
purposes. This was a class full of residents; the
demonstration was on a raised platform with cameras
and a microphone transmitting images and sound to
television screens and speakers throughout the room to
improve visibility and audibility. I do not recall a time
where Dr. Weinik made any jokes at Dr. Dua's expense.
I do not recall seeing Dr. Weinik do anything
unprofessional toward Dr. Dua, nor hear him say
anything unprofessional.

I have acted as a model for Dr. Weinik on numerous

occasions and I have not seen that Dr. Weinik displays a preference for female models over male models.

Sincerley,


Adam C. Mullan, M.D.
acmullan@icloud.com
302-898-6189



**OSS Health**

June 27, 2018

Michael Weinik, D.O.
34 St. James Court
Philadelphia, PA 19106

RE: Dr. Philip Acevedo

Dear Doctor Weinik:

The following is a response to your correspondence in which you asked whether you had positive or negative influence on Dr. Acevedo's fellowship application when he applied last year.

To respond to your request, I pulled his fellowship application file. The letters of reference in his file were from Dr. Maitin, Dr. Cruz and Dr. Schwartz. As you know, you never provided a recommendation letter for him. Likewise, you and I never even spoke about him during this application process.

We are fortunate that we have very strong fellowship applicants. Although Dr. Acevedo was on our final list of applicants, he was ranked lower in our list than the ones who were offered each of our six available positions and accepted. I was able to access our ranking list and Dr. Acevedo would most likely have been offered a spot had two more people turned down our offers.

As you are aware, there are many factors that are in play when we choose and rank fellows. Although Dr. Acevedo would most likely have been a good fellow here, we accepted those ranked higher than him.

To specifically address your question, you had absolutely no influence on our decision since you did not write us a letter, nor did we even discuss his application.

I hope this addresses your concerns. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Michael B. Furman, M.D.

MBF/bls

EXHIBIT
PENGAD 800-831-6989
Y
7-10-18

### Final Written Argument of Dr. Michael Weinik

### Hearing Date: July 10, 2018

### Submitted Post Hearing: August 6, 2018

I appreciate being given the opportunity to read the transcript of the evidence presented at my hearing on July 10, 2018.[1] One thing I found of interest was that the panel had witnesses sworn in before giving testimony. That evidently was so witnesses would understand the importance of telling the truth and that if those witnesses lied, they could be prosecuted for perjury, which I gather is a pretty serious crime.

The more I thought about the significance of the oath for the witnesses, the odder it became to me. You see, accusers: Drs. Dua, Brown, Acevedo, and the rest were NOT ever sworn to tell the truth. Only Temple investigators relating what these witnesses against me supposedly said were sworn. But the information these investigators related at the hearing, which I am sure they did

---

[1]     My lawyers submitted a list of procedural objections in writing that were made part of the record. As it was evident to me that the panel was not interested in hearing of such "technical" objections (e.g. Temple offering to provide me, *after* the hearing for which I had prepared, with the policies and by-laws in effect at the time of my supposed transgressions. Thus, I could not use the correct "law" to prepare my defense). (e.g. p.51 line 14 where Dr. Daly says my counsel can compare the relevant documents *after* the hearing. To my knowledge, this did not happen, and that Temple should have done this *before* the hearing and before providing me the regulations they said were at issue.) I reference those objections here only because my lawyers insist I need to do something they call "preserve" the objections for use later in court. Supposedly, I might be deemed to have "waived" those objections if I do not give the panel an opportunity to first consider and deny them.

as accurately as they knew how to do, that information, itself, was not given to Temple's investigators under oath. Ever. Or recorded electronically that I know of, presented before a notary, or even signed with a signature! Their credibility was never tested by cross examination. Ever. And yet, *all my* witnesses testifying did so under oath, and under penalty of perjury, to events they actually saw with their own eyes, and heard with their own ears. In short, MY witnesses not only travelled, many from great distances, at their own expense to wait around for hours, and endure the hassle of having to testify against their *alma mater*, Temple University, they did so knowing if they lied, they could go to jail. In fact, I had nine other witnesses "on call" to further buttress the lies of Dua, Acevedo, Brown and the rest which the panel stated was not necessary, as the panel had heard enough. Does that mean the panel had heard enough that it *believed* my witnesses that Temple[2] presented non-credible sources in its effort to convict me and ruin my life?

You see, not one of my accusers testified, nor even submitted an affidavit or a signed statement at all! NONE of THEM face going to jail for lying under oath. But all my witnesses did, plus the many more who were willing to go under oath. 30 years of service to Temple, and Temple investigators want to end my career entirely on hearsay testimony. And unreliable hearsay at that!

---

[2]    Except where it is evident that I am referring to the entirety of the University, when I refer to "Temple" here, I am referring to that arm of the Temple University Administration charged with investigating allegations of misconduct against me. Naturally, I recognize that the panelists are part of "Temple," as I hope I still am, and will so remain.

Important thing.  Despite what Temple investigators would have you believe, even under the peculiar rules of the hearing conducted on July 10th, "hearsay" generally is NOT to be considered by the panel.  Here is what is says in Temple's By-Laws about the use of hearsay testimony: "...hearsay will be admitted *if* it is the *sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs...*" (By-Laws 8.4.6, p.76) (*Emphasis added*).  The so-referred to "responsible persons" are the members of this hearing panel.  The question for the panel members becomes: "am I 'accustomed to rely' on the hearsay evidence Temple presented in the "conduct of serious" matters in my own life?"  I cannot believe that any of the doctors on the panel would rely on this hearsay evidence to make *any* important decision in his or her private or professional lives.

In short, you must be so convinced the evidence Temple presented was true. that you would rely on such evidence if you were making a decision of personal importance to you, yourselves.  As we are all doctors with a desire and responsibility to heal people of illness or injury, let's put this question into that context.  How do we decide how to treat a person suffering from illness or injury?

Ideally, we treat patients by meeting them face to face and listening to their symptoms.  We conduct in-person examinations using our skills and knowledge from our education and years of experience.  Further, when we are not certain of the extent of the illness or injury, we will order tests to rule in or rule out the cause and severity of the problem and to corroborate (or disprove)

our initial diagnosis.  Then we discuss the medical issue, perhaps first with colleagues, and then later with the patient.  We provide the patient with proposed treatment options, and then the patient consents to a course of treatment.  This is under ideal circumstances where we have access to the patient, records, and to all the tools of our profession to assist us in deciding how to go about helping the patient.

But what do we do when the patient cannot speak and is not even in our presence?  Perhaps the patient is unconscious or semi-conscious on the side of the roadway being attended by trained paramedics in contact with us by telephone, and the paramedic is relating to us the patient's vital signs, observations of the patient's pupil dilation, observations of the patient's ability to breathe or signs of broken bones or internal injury.  What do we do then?  We rely on the information transmitted by the paramedic and we tell the paramedic how to treat that patient right then and there to save the patient's life and stabilize the patient for transport to the hospital. Has what the EMT told us hearsay?  Sure.  It is information gained outside our presence from the patient, the diagnostic readings outside our presence, anything the paramedic learned from other people on the scene, etc.  But we go ahead and we tell the paramedic how to treat the patient anyway.  Why?  Because we trust that the information the paramedic is relaying is, itself, reliable. The key, though, is that this is precisely the type of hearsay that we doctors have become accustomed to relying upon in making professional decisions.  How can we be sure?  We can't.  But what we can say is when the stakes are so high that it is

a "serious" matter, this is the "kind" of hearsay we find reliable.  And it is ***only*** that kind of hearsay that is admissible in Temple's case against me according to Temple's by-laws.

Let's take the same example of an injured person on the side of the road and you are an attending emergency doctor on the telephone trying to figure out how to treat this person before getting them to the hospital.  However, instead of an EMT from an emergency company speaking to you from on scene, it is the patient's spouse who was a passenger in the car when it wrecked injuring the patient.  The passenger says her husband is awake and alert with just a small bump on his head.  The car is still drivable and the wife says, while they are both scared out of their wits, she holds a master's degree in emergency room nursing specializing in head trauma cases, they live close by and are going home.  She says they a shaken up, but "fine now," and she "knows" these things and "knows" her husband.  Every fiber of your medically trained being is screaming: "no!"  There are all sorts of injuries that might not immediately manifest themselves.  But, you hesitate on account of what the wife said about her medical experience and knowledge of how her husband ordinarily behaves.  You have no reason to disbelieve another medical professional.  You are *inclined* to agree that the wife is in a good position to know, but you order the wife to take her injured husband to the nearest hospital.  No response.  This bothers you.  Nothing you can do, though.  You don't know where the call came from.

Late the next day, a man presents at the ER with a sobbing wife.  The man is unresponsive, seemingly dead from severe brain swelling and the wife, who turns out really is an advanced ER nurse, appears inconsolable.  It is the couple from the call the night before.  The man has been dead for many hours.

Like the EMT in our first example, the wife in this example had given you her observations, qualifications, and she sounded self-assured.  You were tempted to agree because she was a professional. In fact, you ultimately disregarded that hearsay, though you *initially wanted* to believe it.  Why did you disregard it?  Because you are a "responsible" person and you are NOT "accustomed" to relying on that kind of hearsay information in "serious" matters regarding your professional judgement.  Even when it *appeared* that the hearsay from the wife was reliable. You believed her, but that was not good enough when lives are at stake. You're sad the man died, but it is not weighing on your conscious, right?  You tried to do what was right.  What more could you have done?  The wife/nurse was *absolutely determined* to get her way.

Later, a police detective you have known for years because you work in a trauma unit, and an assistant district attorney who works homicide cases for whom you have testified, both serious with grim faces, politely ask to meet with you.  This is business.  Turns out the husband died from a brain hemorrhage, this much you knew.  By the terms of his living will, his wife asked that no extraordinary measures be performed after other doctors told he there was no hope of resuscitating him.  He was cremated at his wife's insistence under her power of attorney.  You're confused.  Why are a seasoned detective and a

homicide ADA talking to you?  It turns out that, yes, the wife is a nurse.  In fact, she does have an MS in nursing and cares for brain injured patients at Temple University Hospital. But, the couple were heading for a divorce and a bitter fight over dividing their assets and custody of their young children.  And the now-deceased husband/father had $5 million in life insurance with his wife as his sole beneficiary.  The DA's Office calls that "motive" for murder.  And it was the wife/beneficiary that invoked the provisions of the living will.  And it was the wife/beneficiary that ordered the body cremated before the ADA could ask a forensic autopsy.  And the wife has training and experience in head injuries and the after-effects of head trauma that do not immediately show...like swelling of the brain.  The ADA thinks the wife allowed her husband to die to avoid a messy divorce/custody dispute, and to collect his life insurance.  That's not all the detective and prosecutor tell you.  The police were alerted by the wife's *boyfriend* who suspects the wife did all of this to help him out of a jam where he was about to lose his job because the husband found out about the affair.  In fact, the boyfriend had just that very day said to the wife her husband was going to see he was fired and that made her very distraught as she and her boyfriend were very close.

Though you wanted to, you did not rely on what the wife told you on the telephone the previous night because you are not "accustomed" to relying on such hearsay in "serious" matters.  Your instincts were good, but there is no way you could have known that the wife had a "motive" to want her husband dead.  In the example with the EMT, he could also have been lying to you, but

based on your long experience, and the "serious" nature of the decision you had to make, it was a reasonable chance to take and one you had taken many times before.  In the example with the wife, a fellow professional with training and experience, but with whom you had no history, you were not "accustomed" to relying on what she told you in the course of making a decision of a "serious" nature.  And it turns out you were right in more ways than you could possibly have known.  In the situation with the wife, while everything *on the surface* pointed to the likelihood that her hearsay was reliable, unconfirmed hearsay from not-known-to-be-reliable sources was information you and other medical professionals do not routinely rely upon.  Digging below the surface, you now know you made the right call.  But you only learned that additional information *after* trained legal investigators uncovered it for you.  Much like learning information on motives to lie I presented at the hearing on July 10th .

By now, my serious objections to how I have been treated in this process are obvious.  Temple could easily have brought before you the people who actually complained about me including Dua, Brown, and Acevedo.  They could have brought in disinterested people to augment what these people supposedly claim.  They could have looked for eyewitnesses from these various events, which, incidentally in Dua's case, I had no difficulty finding in a matter of *days.*  They could have brought the patient who Acevedo said complained about me in the draping incident.  For that matter, I could have found that patient myself had Temple not locked me out of my computer, and you might have heard what the patient or the patient's friend in attendance  actually

thought.  The list of things Temple did NOT do is extensive.  Though they ask you to trust their sources sight unseen.  Statements unverified, and in the case of Dr. Dua, no evidence at all adopting facts from an email authored (by somebody) 4 to 6 YEARS after the fact, in the face of significant evidence that she actively refuses to cooperate on the telephone or in person giving a statement, even affirming she sent an email, while acknowledging she received a written invitation to appear at the request of my lawyer, and flat-out *intentionally* refusing to come.  If this case ever reaches a courtroom, Dr. Dua, Dr. Brown, Dr. Acevedo, et al. will not be able to simply refuse to be deposed and cross-examined at trial.  Why not?  Because in-person questioning under oath is where truth is determined.  But in THIS process, none of my accusers came in person, none were under oath, none cross-examined in front of you so you could judge for yourselves their truthfulness.

The fear of hearsay and false testimony damaging people is as old as civilization itself.  It is so important to orderly society that it is enshrined in the Ten Commandments!  How do you test "bearing false witness?"  *By hearing from the witness!*  Watching and listening to them answer questions, and maybe asking questions yourselves.  Could you ask questions of my accusers on July 10th?  No.  You were left with Temple's investigators' interpretations of what they "thought" such accusers "felt." (e.g. p. 57 lines 4-10, where Dr. Cowell told you what Dr. Cruz "felt" with no basis for how Dr. Cowell could possibly know how someone "feels" without that person telling him so.) Or just plain speculation: "I *think*, he felt extremely…uncomfortable ..." (Dr. Tedaldi

p.85 Line 21-23). Are you "accustomed" to using such knowledge gathering methods in "serious" matters in your own lives? Does *your* bank grant you a loan based on what *you* tell the bank the appraiser told *you* was the value of your home? Or does the bank expect to hear from the appraiser directly? I can understand Temple not wanting me or my lawyers to cross question my accusers. After all, I think they are liars who have conspired to ruin me because they nursed grudges. I wanted to fire Dua's special friend, Dr. Maitin, an effort that conveniently is happening just as Dua's email about alleged misconduct from 4 to 6 years before gets to Temple! How fortuitous for Dr. Maitin who would have been the one out instead of me. Is he just a lucky guy? (At least the "boyfriend" in our example above is the one who called police on the "wife." Here we have nothing from Maitin to exonerate him from involvement). Temple also took away from YOU the opportunity to question my accusers. I testified under oath and answered your questions, as did my witnesses testifying to their firsthand knowledge. No accuser of mine did so: persons from whom you could have learned specifics without Temple's investigators having to guess, or speculate, as to their meaning while ignoring their motivations.

There is little sense in me going over Temple's witnesses presented against me since neither of them testified to anything they did not hear for someone else, and in many cases to what they heard from someone else who

told someone else, etc.  Instead, I will focus on my defense with some detailed attention paid to Drs. Dua, Acevedo, and Brown.[3]

I will note at the outset that nearly all, if not all, of the evidence I presented was *unrebutted*.  Temple presented no evidence bearing on the credibility of their own hearsay witnesses, those hearsay witnesses' motives to want to ruin my career, nor evidence that Temple made any effort whatsoever to uncover the very same witnesses I did that contradicted Temple's case.  On numerous occasions, Temple's investigators told the panel of the extraordinary lengths they went to in order to be thorough and develop corroborating evidence.  (e.g. p.84 line 18-22 by Dr. Tetaldi "--if there was a witnessed event, then we may bring in some of the other people who were there just to either corroborate or refute what was there.").  As we will see, their actions bore little resemblance to what they said they did, with zero effort to obtain independent evidence, or find disinterested eyewitnesses, and extensive effort to make doing so difficult for me.

Including myself, I presented 10 witnesses.  One witness for my character only, one witness by written testimony (Dr. Mullan) who could not leave his clinical responsibilities in Pensacola Florida, and 8 fact witnesses.  As

---

[3]     That I focus here on Dua, Brown, Acevedo and Maitin acting through Dua, is not to suggest that I agree with the lesser hearsay accusations that were never corroborated.  Passing references to somebody says so and so agrees.  Temple did not present even hearsay to corroborate the hearsay when I had the identity of people to check with.  Whatever anyone said was taken by Temple at face-value with precisely zero effort to ascertain if what was said was true, or motivated by malice, bias, or error.

the record shows my lawyers had another 9 fact witnesses "on call," but the panel indicated that since these witnesses would further discredit the thoroughness of Temple's investigation regarding the same people: Dua, Acevedo, Maitin, and Brown, their testimony was not needed and the panel asked Mr. Castor to request Mr. Rogers (his partner) to tell those witnesses they would not be needed.[4] (See P.176, Lines 1-11)

I had dozens of witnesses willing to testify as to my good character and reputation, which the panel recognized at pages 115-116 by agreeing that my reputation was exemplary: "By Dr. Queenan (without objection from the panel or Temple): "...we'll just accept that as truth..."  My lawyer said one would suffice after that comment from Dr. Queenan.  I understand the purpose of so-called character and reputation evidence is that courts and other judicial or quasi-judicial tribunals recognize that persons of good character and high reputation may be *presumed* to act in accordance with that good character and reputation, and that character evidence *alone* may be sufficient to find in favor of an accused by the simple fact that people are presumed not to act in

_____

[4]    Not being a lawyer myself, I do not understand how every witness that discredited Dua, Maitin, Acevedo, Brown, and the rest, would not be helpful to the panel's determination.  Temple relied upon "multiple instances of complaint" as somehow corroborating the truth of one another.  So, I thought the more instances showing Maitin's animosity toward me, Dua, Acevedo, and Brown's poor character as to truthfulness, honesty, ability, and integrity, from people of different years and with different levels of interaction with me would be more persuasive to the panel that these hearsay witnesses were untrustworthy. Unless, of course, the panel had already decided that information supposedly from Dua, Acevedo and Brown is not to be believed, in which case I understand the panel's decision not to hear more evidence disproving Temple's evidence.

opposite to his or her known good character and reputation.  Something my lawyers referred to as "black letter law."  In the midst of this very stressful and contested adversarial process, I very much appreciate the panel's swift finding that my nearly 30 years' of unblemished record and standing in the medical community has granted me the presumption that goes with an exemplary character and reputation after hearing from only one witness.  Thank you.

The one character witness I called, before the panel found further character testimony was unnecessary, was Dr. Gilbert D'Alonzo (p.109 et seq), a high-level faculty member of sterling credentials, and a former president of the very body that was responsible for disciplining doctors for alleged bad behavior.  In addition to testifying to my reputation and character, Dr. D'Alonzo testified I treated "two" of his wives, as well as his daughter with excellent results and nothing whatever to complain about. (p. 112).  Dr. D'Alonzo further testified that in the 2 or 3 cases serious cases of the 4 to 6 cases where he was involved (like this panel currently is) with disciplining doctors, there was never a time when the alleged conduct rose to the level of dismissal as Temple is pushing for against me.  No doubt, Dr. Cowell for Temple would counter that we don't know the regulations, procedures, guidelines, and by-laws from 8 years ago (2010) as applied by Dr. D'Alonzo and his colleagues are the same ones being applied now.  And Dr. Cowell would be right about that.  But just as Dr. Cowell essentially guessed (e.g. p.50 lines 10-20) the written materials were substantially the same 4 to 6 years ago which would have to be applied to the Dua incident, were similar the ones provided me in effect now, despite the

multiple amended dates noting changes, I suggest Dr. D'Alonzo's testimony shows how unusual it is for this complaint against me to have reached the level where dismissal is recommended.  I suggest it is fair to conclude from what Dr. Cowell says on page 50, he really doesn't know what was amended and what was not.  Whether it was substantial or not.  This is not to suggest that Dr. Cowell *should* know these revisions over the many dates they were revised. Certainly not.  I point this out to show that Temple's "prosecutor" in this case did not apply the correct "law" in effect at the time, not for a nefarious reason, but because in this proceeding that could result in the death of my career, the very procedures and standards of conduct to employ were not known even by Temple's lead prosecutor who was content to assume everything from 4 to 6 years ago must have been the same as it is today, because nothing in the realm of workplace interaction between men and women has changed in that time, as is well known...

After noting that in his tenure as the person helping decide on discipline for doctors (whether the standards from 8 years ago were the same then as now), Dr. D'Alonzo finished with this: "I think Dr.Weinik has immense value at our institution at the Temple Hospital as well as our medical school.  He is the go-to person to send patients to that have musculoskeletal complaints.  He does incredible examinations, comes up with the results that are necessary and the treatment plans that are necessary.  And I have known no one in the PM&R Department that meets his level of care and I have referred a lot of people to different doctors in that department.  That's not to say that those

14

doctors are bad or don't practice at a good level.  Dr. Weinik practices at a much higher level.  He's an incredibly valuable individual at our hospital." (p.113-114)

***

Dr. Cowell: "No questions." (p.114)

Dr. D'Alonzo's assessment of my character, reputation, integrity, and ability was not questioned by Temple or by the panel. (p.114)   Yet, Temple asks on the strength of the supposed evidence of Drs. Dua, Acevedo, and Brown to weigh Dr. D'Alonzo's unrebutted testimony concerning me, and my value to the Hospital and medical community, against information attributed to these three, ignore Dr. D'Alonzo's assessment, and throw me out of the University.

So why should you disbelieve the purported accounts of Dua, Brown, and Acevedo, and those working with them?  Let's take surely the most serious of the allegations, the one attributed to Dr. Dua.  Those allegations are contained in an email which Temple introduced into evidence.  Dr. Cowell says in reference to the Dua email used at the hearing: "--this is the complete submission that she provided us" (p.71 Line 11-12).  But this statement was untrue.  The email provided to Temple 6 months before the hearing had Dua's name on it.  But Temple chose to remove the name and not provide it to me until a few days prior to the hearing.  Dr. Cowell's excuse was that I did not ask for the name, and that he would have given it *if* I had asked. (p.71 line 15-20).

15

Except there is no provision in the by-laws or regulations provided to me from Temple as applying to this hearing for "discovery" of a redacted name, so how was I supposed to *know* to ask?  Really?  Why would Temple choose not to provide me with the name?  So I could not investigate it, especially when I later learned that it purported to describe an event from 4 to 6 years ago!  Dr. Cowell later testified/argued that he did *not* first give me something handwritten about the email, I said that he did. A point we may never get to the bottom of.  But of greater significance was that the email with a printed date of January 16, 2018 given to me as I prepared my defense *had the name of the sender missing.*  I was not told of the identity of Dr. Dua until mere *days* before the hearing.  The email is unsigned.  Temple produced no evidence that Dr. Dua wrote it.  Temple produced no evidence that Dr. Dua adopted the contents of the email or was even shown it.  Temple produced no evidence that Dr. Dua ever saw the email after it come into Temple's possession.  Temple admits that Dr. Dua refused to be interviewed over the telephone.  Temple admits that it knew where Dr. Dua worked and that no one from Temple went to interview her.  In short, Temple produced no evidence of *any kind* that Dr. Dua was the author of that email.

What did Temple produce on the authenticity of the Dua email?  Here is the entirety of how Temple "knows" the Dua email is authentic:  At page 70 and 71, Dr.Cowell *said,* that Mr. Wright *said,* an *unnamed* person on the telephone who *might* be a lawyer, but not *acting* as a lawyer, *said,* that Dr. Dua *said...*that Dua was afraid of retaliation from Dr. Weinik.  I don't know what

the added effect of an "unnamed person on the telephone" has to the unreliability of this testimony, nor whether this unnamed person actually talked to Dua as opposed to it being her "feeling" that is what Dua thinks, but even without all that, this is, at least, *triple hearsay*. Is that the kind of evidence a reasonable person is accustomed to rely upon in making a serious decision under the by-laws?!? Seriously?

And yet, when I found out the identity of Dr. Dua as the person Temple claims wrote the email, I located her, had her served with a letter asking her to come and testify on July 10th, and obtained her affirmative statement that she received that letter inviting her to testify. Then, she did not appear. Let's be clear: this email accuses me of committing a *crime*! Moreover, it states *where* the crime took place, but *only* upon the addition of Dr. Dua's identity which was originally kept from me, does the email enable me to narrow down the date I committed this *crime* to sometime between 2012 and 2014, or *4 to 6 years ago*. So, I was accused of a *crime* by an *unnamed* person, and *without* even a date that crime *supposedly* took place!

Though Temple had 6 months, since January, to locate evidence backing up this claim I committed a sexual assault contained in the email, it failed to verify the accusation in any way. In the few days I had after Temple gave me Dua's name, I was able to deduce that the lecture in question must have occurred in 2012, 2013, or 2014 at PCOM at a seminar given only once a year in January. While I did not have time to learn if any video or audio recordings exist of those lectures, I did confirm the possibility that they might. I know

17

there was audio and video as well as a microphone to amplify my voice. Temple did nothing to check with PCOM concerning the possibility of recordings.  Temple did not search for eyewitnesses to the supposed crime.  In fact, the email makes reference to other persons who might have been able to corroborate at least some of the email.  There is a reference in the email bottom paragraph of the first page to a patient with information.  I asked Dr. Cowell if Temple made any effort to identify that patient.  Answer: "no, I did not." (p.75 line 20).  Top of page two of the email makes reference to "a male resident."  I asked Dr. Cowell if he made any effort to identify that male resident? "No, I did not." (p.76 line 4)  Same page in the email makes reference to "my sister" and "another resident."  I asked Dr. Cowell the same question: did you try to identify these people. "No, I did not." (p. 76 line 10).  The patient, the two residents, the sister -- all could have been interviewed to back up what is in the "Dua" email, but they were not sought out.  Dr. Queenan quite naturally inquired about efforts Temple made to identify persons connected to this alleged incident, but Dr. Cowell says it was so long ago: "It would have probably been difficult, if not impossible, to track down particularly the fact that Dr. Dua did not submit personal testimony to be able to investigate who she was referring to." (p. 77 lines 5-11). This response to Dr. Queenan's question is especially troublesome.  Dr. Queenan immediately understood the relevance that Temple did not interview the two residents, the patient, and the sister and how doing so would have helped verify or not verify the accuracy of the "Dua" email.  Dr. Cowell, candid as ever, said it happened a long time ago,

and that Dua did not cooperate.  But of greater significance, Dr. Cowell uses the words "would have been" indicating that Temple *didn't even try*.  No effort at all, despite that my professional life is on the line here. Well, I was able to track down people who were there to refute the "Dua" email.  What I find really beyond belief is despite Dr. Tadaldi's assertions to the contrary that Temple tries to substantiate allegations, it did not do so here (despite having six months head-start on me to do so) when the allegation against me is a crime, and the purported victim of that crime absolutely refused to talk to Temple or give evidence to this panel.  So, no matter how long it takes for me to clear my name on this, there will *always* be a file in Temple's possession that says I physically molested a resident despite no evidence that I did so, no effort by Temple to track down identifiable witnesses, and a legion of witnesses for me saying it never happened that I had to produce to prove my innocence when I should have been *presumed* innocent to begin with, as Temple University is still part of the United States.

I don't know how often Dr. Queenan has had to sit on these panels, but he (and the other panelists by design) knew nothing at all about my case before July 10th according to preliminary comments at the hearing.  And yet, Dr. Queenan asked what should have been obvious to all those working to damn me: "Did we contact anybody that might corroborate...?"  Not only does Dr. Cowell say "no," he says that Temple *didn't even try*.  Later, at page 105, Dr. Queenan, still clearly bothered there was no effort at corroboration on the part of Temple's investigators, addressed Temple's *other* investigator-witness who,

like Dr. Cowell, was also testifying only to what other people told her.  Dr.

Queenan asks Dr. Tedaldi at page 105 about going back and asking other

potential witnesses.  He receives a similar answer from Dr. Tadaldi as he

received from Dr. Cowell: Temple did not try to corroborate the "Dua" email:

"…no, we didn't go beyond that. [Referring to beyond simply *reading* the Dua

email]. (p.106 line 23)

   That left me to look for eye witnesses.  I found them without much

difficulty.  You heard from a number of them.  Here is some of what they said,

and the citation to the record where they said it, about this so-called Dua event

first reported to Temple in January 2018, but allegedly occurring 4 to 6 years

ago:

*****

Testimony by Dr. Conner:

Q:   Were you at the lecture?

A:   I was (p.129 lines 12-13)

Q:   Do you recall Dr. Dua acting as a demonstration model?

A:   I do. (p.130 lines 8-9)

Q:   Do you recall anything out of the ordinary about that event where Dr.

Dua acted as a model with me?

A:   I do not.

Q:   Do you recall me making any comments or jokes at Dr. Dua's expense

making the class laugh?

A:   I do not.

Q:     Do you recall me touching her in a way you saw to be inappropriate?

A:     No.

Q:     Do you think you would have noticed if I humiliated one of your program mates at this lecture?

A:     Yes

Q:     Are you confident that I did not do that:

A:     I am confident. (p. 130-132, lines 8-24,1-12)

Q:     Did Temple investigators ever...contact you to discuss my case and what you might know about it?

A: No. (p.133, lines 7-10)

Q:     (by Dr. Daly) Were any of the models that Dr. Weinik examined, were any male or were they all female?

A:     Male as well.

*****

Testimony by Dr. Arora

Q:     Do you recall Dr. Dua acting as a demonstration model?

A:     I do. (p. 163, Line 18-20)

Q:     Do you recall anything out of the ordinary about the event where Dr. Dua acted as a model with me?

A:     I do not.

Q:     Do you recall me making comments or jokes that at Dr. Dua's expense and making the class laugh?

A:     I do not.

21

Q:      Do you recall me touching her in a way you saw to be inappropriate?

A:      I do not. (p.164, Lines 5-15)

Q:      Do you think you would have noticed if I humiliated one of your program mates at this lecture?

A:      Yes

Q:      Are you confident that I did not? (p.164, Lines 20-24)

A:      Yes (p.165 line 1)

Q:      Did Temple investigators ever...contact you to discuss my case and what you might know about it?

A:      No. (p.166 lines 7-10)


*****

Testimony of Dr. Averna

Q:      Are you aware of...[an] allegation [where] I acted inappropriately with Dr. Dua while she acted as a model?

A:      Yes, I know the allegation.

Q:      Were you at that lecture?

A:      I was. (p. 198 lines 12-19, as amended for brevity)

Q:      Can you describe the lecture...?

A:      ...He's [Dr. Weinik] on stage, *an elevated stage and there's a camera that you can see straight down on the patient as well as you can see Dr. Weinik. There's multiple views.*  And during those examinations he would call up both male and females for examinations of the shoulder, knee, hip, whatever kind of

musculoskeletal examination... (p. 198-199 various lines as amended for brevity) (*Emphasis added*)

Q:     Do you recall Dr. Dua acting as a demonstration model? (p.199, lin2 23-24)

A:     Yes I do. (p.200, line 1)

Q:     Do you recall anything out of the ordinary about the event where Dr. Dua acted as a model with me?)

A:     I do not, no.

Q:     Do you recall making comments or jokes at Dr. Dua's expense making the class laugh?

A:     No, I do not.

Q:     Do you recall me touching her in any way you thought to be inappropriate?

A:     No, *for sure*. (*emphasis added*) (p. 200-201, lines 19-24;1-4)

Q:     Do you think you would have noticed had I humiliated one of your fellow residents...at this lecture?

A:     Of course. [The witness goes on to explain at length why it would have been "grossly obvious if anything inappropriate or out of character..." occurred by virtue of the way the room was set up, the cameras, and the lack of reaction by Dr. Dua.] (p. 201, lines 9-21)

Q:     Are you confident that I did not [say/do anything inappropriate]?

A:     Yeah. [The witness goes on to explain why this would not be possible for me to be inappropriate in that particular venue.] (p. 201 lines 4-10)

Q:      Did Temple investigators ever … contact you to discuss my case and what you might know about it?

A:      No. (p.203, lines 15-18)

Q:      (by Dr. Daly) Where [did you come from today to testify]?

A:      Albuquerque.

Q:      (by Dr. Daly) That's a long way.

A:      Yeah…I cancelled my clinic and got here at 3:00 a.m. this morning.

Q       (by Dr. Daly) That's a long way and a long flight.  *Did you pay for that yourself to fly in and do all this? (emphasis added)*

A:      Yes. I canceled my clinic. I'm a board certified physical medicine rehab doc and interventionalist. I cleared my schedule without objection to be here to defend a man that has worked hard for 30 years and had some odd allegations in recent classes… (p.207 lines 6-22)

Q:      (by Dr. Daly) [Dr. Averna was among the last witnesses who had waited for hours with the others to testify] *Did you get a chance to talk with any folks in the [waiting] room about any of this? (Emphasis added)*

A:      *No.* They just said it was a grilling is all they said.  *No specifics… This isn't a normal thing.* (p. 208, lines 12-22, edited for brevity) *(Emphasis added)*


*****

(Memo of Dr. Mullan introduced)


        I summarized Dr. Mullan's memo at page 219 as follows:

"Dr. Mullan was at the physical examination [involving Dr. Dua] and he also testifies that he was a model and he also testifies that he did not see that I, Dr. Weinik, displayed any preference for female over male models."[5]

**[See memo of Dr. Mullan noting that he witnessed the event where Dr. Dua acted as a model for me and neither saw nor heard me be anything other than professional when Dr. Dua acted as his model.] Transcript, Exhibit 4.**

I presented 4 eyewitnesses, with others in reserve that Mr. Rogers excused, to state that the Dr. Dua's email version of events, or purporting to have from come from Dr. Dua since no evidence of who authored the email was ever presented by Temple, concerning the lecture at PCOM is *completely false*. Until a few days prior to the hearing, I did not even know what event the email referred to.  Once I learned, I was able to reconstruct what happened.  I can produce more witnesses as well.  I suggest there cannot be any other conclusion that the uncorroborated hearsay evidence attributed to, but never adopted by, Dr. Dua is utterly and totally false and could never rise to the level

---

[5]    The hearsay offered by Temple about me spending more time than was necessary with young female patients, or acting unprofessionally with them, was rebutted by virtually every witness who testified.  Dr. Acevedo was the primary proponent of this particularly suggestively, malicious falsehood.  I assert I have conclusively proven false that allegation and I ask the panel to consider that if Acevedo lied (or is mistaken) about that point so easily disproven, what else is he lying (or mistaken) about?

of evidence that a "responsible person" would be "accustomed to rely" upon in making a "serious" decision such as to remove me from my post. In fact, it is incredible to me that anyone at all, responsible or irresponsible, would rely on the so-called Dua email as truthful on anything given it has no corroborating evidence and is directly refuted by eyewitness testimony under oath.

You heard testimony about an unusually close relationship existing between Dr. Dua and Dr. Maitin. It was of course difficult not to make it sound as though the two were having a sexual liaison, and while that could at some point be a question to explore, that possibility is not what was significant about the testimony. The significance was twofold: first, Dua and Maitin were close friends, and Maitin blamed me for his being demoted and me taking his place as interim chair in his place. He was considered as a weak and poor leader as was testified to repeatedly by the residents. As humilisting as it undoubtedly was to him, when I failed to motivate Dr. Maitin to do his job as program director, I concluded he had to go for the good of the program. Dr. Maitin *knew* this and confided it in his close friend Dr. Dua.   After Temple decided to take no action on Cora Brown's allegations because Dr. Brown refused to make a formal complaint (p.28 line 14-18) and put that matter to bed, as the fall of 2017 turned into winter 2018, it became the perfect time for Dua to concoct a story from years ago accusing me of molesting her. Dua's complaint had the effect of resurrecting the already ended Brown complaint as Brown suddenly decided to make her complaint "formal." Safety in numbers right? Brown and Dua, both young women knowing Temple University, perhaps even more than

26

most institutions, is sensitive to sexual assault allegations, came together, or independently managed to get both their matters in front of Temple administrators at precisely the time when I was making a move to remove Maitin as program chair. The perfect play. Of course, as my accusers undoubtledly knew would happen, I am immediately *presumed* guilty, as the new culture of America demands with such allegations, and I get subjected to these proceedings with all the anxiety and expense that entails. The immediate benefit for my accusers is Dua's friend Maitin not only gets to stay as program director, if I get drummed out of Temple as you are being asked to do, my chairmanship opens up and maybe Maitin can get it back? Of course, Dua and Brown didn't count on me fighting back. They are not old enough or experienced enough to know what all of us know: a lifetime of building a good reputation is something worth defending. I daresay that any of the professionals in this proceeding from the panel, to the Temple investigators, to the lawyers, if falsely accused of these vile acts, would fight tooth and nail to salvage their reputations even if it meant exposing Dua, Brown, Acevedo and Maitin in less-than-flattering light. I never want the hospital viewed in a negative way, but these people have set in motion event that require me to expose them for what they are.

Please recall when judging whether to accept the hearsay testimony of Drs. Brown and Acevedo (Dua is in a class by herself, having falsely accused me of a crime which I am told is something called libel *per se*), the panel should only accept that hearsay if it is "the sort of evidence on which responsible

persons are accustomed to rely in the conduct of serious affairs." (By-Laws 8.4.6)  Think about the examples of the EMT and the nurse/wife with a motive to want her husband dead.  You relied on the EMT, but you would not rely on the nurse/wife with motive.  Same victim, same injuries, same level of hearsay. One reliable one not, though what *seemed* reliable at the start, motive and character were the key to proving conclusively that the wife's hearsay was unreliable.  Not only would her custody and financial worries have gone away, she would have saved her boyfriend's job which her husband had threatened. In the proceeding before you, one type (the reliable type) you are to credit, the other repudiate.  Now, I'll apply that analysis to Drs. Brown and Acevedo.

First Dr. Brown.  She writes a letter that is unsigned and undated accusing me of all sorts of nasty things.  Temple attests that Dr. Brown orally adopted the letter as her own.  But why is it Temple never has her sign it, or ever formally adopt it in writing?  Not only is Brown never under oath, nor recorded electronically anyplace with her accusations, she never even signs her name to her letter. Or dates it, for that matter.  Much discussion occurred at the July 10th hearing which centered seemingly on my effort to cast doubt on whether Brown actually wrote the letter.  But in the room on that long Tuesday evening, only my lawyers and me knew the testimony that was to come later on about Cora Brown the legendary liar, unrepentant thief, and vindictive manipulator.  The failure of Temple to get Brown to sign and date her letter, or have her testify was not to say Brown didn't author the letter, it was to show Temple was unaware of the type of person Brown was and made no effort to

find out.  Had Temple done so, it would have been sure to dot every "i" with her, and cross every "t," since vindictive liars don't announce themselves as such, they must be found out through investigation.  Recall the discussion about what Dr. Cruz had to say.  Whether it corroborated Dr. Brown or not. Dr. Cowell said they did interview Dr. Cruz and that he didn't help one side or the other.  One of the panelists even noted when he, the panelist, and a colleague are stopped in the hallway, he doesn't listen while his colleague converses with whomever stopped them if it does not concern him.  The point Temple wants to draw attention away from, however, is this: either Dr. Cruz corroborated what Brown said happened or he did not.  The "why" is unimportant.  The fact is he did not corroborate Brown's story.  Thus, Brown remains uncorroborated is the point. Dr. Cowall begins with the *speculation* of what Dr. Cruz *might* have been "feeling" or "thinking" (p. 57 lines 4-10).  I had no reason to think Dr. Cruz was lying to investigators as apparently Dr. Cowell thought he was, because Dr. Cowell felt it necessary to come up with an excuse for Dr. Cruz's NOT verifying Brown's tale.

There was no evidence presented that Temple did anything at all to learn of the veracity of Cora Brown, the thief who stole from Temple and bragged about it, and whose peers and even supervisors avoided out of fear.  Yes, fear of her well-known vindictive nature the testimony showed.  Who did Temple approach to check out the type of person Cora Brown is?  Certainly not her peers, one of whom testified as follows about Brown.  It is, frankly, frightening that such a person is practicing medicine with a Temple certificate on her wall!

On example from the testimony concerning the type of individual Temple relies upon in Cora Brown, having done nothing at all to learn what type of person Cora Brown is:

(Testimony by Dr. Ilgonikov)

A: Cora Brown was *by far the most untrustworthy and vindictive and poorly ethical* physician that I have met at my time at Temple…I have had multiple conversations with other physicians, attendings, Dr. Maitin in particular, as well as most of my co-residents that would agree that she lacks quality of care and work ethic…*She openly bragged about taking the money*, signing up to go to [a] conference and then not going and keeping the money.  She was *bragging* about that to people in my class. (p.181) (*Emphasis added*).

*****

A:      …Cora Brown, I quickly learned that I would not be friendly or collegial with her.  I tried to stay out of her way as I know most people did because *I know for a fact she's very vindictive*. (p.183, lines 20-24) (*Emphasis added*).

A:      Cora Brown…*I would not trust a word that she says*. (p.184, line 6-7) (*Emphasis added*)

Q:      (by Dr. Queenan) …It was common knowledge [Brown] essentially stole money from Temple?

A:      Amongst the residents. [Yes].

30

At pages188-189, Dr. Ilgonikov, in response to the panel's questions relates specific instances of Brown's efforts to shirk her responsibilities, and even supervisors are afraid of her: "I have had conversations with Amber in the past where she's said…she's afraid that she will, you know, come after your job or something, you know, if something doesn't go her way." (p.189 lines 16-20). Well, "things didn't go her way" when I disciplined Cora Brown about her dress and professionalism, and that she is now going after *my* job just as she has made others fear she would go after theirs'.

Did I get on Dr. Brown about her dress, her professionalism, her deportment?  Absolutely, I did.  But she has paid me back, hasn't she?  Temple swallowed her tale hook, line and sinker.  It frightens me that she might win in the short run: you might believe her.  Dr. Ilgonikov looked you in the eye, answered your questions, stood for cross-examination all under oath.  Is he the liar?  Or was his testimony reliable?  Did his words have the ring of truth about them?  Do you, yourselves, have any colleague from your entire professional lives about whom you would testify in those terms, if it were not the absolute truth?  Did Temple interview Dr. Ilgonikov about Dr. Brown?  No.  Is Dr. Brown's theft going to be investigated?  It should be fairly easy to discern which conference she took money for and did attend.  For that matter, is Dr. Dua going to be investigated for falsely accusing me of a crime, which, itself is a crime?

If you think a doctor who travelled with significant expense and inconvenience, not to mention the hassle of waiting hours to testify, lied to you about how dishonest Dr. Brown is, then I can call more witnesses that the panel asked me to excuse to further make the point. Dr. Brown is a liar, a thief, and manipulatively vindictive. A person to *fear* according to the testimony. Temple did not know this, and did nothing to find out before they offered her hearsay evidence up to you as gospel hoping you will believe her and ruin my career. Small wonder Brown waited for Dua's years-old complaint before she would actually "go formal" with her complaint. She need an accomplice so she, with all her credibility issues, would feel she had back up. She didn't, but she didn't know that.

But I ask you, with the perspective gained about Dr. Brown, the complete lack of corroboration, and nothing in writing certifying her letter as true, coupled with the remarkable coincidence that Brown and Dua's attack come in days apart, just as I am reorganizing the department and giving Maitin the boot, is Brown's hearsay evidence even remotely reliable? Is it still strong like the EMT's hearsay? Or now knowing Brown, is it like the wife with the motive to want her husband dead for money, custody and to keep her boyfriend from being fired on account of her husband? Maybe if Brown faced you and answered your questions under oath like my witnesses and I did, you might credit her. Then again, you might see her for what she is. Nevertheless, Temple did not call her. You did not see her. You have to judge her by the By-Laws' hearsay yardstick. She cannot be believed. In fact, the Board ought to

be told what you learned about before she potentially ruins someone else's life, whether a colleague or patient, creating liability to Temple.

Now we come to Dr. Acevedo.  A man described in testimony is lazy and hard-headed.  Residents tried to help him to no avail, even before medical issues, according to testimony, affected his ability to handle the rigors of the program which he admitted to a resident hoping to help him.  Failed his boards, rubbed attendings and residents alike the wrong way, and of great significance for us, Temple presents to you as a reliable hearsay source.  Temple shows you a fragment of a text which Temple wants you to conclude is a threat by me to Acevedo in connection with Acevedo's unannounced to us interview with Dr. Furman in York.  Did Temple contact Dr. Furman to learn the circumstances under which he and I know each other?  After all, Temple's witnesses pride themselves on their thoroughness, right?  Dr. Tedaldi repeatedly explained that, didn't she?  But, Temple's investigators did not uncover that Acevedo skipped his rounds with me that day without warning.  Temple did not uncover that by concealing his York fellowship interview, Acevedo was unable to avail himself of my friendship with Dr. Furman, in advance, to smooth the way ("not smart" from my text fragment), and Temple failed to uncover that I did nothing at all to interfere with Acevedo getting that particular fellowship (see letter from Dr. Furman).  But Acevedo did, in fact obtain a fellowship, didn't he?  A fellowship Temple failed learn that I had helped him get (see letter from Dr. Naftulin).  The Temple investigators learned none of these things before

accusing me on the strength of Dr. Acevedo's claims and wrongly interpreting the meaning of a text into something sinister.

But what outrageous conclusions, based on rumor and innuendo, DID Acevedo, Brown, others, and Temple's investigators reach from fragments of facts assembled into a picture unrecognizable as fact?  That I am an overbearing supervisor weaponizing the granting or withholding of recommendations.  Fueled by that, Acevedo and others went on the attack.  We know for a fact (now) that I did not do anything to hurt Acevedo's fellowship chances in York, and that I advanced him with Dr. Naftulin.  But Acevedo, did not know that when he signed on to help the seek and destroy mission against me.  Bolstered in Temple's tnvestigator's minds by Brown, and Dua helping Maitin, nothing was done to check out Acevedo's motive to want to destroy my career: his belief that I kept him from getting that fellowship in York.

Here is what Dr. Acevedo's peers said about his ability and character, and in direct testimony, under oath subject to cross-examination and panel scrutiny.  Also, the direct rebuttal of the outrageous accusation that I  spent more time with young, attractive women as opposed to other patients.  Outlandish innuendo designed to create the fiction that I must be some kind of pervert: the modern day hemlock for a professional career.  Again, these are first hand observations, not hearsay as exclusively offered by Temple:

Dr. Yu, a female resident who worked a long Holiday weekend seeing patients with me:

Q:     Have you ever seen me engage in any conduct you thought was inappropriate with a patient?

A:     No

Q:     Have you ever seen anything that made you think I spend more time with young female patients than I do with other patients?

A:     No (p.118)

Q:     Did anyone from Temple ever interview you about my behavior?

A:     No. (p.119)

Q:     (by Dr. Lin) – have you heard of any other comments or attitudes from your co-residents about Dr. Weinik

A:     I have not, no. (p.121)

*****

Dr. Li a female resident who worked with me seeing patients *daily* for a month and part of the program with me for 2 years.

Page 123 covers her testimony concerning the same observations as Dr. Yu.  Both women failing to corroborate Dr. Acevedo's statement that I spend more time with young female patients than with other patients.  She then goes on to testify concerning how I extricated her from a VIP patient (son of a current Board member) who was "hitting on her" at pages 124 and 125.

*****

Dr. Conner:

Q:     …do you agree with [Dr. Acevedo's] accusations concerning the amount of time I spend with young, female patients?

A:     Absolutely not...there was no distinction between sex, race, nothing like that [on how much time I spent with patients]. (p.128 lines 13-24 edited for brevity)

Q:     Did Temple investigators ever...contact you to discuss my case and what you might know about it?

A:     No (p.133, lines 7-10)


*****

Dr. Williams:

Q:     During your time working with me did you ever see any indication that I spent more time with young female patients as opposed to other patients?

A:     No, sir.

Q:     Do you think you had enough interactions with me to know if I spent more time with young female patients than other patients?

A:     Without a doubt, yes. (p.142, lines 10-18)

[After a lengthy explanation concerning how Dr. Williams is sure I don't spend more time with young, female patients than other patients at pages 142-143, the following question and answer ensues:]

Q:     Based on you firsthand knowledge [of Acevedo's accusation that I spend more time with young, female patients] is that accusation ridiculous?

A:     Firsthand knowledge *I would say that accusation is unwarranted, unfounded, and ridiculous.* (p.143 lines 12-16) (*Emphasis added*)

Dr. Cowell asked Dr. Williams if he ever heard complaints from the residents in the years were worked together that I engaged in sexual innuendos at pages 155-156.  Dr. Williams' response: "No, not a single complaint that I remember or ever having been involved with."

*****

Dr. Arora:

Q:      Dr. Acevedo told [Temple investigators an] accusation concerning the amount of time I spent with young female patients?

A:      No, I do not [agree].  I feel you spend equal time with all patients. (p.162, lines 13-18).  On the following page, Dr. Arora stated that if Acevedo says it is a fact that I spend more time with young female patients than other patients, Acevedo is telling a "lie." (p. 162, line 5)

*****

Dr. Ilgonikov:

A:      "…you gave the patients the time that they needed." (p.177, line 23-24)

Q:      Do you agree with any claim that I only used female residents as models?

A:      Absolutely not.

Q:      Were you yourself such a model? (Dr. Ilgonikov is a man.)

A:      I have, yeah, been your model on multiple occasions. (p.178, lines 1-6)

Q:      So if Dr. Acevedo insists that I only used female models, is he lying about that?

A:      That is absolutely not true. (p.178, lines 11-13)

Q:      What sort of resident was Dr. Acevedo?

A:      I mean Dr. Acevedo had trouble as a resident for most of his residency. He was delinquent and late…and I heard he only got worse from one of his…chiefs…

On page 180, Dr. Ilgonikov explained how Dr. Acevedo became angry about Acevedo's belief that I damaged his chances for a fellowship in York, and Dr. Ilgonikov goes on to testify: "That within a short period of time of him not getting that fellowship that some of these complaints came about." (p.180 lines11-13)

On page 183, Dr. Ilgonikov testifies that Dr. Acevedo had a medical issue and told Dr. Ilgonikov that he was "afraid" to admit that he was mentally 100% to come back to the program.  Acevedo "confided" in Dr. Ilgonikov who urged him to be "honest" about his "situation."  I have no way of knowing id Dr. Acevedo did, in fact, "come clean" with the program director concerning his fear that he was not mentally fully healed, but Temple records should confirm whether he did or did not.

*****

Dr. Averna

On page 196, Dr. Averna directly disputes Dr. Acevedo's claim that I spend more time with young, female patients than necessary beginning at line 6.  Then the following exchange occurs:

Q:      If Dr. Acevedo insists that this is fact as opposed to his opinion, that I took longer with young female patients, based on your experience would that be the truth or a lie?

A:      Well, *knowing him as a problem resident, that would be a lie for sure.*
(p.197, lines 1-5) (*Emphasis added*)


Dr. Alverna then testifies at length on pages 197 and 198 concerning
deficiencies in Dr. Acevedo as a resident, including:


-Often he was a major topic of concern among supervisors.

-Lacking professionalism.

-Lateness

-Getting suspended for failing to document his work through dictation.

-Residents saying Acevedo *does not practice safe procedures in caring for
patients*.

-Bad attitude with superiors especially with attending doctors.

-"Rubbing people the wrong way."

-Not a team player in a team environment.

-Needing instruction on how go about being an "adult."

-Failing his "board" exams.

-He should have been dismissed from the program for his multiple failures.

Q:      Do you suggest that anything coming from his [Dr. Acevedo's] behavior
would suggest [he is] less than being credible?

A:      Oh, sure. Even as chief resident overseeing him he should have been
fired on multiple occasions for his behavior, his unprofessionalism.  We had to

39

give him extra calls, I mean he had a lot of extra chances and probably at any other institution [but Temple] he would have been fired. (p.204 lines 15-24)

Q:    *Who was the chair during the time frame when you think he [Acevedo] should have been fired?*

A:    *Dr. Maitin.* (p.205 lines 1-3)

Later, under questioning from the panel, Dr. Averna returned to the multiple problems with Acevedo that warranted termination at page 215 involving:

-Suspension from privileges after failing to document his cases by dictation on multiple occasions.

-Acevedo being late so often to lectures, the chief residents had to set up a "penalty system" requiring more "on calls" for Acevedo as a chronic violator.

-Dr. Van Wine and at least two other attending doctors stating they would rather not work with Acevedo based on his demonstrated past pattern of unprofessionalism and general abrasiveness.

Then this from Dr. Alverna at page 216, lines 4-8: "You know, I knew he was struggling, having a hard time.  So I was like hey, man, you got to get your act together, you have to play nice in the sandbox with the nurses, residents, physicians."  Dr. Daly: "Did that help?"  Dr. Alverna: "I think it did but he's, I don't want to say hard-headed but he's very stubborn.  So I think it helped for

a while and then I could see him kind of distancing himself from us.  But then he came back once he failed his boards and asked for my advice what to do…"

I respectfully suggest to this panel that, similar to Cora Brown, the thief of whom her peers are scared, and think vindictive, and the elusive, uncorroborated, unavailable, Dr. Dua, Dr. Acevedo was angry, stressed, feeling overworked.  Multiple witnesses hotly dispute his insistence that I spend more time with young female patients than needed.   As with Brown and Dua and the wife in our example, he is a very troublesome source with no credibility at all.  But, perhaps not manipulative and outright malicious trying to either help a close friend and under his spell like Dua was for Maitin, or like Cora Brown described in testimony as untrustworthy, a thief and vindictive making people fear for their jobs.  Acevedo might have been simply a young doctor, under enormous pressure to perform, but without the personal skills and coping ability he needed to progress well.  The kind of young doctor others wanted to mentor, "take under a wing," help during a rough patch.  Immature, but fundamentally a "good egg."  Had his program chair not been asleep at the switch brooding over how to best retaliate against me with the help of his friend Dua, Dr. Maitin might have seen Acevedo was worth saving.

That is, until Acevedo went too far.  Much, much too far.  Jumping onto the Maitin/Dua/Brown "Weinik is a pervert.  A dirty old man" bandwagon. There is almost nothing worse in the world we live in than to be so branded.  It is life changing and maybe life (speaking of career) ending.  And there is nothing so easy in this world as to set it in motion, with Temple *so* willing to

41

believe it.  Obviously, my life will never be the same again, even if I am fully exonerated and reinstated, as I hope will happen.  The anxiety and stress have been beyond belief.  Not to mention the expense to hire a legal team.  Because this is it.  This is the ballgame.  If I fail here, I'm looking at years of litigation and all the added stress and expense that goes with it, during which time I will not be practicing medicine.  Who hires "the pervert" regardless that I have done nothing to warrant this treatment from a University to which I remain loyal, and for which I thank God for giving me the chance (formerly) on a daily basis to use the skills He entrusted to me for healing. Maybe my accusers thought they'd give me a good scare to pay me back for imagined slights, and had no idea it would go this far.  If I was a betting man, that is where I would lay my money.  My life is Temple medicine, helping people who need help.  But Acevedo crossed the line from overwrought resident, to false accuser on a matter of dealing with a patient who trusted me with her care.

All of which brings me to the episode with my injecting that patient in her lower back to alleviate pain and suffering.  An incident that Acevedo accuses me of exposing a patient's buttocks, evidently, for my own sexual gratification (I can't believe I am actually writing something so absurd.) Acevedo says I did this in a room full of people including a loved one of the patient, students learning the procedure, and an experienced assistant of sterling reputation, Dr. Williams.  Did Temple produce the patient, or even an

*anonymous* statement from the patient [6]   No.   The patient's "significant other?"

No.  Did Temple give me access to my patient records to try and figure out who

that patient is so I could ask her?  No.  It is intimated by my Temple

investigative accusers that this particular patient refused to be further treated

by me. But every piece of testimony offered by Temple on this point begins with

speculation like "I heard...", "It is my understanding...", "I think I heard..."  Not

even hearsay evidence from the patient herself!  Nothing.  But Temple wants

this panel to believe that this patient was so upset, she would not return to

treat with me based on no evidence at all.  I hope I have already demonstrated

that Acevedo's has no credibility, but Temple does not even offer how he could

possibly know the patient refused to be seen by me again.   However, an

esteemed graduate of our program and a faculty member, the most experienced

doctor in the room apart from me, Dr. Williams, *was* there.  This is non-

hearsay, firsthand eyewitness testimony under oath.  Here is what he said

about the "draping" procedure:"

Page 144, line 16: Sees the whole procedure from beginning to end.

Page 145 -Watched the preparation and described in detail how I went about it

using the procedures Dr. Williams, himself, said he has done hundreds of

times, that he learned from me. See lines 17-23.

---

[6]    I'm told that I cannot have access to the identity of this patient absent
court process, but what I cannot understand is why Temple investigators with
their self-proclaimed efforts to be "fair," would not seek out this patient on their
own to get even a hearsay account from her or her partner?

Page 145 lines 1-5

Q:    did I uncover any more of the patient's buttocks that it was necessary to perform the procedure?

A:    I recall again nothing out of the appropriate and it was a normal draping and procedure.

Lines 6-13 Dr. Willimas testifies he saw nothing that led him to conclude the patient was unduly humiliated or embarrassed and, again, a whole room of people were there to watch and learn, or comfort the patient.

Dr. Williams spends several pages of testimony (pp. 146-148) devoted to explaining to persons who may read the transcript the reasons for needing to sterilize and drape an area much larger than the target for the needle to account for differences in the anatomies of different people.  I asked him directly at line 14, page 147 whether I uncovered the proper area of skin to correctly sterilize the area around the injection?  A: "I believe that you did." Then, I asked Dr. Williams the critical question and he responds on page 148 lines 5-15:

Q:    Dr. Williams, this is a big point in the case.  Are you absolutely sure I properly uncovered this patient, sterilized the correct area and draped her in a professional manner consistent with the way you were also taught to perform the procedure?

A:    Yes.  I believe I have enough experience and moral aptitude if there were something inappropriate I would have said something otherwise and there was nothing out of the ordinary.

The evidence presented shows that Dr. Acevedo is, or at least was, a troubled, immature, resident doctor hanging on by his fingernails.  He thought he might get a fellowship and blamed me, mistakenly, when he did not get that particular fellowship.  Further his observations are suspect, and if not outright lies, grossly in error about how I allocate my time with patients.  Then he went way off base: he falsely accused me of unprofessionalism with a real patient.  And he did that solely to hurt me.  He might have gotten away with it, but for Dr. Williams remembering and being willing to say so under oath.  Not just to Temple investigators asleep or awake, taking accurate notes or not, but under oath subject to penalties of perjury.  That is how we test "bearing false witness" in this country.  Dua, Brown Acevedo…they didn't do that.  Dr, Williams and me, and my other witnesses did.  That's the difference.  Between my case and theirs'.  Would you make a decision on an important matter based on Dr. Williams' medical observations?  I bet you would.  How about the others, those accusing me?  I bet you wouldn't.

Did I get on Dr. Acevedo about blowing off his call on his first day with me, without warning, at a time when we had reason to believe our residents were overstressed even to the point of suicide?  Sure. Was I upset about his lack of professionalism?  Absolutely, I was.  But he has paid me back, hasn't he?  Like Brown, Temple swallowed his tale too.  And, like Brown, he might win in the short run: you might believe him.  Drs. Williams and the others looked you in the eye, answered your questions, stood for cross-examination all under oath.  Are they the liars?  Or is their testimony reliable?  If you think these

doctors travelled enduring the inconvenience to testify, lied to you about the kind of man Dr. Acevedo was (and hopefully is not still), then as with Brown I can call more of the witnesses the panel asked Mr. Rogers to excuse to further make the point.  Dr. Acevedo is at best mistaken that I tried to hurt his fellowship chances, and at worst maliciously joined Brown and Dua to "get" me.  Temple, of course, did not know this, but did nothing to find out before they offered his (and their) hearsay evidence up to you hoping you will believe him and them and grant their wish that you end my career.  But I ask you, could it be that when my accusers saw I was not getting just looked at, or admonished, but that a 30-year career to date, not to mention what I might still have to contribute to medicine, was at risk of being taken from me, these accusers are not at the hearing to look me in in the eye?  I literally gave Dua an invitation.  No show.  More importantly, they were not here to look *you* in your eyes.  Is Acevedo's hearsay evidence reliable?  Brown, Dua's?  Other, mentioned in passing?  Is this the kind of testimony that is still like the EMT's hearsay from the example at the beginning of this argument?  Or, now knowing about these accusers who did not appear, is the testimony much more like the wife with the motive to want her husband dead to save he boyfriend's job, keep her children and become a millionaire?  Motive to lie counts toward credibility and reliability.  You have to judge all of Temple's evidence by the By-Laws' hearsay yardstick.  By that standard, none of it is such that any of you as "responsible persons would be accustomed to rely [on it] in the conduct of serious affairs." (8.4.6).  That is what Temple's by-laws mandate for you in

order to credit Temple's evidence against me and impose the equal of the death penalty on my career.

You now have the background of Temple's witnesses, and their motives, coming from direct, non-hearsay, subject to cross-examination, and under oath witnesses. Weighed against not knowing my accuser's motives, their character, not being under oath, not subject to cross-examination, not allowing you to even see them. I suggest to this panel that not only has Temple failed to show my conduct warrants any adverse action, the hearing showed that the weight of the evidence affirmatively comes crashing down in my favor. I have been attacked, my reputation and career have been placed in question. I had, and continue to have, to fight for my honor, my integrity, and to be able to pursue my calling as a doctor, a healer of people. And I will not stop until my last breath. What Temple's investigators have done and are doing to me is wrong. I look to you, my peers and colleagues, to look rationally at this evidence, consider my character and reputation over 30 years, and as attested to by Dr. D'Alonzo and agreed to by the panel, as exemplary. Compare that against my accusers, their characters and reputations, and what evidence that was not developed that by right and fairness should have been. I am a good and professional doctor. That is all I ever wanted to be. Forces beyond my control are trying to take that from me. You stand as my shield, for I have done no wrong.

Thank you.

Michael Weinik, DO

## MEDICAL STAFF HEARING COMMITTEE REPORT TO THE MEDICAL STAFF EXECUTIVE COMMITTEE REGARDING THE MEDICAL STAFF TERMINATION OF DR. MICHAEL WEINIK

The Medical Staff Hearing Committee consisting of Drs. John Daly (chair), Joseph Queenan and Karen Lin met on the afternoon and evening of July 10, 2018. Present were Mr. Paul Wright, Drs. Cowell and Tedaldi for the Medical Staff and Mr. Castor and Mr. Rogers along with Dr. Michael Weinik for the defense. A stenographer recorded the proceedings.

The Hearing Committee heard multiple witnesses over a period of approximately six hours and had the opportunity themselves to question witnesses during the proceeding. The Hearing Committee received and reviewed multiple documents from the Medical Staff Executive Committee, Dr. Cowell, Dr. Weinik and his attorneys, and written recording of the proceeding. The Committee met subsequently on two occasions to review and discuss the proceedings and the documents that were provided.

The decision of two members of the Committee is to recommend to the Medical Staff Executive Committee that Dr. Weinik have his medical staff privileges modified so that he is not performing direct patient care nor directly overseeing/instructing individual residents. One member of the Committee decided to recommend to the Medical Staff Executive Committee that Dr. Weinik be suspended or be placed on a similar modification as described above. The duration of such suspension or modification was not decided by the Hearing Committee. As part of a remedial action plan, the Committee recommended strongly that Dr. Weinik undergo counseling, behavioral and sexual harassment training, independent of individuals from Temple University Hospital, during the time that his privileges are modified.

The decision was reached because the sexual harassment written and verbal complaints of the female former PM&R resident from 2016, 2017 and 2018 could not be completely substantiated since she was not present at the hearing and witnesses did not corroborate her complaints.  Complaints from Drs. Kinback, Brown, Vyas and Acevedo and Ms. Dzikowski regarding Dr. Weinik's behavior towards female patients and residents, themselves included, were also not substantiated by witnesses brought to the hearing.  However, the Hearing Committee took into account the due diligence of Drs. Cowell and Tedaldi along with Ms. Coull and Dr. Wiggers who directly interviewed the complainants and sought to verify the behavior charges that were brought against Dr. Weinik.  From all information provided to the Hearing Committee, there appeared to be a pattern of Dr. Weinik's behavior that is unacceptable for a member of the Temple University Hospital staff.

The initial recommendation of the Medical Staff Executive Committee (MSEC) was for Dr. Weinik to undergo professional coaching by Ms. Saccomandi; however, it appeared that Dr. Weinik did not fully participate in this effort until near the end of the coaching period. While he claimed illness during this time, there was no corroboration of this to the Committee.  Thus, it is unclear to the Committee that Dr. Weinik tried diligently to adhere to the initial recommendations of the MSEC.

Thus, the Committee voted unanimously that Dr. Weinik participate diligently in his own behavioral and sexual harassment therapy and demonstrate satisfactory completion of a course of such therapy.  Should he be allowed to return to the medical staff or have his medical privileges fully restored, he would be required to be monitored by senior leadership at the medical center as part of a continued remedial action plan.



**TEMPLE HEALTH**
TEMPLE UNIVERSITY HOSPITAL

**VINCENT COWELL, MD**
Chair, Medical Staff Executive Committee
Professor, Clinical Anesthesiology
Lewis Katz School of Medicine at Temple University

August 27, 2018

Dear Dr. DiSesa:

At the specially called Medical Staff Executive Committee (MSEC) meeting today, the MSEC reviewed and considered the recommendation of the Hearing Panel regarding Dr. Weinik's status on the Medical Staff.  Given my role as an investigator of the allegations against Dr. Weinik and my role as the advocate for the Medical Staff at Dr. Weinik's July 10, 2018 hearing, I recused myself from participating in today's MSEC meeting.   Dr. McNamara, the immediate past Chair of the MSEC, presided over the meeting in my stead.

The MSEC disagreed with the Hearing Panel's recommendations and by majority vote decided to reaffirm its earlier recommendation for termination of Dr. Weinik's Medical Staff membership.  The MSEC seized on the Hearing Panel's finding that "there appeared to be a pattern of Dr. Weinik's behavior that is unacceptable for a member of the Temple University Hospital staff."  Therefore, the committee agreed with the Hearing Panel's finding about Dr. Weinik's behavior, but disagreed about the remedy for that behavior.

Pursuant to the Medical Staff Bylaws, Dr. Weinik has twenty one (21) days to request an appellate review of this recommendation by the Board.  If he chooses not to request appellate review, the MSEC's recommendation will be submitted to the Board for its consideration after the twenty one day period has elapsed.

Respectfully,

Vincent Cowell, M.D.
Medical Staff Executive Committee Chair

cc:     Michael Weinik, D.O.
        Bruce Castor, Esquire
        Paul B. Wright, Esquire"

**TEMPLE UNIVERSITY HOSPITAL**
3509 N. Broad Street, Philadelphia, PA  19140
TempleHealth.org   800-TEMPLE-MED

Temple Health refers to the health, education and research activities carried out by the affiliates of Temple University Health System (TUHS) and by the Lewis Katz School of Medicine at Temple University. TUHS neither provides nor controls the provision of health care. All health care is provided by its member organizations or independent health care providers affiliated with TUHS member organizations. Each TUHS member organization is owned and operated pursuant to its governing documents.