**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **MICHAEL WEINIK, D.O.,** | : | |
| | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 19-3503** |
| **TEMPLE UNIVERSITY OF THE** | : | |
| **COMMONWEALTH SYSTEM OF** | : | |
| **HIGHER EDUCATION, et al.,** | : | |
| | : | |
| *Defendants.* | : | |

_____

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                                                    **May 20, 2024**

This case revolves around the 2018 termination of Plaintiff, Michael Weinik, D.O., the former Chair of Physical Medicine and Rehabilitation Department at Temple University Hospital. In conjunction with this termination Weinik also lost his medical staff privileges from Temple University Lewis Katz School of Medicine. These actions were taken following complaints of sexual harassment against Weinik made by several resident doctors.

Plaintiff has now sued Defendants Temple University of the Commonwealth System of Higher Education, Temple University Lewis Katz School of Medicine, Temple University Hospital ("TUH") (collectively, "Temple" or the "Temple Defendants"), Defendant Dr. Phillip Acevedo, and Defendant Dr. Shivani Dua, alleging a violation of his due process rights, and for libel, slander, injurious falsehood, and breach of contract.

The Temple Defendants together with Dr. Acevedo and Dr. Dua have each filed Motions for Summary Judgment. For the following reasons, these Motions will be granted, and judgment will be entered in favor of all Defendants and against Plaintiff on all claims.

## I.   STATEMENT OF FACTS

Because many levels of review occurred within Temple before Plaintiff was terminated, the background of this case is protracted and somewhat complicated.  Nonetheless, a full recitation of the facts is necessary to understand why this matter must be resolved as a matter of law and not a factfinder.  The following evidence is derived from the parties' submissions and is undisputed unless noted.  Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiff.[1]

### A.   Plaintiff's Employment at Temple School of Medicine

Plaintiff was employed by Temple's School of Medicine as a full clinical Professor of Physical Medicine & Rehabilitation ("PM&R") and had practiced medicine at the University since 1986.  The Dean of the Medical School, Dr. Larry Kaiser, appointed Plaintiff as the Interim Chair of Temple's PM&R Department in 2015, and Plaintiff held that position for about two years.  (PSUF – Temple ¶ 1; Temple Resp. 1.)

Plaintiff's position with the School of Medicine was "non-tenure track," ending on June 30, 2019, "unless renewed by a separate written agreement."  (Temple SUF ¶¶ 10–11; PR – Temple ¶¶ 10–11.)  Pursuant to his Letter of Appointment, Plaintiff's appointment to the faculty and continued employment was contingent upon several "Conditions of Employment" including "appointment to the medical staff of Temple University Hospital and such other hospitals as the Dean may designate."  (Temple Ex. 2, p. 5.)  The Letter of Appointment stated that Plaintiff's "failure to maintain any

---

[1]        References to the parties' pleadings will be made as follows:  Dua's  Statement of Undisputed Facts ("Dua SUF"), Plaintiff's Response to Dua ("PR - Dua"), Plaintiff's Counterstatement of Undisputed Facts to Dua ("PSUF - Dua"), Dua's Response ("Dua Resp."), Temple Defendants' Statement of Undisputed Facts ("Temple SUF"), Plaintiff's Response to Temple Defendants ("PR – Temple"), Plaintiff's Counterstatement of Undisputed Facts to Temple Defendants ("PSUF – Temple"), and the Temple Defendants' Response ("Temple Resp.").  To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute.  I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

Condition of Employment" gave Temple University the right to "terminate his Appointment immediately, without advance notice and without any further obligation to [Plaintiff]." (Id. p. 6.)

**B.  TUH's Physician Professional Conduct Policy and Bylaws of the Medical Staff**

As a member of the TUH medical staff, Plaintiff was required to follow TUH's Physician Professional Conduct Policy. (Temple SUF ¶¶ 14; PR – Temple ¶¶ 14.) This Policy empowers the "Medical Staff President or designee" to investigate a "Formal Complaint" of "Disruptive Conduct," which is defined in part as "[s]exual harassment" or "[i]nappropriate language or comments." (Temple Ex. 3 pp. 1–3.) According to the procedures, upon receipt of a Formal Complaint, the Medical Staff President is required to ensure that such complaint meets the requirements of the policy. Prior to the commencement of an evaluation of the allegations, the Department Chair/Section Chief shall notify the involved physician about the Formal Complaint, either in person or by telephone/email. (Id. pp. 1–2.) If the investigation of a Formal Complaint reveals that the behavior meets the definition of Disruptive Conduct, the Department Chair/Section Chief and the Medical Staff President may determine that the complaint warrants submission to the Medical Staff Executive Committee for "possible Corrective Action" pursuant to Article 7.3 of the Medical Staff Bylaws. (Id. p. 3.)

Section 7.3.3 of the TUH Bylaws of the Professional Medical Staff ("TUH Bylaws") sets forth the actions the Medical Staff Executive Committee may take upon the results of the investigation. These actions may include, without limitation:

> (a) Rejecting the possibility of corrective action and, if the [Medical Staff Executive Committee] determines there was not credible evidence for the complaint in the first instance, removing any adverse information from the Practitioner's file;
>
> (b) Referring the matter back to the ad hoc committee with specific directions for further investigation;
>
> (c) Issuing a letter of admonition, reprimand, or warning to be included in the credentials file of the Practitioner. In the event such a letter is issued, the Practitioner may make a written response that will be placed in the Practitioner's credentials file; a letter of admonition, reprimand, or warning will not entitle the Practitioner to the hearing

and appellate review procedures of Article VIII of these Bylaws. Such letter will be removed from the Practitioners' credentials file after five (5) years if no further corrective action is taken against the Practitioner during this time;

(d) Recommending a remedial action plan to be designed in consultation with the Department Chair and subject to the oversight of the Department Chair and [Medical Staff Executive Committee], with specific outcome measures and a compliance monitoring plan;

(e) Recommending reduction, modification, suspension, or termination of Clinical Privileges, or Specified AHP Privileges, as applicable;

(f) Recommending reductions of Professional Medical Staff membership status or limitation of any prerogatives related to the Practitioner's delivery of patient care;

(g) Recommending suspension, termination, or probation of Professional Medical Staff membership; or

(h) Taking other actions deemed appropriate under the circumstances.

(Temple Ex. 4 § 7.3.3.)  If termination of Medical Staff membership is recommended, the affected practitioner must be given notice that he/she has the right to invoke the hearing procedures in Section VIII of the Bylaws.  (Id. §§ 7.4.4, 8.2.)

Section VIII of the Bylaws states that when a hearing is requested on an adverse recommendation of the Medical Staff Executive Committee Hearing Committee, the Medical Staff Executive Committee Chair in consultation with the Medical Staff President and Chief Medical Officer may direct that a hearing be held:  (1) before a hearing referee who is appointed by the Chair of the Medical Staff Executive Committee or his/her designee, (2) before a panel of at least three Medical Staff Members chosen by the Chair of the Medical Staff Executive Committee, or (3) by an independent peer review panel of physicians from outside the hospital selected by the Chair of the Medical Staff Executive Committee.  (Id. § 8.3.4.)   The practitioner is entitled to be represented by an attorney, but the role of the attorney may be restricted to providing counsel to the practitioner, without active participation at the hearing.  (Id. § 8.4.1.)  "Within reasonable limitations," the Medical Staff Executive Committee, the hearing committee, and the practitioner may call and examine witnesses for

relevant testimony, introduce relevant exhibits or other documents, cross-examine or impeach witnesses who have testified, and otherwise rebut evidence.  (Id. § 8.4.4.)

Within ten business days after final adjournment of the hearing, the hearing committee will render a recommendation, accompanied by a report in writing, and deliver it to the Medical Staff Executive Committee.  (Id. § 8.4.8.) The Medical Staff Executive Committee will review that report and recommendation at its next regularly scheduled meeting and, generally within thirty days of such meeting, will affirm, modify, or reverse the report and recommendation of the hearing committee.  (Id. § 8.4.9.)  The practitioner may appeal an adverse recommendation within twenty-one days of that decision.  (Id. § 8.5.)

If the Medical Staff Executive Committee's decision is appealed, the Board of Governors "will further determine whether the appeal raises sufficient evidence to warrant further review," and if so, will appoint an Appeal Board made up of no less than three members of the Board.  (Id. § 8.5.4.) After the conclusion of the appellate review proceeding, the Board of Governors will render a decision in writing and may affirm, modify, or reverse the decision of the Medical Staff Executive Committee, or remand to the hearing committee or Medical Staff Executive Committee for reconsideration.  (Id. § 8.5.7.)  After exhaustion or waiver of all hearing and appeal rights, the Board will render a final decision which constitutes final action from which there is no appeal.  (Id. § 8.5.9.)

**C.  <u>Sexual Harassment Complaints Against Plaintiff in 2017 and the Resulting Investigation</u>**

In 2017, Plaintiff replaced Dr. Ian Maitin as chair of the Physical Medicine & Rehabilitation ("PM&R") Department.  Shortly thereafter, Dr. Cora Brown, a PM&R resident, met with Dr. Maitin to discuss filing a complaint against Plaintiff for harassment.  Dr. Maitin encouraged Dr. Brown to report her concerns to Sue Coull, the Assistant Dean for Graduate Medical Education at Temple's School of Medicine and TUH's Associate Hospital Director for Graduate Medical Education.  (PSUF - Temple ¶ 2; Temple Resp. ¶ 2.)

On November 3, 2016, Dr. Brown met with Sue Coull to discuss Brown's concerns with Plaintiff.  (Temple Ex. 5.)  According to Ms. Coull's notes, Dr. Brown made the following allegations against Plaintiff:

- Dr. Brown was in the EMG room, and Plaintiff came in.  He asked Dr. Brown if she was going to the APE conference.  When Dr. Brown said no because she had nothing to present, Plaintiff commented, "you don't want to hang out [with] us anymore" and "It's in Vegas, there are a lot of whore houses in Vegas I can bring you to one."

- On another occasion, Plaintiff asked Dr. Brown if she moonlights, and when she replied no, he said "don't you need the money . . . oh that's right . . . I forgot your husband does well . . ."

- A year prior, about four weeks after Dr. Brown had her baby, Plaintiff made a comment about how she lost weight, how her tummy looks tight, and would sometimes touch her hair.

- Plaintiff made comments about her clothes, commenting about how good she looked.

- Plaintiff said to Dr. Brown, "what is it with you Asian girls, always into Jewish men."

(Temple Ex. 5.)  Dr. Brown stated that she did not want to make a formal complaint in writing against Plaintiff but, because of his leadership position, just wanted him to be careful about what he says and how he acts.  (Id.)

In a subsequent letter to Ms. Coull on February 28, 2017, Dr. Brown reported several additional incidents with Plaintiff:

- About a week prior, Dr. Brown was leaving the resident lounge in the basement of the Rock Pavilion and Plaintiff was entering the lounge.  Plaintiff blocked the door with his body, preventing her from leaving.  After three attempts to leave, she was able to get by him.  According to Dr. Brown, "[h]is body came so close to mine when he tried to prohibit me from leaving the lounge."

- On February 24, 2017, at the wedding of his co-resident, Plaintiff approached Dr. Brown a few times, calling her "so skinny" and "an anorexic," and making comments about how sexy her dress looked but she was too skinny.

- On Monday afternoon, February 27, 2017, Dr. Brown was walking out of the EMG room with Dr. Cruz, and Plaintiff was passing through the hallway.  He stopped her and began asking her questions about why her last name was different from her husband's, whether she was married before, and whether she was adopted.  When she responded that these were personal questions that she did not feel comfortable answering, he commented on how she looked and indicated that her attire was not appropriate for work.

6

(Temple Ex. 7.)  Dr. Brown then noted that Plaintiff's "obsessive and stalking behaviors about me continue to occur at not only Temple University Hospital but at outside Temple [H]ospital as well. . . . I feel so violated and so uncomfortable even putting my footstep around [Physical Medicine & Rehabilitation] clinic worrying that I would run into [Plaintiff] and hear his inappropriate comments about me." (Id.)

Dr. Brown's letter prompted an investigation by TUH.  (Temple SUF ¶ 32; PR – Temple ¶ 32.) On April 5, 2017, Dr. Vincent Cowell, President of the TUH Medical Staff, and Dr. Ellen Tedaldi, Past President of the TUH Medical Staff, sent a letter to Plaintiff attaching Dr. Brown's written statement detailing her allegations and describing the investigatory efforts they had taken.  (Temple Ex. 9.)  According to the letter, Drs. Cowell and Tedaldi concluded that "there is insufficient evidence to fully support all of the individual allegations.  However, we are persuaded that you are responsible in some part for an unwelcomed intrusion into Dr. Brown's personal and private space.  Accordingly, we formally recommend that you undergo professional coaching with follow-up and that progress be provided to Dr. Kaiser [Dean of the Medical School], in lieu of the department Chair person." (Id.)

Allyson Saccomandi, a Temple counselor, met with Plaintiff in April 2017 to provide coaching for sexual harassment.  (Pl. Ex. 7.)  Over the next few months, Ms. Saccomandi assigned Plaintiff various tasks and repeatedly reached out to Plaintiff regarding his compliance, but Plaintiff indicated that his patients and some recent health issues had slowed his progress.  (Id.)  Nonetheless, Plaintiff met with Ms. Saccomandi on several occasions through September 2018.  (Id.)  Plaintiff repeatedly cancelled meetings in November and December 2018 but made significant progress in his coaching assignments at a December 21, 2017 meeting.  (Id.)  In her summary report dated January 23, 2018, Ms. Saccomandi remarked that, "I am hoping 2018 brings a renewed focus but I am concerned that it is not a priority." (Id.)

### D.  Sexual Harassment Complaints Against Plaintiff in 2018

In 2018, Plaintiff experienced some resistance regarding his efforts to make changes to Temple's PM&R Department as interim Chair, including attempting to replace Dr. Maitin with Dr. Ernesto Cruz as the PM&R Residency's Program Director and seeking to have the residency cease providing professional services for the Philadelphia Nursing Home medical rotation (led by Dr. Maitin) because it was not financially sustainable. Among those administrators and residents who opposed the changes was resident Dr. Phillip Acevedo. (PSUF – Temple ¶¶ 5–6; Temple Resp. ¶¶ 5–6.)

On January 12, 2018, Amber Dzikowski, Graduate Medical Education ("GME") Administrator for TUH's PM&R Department, overheard a conversation between Dr. Acevedo and fellow resident Nicholas Kinback concerning Plaintiff's alleged "inappropriate touching" of an attractive female patient that caused Dr. Acevedo to leave an exam room. Dr. Kinback subsequently relayed that story directly to Ms. Dzikowski. (PSUF – Temple ¶ 7; Temple Resp. ¶ 7.)

On January 17, 2018, Ms. Dzikowski sent an email to Sue Coull (as noted previously, the Assistant Dean for GME), summarizing some concerns about Plaintiff. (Temple Ex. 12.) In her email, Ms. Dzikowski stated that she had met with Dr. Acevedo, who voiced concern about the removal of the "PNH rotation" led by Dr. Maitin and expressed his belief that this service was being eliminated due to Plaintiff's personal vendetta against Dr. Maitin and efforts to eliminate him as the Residency Program Director. (Id.) According to the email, Dr. Acevedo mentioned other issues involving Plaintiff and his "inappropriate behavior" involving patients and residents. (Id.) Dr. Acevedo described several incidents involving Plaintiff inappropriately touching female patients, as well as several physical examination demonstrations in which he used only female residents as models. (Id.) Ms. Coull later prepared a summary of a meeting she had with Ms. Dzikowski, indicating that Ms. Dzikowski had spoken with another senior resident, Nick Kinback, who also described Dr. Acevedo's experience with Plaintiff. (Pl.'s Ex. 13.)

In that same time period, Dr. Shivani Dua, a former resident at TUH, learned that Plaintiff was slated to become the chair of the PM&R Department.  (Dua SUF ¶ 4; PR – Dua ¶ 4.)  As such, she reached out to Dr. Maitin indicating that she wanted to send a note about what she experienced with Plaintiff because she felt guilty that she did not speak up when she was a resident.  (Pl. Ex. 5, Dep. of Ian Maitin ("Maitin Dep.") 102:4–20.)  Dr. Maitin directed her to speak to the GME Administrator. (Id. at 102:21–24.)

On January 16, 2018, Dr. Dua emailed Amber Dzikowski, reporting the following:

- "In the current environment where women are finally being supported instead of hushed, deemed dramatic or ignored for telling their stories of sexual harassment and misconduct, I feel it is time to share some situations I experienced not very long ago at Temple as a pmr resident."

- "I was a PGY-2 [resident] when I had my first uncomfortable encounter with [Plaintiff].  I was on consults and walking through the hall from the resident room through his clinic.  He stopped me and asked me 'So (my name), Are you a good girl or a bad girl?'  I was puzzled and weirded out by the tone of his voice and the nature of his question.  I asked 'what?'  He repeated 'Are you a good girl or a bad girl?  I bet you're a bad girl'.  I said 'I don't know what you are talking about' to which he replied 'yeah, you are definitely a bad girl, don't worry, we like bad girls at Temple'.  He then laughed and I felt awful and confused and I said 'I don't know what you are even talking about' and I just walked away as he kept laughing."

- That same year I was wearing an appropriate length work skirt that just showed my knees.  In that same hallway he stopped me and asked if I was hyper-mobile.  I said 'I don't think so'.  He then knelt down on his knee to take a look at my knees and then touched the popliteal area of my leg with his hand as he looked from the side and he then said 'you are like Gumby, you look like you are probable so flexible.'  I said 'No, I am not' and I backed away from his hand.  He responded 'I would like to find out for myself'.  Again I walked away and this time I remember laughing out loud to try to reduce the awkwardness.  I was in fear that one day I had to work with this guy.  I didn't want to piss him off but I felt violated."

- "I avoided him as many female residents do because of his unusual and often perverted comments regarding any female: patients, nurses, therapists, and residents.  Anyone was fair game and male residents would often pretend to play along and say 'its just weinik being weinik.'  I never understood that excuse."

- "As a PGY-3, I had only one rotation that I had to work with him once a week in march because I had an outpatient block and [Plaintiff] always needs extra residents assigned as the 'helper resident' on his rotation because he cannot seem to effectively complete a clinic without lots of resident help.  I was already on guard but he was generally friendly and yes he would make comments but I was glad they were not directed at me.  But then I saw how he treated young female patients or just pretty women differently than other patients.  His exam would become 'extensive' as he would check for various pathologies but it always seemed

overboard and frankly made me really uncomfortable.  Other residents would make comments like 'oh boy she is a pretty girl, looks like this should take about an hour'.  I hated those encounters as they were unnecessarily 'handsy' exams and the patients were oblivious to the fact that he was touching them everywhere looking for god knows what.  I understand the importance of the physical exam but this was just over the top and only directed at a specific population – females – especially young and pretty."

- "He had one patient that he saw on his list and he said 'she comes in to see me because her husband doesn't give her enough loving.  Weinik will make sure she is taken care of, haha, She will get all dolled up for me and just watch, she will have me adjust (osteopathic manipulation) her and ill make her feel good.'  He would make these comments with a tone and smile that was so unprofessional.  I always thought to say something but again he was the boss, the attending, the guy filling out my evaluation.  I didnt want to anger him in any way but i hated how this all made me feel."

- "That month we had our yearly physical examination workshop at pcom.  He called me to the stage in the front of everyone to so he could demonstrate the lower body physical examination maneuvers on me.  I declined and lied and said i had a spinning injury and i didnt want to make anything worse.  His response in front of everyone was 'if something is wrong ill find it so just come up here.'  I obliged because i felt cornered after that response but i really didnt want his hands to touch my body.  I had the right to decline but couldn't because he was insisting i participate.  I went up there faced everyone and he was behind me.  First thing he says is to check range of motion of my spine by touching my toes.  I said i cant touch my toes.  And he said 'sure you can, just try, i wont tell them about your tramp stamp.'  I was super offended.  I dont have a back tattoo aka a tramp stamp and that was just a super demeaning unnecessary comment.  He laughed as did the whole audience.  I felt embarrassed but tried to just go with it to get the whole thing over with.  He then had me stand and said he was checking my ischial bursa and he said 'very nice, very nice'.  Again uncomfortable audience laughter . . . I didnt like his hands on my buttocks because i felt like i was just like those patients he manipulates . . . in an impossible position.  Then he went on and on hands everywhere and eventually saying he was going to check for Pubalgia also known as a sports hernia and athletic pubalgia.  This is a chronic groin lesion but to check he essentially would pushing my pubic symphysis in front of everyone. I said "i dont know about all that".  Before i could stop him his hand was on not just my pubic region but on my vulva!  I shot up off the table and said "yeah thats not my pubic symphysis".  Everyone started laughing, i was mortified but tried to play it off.  I was beyond offended and felt manipulated, used, embarrassed and horrified.  A male chief resident came up to me right away and asked if i was ok.  When i said "yes im fine" he eased up and said "damn he didnt even buy you dinner before that."  I went home and called my sister and another co-resident and cried. . . a lot . . . not just that night either.  I carried it with me.  They encouraged me to say something to my chairman or to gme or anyone, even [Plaintiff] himself.  I said i would and i didn't . . . probably because I thought it wouldnt make a difference, that i would be ignored, that "weinik was just being weinik", because i was scared and embarrassed and wanted to just move on."

- "My #1 scheduling request was to work on the weinik [Plaintiff's] rotation in February because its a short month and the emg course would reduce the number of days of interaction.  He is a good teacher and i learned a lot from him about the spine and sports.  He has good qualities and attributes as no one is all bad.  His behavior and comments were just often unacceptable. . . .  But now I fear for others and feel i must open up about this. I still feel the

need to remain anonymous because pmr is a small field and he is well connected.  I work near and dont want my job or my life to be compromised and i dont want sympathy.  I just dont want this to happen to others."

(Temple Ex. 10.)

When Ms. Dzikowski explained that she was going to escalate Dr. Dua's email to the appropriate authority, Dr. Dua responded that that she did not want her name mentioned.  (Pl. Ex. 38.) She further stated, "I am even concerned about the content of my email being so specific that it will be obvious that I was the former resident who came forward.  I work in the Philadelphia area and work with residents and am friends with people that work closely with [Plaintiff].  I am concerned about how this information will be used and am already somewhat regretting coming forward.  Please make this very known to whoever will be contacting me."  (Id.)

At her deposition, Dr. Dua testified regarding her motivations for sending this email.  She explained that, upon learning that Plaintiff might become head of the PM&R Department, she wanted any potential problem to be "brought to light."  (Dua Ex. A, Dep. of Shivani Dua ("Dua Dep.") 49:11– 25.)  She stated, "I needed to say something so that it could be looked into, essentially, so that this would be something that someone would do something with this information," and "so that for future residences and those that will be under the PM&R department, that they have someone that they feel is safe and that they can talk to about any issues that come up."  (Id. at 50:1–4, 50:15–20.)  When asked what she believed Temple would do to look into her allegations, she stated that she:

> [E]nvisioned that an investigation would take place into my — to see if this was a pattern of behavior, to see if this had been documented with any other people prior or post, if that was worth an investigation, that this would be looked into . . . Was I the first person to ever say that [Plaintiff] had made them uncomfortable?  Was I the first person to have written or said something?  Is this the first time this had been looked into? . . . I am not Graduate Medical Education.  I do not know what their steps are.  I just know that there are formal steps.  There are things that they're supposed to do.  And there are ways to investigate issues because that's what they're there for.

(Id. at 69:20–70:24.)

Plaintiff had a different interpretation of the events described by Dr. Dua.  For example, he indicated that he did not ask Dr. Dua if she was a good girl or a bad girl but rather whether "this is the good Shivani [Dua] or the bad Shivani" because she was wearing an "inappropriately" short skirt.  (Temple Ex. 11, Dep. of Michael Weinik ("Weinik Dep.") 122:1–25.)  He also recalled examining Dr. Dua in the context of a presentation but did not believe he touched her vulva, only that at some point during the presentation "she jumped up."  (Id. at 131:6–132:20.)  Plaintiff further remembered that after that incident, one of the chief residents commented to Dr. Dua, "Damn.  He didn't even buy you dinner before that," and Plaintiff approached that resident and asked why the chief resident made that comment.  (Id. at 134:15-22.)

### E.  **TUH's 2018 Investigation into Sexual Harassment Complaints**

After receiving Dr. Dua's email, Ms. Dzikowski inadvertently forwarded it to Dr. Ernesto Cruz, Plaintiff's colleague who was not involved in the investigatory process.  (Pl.'s Ex. 15.)  Although Ms. Dzikowski testified that this was a mistake and that she intended to forward it to Susan Coull, Dr. Cruz nonetheless had it on his phone and showed it to Dr. Maitin.  (Temple Reply Ex. C, Dep. of Amber Dzikowski ("Dzikowski Dep.") 93:9–24; Maitin Dep. 110:8–23.)

On January 25, 2018, after being advised of the allegations against Plaintiff, Dr. Vincent Cowell, President of the Medical Staff, sent an email to Plaintiff, (through Pamela Fierro, Director of Medical Staff Affairs at TUH), stating, "[P]lease understand that a concern has been registered with the Medical Staff in regard to Professional Conduct on your behalf.  Accordingly, an investigation has been initiated under the Physician Professional Conduct policy (TUH-ADMIN-950.1044).   Pam Fierro, Director, Med Staff Affairs will be reaching out to you to arrange for a meeting.  You may preview the concerns prior to the meeting via arrangements with Pam Fierro."  (Temple. Ex. 13.)  Plaintiff made arrangements to meet with Ms. Fierro.  (Temple Ex. 13.)  Dr. Cowell testified that Dr. Dua's e-mail was the "[f]ormal complaint that got us going with this investigation."  (Dua Ex. D, Dep. of Vincent Cowell ("Cowell Dep.") 121:3–7.)

According to a document entitled "Investigative Report Summary Description," Dr. Cowell organized a panel (himself and Past-President Ellen Tedaldi, M.D.) to conduct the investigation of the allegations against Plaintiff.  (Temple Ex. 14.)  The summary document indicated that the panel met with and interviewed the following individuals:  Dr. Acevedo (senior resident); Ms. Dzikowski (GME Administrator); Nicholas Kinback (senior resident); Katie Hatt (Chief Resident); Rakhi Vyas (resident); Dr. Reed Williams (faculty member); and Plaintiff.  (Id.)

The investigation summary regarding the meeting with Dr. Acevedo on January 25, 2018, revealed the following:

- Dr. Acevedo described an incident that he witnessed where Plaintiff engaged in an unnecessarily lengthy prep of a witness that revealed the patient's buttocks, causing Dr. Acevedo to leave the room out of discomfort.

- Dr. Acevedo expressed his belief that approximately 50% of the residents were uncomfortable with Plaintiff's exams.

- Dr. Acevedo remarked that Plaintiff would spend forty-five minutes with a young female patient but only ten minutes with an older male patient.

- Dr. Acevedo indicated that he believed every resident felt the same about Plaintiff, but everyone was afraid to express their feelings because everyone needed a letter of recommendation from him.

- Dr. Acevedo indicated that he believed Plaintiff retaliated against him during a fellowship interview.

- Dr. Acevedo shared that Plaintiff did patient-simulated demonstrations using the residents as the patients but only selected female patients.

(Id.)

According to the investigation summary, Amber Dzikowski (as noted above, the GME administrator) reported that: "she hears a lot of stories from residents regarding [Plaintiff's] inappropriate behavior"; "she feels uncomfortable around him, that his eyes would look at her chest and not her face and he is very complimentary of her hair and outfits"; "[h]e asked very personal questions"; and "he uses his position as Chair as a fear tactic.  He openly tells residents that they need

a letter from him.  He is notorious for making phone calls to either praise a resident or say 'don't take

that resident.'"  (Id.)

The investigation summary regarding the meeting with senior resident, Nicholas Kinback,

reported Dr. Kinback's observations and impressions as follows:

- "It has become a joke among residents that [Plaintiff] spends more time with young, female patients and that [Plaintiff] is more 'hands-on' with young, female patients."

- "There is 'nothing illegal' in the exams; there is just a pattern of behavior that the majority of residents have noticed."

- Although Dr. Kinback noted that nothing in Plaintiff's behavior made him feel uncomfortable, he observed that younger females get a more thorough exam.

- Dr. Kinback had heard at least six residents, out of a class of nine, make the same comments and observations.

(Id.)

The investigatory summary listed the observations and opinions of Chief Resident Katie Hatt

as follows:

- Dr. Hatt never had a personal incident with Plaintiff but knew that if Plaintiff had a younger attractive female patient, he would be more thorough and take longer during exams.

- Plaintiff "always chooses female patients for the patient simulated demos."

- Dr. Hatt observed Plaintiff asking personal questions like "what are you going to do later tonight?"

- Dr. Hatt stated, "The exams are not inappropriate but you notice a pattern."

- Dr. Hatt, who is responsible for creating resident schedules, remarked, "[Plaintiff] throws a hissy fit if you take a resident from him even on a light patient day."

- Dr. Hatt never felt uncomfortable being a model for Plaintiff's examinations.

(Id.)

Resident, Rakhi Vyas, reported the following impressions regarding her experience with

Plaintiff during her residency:

- Dr. Vyas elaborated on times where she thought Plaintiff had been inappropriate.  For example, one time last year she was wearing a black dress and Plaintiff commented that "there are only certain times a girl wears a little black dress and one of those times is when she is on the walk of shame."

- Dr. Vyas believed that when Plaintiff sees an attractive female patient, he is more thorough, and that all the residents noticed it.

- Dr. Vyas indicated that she was not surprised at the investigation and indicated that, "I think this needs to be addressed because he says inappropriate things, I just don't let things get to me."

- Dr. Vyas reiterated that Plaintiff favors doing simulation exams on females but never felt strange when he did the exam on her.

(Id.)

During the interview with Faculty member Reed Williams, Dr. Williams indicated the

following:

- Dr. Reed did not recall any inappropriate or egregious behavior by Plaintiff during a procedure.

- Dr. Reed described Plaintiff as "gregarious" but never thought he was out of bounds or inappropriate.  He believed that he may spend more time with a patient given that patient's anxiety.

- Dr. Reed believed that Plaintiff was a consummate clinician and that his only problem was that he would sometimes "say things he shouldn't" or be "overly flirtatious."

Id.

Finally, the investigation included an interview with Plaintiff:

- When asked to read the email from Dr. Dua (whose name had been redacted), Plaintiff had a vague recollection of examining Dr. Dua in an exemplary examination but did not remember doing anything improper.

- Plaintiff indicated that he runs late with all of his patients and makes no distinction between men and women.

- Plaintiff stated, "I feel bad that I don't know who this (referring to complaint) resident is cause I would have corrected.  She had a horrible experience and I regret that.  Had I known she was uncomfortable, I would not have examined her."

- Plaintiff indicated that since the last complaint he has avoided going out for drinks, going to the resident barbecue, going to the holiday party, or going to social events.

- Plaintiff stated that he has known some of his patients for over thirty years, so maybe he got too casual.

- Plaintiff remarked, "I have done a lot of soul-searching.  I like to teach, that's why I am here. The fact that I'm doing this bothers me.  I think about how I do everything, try to be mindful of what I do.  I am different."

Id.  During the interview, Dr. Cowell showed Plaintiff Dr. Dua's email, but Dr. Dua's name was redacted.  (Cowell Dep. 122:3–20.)

Drs. Cowell and Tedaldi attempted to interview Dr. Dua.  She did not respond to their request for an interview and was unwilling to cooperate with the investigation in any way.  (Temple SUF ¶ 49; PR – Temple ¶ 49; Pl.'s Ex. 18; Pl.'s Ex. 19.)

### F.    TUH'S Medical Staff Executive Committee's March 2018 Recommendation and Plaintiff's Subsequent Appeal

On March 13, 2018, before Dr. Cowell presented the results of his investigation, Plaintiff was removed as Interim PM&R Chair.  (PSUF – Temple ¶ 19; Temple Resp. ¶ 19.)  The following day (March 14, 2018), he signed a new contract for a non-tenure track position, that ran until June 30, 2019, which replaced the remainder of the one-year term of his prior contract.  (Id.)  The Terms and Conditions of the Appointment Letter permitted Temple to immediately terminate Plaintiff without notice for "failure to maintain any Condition of Employment," and noted that "Termination pursuant to this provision shall not be considered termination for 'adequate cause' as referenced in the *Temple University Faculty Handbook* and the *Lewis Katz School of Medicine Policy on Appointment as a clinician Educator on the Clinician Educator Track* and neither the Faculty Handbook nor the Lewis Katz School of Medicine Policy shall be applicable to such termination."  (Temple Ex. 2, p. 6.)

On March 15, 2018, following a presentation by Dr. Cowell, TUH's Medical Staff Executive Committee met to discuss Plaintiff's medical staff privileges and voted unanimously to terminate those privileges.  (Temple SUF ¶ 51; PR – Temple ¶ 51.)  That same day, TUH sent a letter to Plaintiff officially implementing that decision.  (Temple SUF ¶ 53; PR – Temple ¶ 53.)  The letter served as

"Special Notice" that his "Medical Staff membership and privileges" be terminated effective immediately based on the allegations of professional misconduct made against him.  (Temple Ex. 20.). The letter further stated that, "[p]lease know that you are being removed from the PM&R schedule and will not be schedule for Inpatient service nor seeing outpatients while the Bylaws process takes place." (Id.)  Shortly after the termination of privileges, Plaintiff was asked to turn in his Temple cell phone. (Temple SUF ¶ 56; PR – Temple ¶ 56.)

On April 6, 2018, Plaintiff, through his counsel, requested a hearing under the TUH Bylaws. (Temple SUF ¶ 57; PR – Temple ¶ 57.)  Paul B. Wright, Senior Counsel for Temple University Health System, responded to that letter and scheduled an "Article VIII hearing" for Wednesday, May 16, 2018, at 4:00 p.m.  (Temple Ex. 22.)   The letter, directed to Plaintiff's counsel, advised that the Hearing Panel would consist of three Medical Staff Members, all of whom were identified by name. (Id.)  The letter also listed all the documentary evidence that the Medical Staff Executive Committee intended to introduce.  (Id.)  The Medical Staff Executive Committee indicated that it would provide Plaintiff with final lists and documentary evidence within fifteen days of the hearing date.  (Id.)  At Plaintiff's counsel's request, the hearing was rescheduled to July 10, 2018.  (Temple Ex. 22.)

### G.    TUH's Security Alert for Plaintiff

Shortly after the revocation of Plaintiff's hospital privileges, several employees at TUH learned that Plaintiff had allegedly threatened that "he had a gun and . . . knew how to use it." (Temple Ex. 6, Dep. of Dr. Susan Wiegers ("Wiegers Dep.") 206:5–18.)  Dr. Susan Wiegers, the Senior Associate Dean of Faculty Affairs, testified that she was "completely freaked out because, in my opinion, Michael Weinik is a[n] immature, impulsive person with very poor boundaries, and I was very scared."  (Id. at 206:14–18.) TUH issued a "Security Alert" indicating that Plaintiff had been separated from staff at Temple University Health System, that he was "believed to have a concealed weapons permit," and that "no threat[]s have been tied to this bulletin or action needed – awareness only."  Temple's Rule 30(b)(6) witness on this issue could not explain precisely what prompted the

issuance of the Security Alert.  (Pl.'s Ex. 28, Dep. of Shane McDevitt ("McDevitt Dep.") 29:7–15.)

Although the security alert was provided to security guards at the entrances to TUH and was not

visible to the public, Dr. Wiegers received this alert and forwarded it to the Dean of the Medical

School and a number of Temple faculty and staff, including the Continuing Medical Education staff.

(Wiegers Dep. 209:16–220:3, Pl.'s Ex. 27.)

### H.    The July 2018 Hearing and Medical Staff Executive Committee's August 2018 Recommendation to Uphold Revocation of Privileges

On June 26, 2018, prior to the rescheduled hearing date, Attorney Wright for TUH sent a letter

to Plaintiff's counsel naming the members of the Hearing Panel, identifying the witnesses that TUH

would call during the hearing, and listing the documentary evidence that would be used at the hearing.

(Temple Ex. 35.)

On July 6, 2018, Attorney Wright for TUH emailed Plaintiff's counsel setting forth the rules

that would govern the hearing process.  (Temple Ex. 24.)  The rules included the following:

1.    All witnesses will be sworn by the court reporter;

2.    Attorneys for either party shall have no speaking role during the hearing (no opening statements, objections, questioning of witnesses, closing arguments, etc.);

3.    Attorneys for either party will be able to privately counsel their clients during the hearing;

4.    Opening statements by each party will be limited to approximately five (5) minutes;

5.    Closing oral arguments by each party will be limited to approximately ten (10) minutes;

6.    The Hearing panel may ask questions of any party or witness;

7.    For each phase of the hearing (opening statements, presentation of evidence, closing oral arguments) the Medical Staff shall go first and Dr. Weinik shall go second;

8.    The Chair of the Hearing panel, in consultation with other panel members, shall make rulings on the admissibility of any testimony or other evidence;

9.      The Chair of the Hearing panel may ask either party to state the relevance of any proposed testimony or other evidence before hearing or accepting the same;

10.     Any witness, called by either party, will testify once, and will be subject to direct or cross examination by either or both parties and will be dismissed after giving such testimony;

11.     Each party may submit a written closing statement to the panel within three (3) calendar days of receipt of the hearing transcript;

12.     Any party who will submit a written closing statement to the panel must so advise the panel before the hearing is adjourned;

13.     The Chair of the Hearing panel may dismiss either party or conclude the hearing if a party repeatedly violates, despite warning, the rules established by the Hearing panel.

(Temple Ex. 24.)

On July 10, 2018, a hearing was held before a committee of TUH Medical Staff.  The six-hour hearing was conducted according to the TUH Bylaws.  TUH presented two witnesses: Dr. Cowell and Dr. Tedaldi, the two faculty members who led the investigation. TUH did not present any live or sworn testimony from any of Plaintiff's accusers.  (PSUF – Temple ¶ 26; Temple Resp. ¶ 26.)

Plaintiff made "objections" and presented testimony from multiple witnesses during the hearing, including Dr. Reed Williams, who was present during the incident described by Acevedo where the patient's buttocks were allegedly exposed.  (Temple SUF ¶ 68; PR – Temple ¶ 68; PSUF – Temple ¶ 28; Temple Resp. ¶ 28.)  Dr. Williams testified that he did not see anything improper or out of the ordinary during the medical examination in question, that Plaintiff spent the appropriate time with patients as needed, and that he had no recollection of Plaintiff ever singling out younger women. (PSUF – Temple ¶ 29; Temple Resp. ¶ 29.)   Plaintiff also called as witnesses two former Temple PM&R residents who were present for the examination incident alleged by Dr. Dua, who both testified that they did not see Plaintiff do anything wrong.  (See Pl.'s Ex. 29 at 130:16–131:12 (former resident, Dr. Christopher Conner testified that he was present during the demonstration involving Dr. Dua and

did not recall Plaintiff touching her in a way he saw to be inappropriate); 164:5–165:1 (former resident Vikram Arora testified that he did not see anything inappropriate in Plaintiff's examination of Dr. Dua).)  Plaintiff took issue with the fact that Dr. Cowell never interviewed Dr. Dua, that no witness provided a sworn statement, and that no accusers were presented who could be subject to cross-examination. (Weinik Dep. 163:7–165:21.)

The Hearing Committee subsequently conferred and issued the following Committee Report:

> The Medical Staff Hearing Committee consisting of Drs. John Daly (chair), Joseph Queenan and Karen Lin met on the afternoon and evening of July 10, 2018.  Present were Mr. Paul Wright, Drs. Cowell and Tedaldi for the Medical Staff and Mr. Castor and Mr. Rogers along with Dr. Michael Weinik for the defense.  A stenographer recorded the proceedings.
>
> The Hearing Committee heard multiple witnesses over a period of approximately six hours and had the opportunity to question witnesses during the proceeding.  The Hearing Committee received and reviewed multiple documents from the Medical Staff Executive Committee, Dr. Cowell, Dr. Weinik and his attorneys, and written recording of the proceeding.  The Committee met subsequently on two occasions to review and discuss the proceedings and the documents that were provided.
>
> The decision of two members of the Committee is to recommend to the Medical Staff Executive Committee that Dr. Weinik have his medical staff privileges modified so that he is not performing direct patient care nor directly overseeing/instructing individual residents.  One member of the Committee decided to recommend to the Medical Staff Executive Committee that Dr. Weinik be suspended or be placed on a similar modification as described above.  The duration of such suspension or modification was not decided by the Hearing Committee.  As a part of a remedial action plan, the Committee recommended strongly that Dr. Weinik undergo counseling, behavioral and sexual harassment training, independent of individuals from Temple University Hospital, during the time that his privileges are modified.
>
> The decision was reached because the sexual harassment written and verbal complaints of the female former PM&R resident from 2016, 2017 and 2018 could not be completely substantiated since she was not present at the hearing and witnesses did not corroborate her complaints.   Complaints from Drs. Kinback, Brown, Vyas and Acevedo and Ms. Dzikowski regarding Dr. Weinik's behavior towards female patients and residents, themselves included, were also not

substantiated by witnesses brought to the hearing. However, the Hearing Committee took into account the due diligence of Drs. Cowell and Tedaldi along with Ms. Coull and Dr. Wiggers who directly interviewed the complainants and sought to verify the behavior charges that were brought against Dr. Weinik. From all information provided to the Hearing Committee, there appeared to be a pattern of Dr. Weinik's behavior that is unacceptable for a member of the Temple University Hospital staff.

The initial recommendation of the Medical Staff Executive Committee (MSEC) was for Dr. Weinik to undergo professional coaching by Ms. Saccomandi; however, it appeared that Dr. Weinik did not fully participate in this effort until near the end of the coaching period. While he claimed illness during this time, there was no corroboration of this to the Committee. Thus, it is unclear to the Committee that Dr. Weinik tried diligently to adhere to the initial recommendations of the MSEC.

Thus, the Committee voted unanimously that Dr. Weinik participate diligently in his own behavioral and sexual harassment therapy and demonstrate satisfactory completion of a course of such therapy. Should he be allowed to return to the medical staff or have his medical privileges fully restored, he would be required to be monitored by senior leadership at the medical center as part of a continued remedial action plan.

(Temple Ex. 26.)

On August 27, 2018, the TUH Medical Staff Executive Committee reviewed the Hearing Committee's recommendation and unanimously voted to terminate Plaintiff. (Temple Ex. 19, Rule 30(b)(6) Dep. of Dr. Robert McNamara ("McNamara Dep.") 47:14–22.) Prior to the vote, Medical Staff Executive Committee members were given time to read and discuss all the materials. (Id. at 48:7–49:1.) TUH's Rule 30(b)(6) deponent, Dr. Robert McNamara, summarized the discussions as follows:

So I recall discussing like, well, how would this work not seeing patients for a period of time? This is a small department. Removal from teaching activities, is this even a practical recommendation, you know, given the nature of [Plaintiff's] department? You know, what would be the impact on, you know, the house staff who obviously know there is something going on. You know, how would it work what the hearing panel recommended?

> And so there was certainly discussion of the alternate recommendations, you know, against termination; but again we went back to the nature of the allegations to what we had made our original decision on, and it was just felt that in an educational institution that termination was the proper step.

(McNamara Dep. 49:7–50:3.)

Later that same day, Dr. Cowell, the Medical Staff Executive Committee Chair, sent a letter to

Verdi DiSesa, M.D. – CEO of Temple University Hospital, stating:

> At the specially called Medical Staff Executive Committee (MSEC) meeting today, the MSEC reviewed and considered the recommendation of the Hearing Panel regarding [Plaintiff's] status on the Medical Staff. Given my role as an investigator of the allegations against [Plaintiff] and my role as the advocate for the Medical Staff at [Plaintiff's] July 10, 2018 hearing, I recused myself from participating in today's MSEC meeting. Dr. McNamara, the immediate past Chair of the MSEC, presided over the meeting in my stead.
>
> The MSEC disagreed with the Hearing Panel's recommendations and by majority vote decided to reaffirm its earlier recommendation for termination of [Plaintiff's] Medical Staff membership. The MSEC seized on the Hearing Panel's finding that 'there appeared to be a pattern of [Plaintiff's] behavior that is unacceptable for a member of the Temple University Hospital staff." Therefore, the committee agreed with the Hearing Panel's finding about [Plaintiff's] behavior, but disagreed about the remedy for that behavior.
>
> Pursuant to the Medical Staff Bylaws, [Plaintiff] has twenty one (21) days to request an appellate review of this recommendation by the Board. If he chooses not to request appellate review, the MSEC's recommendation will be submitted to the Board for its consideration after the twenty one day period has elapsed.

(Temple Ex. 27.)

Plaintiff appealed the Medical Staff Executive Committee's decision to the TUH Board of

Governors. On October 26, 2018, the TUH Board of Governors voted to terminate Plaintiff's

membership and privileges. (Temple SUF ¶ 77; PSUF – Temple ¶ 77.) As a result of the Board's

decision, Plaintiff was informed that his "employment with Temple University also terminates

effective immediately." (Temple SUF ¶ 78; PSUF – Temple ¶ 78.)

On October 30, 2018, TUH reported to the National Practitioner Data Bank ("NPDB") that Plaintiff's clinical privileges were revoked on the basis of the "Violation of By-laws, Protocols or Guidelines," "Disruptive Conduct," and "Sexual Misconduct." (Temple Ex. 30.)

### I.     **Procedural History**

On June 27, 2019, Plaintiff filed suit against the Temple Defendants, Dr. Acevedo, and Dr. Dua in the Philadelphia Court of Common Pleas. On August 1, 2019, Defendants removed the case to federal court. Thereafter, Plaintiff filed an Amended Complaint setting forth the following claims: (1) violations of due process against the Temple Defendants (Count I); (2) breach of contract against the Temple Defendants (Count II); (3) libel against all Defendants (Count III); (4) slander against all Defendants (Count IV); and (5) injurious falsehood against all Defendants (Count V).

All Defendants moved to dismiss the Amended Complaint. I denied those Motions on July 10, 2020. Weinik v. Temple Univ. of the Commonwealth Sys. of Higher Educ., No. 19-cv-3503, 2020 WL 3892963 (E.D. Pa. July 10, 2020). Defendant Dua, who sought dismissal on the grounds of quasi-judicial privilege, filed an interlocutory appeal to the United States Court of Appeals for the Third Circuit, resulting in a stay on all proceedings. On January 4, 2022, the Third Circuit dismissed the appeal for lack of jurisdiction and remanded the case for further proceedings. Weinik v. Temple Univ. of the Commonwealth Sys. of Higher Educ., App. No. 20-2525, 2021 WL 5882039 (3d Cir. Dec. 13, 2021). The parties then proceeded through discovery, and all Defendants have now filed motions for summary judgment.

### II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue, in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  Id. at 252.  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).  Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

## III.   DEFENDANT DUA'S MOTION FOR SUMMARY JUDGMENT

Dr. Dua first seeks summary judgment on each of Plaintiff's three defamation claims against her (libel, slander, and injurious falsehood) because the statements on which those claims are premised are subject to immunity under Pennsylvania's quasi-judicial privilege.  Having already written on this

issue in the context of Dr. Dua's prior motion to dismiss, I only set forth relevant portions of my legal discussion here.

"It has long been the law of Pennsylvania that statements made by judges, attorneys, witnesses and parties in the course of or pertinent to any stage of judicial proceedings are absolutely privileged and, therefore, cannot form the basis for liability for defamation." Pawlowski v. Smorto, 588 A.2d 36, 41 (Pa. Super. Ct. 1991); see also Binder v. Triangle Publ'ns, Inc., 275 A.2d 53, 56 (Pa. 1971) ("All communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege which cannot be destroyed by abuse."). Pennsylvania affords this privilege so that "[a]ll persons involved in a judicial proceeding are encouraged . . . to speak frankly and argue freely without danger or concern that they may be required to defend their statements in a later defamation action." Smith v. Griffiths, 476 A.2d 22, 24 (Pa. Super. Ct. 1984); accord Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 311 (3d Cir. 2003).

The judicial privilege has been extended to proceedings that are "quasi-judicial" in nature, which "has been defined to include any hearing before a tribunal which performs a judicial function, including many administrative officers, boards and commissions, so far as they have the powers of discretion in applying the law to the facts which are regarded as judicial or 'quasi-judicial' in character." Milliner v. Enck, 709 A.2d 417, 419 n.1 (Pa. Super. Ct. 1998). "[U]nder Pennsylvania law[,] government involvement is also a necessary condition for according quasi-judicial status to grievance procedures." Overall v. University of Pa., 412 F.3d 492, 497 (3d Cir. 2005); see also Harris v. Saint Joseph's Univ., No. 13-cv-3937, 2014 WL 1910242, at *9 (E.D. Pa. May 13, 2014). In other words, the quasi-judicial privilege must involve

"proceedings before federal, state, or local governmental bodies, or proceedings held pursuant to a statute or administrative regulation."[2]  Overall, 412 F.3d at 497.

In order to establish that the quasi-judicial privilege applies, the party asserting it must establish two elements: (1) the allegedly defamatory statements were issued during the regular course of judicial proceedings and (2) the statements were "pertinent and material" to those proceedings. Bochetto v. Gibson, 860 A.2d 67, 73 (Pa. 2004).

### A.   Whether the Proceedings Were Quasi-Judicial in Nature

The Pennsylvania Superior Court has explained that, "[i]n order to determine whether an individual is entitled to quasi-judicial immunity, we first examine the nature of the actions complained of to ascertain whether they were performed within the quasi-judicial adjudicatory function." Greenberg v. McGraw, 161 A.3d 976, 985 (Pa. Super. 2017) (quoting Pollina v. Dishong, 98 A.3d 613, 621 (Pa. Super. 2014)).  "The test to determine if a function is 'quasi-judicial' is whether it involves the exercise of discretion and requires notice and a hearing."  Urbano v. Meneses, 431 A.2d 308, 311 (Pa. Super. Ct. 1981) (citations omitted).  More specifically, the court must "look to the presence and exercise of discretionary decision-making authority (i.e., applying the law, rules and regulations to the factual matrix of a given case) as well as the existence of procedural safeguards in the administrative proceeding similar to the safeguards afforded at a judicial proceeding (e.g., notice, hearing, right to cross-examine witnesses, etc.)."  Pollina, 98 A.3d at 620–21 (Pa. Super. 2014) (citation omitted). The Superior Court has noted that "the majority of jurisdictions apply absolute privilege to defamatory statements which are made in relation to a 'quasi-judicial proceeding.'" Milliner, 709 A.2d at 419 n.1 (citations omitted).

In connection with Defendant Dua's motion to dismiss, I previously found that the hearing at issue, conducted pursuant to the Temple University Hospital Bylaws, shared many characteristics of

---

[2]      Here, neither party disputes that Temple University is a governmental entity for purposes of this case.  The Amended Complaint specifically pleads that Temple University and its affiliated entities are "state-related institutions."  (Am. Compl. ¶¶ 2–5.)

the adjudicatory process and, thus, was quasi-judicial in nature.  Weinik v. Temple Univ. of the Commonwealth Sys. of Higher Educ., No. 19-cv-3503, 2020 WL 3892963, at *6–8 (E.D. Pa. July 10, 2020).  Neither party challenges that finding for purposes of summary judgment.  Accordingly, I reaffirm that the Temple Defendants' peer review process, as conducted pursuant to sections VII and VIII of the Bylaws of the Professional Medical Staff, constituted a quasi-judicial proceeding.

    **B.  Whether the Alleged Defamatory Statements Made Were Pertinent and Material to the Proceedings**

    The parties' main dispute focuses on the second prong of the quasi-judicial immunity test.  At the motion to dismiss stage, I concluded that a factual issue remained regarding Dr. Dua's intent in making the alleged to defamatory statements and thus denied Dr. Dua's motion to dismiss.  The Third Circuit affirmed that ruling.  Weinik v. Temple Univ. of Commwealth Sys. of Higher Ed., No. 20-2525, 2020 WL 3892963 (Dec. 13, 2021).  Dr. Dua now argues that the undisputed evidence produced during discovery establishes that her statements were made with the intent to initiate quasi-judicial proceedings.

    Judicial privilege is applicable to "communications made prior to the institution of proceedings if such communications were 'pertinent and material' and ha[d] been issued in the regular course of preparing for contemplated proceedings."  Greenberg, 161 A.3d at 982 (quoting Post v. Mendel, 507 A.2d 351, 356 (Pa. 1986)); see also Milliner, 709 A.2d at 420 ("It is clear that an allegedly defamatory communication is absolutely privileged when it is published prior to a 'judicial proceeding' as long as that communication has a bearing on the subject matter of the litigation.").  The privilege has been extended to statements made by private parties to officials for the purpose of initiating charges or proceedings, even if those statements were allegedly false.  Greenberg, 161 A.3d at 987–89 (finding that judicial privilege applied where the complaint alleged that the defendant made an allegedly retaliatory and defamatory false report to the Board of Medicine for the purpose of instigating legal process against Plaintiff's license); see also Restatement (Second) Torts § 588 cmt. e ("As to

communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or possible party to the proceeding.").

The Pennsylvania Supreme Court more clearly refined this principle in Schanne v. Addis, 121 A.3d 942 (Pa. 2015).  There, the plaintiff, a high school teacher, filed a federal complaint alleging that a former student told her friend she had been involved with the plaintiff years earlier, while she was his student.  When the friend reported this information, the high school held a pre-termination hearing and fired the teacher.  Id. at 943–44.  The teacher sued the former student for defamation, and the District Court granted summary judgment to the former student on the basis of quasi-judicial privilege because the former student's statement to the friend "served as the catalyst" for the hearing, even though the former student did not intend to initiate a proceeding when she talked to her friend.  Id. at 945 (quoting Schanne v. Addis, 898 F. Supp. 2d 751, 757 (E.D. Pa. 2012), vacated and remanded 615 F. App'x 759 (3d Cir. 2015)).

On appeal, the Third Circuit certified the following question to the Pennsylvania Supreme court: "Does the absolute judicial privilege apply to an allegation of sexual misconduct against a teacher by a former student, which allegation was made prior to the commencement of any quasi-judicial proceeding and without an intent that the allegation lead to a quasi-judicial proceeding?"  Id. The Pennsylvania Supreme Court held that the privilege "does not apply to an allegation made by an adult before commencement of any quasi-judicial proceeding and without an intent that it lead to a quasi-judicial proceeding."  Id. at 952.  The court explained that the privilege "incentiviz[es] individuals to speak freely . . . in *seeking to initiate* judicial or quasi-judicial proceedings," but it does not serve this policy when the individual does not intend to "initiat[e] proceedings or otherwise obtain[] a remedy."  Id. at 949 (emphasis in original).  The Pennsylvania Supreme Court further emphasized that this standard required an inquiry into the factual issue of the speaker's intent.  Id. at 951.  Finding that the quasi-judicial privilege did not apply to the facts before it, the Court

distinguished cases where "the communications at issue were made in a directed effort to initiate proceedings or otherwise obtain relief from school officials for harm stemming from a school employee's misconduct." Id. at 950 (citing cases).

In this case, at the motion to dismiss stage, I declined to find that Dr. Dua was entitled to immunity, as it could not be decided based on the pleadings that Dr. Dua spoke with the intent of causing the initiation of quasi-judicial proceedings. Weinik, 2020 WL 3892963, at *9. Following discovery, however, Dr. Dua has produced undisputed evidence of her intent to seek a remedy or initiate some type of quasi-judicial proceeding against Plaintiff. At her deposition, she testified as follows:

- When asked why she directed her January 16, 2018 email to Amber Dzikowski, Dr. Dua stated, "[b]ecause she is or was, I believe was, the residency program coordinator of Graduate Medical Education and Graduate Medical Education are the people responsible for the teaching attendings. . . . And when I was a resident, I remember that the way you would submit any sort of issue or conversation, complication, anything that was an issue in any of your rotations, we were told to report it to Graduate Medical Education." (Dua Dep. 40:24–41:10.)

- When asked why she decided to send the email, Dr. Dua stated, "it became knowledge that he was going to become the official chairman of the Department of Physical Medicine and Rehab and that gave me a lot of anxiety and a lot of concern, especially going through what I went through. . . . I wanted to make sure that that was a decision that wasn't taken lightly. I was very concerned for, I was very concerned for what that could mean for future residents, especially female ones." (Id. at 42:3–19.)

- Dr. Dua testified that, "I know that I intended to send the email to Graduate Medical Education was my intention so that it could be reviewed and looked into. . . . I know that it was an email that I sent with the intention of it reaching the right people. And in my opinion and from what I've gathered in residency, the right people was Graduate Medical Education." (Id. at 45:15–24.)

- When asked about what motivated her, Dr. Dua indicated that "[i]t was the fear Dr. Weinik was unaware potentially or maybe fully aware, but what I knew was the way he acted, in my professional opinion, was, for lack of a better word, saddening and disappointing. . . . And I worried for future residents that were going to be in the department, as well as patients, etc. . . . But it was that once you have an official title, you can breed a certain culture and it does make it harder for women to speak up when they don't feel that the leadership is supporting those types of complaints. . . . And I would be fearful that they wouldn't have anywhere to turn to if he became officially the chairman. Then where would they go if they had a complaint . . . and they felt that they needed to say something? (Id. at 45:15–46:25.)

- Dr. Dua further explained, "It was that I didn't want this to not be brought to light. I wanted it to be looked into. . . . I wanted it to be an opportunity potentially to learn, change, grow; if it was identified and you, know, thought to be a problem, one that, you know, was brought to light. . . . I needed to say something so that it could be looked into, essentially, so that this would be something that someone would do something with this information. . . . I told you about some experiences that I had that were of concern, and I wanted that to go to someone that had—someone that could do something about it. . . . And Graduate Medical Education are the people that can at least, you know, decide if they need to educate a doctor, if they need to tell a doctor this is not right, if they need to look into an investigation. That's Graduate Medical Education. . . . I don't know anything about that. I just know that needed to say something so that for future residents and those that will be under that PM&R department, that they have someone that they feel is safe and that they can talk to about any issues that come up. (Id. at 49:19–50:20.)

- Testifying further about her intentions, Dr. Dua stated, "[w]hat I know is that—I know that I had written an email. I know that that prompted an investigation, as hoped, and that that would be looked into. And it must have found something if that's where it landed." (Id. at 63:2–6.)

- When asked why she refused to later cooperate any further with Temple, Dr. Dua replied, "I was really angry at Temple at the time because I thought I had made it extremely clear in my email that this was something that was done not out of cowardice did I want to remain anonymous but out of fear and anxiety and out of fear for retaliation, fear for my career, a lot of things. . . . I made it extremely clear that PM&R is an extremely small field. Everyone know everyone knows everyone. . . . And I knew that if my name was brought to light, that would be very scary for me. And I had been told, you know, as resident that when you make a complaint to Graduate Medical Education, it will be taken seriously. . . . It will be looked into. It will be investigated. It will be—you know, next step will be determined by GME, not the person that makes the complaint, but that you would have this option of being anonymous. . . . You would just know I'm writing this complaint to Graduate Medical Education and this will be looked into or investigated and something may or may not happen. Right? . . . And that's what I thought would happen, that this would be looked into and that something may or may not happen but that something would happen in that, obviously, Graduate Medical Education would do their due diligence and look into this as expected, as hoped. . . . But when it came out that they were going to use my name and reveal my identity, I went into—I mean, that was— that was exactly what I had asked for not to happen. . . . And I did that because I thought that Graduate Medical Education had the option of protecting their residents and their former residents. . . . I wasn't trying to be a source. I was trying to have this be looked into. (Id. at 64:2–66:7.)

- When asked what Dr. Dua envisioned Temple would do to look into her allegations, she stated, "I envisioned that an investigation would take place into my—to see if this was a pattern of behavior, to see if this had been documented with any other people prior or post, if that was worth an investigation, that this would be looked into. . . . Was I the first person to ever say that Dr. Weinik had made them uncomfortable? Was I the first person to have written or said something? Is this the first time this had been looked into? . . . I wanted that to sort of say let's look back in his file and see if this is a pattern of behavior. Is this something that is, you know, an issue that has come up before? Is this totally new and off the—totally in left field? Where did this come from? . . . I am not Graduate Medical Education. I do not know what their steps are. I just know that there are formal steps. There are things that they're supposed to do. And

there are ways to investigate issues because that's what they're there for." (Id. at 69:20–70:24.)

The clear import of this undisputed testimony is that Dr. Dua, having long since left Temple's employ, was concerned about Plaintiff's potential promotion given her previous encounters with him. She sought out and ultimately contacted the appropriate individual at Temple with authority to act on her complaints and provided information regarding her experiences with Plaintiff. Her subsequent testimony repeatedly emphasized her intent that "something" be done by Temple with this information, whether it be an investigation, counseling, discipline, or other type of proceeding. For purposes of the quasi-judicial privilege under Pennsylvania, it is sufficient that she subjectively intended to initiate some type of action by Temple against Plaintiff.

In an effort to avoid application of quasi-judicial immunity to Dr. Dua, Plaintiff posits two arguments. First, he contends that the initial "gossip" that Dr. Dua spread among Temple's PM&R residents *before* sending her defamatory email to Ms. Dzikowski is not entitled to immunity under the judicial proceedings privilege because it clearly was not intended to initiate a quasi-judicial proceeding. Specifically, Plaintiff points to the following testimony of Dr. Kinback, another PM&R resident, about his conversation with Dr. Dua:

> Q.      Did you ever discuss [Plaintiff] Dr. Weinik with Dr. Dua?
>
> A.      She mentioned basically that one event where she felt very embarrassed by when she was, I believe, a first year resident.
>
> . . .
> Q.      What did Dr. Dua say to you precisely?
>
> A.      So, it was, I believe, something about she was used as the patient model during an exam in front of the class, and didn't get in details. I could tell she was very emotional about it. I could tell she felt very hurtful about it, she felt, I would say, very embarrassed. She basically reiterated that it felt inappropriate to her.

(Pl. Ex 14, Dep. of Nicholas Kinback ("Kinback Dep.") 21:1–5, 22:5–14.) After his conversation with Dr. Dua, Dr. Kinback relayed the details of Dr. Dua's concerns to fellow resident Dr. Acevedo. Ms.

Dzikowski overheard this particular conversation between Dr. Kinback and Dr. Acevedo, and she included it in the investigation of Plaintiff.  Analogizing the facts in <u>Schanne</u>, Plaintiff contends that Dr. Dua's original conversation with Dr. Kinback—which was then repeated to Dr. Acevedo—was clearly not intended to initiate a "quasi-judicial proceeding," as it was merely "small talk."  (<u>Id.</u> at 23:21–24.)

Dr. Dua, however, does not claim immunity as to this statement but rather contends that this statement is not actionable defamation.  "Under the First Amendment there is no such thing as a false idea."  <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 339 (1974).  As such, a court must carefully analyze an opinion for its defamatory opinion.  Generally, an opinion is not actionable as defamatory unless the underlying facts are false.  <u>Momah v. Albert Einstein Md. Ctr.</u>, 978 F. Supp. 621, 634 (E.D. Pa. 1997).  To determine whether a statement constitutes an opinion capable of defamatory meaning, the court asks whether the statement is "provable as false."  <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 19 (1990).  "Pennsylvania courts have held that if an opinion is joined with the facts that led someone to form that opinion, that opinion is not actionable defamation."  <u>Manco v. St. Joseph's Univ.</u>, No. 22-cv-285, 2024 WL 299265, at *12 (E.D. Pa. Jan. 25, 2024).

Here, both Plaintiff and Dr. Dua agree on the underlying facts—that Dr. Dua was used as a patient model during an exam by Plaintiff in front of the class of residents.  They differ, however, on whether that interaction was sexually inappropriate.  Dr. Dua's statement to Dr. Kinback expressed nothing more than her feelings and opinion about that exam.  She felt "emotional," "hurtful," and "very embarrassed" by it, and reiterated that it felt "inappropriate" to her.  Such feelings are not actionable and are not "facts" provable as false.  Moreover, the fact that the Temple Defendants ultimately considered her opinions in the investigation does not render the statement actionable.

Second, Plaintiff argues that Dr. Dua's email is not subject to judicial immunity because there is sufficient evidence for a jury to conclude that Dr. Dua did not "earnestly intend to pursue a 'quasi-judicial proceeding'" against Plaintiff but rather was motivated by the fact that Plaintiff was about to be named chair of the PM&R Department. (Pl.'s Resp. to Dua MSJ 15.) Plaintiff asserts that Dr. Dua only "vaguely responded" that she wanted her complaint "reviewed and looked into." (Id.) Thereafter, in all of Dr. Dua's subsequent communications and interactions with Temple, she refused to do anything additional to cooperate with Temple or substantiate her allegations, and expressly refused to appear as a witness at the proceeding. Based on these facts, Plaintiff argues that a jury can easily conclude that Dr. Dua never intended to pursue a "quasi-judicial proceeding" against him.

Plaintiff's argument conflates the requisite intent to *initiate* a judicial proceeding with intent to pursue and participate in a proceeding, the latter of which is not required for operation of judicial proceeding immunity. The analogous case of <u>Fogel v. University of the Arts</u>, No. 18-cv-5137, 2019 WL 1384577 (E.D. Pa. Mar. 27, 2019) is instructive. There, the plaintiff, a university professor, was terminated after a female professor from another university claimed that the plaintiff engaged in repeated sexual advances towards her. <u>Id.</u> at *1. The investigation against the plaintiff began when the female professor wrote to the defendant university's Title IX coordinator and diversity director and asserted that, on some unspecified day in March 2016, the plaintiff had greeted her with a kiss at a conference. <u>Id.</u> at *2. The plaintiff sued alleging defamation and false light against both the university and the female professor who reported the sexual behavior. <u>Id.</u> at *4. The female professor claimed immunity under the quasi-judicial privilege. <u>Id.</u> at *9. The court found that the female professor's statements were "pertinent and material" to the Title IX coordinator's subsequent investigation and conclusions about the plaintiff's conduct. <u>Id.</u> at *10. The court went on to note that "[t]he policy rationale explained in the supreme court's opinion in <u>Schanne</u> applies here to 'incentivize' individuals like [the defendant] to speak freely in seeking to initiate proceedings for sexual misconduct." <u>Id.</u> at *10. Finally, the court remarked that this rule "accords with the Restatement rule for communications

33

*preliminary to* proposed judicial or quasi-judicial proceedings, where absolute immunity applies 'when the communication has some relation to a proceeding that is actual contemplated in good faith and under serious consideration by the witness or possible party to the proceeding.'" Id. at *9 (quoting Schanne, 121 A.3d at 950 (quoting Comment to Restatement (Second) of Torts § 588 (1977))); see also Greenberg v. McGraw, 161 A.3d 976, 988 (Pa. Super. Ct. 2017) (noting that the weight of authority in Pennsylvania extends an absolute privilege to statements made by individuals seeking to initiate judicial or quasi-judicial proceedings regardless of their motives for doing so).

Here, it is undisputed that Dr. Dua—initially alerted by Plaintiff's imminent appointment as chair of the PM&R Department—emailed the appropriate channels at Temple to initiate the investigatory process through which Plaintiff was ultimately terminated.  At all times, Dr. Dua unequivocally testified that she intended that some type of investigation and/or proceeding occur, even though she could not articulate precisely what form that investigation or proceeding would take. While Dr. Dua demonstrated an obvious unwillingness to facilitate the process any further or to herself participate in the investigation, these facts—taken in the light most favorable to Plaintiff—do not undermine the otherwise undisputed evidence that she intended that her email be used to *initiate* an investigation, quasi-judicial proceeding, or some other remedy by Temple to address what she believed was a troubling pattern of behavior by Plaintiff.

As no reasonable jury could find that Dr. Dua did not intend to initiate some type of quasi-judicial proceeding against Plaintiff, I will apply quasi-judicial immunity and grant summary judgment in favor of Dr. Dua on all claims against her.[3]

## IV.    MOTION FOR SUMMARY JUDGMENT BY THE TEMPLE DEFENDANTS AND DR. ACEVEDO

### A.    Defamation Claims Against the Temple Defendants (Counts III, IV, and V)

---

[3]    Dr. Dua offers several other bases for her Motion for Summary Judgment.  Having granted summary judgment on the basis of the quasi-judicial privilege, I need not address these other grounds.

The Temple Defendants first seek summary judgment on Plaintiff's claims for libel, slander, and injurious falsehood (Counts III-IV) on several grounds.   To the extent the alleged defamatory statements were made in the context of the peer review process conducted through the Physician Professional Conduct Policy, they claim entitlement to immunity under the Health Care Quality Improvement Act.   The Temple Defendants also assert that even if the alleged defamation occurred outside the peer review process, such statements are not independently actionable.

> 1.   Health Care Quality Improvement Act

The Temple Defendants first contend that each of the alleged defamatory communications were made within the professional peer review process, and thus are barred by the immunity provisions of the Health Care Quality Improvement Act ("HCQIA").

"Peer review, the process by which physicians and hospitals evaluate and discipline staff doctors, has become an integral component of the health care system in the United States.  Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1321 (11th Cir. 1994).  "Prior to the passage of HCQIA, the specter of litigation seriously impeded the development and vigorous enforcement of hospital peer review procedures.  Congress found that '[t]he threat of private money damage liability under [state and] Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in professional peer review."  Id.

The HCQIA was enacted in 1986 "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior."  Brader v. Allegheny Gen. Hosp., 167 F3d 832, 839 (3d Cir. 1999) (quoting H.R. Rep. No. 903, 99th Cong. 2d Sess. 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384).  "The HCQIA established a national reporting system requiring that insurance companies report medical malpractice payments made; that boards of medical examiners report sanctions imposed against physicians; and that hospitals report adverse professional review information."  Gordon v. Lewistown Hosp., 423 F.3d 184, 201 (3d Cir. 2005) (citing 42 U.S.C. §§ 11131–33).  "To support that purpose and ensure that

both hospitals and doctors engage in meaningful professional review, Congress granted immunity to those persons participating in professional review activities." Id. (citing 42 U.S.C. § 11101(5), 11111(a); H.R. Rep. 99–903 at 2–3, *reprinted in* 1986 U.S.C.C.A.N. at 6385). "Specifically, the Act provides that persons participating in professional review activities or providing information to professional review bodies are immune from suit for money damages arising out of their participation in such activities." Id. (citing 42 U.S.C. § 11111(a)(1)-(2)).

The HCQIA defines a "professional review action" as:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).

In order to qualify for HCQIA immunity, the professional review action must be taken: (1) in the reasonable belief that the action was in the furtherance of quality healthcare, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). Id. at § 11112(a). A professional review action is presumed to have met these standards for immunity "unless the presumption is rebutted by a preponderance of the evidence." Gordon, 423 F.3d at 202 (citing 42 U.S.C. § 11112(a)). The presumption of immunity underscores that "the role of federal courts on 'review of such actions is not to substitute our judgment for that of the hospital's governing board or to

reweigh the evidence regarding the renewal or termination of medical staff privileges.'" <u>Bryan</u>, 33 F.3d at 1337 (quoting <u>Shahawy v. Harrison</u>, 875 F.2d 1529, 1533 (11th Cir. 1989)).

A plaintiff-physician bears a "high burden" of demonstrating that a professional review action should not be afforded immunity. <u>Gordon</u>, 423 F.3d at 202 (citing 42 U.S.C. § 11112 (a)). A plaintiff can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that the defendants did not conduct the relevant peer review actions in accordance with one of the HCQIA standards. <u>Id.</u> (affirming summary judgment based on HCQIA) <u>See also</u> <u>Brader</u>, 167 F.3d at 839 (affirming a motion for summary judgment based on HCQIA immunity, holding that "although the defendant is the moving party, we must examine the record to determine whether the plaintiff 'satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA'"); <u>Pamintuan v. Nanticoke Mem. Hosp., Inc.</u>, No. 96-cv-233, 1997 WL 129338, at *12 (D. Del. Feb. 24, 1997) (granting summary judgment and noting that, at the summary judgment stage, a plaintiff has the burden of establishing that the procedures followed by the defendant did not meet the standards set out in the HCQIA). "When a court considers whether a health care entity is immune from damages for a given professional review action, it considers whether that action, *considered as a whole*, and including all the professional review activities relating to it, meets the standards set forth in § 11112(a). <u>Singh v. Blue Cross/Blue Shield of Mass., Inc.</u>, 308 F.3d 25, 37 (1st Cir. 2002) (affirming summary judgment based on HCQIA). The Act imposes an objective standard. <u>Mathews v. Lancaster Gen. Hosp.</u>, 87 F.3d 624, 638 (3d Cir. 1996) (affirming summary judgment on HCQIA immunity).

In disputing the application of HCQIA immunity, Plaintiff contends that the Temple Defendants' actions do not meet the four standards for application of HCQIA immunity.

*a. Reasonable Belief that the Action Furthered Quality Health Care*

Plaintiff argues that, under the first factor, a preponderance of the evidence shows that the Temple Defendants did not have a reasonable belief that their actions were "in furtherance of quality healthcare" because the only action that actually related to patient care was Dr. Acevedo's assertion that Plaintiff unnecessarily exposed a patient's buttocks during an examination, while the remainder pertained to physician residents. Plaintiff asserts that the investigator, Dr. Cowell, did not seek out the patient in question for corroboration, and attending physician Dr. Williams testified at the hearing that he did not see anything inappropriate about Plaintiff's examination of that patient or any other female patients. (Pl.'s Ex. 29, at 142:20–143:11.) Plaintiff also cites to testimony from Dr. Kaiser, Dean of Temple Medical School at the time, that in all of his years of referring patients to Plaintiff, no one ever complained about the care they received. (Pl.'s Ex. 3, Dep. of Larry Kaiser ("Kaiser Dep.") 21:9–13.) Plaintiff posits that the Temple Defendants' actions were actually motivated by a professional rivalry to removed him as Chair of the PM&R Department.

As it relates to assessing whether a defendant held a reasonable belief that the action in question furthered the quality of healthcare, the Third Circuit has adopted an objective standard of reasonableness, and "thus the good or bad faith (or subjective motivations) of the reviewers is irrelevant." Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 389 (3d Cir. 1999). Under the first prong of the HCQIA immunity test, Plaintiff must show that the totality of the information available to the Temple Hospital reviewers did not provide a reasonable belief that their actions would further quality health care. The standard is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would have concluded that their actions would restrict incompetent behavior or would protect patients." Id. (quotations omitted). Thus, "[a]ssertions of bad faith or anticompetitive motives are irrelevant to the question of whether a decision was taken in a reasonable belief that it would further quality health care." Id. (citing Bryan, 33 F.3d at 1335 ("[Plaintiff's] assertions of hostility do not support his position [that the HCQIA does not apply]

because they are irrelevant to the reasonableness standards of § 11112(a).  The test is an objective one, so bad faith is immaterial.")).

Under this objective standard, the totality of the circumstances surrounding the professional review action taken against Plaintiff reveal that the Temple Defendants held an objectively reasonable belief that the action would further quality health care.  It is undisputed that multiple residents raised concerns about Plaintiff's practice of giving unnecessarily long exams to or engaging in unnecessarily physical exams of female patients.  Dr. Acevedo specifically described an incident where Plaintiff engaged in an unnecessarily lengthy prep of a female patient that revealed the patient's buttocks, and it was a repeated joke among residents that Plaintiff was more "hands-on" with young, female patients.  Indeed, Plaintiff himself acknowledged the potential inappropriateness of his behavior, stating that, "I have known some of my patients for over 30 years so maybe I do get too casual."  (Temple Ex. 14.)  The mere fact that there were differing perceptions of Plaintiff's examination practice does not render unreasonable the Temple Defendants' belief that such examinations were inappropriate.

Moreover, the record is replete with reports of Plaintiff's sexual advances towards female residents.  During his own interview, Plaintiff did not deny many of the alleged facts, only the interpretations of those facts.  He made comments such as: "This is not acceptable [referencing Dua's email]; I was not a good person for this person"; "I have done a lot of soul-searching.  I like to teach, that's why I am here.  The fact that I'm doing this bothers me"; "If I knew who this was I would apologize.  This can't happen.  I own it"; "I know what I have to do.  But I get depressed that my behavior has hurt anyone.  I am disappointed in myself, that I didn't see this."  (Temple Ex. 14.)

Read together, Plaintiff's comments reflect that he affirmatively acknowledged many of the actions of which he was accused.  While some of this conduct did not directly involve patients, it was objectively reasonable for the Temple Defendants to believe that a sexually hostile work environment could affect patient care by its doctors.  See Bryan, 33 F.3d at 1335 (reversing district court's denial of hospital's motion for judgment as a matter of law, finding that "in the furtherance of quality health

care" prong was met where physician had exhibited pattern of unprofessional conduct in interacting with other staff members and where physician's presence in operating and patient rooms was disruptive and "interfered with the important work of other employees."); see also Leal v. Sec'y , U.S. Dept. of Health & Human Servs., 620 F.3d 1280 (11th Cir. 2010) ("Disruptive and abusive behavior by a physician, even if not resulting in actual or immediate harm to a patient, poses a serious threat to patient health or welfare.  A physician must work collaboratively with other members of a medical staff in order to provide quality care to patients . . . disruptive behavior threatens lives."). Accordingly, I find that Plaintiff has created no factual issue as to this factor.

### b.  Reasonable Effort to Obtain the Facts

Under the second factor for HCQIA immunity, Plaintiff contends that a preponderance of the evidence demonstrates that the Temple Defendants did not make a "reasonable effort" to obtain the actual facts underlying Dr. Dua's and Dr. Acevedo's allegations against him.  Plaintiff claims that the Temple Defendants ignored the sworn, eyewitness testimony of its faculty member, Dr. Williams, who testified under oath that Plaintiff did nothing wrong.  Moreover, in contrast to Plaintiff's presentation of live testimony from Drs. William, Connor, and Arora, the Temple Defendants failed to provide any witnesses with first-hand knowledge at the hearing but rather chose to present only the testimony of investigators Drs. Cowell and Tedaldi.  Based on these facts, Plaintiff asserts that a jury can easily conclude that the Temple Defendants did not make a "reasonable effort" to obtain the actual facts.

Such arguments fail to meet Plaintiff's burden by a preponderance of the evidence.  The Third Circuit has held that, in reviewing the reasonableness of a factual investigation under the HCQIA, the proper standard is "whether the totality of the process leading up to [the professional review action] evidenced a reasonable effort to obtain the facts of the matter."  See Mathews, 87 F.3d at 637.  A "[p]laintiff is entitled to a reasonable investigation under the [HCQIA], not a perfect investigation." Sklaroff v. Allegheny Health Educ. Research Found., No. 95-cv-4758, 1996 WL 383137, at *8 (E.D. Pa. July 8, 1996) (granting summary judgment under HCQIA), aff'd, 118 F.3d 1578 (3d Cir.1997).  In

other words, "[t]he requirement that the peer review body expend a 'reasonable effort to obtain the facts' does not require that the investigation be flawless.  Rather, it connotes that the investigation must be conducted in a sensible fashion."  <u>Manzetti v. Mercy Hosp. of Pitt.</u>, 776 A.2d 938, 948 (Pa. 2001).

The undisputed evidence shows that the Temple Defendants engaged in thorough and extensive investigations of the various accusations of sexual harassment in both 2017 and 2018.  In 2017, the Temple Defendants investigated complaints from Dr. Brown, and, although they concluded that there was insufficient evidence to support some of the individual allegations, they were persuaded that Plaintiff was partly responsible for "an unwelcomed intrusion into Dr. Brown's personal and private space."  In response to similar allegations in 2018, the Temple Defendants engaged in a second investigation, which involved interviews with seven different individuals at Temple University, including Plaintiff.  Many of those interviews described questionable behavior by Plaintiff towards not only female doctors but also towards female patients.  Indeed, Plaintiff did not deny many of the alleged facts of what happened, only the interpretations of those facts.  While the investigation revealed some contrary accounts of the events at issue, the existence of those accounts does not otherwise render the investigation unreasonable.  <u>See</u> <u>Bhatt v. Brownsville Gen. Hosp.</u>, 03-cv-1578, 2006 WL 167955, at *23 (W.D. Pa. Jan. 20, 2006) (granting summary judgment under HCQIA and noting that "[t]hough Dr. Bhatt believes that the testimony of more witnesses and the introduction of his state ranking information may have helped his case, the absence of such evidence does not transform the detailed and multi-layered review of patient charts conducted by the Hospital into an unreasonable effort.").  As such, Plaintiff has not established, by a preponderance of the evidence, that a jury could find that the Temple Defendants failed to make a reasonable effort to obtain the facts.

*c.  Adequate Notice and Hearing Procedures*

Under the third factor, a hospital must afford adequate notice and hearing procedures, or "other procedures as are fair to the physician under the circumstances."  § 11112(a)(3). Section 11112(b)

41

creates a safe harbor whereby professional review actions meeting the provisions of that section will

be deemed to have met the notice and hearing requirement of § 11112(a)(3).  <u>Brader</u>, 167 F.3d at 841.

Specifically, a health care entity is deemed to have met the adequate notice and hearing requirement of

(a)(3) with respect to a physician if the following are satisfied:

> **(1)  Notice of proposed action**
>
> The physician has been given notice stating--
> **(A)(i)** that a professional review action has been proposed to be taken against the physician,
>     **(ii)** reasons for the proposed action,
> **(B)(i)** that the physician has the right to request a hearing on the proposed action,
>     **(ii)** any time limit (of not less than 30 days) within which to request such a hearing, and
> **(C)** a summary of the rights in the hearing under paragraph (3).
>
> **(2)  Notice of hearing**
>
> If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating--
> **(A)** the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
> **(B)** a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
>
> **(3)  Conduct of hearing and notice**
>
> If a hearing is requested on a timely basis under paragraph (1)(B)--
> **(A)** subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)--
>     **(i)** before an arbitrator mutually acceptable to the physician and the health care entity,
>     **(ii)** before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or
>     **(iii)** before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

**(B)** the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

**(C)** in the hearing the physician involved has the right--

> **(i)** to representation by an attorney or other person of the physician's choice,
>
> **(ii)** to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,
>
> **(iii)** to call, examine, and cross-examine witnesses,
>
> **(iv)** to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and
>
> **(v)** to submit a written statement at the close of the hearing; and

**(D)** upon completion of the hearing, the physician involved has the right--

> **(i)** to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and
>
> **(ii)** to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b).

Notably, this section makes clear that a professional review body's failure to meet the conditions described in this subsection shall not, alone, constitute failure to meet the standards of subsection (a)(3). Id. "The HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision." Brader, 167 F.3d at 842 (quotations omitted). "For us to conclude otherwise would be to tie the hands of hospitals and force every informal review activity of a doctor or a department into time-consuming and (depending on the outcome of the informal review) possibly unnecessary formalized proceedings." Id.

Plaintiff contends that a jury could conclude that the Temple Defendants "denied or severely restricted" his rights to at least four hallmarks of the HCQIA's "adequate notice and hearing" requirements. (Pl.'s Mem. Opp'n Temple MSJ 20.)

First, Plaintiff claims that Temple only provided Plaintiff with approximately two-weeks' notice as to when, how, and where the July 10, 2018 hearing would take place, instead of the thirty-day notice enumerated in the statute.  The undisputed evidence, however, reveals that Plaintiff, through counsel first requested a hearing on April 6, 2018.  (Temple Ex. 21.)  On April 17, 2018, Temple's Senior Counsel, Paul Wright, sent Plaintiff's counsel a letter scheduling the hearing for May 16, 2018, identifying the Hearing Panel members, listing the witnesses that would be called, and setting forth all of the documentary evidence Temple intended to use.  The letter further advised that "[t]he [Medical Staff Executive Committee] will provide [Plaintiff] with final lists of witnesses and documentary evidence within fifteen (15) days of the hearing date."  (Temple Ex. 22.)  *At Plaintiff's request*, the hearing was rescheduled to July 10, 2018.  (Pl.'s Ex. 35.)  Mr. Wright then sent Plaintiff's counsel a second letter dated June 26, 2018, again identifying the Hearing Panel members, witnesses, and documentary evidence.  (Id.)  Although that second letter was less than thirty days prior to the rescheduled hearing, Plaintiff had already been provided with the same information via the original April 17th letter.  Thus, no reasonable jury could find that Plaintiff had less than the thirty-day notice of his hearing, as contemplated under § 1112(b)(2).

Second, Plaintiff claims that, although Mr. Wright's June 26, 2018 letter provided Plaintiff with a copy of Dr. Dua's email, the copy redacted Dr. Dua's name.  (Pl.'s Ex. 35.)  Mr. Wright did not disclose Dr. Dua's name until a phone call to Plaintiff's counsel on the evening of July 3, 2018, one week before the hearing.  At the hearing, Plaintiff notes that Temple entered Dr. Dua's unsworn, unauthenticated, hearsay email into evidence, without providing Plaintiff any opportunity to cross-examine her.

Plaintiff, however, has provided no evidence that he sought to uncover Dr. Dua's name prior to July 3, 2018.  Nor does Plaintiff establish that he sought either to present Dr. Dua as a witness or to postpone the hearing in order to further investigate.  Moreover, the evidence is undisputed that, although Plaintiff claims his counsel had to "scramble over the July 4th holiday," he was able to

present rebuttal witnesses to appear at the July 10th hearing regarding the precise incidents alleged in Dr. Dua's email. (Pl.'s Resp. Opp'n Summ. J. 21.)

Third, Plaintiff contends that the Temple Defendants effectively denied him the opportunity to cross-examine the witnesses because it offered their testimony in the form of witness statements presented by Drs. Cowell and Tedaldi. Plaintiff points out that these statements were unsigned, and unsworn, and consisted entirely of hearsay.

However, the HCQIA specifically notes that a physician can "present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law." 42 U.S.C. § 11112(b)(3)(C)(iv). This section has been interpreted as permitting hearsay testimony from both sides. See Imperial v. Suburban Hosp. Ass'n, Inc., 862 F. Supp. 1390, 1397 (D. Md. 1993) (holding, on summary judgment, that hearing did not violate due process under HCQIA even though hospital used hearsay testimony because HCQIA does not prohibit use of hearsay in peer review process), aff'd 37 F.3d 1026 (4th Cir. 1994); see also Brader, 167 F.3d at 841 (rejecting physician's challenge to HCQIA immunity based on hospital's use of "unsupported hearsay"; court notes that the hearing panel's bylaws permitted it to "admit any relevant evidence, regardless of its admissibility in a court of law."). And it is undisputed that Plaintiff had notice of the evidence to be presented and was able to call witnesses himself.

Finally, Plaintiff argues that while the Temple Defendants allowed his counsel to be present at the hearing, counsel was not permitted to directly address the panel, question witnesses, or provide argument. This argument disregards Temple's Bylaws, which provide that although a practitioner is entitled to be represented by an attorney, the role of the attorney may be restricted to providing counsel to the practitioner, without active participation at the hearing. (Temple Ex. 4 § 8.4.1.) The same rules applied to counsel for TUH—he was not permitted to speak or cross-examine witnesses. (Temple Ex. 25, Hrg. Trans. 6:21–7:1.) As nothing in the HCQIA requires that an attorney be permitted to actively participate, Plaintiff's argument fails. See Randall v. U.S., 30 F.3d 518, 523 (4th Cir. 1994) ("Courts

have held . . . that due process is satisfied by counsel's presence, without formal representation, at a hearing.").

In short, Plaintiff's arguments do not create a genuine issue of material fact as to the adequacy of the notice and hearing procedures provided by the Temple Defendants.  It is undisputed that after Plaintiff requested a hearing, he was given notice of the time, place, and date, as well as a list of witnesses expected to testify and a list of exhibits expected to be used.  The hearing itself conformed to § 1112(b)(3)'s requirements:  it was held before a panel appointed by TUH; Plaintiff was represented by an attorney; and Plaintiff was allowed to cross-examine witnesses, present evidence, and submit a written statement at the end of the hearing.  Over the course of six hours, the Hearing Panel heard from multiple witnesses, after which it rendered its decision.  Plaintiff also received the panel's recommendations, which included the bases for the decision.  See Brader, 167 F.3d at 842–43 (finding, under similar circumstances, that the District Court erred in deciding that there were genuine issues of fact as to whether § 1112(a)(3)'s requirements were met).  Plaintiff has failed to create any dispute of fact regarding whether he received adequate notice and hearing procedures.

### d.   *Reasonable Belief that the Action Was Warranted by the Facts Known*

The final element for HCQIA immunity queries whether the professional review action "was taken in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain those facts."  Brader, 167 F.3d at 843.  This analysis "closely tracks" the analysis under the first prong of the test pursuant to § 1112(a)(1).  Id.  "HCQIA clearly grants broad discretion to hospital boards with regard to staff privilege decisions.  Accordingly, as in all procedural due process cases, the role of federal courts on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges."  Bryan, 33 F.3d at 1337 (internal quotation marks omitted).  "The 'reasonable belief' standard is satisfied 'if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict

incompetent behavior or would protect patients.'"   <u>Pamintuan v. Nantiocke Mem. Hosp.</u>, 192 F.3d 378, 389 (3d Cir. 1999).

Plaintiff contends that "a jury can . . . easily conclude that Temple did <u>not</u> have a reasonable belief that the firing of [Plaintiff[ . . . was warranted by the facts known" after the hearing.  (Pl.'s Resp. Opp'n Temple Summ. J. 22 (emphasis in original).)   Plaintiff reasons that the three-member faculty Hearing Panel did not recommend that Temple fire him but rather that Temple suspend his medical and teaching privileges and that Plaintiff diligently engage in professional therapy.  The Hearing Panel reached that decision because it determined that the sexual harassment complaints from 2017 and 2018 could not be completely substantiated since Dr. Dua was not present at the hearing, but "[f]rom all information provided to the Hearing Committee, there appeared to be a pattern of Dr. Weinik's behavior that is unacceptable for a member of the Temple University Hospital staff."  (Temple Ex. 26.) Plaintiff notes that the Medical Staff Executive Committee ignored the Hearing Panel's recommendation and decided to terminate Plaintiff anyway, a decision with which the Dean of the Medical School disagreed with since he believed there were other ways of dealing with the accusations.  (Kaiser Dep. 98:23–99:15, 103:21–104:7.)   Based on this evidence, Plaintiff contends that a jury could find that Temple did not have a reasonable belief that firing Plaintiff was warranted.

Plaintiff's argument misapplies the proper standard.  While Plaintiff's evidence may call into question whether the Temple Defendants could have reasonably reached a different conclusion as to the appropriate remedial action, it does not negate, by a preponderance of the evidence, the objective *reasonableness* of the Temple Defendants' belief that their actions towards Plaintiff were warranted. See <u>Mathews</u>, 87 F.3d at 638 (noting that a plaintiff must show that the facts relied upon by the decisionmakers were "so obviously mistaken or inadequate as to make them unreasonable"); <u>Brader</u>, 167 F.3d at 843 ("[A] plaintiff's showing 'that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding' does not 'meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the

peer review process.'" (quotations omitted)); see also Austin v. McNamara, 979 F.2d 728, 735 (9th Cir. 1992) (While a final decision panel's rejection of a committee's suspension recommendation "do[es] call into question the ultimate reasonableness of [the physician's] suspension[,] [t]hat is a different question of 'reasonableness,' however, than the issue of whether the defendants acted in the 'reasonable belief that the [suspension] was warranted by the facts known after reasonable effort to obtain facts' as required by section 11112(a)(4)." (quotations omitted)).

The Hearing Panel expressly noted that "there appeared to be a pattern of [Plaintiff's] behavior that is unacceptable for a member of the Temple University Hospital staff" and that Plaintiff had not adhered to a prior recommendation that he undergo professional coaching.  (Temple Ex. 26.)  There was ample evidence from the investigation and hearing to support that finding.  The Medical Staff Executive Committee properly relied on those conclusions, recognizing that there had been numerous and repeated complaints about Plaintiff, and determined that termination was the proper course. (Temple Ex. 27.)  Medical Staff Executive Committee member Dr. McNamara explained that the alternate recommendations of the Hearing Panel were unworkable and impractical in the educational setting.  (McNamara Dep. 49:7–50:3.)  See Singh v. Blue Cross/Blue Shield of Mass., 308 F.3d 25 (1st Cir. 2002) ("The reversal of a peer review committee's recommendation of an adverse professional review action by a higher level peer review panel does not indicate that the initial recommendation was made without a reasonable belief that the recommendation would further quality health care."); Sklaroff v. Allegheny Health Educ. Research Found., No. 95-cv-4758, 1996 WL 383137 (E.D. Pa. July 8, 1996) (applying HCQIA immunity to peer review committee's finding that plaintiff-physician should be immediately suspended, even though higher level committee later determined that the plaintiff-physician could safely practice at the hospital as a consultant).  The mere fact that Dean Kaiser also disagreed with the recommendation does not undermine the objective reasonableness of that decision, particularly in view of Dr. Kaiser's admission that he was not part of the MSEC, was not

present at the hearing, and separated himself from the process because of his personal relationship with Plaintiff.  (Kaiser Dep. 76:18–77:3, 90:1–8, 93:16–95:24.)

> e.  *Conclusion as to HCQIA Immunity*

It is well established that § 1112(a) of the HCQIA imposes an objective standard.  Under this section, "the standard is met when peer reviewers reasonably conclude that their actions will restrict incompetent behavior or protect patients."  Mathews, 87 F.3d at 638.  "The intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise."  Bryan, 33 F.3d at 1337.  The record here supports the existence of all four elements in § 1112(a) thus resulting in a presumption of immunity.  Repeatedly, courts have granted summary judgment in similar cases.  Gordon, 423 F.3d at 203–04 (citing appellate cases affirming grants of HCQIA immunity).

Plaintiff has failed to come forth with sufficient evidence to allow a reasonable jury to conclude that those elements were not met; rather he seeks to revisit the correctness of the Temple Defendants' decision.  An attempt to have a court substitute its decision on the merits for that of health care professionals is precisely the type of action that Congress intended to foreclose by passing the HCQIA.  In sum, given the evidence of the care taken by the Temple Defendants in the peer review process and the absence of any material dispute over historical facts, no reasonable jury could reject the Temple Defendants' assertion that its professional review actions were taken in the reasonable belief that they would further quality health care, were warranted by the facts known, were based on adequate factfinding, and afforded Plaintiff fair notice and procedure.  Accordingly, I find that HCQIA immunity applies to this matter, and I will grant summary judgment in favor of the Temple Defendants on Plaintiff's claims of money damages for libel, slander, and injurious falsehood as to any statements made within the course of those proceedings.

**B.** **Defamation Claims as to Statements by the Temple Defendants Outside the Scope of the Peer-Review Process**

Plaintiff also brings defamation claims against the Temple Defendants for three sets of statements that occurred outside the peer-review process: (1) the leak of Dr. Dua's email to Ernesto Cruz; (2) Temple's dissemination of the security alert; and (3) Temple's report of Plaintiff's loss of privileges to the NPDB.

### 1. *The Leak of Dr. Dua's Email to Dr. Cruz*

As noted above, after receiving Dr. Dua's email, Ms. Dzikowski inadvertently forwarded it to Dr. Ernesto Cruz, Plaintiff's colleague who was not involved in the investigatory process.  (Pl.'s Ex. 15.)  Although Ms. Dzikowski testified that she made a mistake and intended to forward the email to her supervisor Susan Coull, Dr. Cruz nonetheless had it on his phone and showed it to Dr. Maitin. (Dzikowski Dep. 93:9–24; Maitin Dep. 110:8–23.)  When Ms. Dzikowski discovered her mistake, she went to Dr. Cruz and had him delete it in front of her.  (Dzikowski Dep. 93:9–24.)  Plaintiff now contends that this leaked email constitutes a separate basis for his defamation claims against the Temple Defendants.

In an action for defamation under Pennsylvania law, a plaintiff has burden of proving the defamatory character of the communication, publication by the defendant, its application to the plaintiff, the understanding by the recipient of its defamatory meaning, the understanding by the recipient of it as intended to be applied to the plaintiff, special harm resulting to the plaintiff from its publication, and abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. § 8343(a). Pennsylvania recognizes an exception to the requirement of showing special harm where the words constitute defamation *per se*.   A defamatory statement which "imputes a criminal offense, loathsome disease, business misconduct, or serious sexual misconduct . . . constitutes defamation *per se* and proof of 'special' damages is not required."   Rose v. Dowd, 265 F. Supp. 3d 525, 531 (E.D. Pa. 2017) (citations omitted).  The difference between defamation and defamation *per se* is that "only general

damages, *i.e.*, proof that one's reputation was actually affected by the defamation or that one suffered personal humiliation, or both, must be proven; special damages, *i.e.*, out-of-pocket expenses borne by the plaintiff due to the defamation need not be proven."  Joseph v. Scranton Times L.P., 959 A.2d 322, 344 (Pa. Super. 2008); see also Pyle v. Meritor Sav. Bank,  Nos. 92-cv-7361, 92-cv-7362, 1996 WL 115048, at *11 (E.D. Pa. 1994) (noting that a plaintiff who claims defamation *per se* "must prove general damages from a defamatory publication and cannot rely upon presumed damages.").

In such a case of a defamation *per se*, a plaintiff "cannot rely on a presumption of damages," but rather "must offer actual specific evidence of such general damages."  Beverly Enters, Inc. v. Trump, 182 F.3d 183 n.2 (3d Cir. 1999); see also McNulty v. Citadel Broadcasting Co., 58 F. App'x 556, 567 (3d Cir. 2003) (holding that a defamation *per se* plaintiff must produce evidence of general damages, that is "that one's reputation was actually affected by the slander or that one suffered personal humiliation." (quotations omitted)); Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 582 (E.D. Pa. 1999) (granting summary judgment where plaintiff failed to produce evidence of general damages so as to permit recovery under defamation *per se*).  "In determining if a Plaintiff has demonstrated any loss to reputation, it must be measured by the perception of others, rather than that of the plaintiff himself because reputation is the estimation in which one's character is held by his neighbors or associates."  Pennoyer v. Marriott Hotel Servs, Inc., 324 F. Supp. 2d 614, 619 (E.D. Pa. 2004) (internal citations and quotation omitted).

Here, Plaintiff has produced no evidence regarding general damages.  Plaintiff admitted that he did not learn of the inadvertently-forwarded email until discovery in this matter.  (Pl.'s Resp. Opp'n Temple Summ J. 13–14.)   As such, he cannot suggest that he suffered any specific personal humiliation separate from his termination.  Nor has Plaintiff pointed to any testimony or evidence that his reputation was separately affected by that email outside of what happened after the peer-review process.  Dr. Cruz, who received the email, was not deposed.  Dr. Maitin testified only that when he saw the email, he was "shocked" and "[d]isappointed."  (Maitin Dep. 110:20.)  This vague statement—

which does not indicate whether Dr. Maitin was "shocked" and "disappointed" about Dr. Dua's reporting of claims against Plaintiff, Plaintiff's alleged actions, or the fact that the email was leaked— would not allow for a jury to infer that Dr. Maitin's estimation of Plaintiff's reputation changed. Indeed, according to Plaintiff's own allegations in the Amended Complaint, Dr. Maitin was the individual responsible for spurring on the residents to make false sexual harassment claims against Plaintiff.  (See Am. Compl. ¶¶ 32–34, 36 (alleging that Dr. Maitin "set in motion a series of events weaponizing residents he befriended, or had power over in his position as Director, to falsely accuse [Plaintiff] of sexual harassment").)  And Plaintiff has presented no other witness to attest that his reputation in the community was harmed by this particular email.  As Plaintiff has not met his burden of proof of producing evidence that would allow a jury to find that this leaked email adversely affected Plaintiff's reputation, I will grant summary judgment on this claim.

### 2.   The Release of the Security Alert

The second statement outside the peer-review process which Plaintiff constitutes defamation is the release of the security alert.  The Temple Defendants contend that this statement was conditionally privileged.

A party may defend a defamation action by showing that a statement was made pursuant to a conditional privilege.  See Pacitti v. Durr, No. 05-cv-317, 2008 WL 793875, at *16 (W.D. Pa. Mar. 24, 2008).  Pennsylvania law recognizes a conditional privilege where "the [speaker] reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know."  Kia v. Imaging Sciences Intern., Inc., 735 F. Supp. 2d 256, 274 (E.D. Pa. 2010) (quoting Daywalt v. Montgomery Hosp., 573 A.2d 1118 (Pa. Super. Ct. 1990)).  "[P]roper occasions giving rise to a conditional privilege exist when: (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved."  Baker v. Benton Area Sch. Dist., 418 F. Supp. 3d 17, 60 (M.D. Pa. 2019) (quoting Beckman v. Dunn, 419 A.2d 583, 588 (Pa. Super. 1980)).

The question of whether a privilege applies is an issue of law for the court to decide.   Kia, 735 F. Supp. 2d at 275 (citations omitted).

Once the conditional privilege has been raised and established, the burden of proving abuse of that conditional privilege then shifts to the plaintiff.  Simms v. Exeter Architectural Prods., Inc., 916 F. Supp. 432, 436 (M.D. Pa. 1996); see also 42 Pa. Cons. Stat. § 8343.  A defendant abuses and therefore waives a conditional privilege when "the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given or to a person not reasonably believed to be necessary to the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose." Id. (quoting Beckman v. Dunn, 419 A.2d 583 (Pa. 1980)).

Here, the security alert was conditionally privileged.  As recounted above, shortly after the revocation of Plaintiff's hospital privileges, several employees at TUH learned of an alleged threat by Plaintiff that "he had a gun and . . . knew how to use it."  (Wiegers Dep. 206:5–18.)  Plaintiff has neither affirmatively denied making that statement nor pointed to any evidence that would suggest he did not make the statement.  TUH thus issued a "Security Alert" indicating that Plaintiff had been separated from staff at Temple University Health System, that he was "believed to have a concealed weapons permit," and that "no threat[]s have been tied to this bulletin or action needed – awareness only."  Although the security alert was provided to security guards at the entrances to TUH and was not visible to the public, Susan Wiegers, the Senior Associate Dean of Faculty Affairs, received this alert and forwarded it to the Dean of the Medical School and a number of Temple faculty and staff, including the Continuing Medical Education staff.  (Wiegers Dep. 209:16–220:3, Pl.'s Ex. 27.)  Dr. Wiegers testified that she did so because these individuals were the subject of the threat, and it was for their own safety and to be on the lookout.  (Id. at 209:9–16, 215:3–221:4.)

Plaintiff has not adduced any facts to suggest that the Temple Defendants were acting outside of their conditional privilege or that the dissemination of the alert to certain individuals was actuated

by malice or negligence.   The mere fact that the Dean of the Medical School, Larry Kaiser, subjectively believed that the alert's dissemination "inordinately raised alarm against [Plaintiff] among his former peers at Temple," does not undermine the fact that the Temple Defendants were conditionally privileged to send that alert.   (Kaiser Dep. 87:15–24.)  Nor has Plaintiff produced evidence to create any inference that it was sent to a broader range of people than necessary for purposes of the threat.  Accordingly, I find that this communication is not actionable defamation.

### 3.  Report to the National Practitioner's Databank

Finally, Plaintiff alleges that the Temple Defendants' reporting to the National Practitioner Data Bank ("NPDB") constitutes defamation.  As noted above, as a result of the decision to terminate Plaintiff, TUH reported to the National Practitioner Data Bank that Plaintiff's clinical privileges were terminated on the basis of the "Violation of By-laws, Protocols or Guidelines," "Disruptive Conduct," and "Sexual Misconduct."  (Temple Ex. 30.)  Plaintiff asserts that the report that he was dismissed for "sexual misconduct" was false, in light of the fact that Temple never found him culpable of such misconduct.

Defendant responds that Plaintiff—through his acceptance of the TUH Bylaws of the Professional Medical Staff—consented to the reporting of information about his revocation of clinical privileges to the NPDB, thus cloaking the Temple Defendants with absolute immunity.  Those by-laws provide that a member of the TUH Medical Staff "[c]onsents to the disclosure to other hospitals, medical societies, licensing boards, the National Practitioner Data Bank, and to any other entity to which disclosure is required by law, any information regarding his/her professional or ethical standing that the Hospital or Professional Medical Staff may have, and releases the Professional Medical Staff and the Hospital from liability for doing so to the fullest extent permitted by law."  (Temple Defs.' Ex. 31 § 5.4.2(h).)  As consent to the publication of alleged defamatory information is a complete defense to a defamation claim, the Temple Defendants contend that this claim must be dismissed.

I need not reach the issue of consent as, under the HCQIA, "medical entities are required to submit to the National Practitioner Data Bank ("NPDB") certain information concerning the professional competence and conduct of health care practitioners in their employ." Zheng v. Quest Diagnostics, Inc., 248 F. App'x 416, 417 (3d Cir. 2007). The NPDB, which was established by the HCQIA, is essentially "an online-database created by the DHHS to share information on doctors who have adverse employment actions taken against them." Id. Congress established the NPDB "to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2). The NPDB is not available to the general public. Only authorized medical health entities and professionals can access its information. Zheng, 248 F. App'x at 417. "Reporting under the HCQIA is mandatory. A medical health entity that takes an adverse action against one of its employees must report this fact to the NPDB and state the reasons for the action." Id.; 42 U.S.C. § 11133(a).

Under the statute, where, as here, a health care entity which takes a professional review that adversely affects the clinical privileges of a physician for longer than thirty days, it "shall" report to the Board of Medical Examiners the following information: (a) the name of the physician or practitioner involved; (b) a description of the acts or omissions or other reasons for the action, and (c) such other information respecting the circumstances of the action or surrender as appropriate. 42 U.S.C. § 11133(a)(3). Section 11137 specifically provides that, "[n]o person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report." Id. § 11137(c).

In light of these provisions, to the extent the Temple Defendants' actions during the peer review process are immunized, they cannot be liable for complying with their statutorily-mandated duty to report the results of its actions to the NPDB. Regardless of whether the allegations of sexual harassment against Plaintiff could be fully substantiated or corroborated, the Temple Defendants made a specific finding that Plaintiff had engaged in "unacceptable" behavior towards women and should be

dismissed on those grounds.  That finding then *required* that the Temple Defendants report this same rationale to the NPDB.  Plaintiff has produced no evidence to indicate that the Temple Defendants knew of any falsity in their report.  Accordingly, I will dismiss grant summary judgment in favor of the Temple Defendants on these claims.[4]

## C. Breach of Contract Claim Against the Temple Defendants

The Temple Defendants next seek summary judgment on the Plaintiff's breach of contract claim, noting that Plaintiff was employed under a Letter of Appointment with Temple's School of Medicine, which he ultimately breached by failing to maintain staff privileges at TUH.  Plaintiff responds that the Temple Defendants breached both the express terms of his employment contract and the implied duty of good faith and fair dealing by not following the procedural protections of the Clinical Educator Track Guidelines incorporated by reference.  Plaintiff specifically asserts that the Temple Defendants never demanded a formal complaint from either Dr. Acevedo or Dr. Dua, as required under Temple's Administrative Policies and procedures.

Again, these arguments need not be resolved in light of my finding that HCQIA immunity applies.  The HCQIA immunizes "(A) the professional review body, (B) any person acting as a member of staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action" from all damages claims which arise out of the peer review process.  42 U.S.C. § 11111(a)(1); Bakare v. Pinnacle Health Hosps., Inc., 469 F. Supp. 2d 272, 290–91 (M.D. Pa. 2006).  The immunity extends to hospitals and corporate entities.  42 U.S.C. § 11151(4)(A)(i), (11).  Breach of contract claims that allege breaches of bylaws or other procedural protections or improper termination during the peer review process fall within the ambit of HCQIA immunity.  See Brader, 167 F.3d at 839 (affirming

---

[4]       The Temple Defendants also contend that Counts III, IV, and V against them should be dismissed as barred by the statute of limitations and Pennsylvania's judicial proceedings privilege.  Having dismissed those claims on other grounds, I need not address these arguments here.  Nonetheless, I note that Plaintiff does not appear to dispute that the Temple Defendants' statements occurring during the course of the peer review proceedings are subject to quasi-judicial immunity.

grant of summary judgment on breach of contract claim because the HCQIA grants immunity from suit for money damages to participants in peer review actions); <u>Bakare</u>, 469 F. Supp. 2d at 290–91 (finding that HCQIA immunity barred claim for breach of contract with respect to alleged breach of the Medical Staff Bylaws during the peer review process); <u>Perez v. Pottstown Mem. Med. Ctr.</u>, No. 97-cv-3334, 1998 WL 464916, at *14 (E.D. Pa. Aug. 3, 1998) (finding that HCQIA immunity applied to breach of contract claims arising out of peer review process), <u>aff'd</u>, 210 F.3d 358 (3d Cir. 2000); <u>Bhatt</u>, 2006 WL 167955, at *21 (finding that claims for breach of contract regarding hospital bylaws were barred by HCQIA immunity).

Plaintiff's breach of contract claim squarely arises out of the peer review action and resulting disciplinary action.  Having already found that HCQIA immunity applies, I will dismiss this claim.

### D.  Due Process Claim Against the Temple Defendants (Count I)

Plaintiff's final claim against the Temple Defendants seeks monetary and injunctive relief in connection with an alleged violation of his procedural due process rights, claiming that he had a property interest in the remainder of his contract with the Temple Defendants.  It is well established that the HCQIA expressly exempts civil rights violations from the statute's immunity provision and applies only to immunity from monetary damages.  <u>See</u> 42 U.S.C. § 11111(a)(1).  Accordingly, I find that Count I of the Amended Complaint is not barred by HCQIA immunity.

Nonetheless, the Temple Defendants are entitled to summary judgment on this claim.  In the context of wrongful public employment termination, an individual who is terminated may assert a constitutional claim if he can show that his termination deprived him of a liberty or property interest protected by the Constitution.  <u>Perry v. Sindermann</u>, 408 U.S. 593, 599 (1972).  Whether an employment agreement or contract either explicitly or implicitly confers a property interest in continued employment is not governed by the Constitution or federal law but rather by an independent source, such as state law.  <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972).

Under Pennsylvania law, a two-step inquiry is applied to determine whether a plaintiff was deprived of his or her property rights in employment without due process of law.  First, a court must determine the extent, if any, of the plaintiff's property rights in employment.  Tremblay v. Delaware Cnty., PA., No. 04-cv-2740, 2005 WL 1126960, at *3 (E.D. Pa. 2005).  A person claiming a property interest in employment must point to some source that confers a legitimate interest—beyond "a unilateral expectation" of continued employment—that would entitle the person to such continued employment.  Roth, 408 U.S. at 577; Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005).  "In the governmental context, while at-will employment is not generally considered a property interest . . . employment contracts that contain a 'just cause' provision create a property interest in continued employment."  Wilson v. MVM, Inc., 475 F.3d 166, 177 (3d Cir. 2007).  Thereafter, if a property right is found to exist, the Court must then consider whether the deprivation of the property violated the due process clause of the Fourteenth Amendment.  Id. at 178.

The parties focus on the first step of the inquiry and dispute whether Plaintiff had a property right in continued employment with Temple University School of Medicine and Temple University Hospital.  The Temple Defendants assert that Plaintiff did not have a due process property interest in the remainder of his contract with Temple School of Medicine.  They argue that Plaintiff's position was "non tenure-track" and was to end on June 30, 2019, "unless renewed by a separate written agreement."  (Temple Defs.' Ex. 2.)  The terms and conditions of his Appointment Letter permitted Temple School of Medicine to immediately terminate him without notice for failure to maintain any Condition of Employment, which would not constitute termination for "adequate cause."  (Id.)  One of those conditions of employment was his maintenance of medical staff privileges at TUH, which he failed to do after TUH terminated him.

Plaintiff responds that he had a one-year contract with the School of Medicine that ran from April 1, 2018 through June 30, 2019, made pursuant to the Guidelines on Appointment as a Clinician Educator on the Clinician Educator Track ("CET Guidelines").  (Pl.'s Ex. 23.)  The "Termination"

provision of the CET Guidelines expressly includes an "adequate cause" provision, which sets forth minimum due process requirements to determine whether "adequate cause" exists.  (Pl.'s Ex. 24.) Although the contract exempted Plaintiff from the "adequate cause" procedural protections if he failed to maintain Temple University Hospital Privileges, those privileges were protected by the procedural due process rights set forth in section 8.1.3 of the By-laws of the Professional Medical Staff. Moreover, Plaintiff contends that his denial of due process claim is based not only on the loss of the property right he had in the remainder of his contract with Temple, but also in the allegedly false reporting to the NPDB that he was fired for "sexual misconduct," which robbed him of his liberty interest to serve as a medical professor.

Even assuming Plaintiff had a protected property interest in his continued employment—a finding that is not entirely clear—he has failed to create a genuine issue of material fact as to the second step of the due process analysis—whether the deprivation of the property violated the due process clause of the Fourteenth Amendment. "The essential requirements of due process . . . are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Cleveland Bd. Of Ed. v. Loudermill, 470 U.S. 532, 546 (1985).  The HCQIA mimics those due process requirements, noting that in order to obtain immunity, a peer review group must provide sufficient due process protection to the subject physician.  42 U.S.C. § 11112.  The Act then specifically details the procedures which Congress deemed to be appropriate due process.  Id.

As set forth in detail above, I found that the undisputed evidence established that the procedures provided by Temple University Hospital satisfied the standards set forth in § 11112.  By logical extension, these procedures also satisfied Plaintiff's due process rights for purposes of Plaintiff's termination from Temple University Hospital.  See Doe v. Rogers, 139 F. Supp. 3d 120, 165 (D.D.C. 2015) (finding that the Health Care Quality Improvement Act and the dispute procedures provided by the agency's regulations afforded adequate due process for plaintiffs); Goldsmith v.

Harding Hosp., Inc., 762 F. Supp. 187 (S.D. Oh. 1991) ("If the provisions of § 11112 are complied with, the physician is incidentally afforded the benefits of due process.").  Once Plaintiff lost his staff privileges at Temple University Hospital, he violated one of the conditions of his employment with Temple School of Medicine, which required "appointment to the medical staff of Temple University Hospital and such other hospitals as the Dean may designate."  (Temple Ex. 2, p. 5.)  According to Plaintiff's contract with Temple University Hospital, if Plaintiff failed to maintain any condition of employment, he was subject to termination "without advance notice and without further obligation to you," and such termination would not be considered for "adequate cause" and would not require any of the procedures required in the Temple School of Medicine Faculty Handbooks.  (Id. p. 6.)

With respect to Plaintiff's claim that allegedly false reporting to the NPDB that he was fired for "sexual misconduct" robbed him of his liberty interest to serve as a medical professor, I also find that Plaintiff does not have a valid due process claim.  While Plaintiff is correct that, generally, a Fourteenth Amendment liberty interest is implicated by public announcement of a reasons for an employee's discharge, it is well established that where the announcement at issue is a disclosure to the NPDB, an employee is not deprived of a constitutionally protected liberty interest where that report harms their reputation.  See Doe v. U.S. Dept. of Health & Human Servs., 871 F. Supp. 808, 813–14 (E.D. Pa. 1994); see also Randall v. U.S., 30 F.3d 518, 522 (4th Cir. 1994) (finding that adverse report to NPDB did not violate liberty interest); Brown v. Med. Coll. Of Ohio, 79 F. Supp. 2d 840, 846 (N.D. Ohio 1999) ("Every court to have addressed the issue has held that a wrongful report to the NPDB does not constitute a deprivation of a liberty or property interest that is protected by federal law." (citing cases)).

Accordingly, I will grant summary judgment in favor of the Temple Defendants on Plaintiff's procedural due process claims under 42 U.S.C. § 1983.

### E.  **Defamation Claims Against Dr. Acevedo**

The sole remaining claims are those for defamation against Dr. Acevedo.  The Temple Defendants contend that these claims are all barred by the statute of limitations.[5]

Pennsylvania law provides a one-year statute of limitations for "an action for libel, slander or invasion of privacy."  42 Pa. Cons. Stat. § 5523(1).  The time within which a matter must be commenced is calculated from the time the cause of action accrued.  Id. § 5502.  Usually, a claim accrues at "the occurrence of the final significant event necessary to make the claim suable."  Barnes v. Am. Tobacco Co., 161 F.3d 127, 136 (3d Cir. 1998) (citing Mack Trucks, Inc. v. Bendix–Westinghouse Auto. Air Brake Co., 372 F.2d 18, 20 (3d Cir. 1966)).  "[I]t is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to initiate suit within the prescribed period."  Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000) (citing Hayward v. Med. Ctr. of Beaver Cty., 608 A.2d 1040, 1042 (1992)).

Generally, under Pennsylvania law, the cause of action accrues on the date of publication of the defamatory statements, regardless of when the plaintiff became aware of the statements.  Barrett v. Catacombs Press, 64 F. Supp. 2d 440, 446–47 (E.D. Pa. 1999).  Where, however, the communications are secret and a plaintiff could not be expected to know of the defamatory statements, the discovery rule may apply.  Id.; see also Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 306 (E.D. Pa. 2006).  The "discovery rule" will toll the running of the limitations period until "the plaintiff knows or reasonably should know (1) that he has been injured, and (2) that his injury has been caused by another party's conduct."  Romah v. Hygienic Sanitation Co., 705 A.2d 841, 857 (Pa. Super. Ct. 1997) (quotations omitted).  Generally, "once a plaintiff possesses the salient facts concerning the occurrence

---

[5]     The Temple Defendants also allege that Dr. Acevedo is entitled to quasi-judicial immunity.  Due to the untimely passing of Dr. Acevedo, however, there is no testimony regarding his intentions in making his complaints about Plaintiff.  As I will dismiss the claims against him on grounds of the statute of limitations, I need not address quasi-judicial immunity.

of his injury and who or what caused it, he has the ability to investigate and pursue his claim." Id. (emphasis omitted) (quoting Baily v. Lewis, 763 F. Supp. 802, 806–07 (E.D. Pa. 1991), aff'd 950 F.2d 721 (3d Cir. 1991) (further quotations omitted)).

Here, all of the alleged defamatory statements by Dr. Acevedo were made more than one year prior to Plaintiff's filing suit. Specifically:

- On January 12, 2018, Amber Dzikowski, the GME Administrator, overheard a conversation between Dr. Acevedo and fellow resident Nicholas Kinback concerning Plaintiff and Plaintiff's alleged "inappropriate touching" of an attractive female patient that caused Dr. Acevedo to leave an exam room. Dr. Kinback ultimately related that story to Ms. Dzikowski. (PSUF – Temple ¶ 7; Temple Resp. ¶ 7.)

- Thereafter, Ms. Dzikowski emailed Sue Coull summarizing some concerns about Plaintiff. (Temple Ex. 12.) In her email, Ms. Dzikowski stated that she met with Phillip Acevedo who voiced concern about the removal of the "PNH rotation" led by Dr. Maitin and expressed his belief that this service was being eliminated was due to Plaintiff's personal vendetta against Dr. Maitin and efforts to eliminate him as the Residency Program Director. (Id.) According to the email, Dr. Acevedo mentioned other issues involving Plaintiff and his "inappropriate behavior" involving patients and residents. (Id.) Dr. Acevedo described several incidents involving Plaintiff inappropriately touching female patients, as well as several physical examination demonstrations wherein he used only female residents. (Id.)

- Ms. Coull later prepared a summary of a meeting she had had with Ms. Dzikowski on January 15, 2018, indicating that Ms. Dzikowski had spoken with another senior resident, Nick Kinback, who described Dr. Acevedo's experience with Dr. Weinik. (Weinik Ex. 13.)

- Finally, during Dr. Cowell's investigation on January 25, 2018, Dr. Acevedo described numerous incidents and experiences with Plaintiff that he believed were inappropriate.

Despite the fact that the last of the potentially actionable statements by Dr. Acevedo occurred in late January 2018, Plaintiff did not institute suit until June of 2019.

To avoid a statute of limitations bar, Plaintiff contends that the Temple Defendants are estopped from asserting the statute of limitations due to their concealment of facts. Under Pennsylvania law, where "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations. McNair v. Weikers, 446 A.2d 905, 909 (Pa. Super. 1982) (quotation omitted).

The defendants' conduct "need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient."  Id. (citing Walters v. Ditzler, 227 A.2d 833 (1967)).  Nonetheless, the defendant must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied.  Lange v. Burd, 800 A.2d 336, 339 (Pa. Super. Ct. 2002).  "Mere mistake, misunderstanding or lack of knowledge is insufficient . . . and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party."  McNair, 446 A.2d at 909 (citations omitted).  "[A] plaintiff who fails to allege any due diligence is virtually foreclosed from invoking the fraudulent concealment doctrine." Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 422 (E.D. Pa. 2014) (quotations omitted).

Here, Plaintiff contends that Temple affirmatively misrepresented to him (and the hearing panel) that Dr. Acevedo had intentionally filed a formal complaint with Temple, which would have rendered his statements not actionable under the quasi-judicial privilege.  In support of this argument, Plaintiff points to the hearing testimony of Dr. Tedaldi who allegedly portrayed Dr. Acevedo as having reached out to Temple to complain about Plaintiff, noting: "Well, they -- the other, the two senior residents that we did, Nicholas Kenback [sic] and Phil Acevedo, they were, they were the ones that had gone to the administrator with their concerns about Dr. Weinik."  (Pl.'s Ex. 29 at 94:18–23 (emphasis added); see also id. at 97:14-17 ("I think they went first to -- from my understanding they went first to Amber and then she met with Sue Coull.") (emphasis added).).  Plaintiff reasons that because the Temple Defendants actively misled him about whether Dr. Acevedo filed a formal complaint, it was not until after the July 10, 2018 hearing that Dr. Weinik discovered that Dr. Acevedo's allegations against him were not privileged, thus estopping the Temple Defendants from invoking the bar of the statute of limitations.

Plaintiff's about face regarding his belief as to the operation of the quasi-judicial privilege is unsupported by any evidence of record.  At the motion to dismiss stage, wherein the Temple Defendants raised the statute of limitations, Plaintiff did not argue that he was misled into believing

that Dr. Acevedo was protected by quasi-judicial immunity. Indeed, he strenuously objected that quasi-judicial immunity applied. Now, at the summary judgment stage, Plaintiff cites a few isolated lines from the hearing testimony—wherein Dr. Tedaldi expressed his *belief* that Drs. Acevedo and Kinback first went to Ms. Dzikowski—to suggest that this testimony fraudulently led him to believe that Dr. Acevedo had initiated a formal complaint. Beyond this ambiguous testimony, the record is devoid of any evidence reflecting any affirmative or implicit misleading of Plaintiff as to the nature of Dr. Acevedo's involvement. Nor has Plaintiff produced any evidence, either through affidavits or deposition testimony, that this testimony precluded him from acting on his defamation claim. Finally, there is no evidence that Plaintiff exercised any due diligence to determine whether Dr. Acevedo would be covered by any privilege. Indeed, the sole reasonable inference is that that Plaintiff's failure to institute a timely action against Dr. Acevedo resulted from his own mistake, misunderstanding, or lack of knowledge. Accordingly, no estoppel applies, and Plaintiff's defamation claims against Dr. Acevedo are time barred.

## V.    CONCLUSION

In light of the foregoing, I will grant summary judgment in favor of all Defendants and against Plaintiff on all claims raised in the Amended Complaint. An appropriate Order follows.